**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHIANA AREA ELECTRICAL WORKERS' PENSION FUND, individually and on behalf of all others similarly situated, | |
| Plaintiff, | <u>CLASS ACTION</u> |
| v. | **<u>JURY TRIAL DEMANDED</u>** |
| INARI MEDICAL, INC., WILLIAM HOFFMAN, ANDREW HYKES, and MITCH C. HILL, | |
| Defendants. | |

**CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Michiana Area Electrical Workers' Pension Fund ("MAEW" or "Plaintiff"), by and through its undersigned counsel, alleges the following based upon personal knowledge as to Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things: (i) a review of Securities and Exchange Commission ("SEC") filings by Inari Medical, Inc. ("Inari" or the "Company"); (ii) a review and analysis of other publicly available information, including press releases issued by Inari, transcripts of Inari conference calls, analyst reports on Inari, and news articles concerning Inari; and (iii) a review and analysis of other available materials relating to Inari. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal securities class action on behalf of all purchasers of shares of the common stock of Inari between February 24, 2022 through February 28, 2024, inclusive (the "Class Period"), seeking to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against Inari, William Hoffman ("Hoffman"), Andrew Hykes ("Hykes"), and Mitch C. Hill ("Hill"), all of whom are collectively referred to as the "Defendants."

2.      Inari is a medical device company that specializes in developing, manufacturing and commercializing catheter-based technologies for treating venous thromboembolism ("VTE"), a condition that occurs when a blood clot forms in a vein, usually in the lower leg, thigh, or pelvis.

3.      On February 29, 2024, Inari shocked investors when the Company disclosed it received a civil investigative demand by the U.S. Department of Justice ("DOJ") over certain payments to healthcare professionals relating to meals and consulting services, and warned that

"depending on the outcome of the investigation, there may be a material impact on our business, results of operations, or financial condition."

4.     In response to the disclosure, analysts that closely follow the Company immediately reacted negatively and downgraded the stock.  For instance, Piper Sandler downgraded Inari from overweight to neutral and slashed its price target from $85 per share to $55 per share, stating that that it was moving to the sidelines due to the DOJ investigation and concerns regarding Inari's business overall.  Likewise, Needham's analyst stated that the investigation will create an overhang on the stock and some near-term selling pressure on the Company's shares and could take years to resolve.

5.     As a result of the DOJ investigation disclosure and the negative analyst reactions, Inari's share price plummeted over $12 per share or 21% the very next trading day – from a closing price of $58.26 per share on February 28, 2024 to $46.12 per share on February 29, 2024 – wiping out approximately $700 million in market capitalization in one trading day.

6.     Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants repeatedly touted Inari's financial results and the success of its product sales, but failed to disclose that these numbers were inflated by bribes and other improper and illegal payments to healthcare providers.

7.     As a result of Defendants' wrongful acts and omissions, and the large decline in the market value of the Company's common stock, Plaintiff MAEW and other class members have suffered significant losses and damages.

## II.   JURISDICTION AND VENUE

8.     The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78y(a), and the rules and regulations promulgated thereunder, including SEC

Rule 10b-5, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action

pursuant to 28 U.S.C. § 1331, and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

9.      Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. §

78aa and 28 U.S.C. § 1391(b) because the Company conducts a substantial amount of business in

this District and a significant portion of the damages due to Defendants' misconduct were suffered

within this District. Further, Inari's common stock trades on the NASDAQ, located within this

District.

10.     In connection with the acts, conduct, and other wrongs alleged in this Complaint,

Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including, but not limited to, the U.S. mails, interstate telephone communications, and facilities of

the national securities markets.

## III.    PARTIES

11.     Plaintiff MAEW is a union pension fund based in Lansing, Michigan that manages

all health, pension, and money purchase plan benefits that the Michiana area electrical workers

receive through collective bargaining.  As of March 2024, it had $162 million worth of assets under

management.  As set forth in the attached certification, Plaintiff MAEW purchased or otherwise

acquired shares of Inari common stock during the Class Period and was damaged thereby.

12.     Defendant Inari is a Delaware company that manufactures medical devices

focusing on developing, manufacturing, and commercializing catheter-based technologies for

treating VTE.  Inari is based in California, and its common stock trades on the NASDAQ under

the ticker symbol "NARI."

13.     Defendant Hoffman was the Company's President and Chief Executive Officer ("CEO") until January 1, 2023, when he was succeeded by Defendant Hykes.  Defendant Hoffman remains a member of Inari's Board of Directors (the "Board").

14.     Defendant Hykes currently serves as Inari's President and CEO, as well as a member of the Board.  He was formerly the Company's Chief Operations Officer prior to being appointed as President and CEO.

15.     Defendant Hill served, at all relevant times, as Inari's Chief Financial Officer.

16.     Defendants Hoffman, Hykes, and Hill are collectively referred to as the "Individual Defendants." During the Class Period, the Individual Defendants actively managed the Company, overseeing its operations as well as finances, and made the materially false and misleading statements described below.  The Individual Defendants, by virtue of their positions, had extensive knowledge about the core aspects of Inari's financial and business operations.  They were also deeply involved in deciding which disclosures would be made by the Company to its investors. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts that had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were materially false and/or misleading at the time they were made.

## IV.     SUBSTANTIVE ALLEGATIONS

17.     Inari manufactures a variety of products, including minimally invasive, novel, catheter-based mechanical thrombectomy devices and their accessories to address the unique characteristics of specific medical conditions.  These products are aimed at improving outcomes for patients suffering from VTE and other vascular diseases and conditions, including chronic

venous disease, small vessel thrombosis, arterial thromboembolism and chronic-limb-threatening ischemia.

18.     Throughout the Class Period, Defendants consistently touted Inari's "record revenue," purportedly driven by "the strength in our core VTE business."  But Defendants failed to disclose that a significant portion of its expenses were used to compensate medical professionals improperly for using Inari's products. Thus, unbeknownst to investors, while Defendants were speaking positively about the Company's growth prospects, it had been engaging in illegal business practices.  Specifically, the Company had been unlawfully compensating health care professionals in violation of the federal Anti-Kickback Statute and Civil False Claims Act.

19.      The federal Anti-Kickback Statute is a criminal statute that prohibits the exchange, or offer to exchange, anything of value in an effort to induce or reward the referral of business reimbursable by federal health care programs.  The False Claims Act makes it unlawful to submit, or cause to be submitted, claims for payment to federal health care programs that are known to be false or fraudulent.

20.     Defendants' violation of these statutes made their business practices unsustainable and rendered false and misleading certain statements they made about the Company's financial results, as well as the composition of the Company's expenses.

21.     Defendants' materially false and misleading statements as well as omissions of material facts caused Inari's stock to trade at artificially inflated prices during the Class Period, which caused investors to pay more for Inari's stock than it was actually worth.

## V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS

22.     After the markets closed on February 23, 2022, Inari announced its financial results for its fiscal year that ended on December 31, 2021, which beat analyst estimates.  In its Form 8-

K filed with the SEC on the same date, Defendant Hoffman stated that "our fourth quarter was again successful and productive." The Company attributed its revenue growth to its continued U.S. commercial expansion and new product introductions.

23. During the earnings conference call with investors that took place the same day, Defendant Hoffman highlighted the impressive growth the Company was experiencing:

> Our revenue in Q4 was $83.2 million, up $34.6 million or 71% from the same quarter last year and up $10.3 million or 14% from Q3.
>
> ***Procedure growth was also strong***. Our physician customers performed approximately 7,700 procedures, including a modest number of cases from Europe. This procedure count is up from 6,700 procedures or about 15% from Q3. Our revenue in 2021 was $277 million, up $137.3 million or 98% from the prior year.
>
> Our physician customers performed approximately 25,700 procedures in 2021, up 95% from 13,200 procedures in 2020.

24. Defendant Hoffman stated that the following factors contributed to the Company's growth: (i) the expansion of Inari's sales organization; (ii) building awareness and driving deeper adoption at existing hospital customers; (iii) building upon Inari's base of clinical evidence; (iv) expanding Inari's product portfolio; and (v) expansion into international markets. He explained:

> We now believe there are over 2,000 hospitals that could potentially perform our procedures. ***The bottom line is our markets are even larger than we thought, and we remain very early in the stages of penetrating these markets***.
>
> All of this serves to underscore the need for a larger sales organization. We ended 2021 with just over 200 territories, slightly above the range, to which we guided earlier in the year. We expect to add territories in 2022 at roughly the same cadence we've demonstrated in the past and finish the year with at least 275 territories. We continue to believe that our sales organization when fully built out will be the largest in the peripheral space.
>
> Our second growth driver is building awareness and driving deeper adoption at existing hospital customers. Most VTE patients continue to be treated with anticoagulation alone and in fact, a large percentage of these patients never even see a physician, who is a VTE expert. ***We continue to drive awareness of the benefits in our procedures with non-interventional physicians and we continue to work with hospital administrators to install more systematic processes to***

***consistently identify and triage VTE patients to the physicians, who best understand the disease state.*** We are supporting these efforts by building centralized capabilities, our field team can leverage, including a health economics and market access team, a national accounts team and the Inari Solutions Group, a team of former hospital administrators who can share best practices on disease state program buildings.

25.     Consistent with the statements above, Defendant Hill elaborated on the Company's expenses as part of his prepared remarks:

SG&A expense was $54.5 million in the fourth quarter of 2021, compared with $31.4 million for the same period of the prior year. The $23.1 million increase was primarily due to personnel related expenses because of increased headcount across our organization, higher travel expenses in Q4 2021 compared to unusually low levels of travel in Q4 of '20 and higher facility-related costs and marketing costs. As you heard from Bill, we expect to incur increased operating expenses targeted toward driving growth, expanding our commercial effort, building additional clinical evidence and developing new products. Net income for the fourth quarter of 2021 was $1.1 million, compared with $7 million for the same period of the prior year.

26.     Equity analysts welcomed these remarks, with Canaccord even reiterating its strong buy recommendation.

27.     Over the next several trading days, the stock price went up by more than 30%, from a closing price of $76.00 per share on February 23, 2022, to a closing price of $99.47 per share on March 3, 2022.

28.     However, these statements were false and misleading.  Defendants failed to disclose that the reason for its positive results in the fourth quarter of 2022 was that it was employing illegal practices in violation of the federal Anti-Kickback Statute and False Claims Act. Thus, Inari's success was unsustainable, which investors did not know.

29.     Throughout the Class Period, Defendants continued to make similar positive statements about Inari's business.  For example, on August 3, 2022, Inari reported its financial results for the second quarter of 2022 after market hours.  In its press release accompanying the

Form 8-K filed with the SEC on the same date, the Company boasted its increase in revenue generated as well as the expansion of its commercial footprint.  Additionally, the Company likewise reaffirmed its revenue guidance it had previously adjusted upward by $10 million.  The Company attributed its impressive performance to "continued U.S. commercial expansion and new product introductions." In a press release issued on the same day, Defendant Hoffman stated that the Company executed crisply across all five of its growth drivers despite the challenging environment, produced robust revenue growth, and hired its largest class of new sales professionals.

30.     Also on August 3, 2022, Defendants held an earnings conference call with investors.  During the call, Defendant Hoffman highlighted the Company's revenue growth in his prepared remarks, and indicated that it was due to its products gaining traction in the industry:

> Our revenue in Q2 was $92.7 million, up $29.3 million or 46% from the same quarter last year, and up $5.9 million or 7% from Q1 of 2022. Our core business was strong as we expected. We saw additional revenue based on more rapid-than-expected stocking and adoption of our entry sheets, essentially transferring some of our Q3 expected revenue into Q2. We are especially pleased with these results given the significant headwinds we encountered, most notably hospital staff shortages in addition to the well-documented contrast supply shortages.

31.     Defendant Hoffman also announced that Defendant Hykes would be the Company's next CEO.  Defendant Hykes proceeded to elaborate on the Company's growth drivers and what investors can expect in the upcoming quarter:

> I'd now like to share with you the recent progress we've made on all of our growth drivers. Our first growth driver is transition of our sales organization. You will recall that we committed to at least 275 territories by the end of 2022. We entered July with over 270 territories, nearly reaching our annual goal in just the first six months of the year. We made this decision to accelerate the expansion of our sales organization for three reasons. First, we were encouraged by the traction we saw at the start of the year. Second, smaller territories have had a highly favorable impact on our second growth driver, producing deeper penetration in accounts.  Third, this expanded sales organization will enable us to launch several new products later this

year with nearly the full complement of sales professions we had planned for 2022, and with a complete focus of our commercial management team.

Notably, we managed to hire more than 100 new sales professionals in the first half of the year while also delivering best-in-class revenue performance and navigating a set of especially challenging macro headwinds. We are pleased with our execution in the first half of year, and we're optimistic about the back half of year. We're also making solid progress with our second growth driver, producing deeper adoption within existing hospital customers. Most VTE patients, despite our commercial success, never even see a physician with the skills and expertise to make the most informed clinical decisions. Our goal is to establish systems and processes that ensure patients are consistently identified and triaged to VTE expert [*sic*]. As I mentioned, smaller territories are especially useful for this effort.

32.    In elaborating on the Company's growth drivers, Defendant Hill explained that the increase in expenses go hand in hand with the increase in revenue:

> ***The $30.3 million increase was primarily due to personnel-related expenses as we increased headcount across the organization and secondarily due to higher marketing costs, travel expenses and facility-related costs***. Net loss for the second quarter of 2022 was $10.2 million compared to net income of $4.1 million for the same period of the prior year. The basic and fully diluted net loss per share for the second quarter of 2022 was $0.19 based on the weighted average basic and fully diluted share count of 53.2 million. These compared with a basic and fully diluted net income per share of $0.08 and $0.07 based on weighted average basic and fully diluted share count of 49.7 million and 55.6 million, respectively, for the same period of the prior year.

33.    Satisfied that Inari comfortably beat estimates and maintained guidance, equity analysts reaffirmed their buy recommendations, with Piper Sandler reiterating its overweight rating.

34.    However, the statements made in connection with the second quarter earnings results were false and misleading.  Specifically, in discussing the Company's growth drivers, Defendants failed to state that the reason for the successful quarter was that it was employing illegal practices that violate the federal Anti-Kickback Statute and False Claims Act.  In addition, statements about the Company's increased expenses were false and misleading because they failed

to explain that a major reason for the increased expenses was that the Company was illegally compensating medical professionals to use its products.

35.     On February 27, 2023 Inari announced its fourth quarter and full year 2022 financial results after market hours.  In its press release accompanying the Form 8-K filed with the SEC on the same date, Defendant Hykes touted Inari's double-digit growth, attributing it to continued U.S. commercial expansion, increased adoption of procedures, and introduction of new products.  Defendant Hykes further stated that "[c]risp execution across all five of our growth drivers generated robust revenue growth in the fourth quarter."

36.     During the earnings conference call with investors that took place the same day, Defendant Hill highlighted Inari's double-digit growth, both year-over-year and as compared to the previous quarter.

37.     When asked about what elements comprised the full fiscal year guidance and how Inari's core VTE business contributed to it, Defendant Hykes stated that it was largely driven by the core VTE business in the U.S., and also expressed his confidence in Inari's revenue numbers, saying:

> I think the way we constructed guidance, as you heard Mitch mentioned earlier, we were very deliberate about contemplating all the different dynamics across the business, the core business, the new TAMs, U.S., OUS, competitive dynamics, pricing, all of those factors were contemplated in the guidance.
>
> It was, at the same time, I think, largely driven by or reflective of our confidence and the continued growth of the core VTE franchise here in the U.S. That's obviously the largest part of the business still. The part of the business we have best line of sight and can forecast most confidently. So that 24% growth at the midpoint, I think, is clearly driven by and reflective of our confidence in the core franchise.

38.     Equity analysts enthusiastically received these results, as well as Defendants Hykes's and Hill's assurances, with Marie Thibault from BTIG noting that Inari's consistent execution was being driven by "both share wins from thrombolytic therapy and fast market

growth." She further noted that, "[w]hen asked if this was a sustainable trend, management said they believe historical growth rates can continue."

39.     The statements made to explain the success of the fourth quarter and full fiscal year of 2022 were false and misleading.  Specifically, despite Defendants' touting of their "confidence" in the results of the Company, those results were, at least in part, due to the use of illegal and unsustainable business practices of improper compensation of medical personnel, in violation of federal law.

40.     After the markets closed on August 2, 2023, Inari announced its financial results for the quarter that ended on June 30, 2023. In its press release accompanying the Form 8-K filed with the SEC on the same date, the Company disclosed that it again generated double digit revenues, and highlighted that it "delivered net income of $2.1 million in Q2 of 2023, compared to a $10.2 million net loss in Q2 of 2022." Further, the Company disclosed that it was raising its revenue guidance to a range of $482 million to $492 million, an increase of $4 million, from its prior guidance range of $478 million to $488 million.

41.     During the earnings conference call with investors that took place the same day, Defendant Hill elaborated on Inari's financial performance as part of his prepared remarks. In explaining the Company's expenses, Defendant Hill stated that the increase in selling, general, and administrative expenses was "***primarily due to personnel related expenses***," and "secondarily due to higher travel expenses." Defendant Hill further emphasized that "[n]et income for the second quarter of 2023 was $2.1 million compared to net loss of $10.2 million for the same period of the prior year."

42.     Market analysts were delighted, as the Company reported net profit when the street consensus was that Inari would have a net loss.  Canaccord Genuity raised its price target,

reasoning, among others, that "[t]he VTE Excellence program has been successful in establishing hospital programs to identify and treat patients.  TAM penetration in advanced-phase accounts can be 3-4x than that of earlier phases.  There is also increasing traction building in large IDN and GPOs, which will bolster the VTE Excellence program." Additionally, with regard to the revenue guidance, Piper Sandler noted that Inari has "a good track-record of under-promising and over-delivering," further noting that it was highly achievable as "the guidance could ultimately prove conservative again."

43.    As a result, on August 3, 2023 the price of Inari's shares rose to a closing price of $67.63 per share, from the previous trading day's closing price of $55.60 per share, reflecting more than a 21% increase.

44.    The statements made in connection with the Company's results for the second quarter of 2023 were false and misleading.  In explaining the composition of expenses, Defendant Hill falsely stated that the increased expenses were due to "personnel related expenses," but failed to disclose that a portion of those expenses were used to improperly compensate medical personnel, in violation of federal law.  In addition, omitting this illegal practice made statements concerning the Company's success false and misleading.

45.    On November 1, 2023, the Company reported its financial results for the quarter that ended on September 30, 2023.  In its press release accompanying the Form 8-K filed with the SEC on the same date, Defendant Hykes stated that the Company "saw meaningful contributions from our core VTE business, new product launches, and international geographies." He further stated that the "core business is thriving, and we are confident in our ability to continue to grow sustainably for years to come. Most importantly, we remain fully committed to continuing to advance our mission of addressing major unmet needs for patients."

46.     This statement was false and misleading because, in fact, the "core business" was only "thriving" due to the Company's improper compensation of medical personnel, in violation of federal law, a fact which Defendants did not disclose.

47.     On November 1, 2023, during an earnings conference call with investors, Defendant Hykes, as part of his prepared remarks, touted that the Company generated record revenue and executed crisply across all its growth drivers, driven by continued strength in the core VTE business, along with meaningful contributions from international business and new products. Elaborating on the growth drivers, he stated:

> Revenue in Q3 was $126.4 million, up 31% year-over-year. Our international business generated revenue of $6.5 million in Q3, up 151% year-over-year and 26% sequentially from Q2. In addition to our topline performance, we also made steady progress during the quarter on our bottom-line and returned to operating profitability for the first time since 2021. This achievement underscores our commitment to invest strategically in the business, while also driving operating leverage with revenue growing at double the rate of OpEx in the quarter.

> During Q3, we also made progress across our five growth drivers. Our first growth driver, expanding our US commercial footprint. We added more headcount in Q3 and remain on track to meet our year end goal. We continue to generate operating leverage and productivity gains from a more measured pace of territory development. Our broad commercial footprint and methodical approach to expansion results in focused areas of coverage, positioning us well to introduce new products to the market and to execute on our second growth driver, increasing penetration of existing accounts.

> VTE Excellence is a highly differentiated, comprehensive, and **repeatable approach** to help hospitals establish VTE programs and drive deeper penetration of our therapies. **We remain in the very early innings of market penetration and we continue to see tremendous value and a programmatic approach to ensure patients are consistently identified, screened and evaluated by a VTE expert. We continue to make progress and are successfully moving customers along the VTE Excellence Continuum to more advanced phases of program development, where TAM penetration is 3x to 4x higher than in earlier phases**.

48.     Defendant Hill likewise commented on the Company's financial situation, elaborating on expenses:

Operating expenses were $109.8 million in the third quarter of 2023 compared with $94.9 million for the same period of the prior year. R&D expense was $21.5 million in the third quarter of 2023 compared with $19.1 million for the same period of 2022. The $2.4 million increase in R&D expense was primarily driven by an increase in material and supplies expenses and secondarily, due to higher personnel-related expenses as we increased our headcount.

SG&A expense was $88.3 million in the third quarter of 2023 compared with $75.8 million for the same period of the prior year. ***The $12.5 million increase was primarily due to personnel-related expenses as we increased our headcount and secondarily, due to higher expenses related to professional fees***. Operating income was $2.1 million in the third quarter of 2023 compared with a $9.8 million operating loss for the same period in the prior year. ***This performance reflects our team's commitment to discipline spending controls, while fully funding our commercial, clinical, and innovation growth drivers***.

49.     The statements in connection with the Company's results for the third quarter of 2023 were false and misleading because Defendants failed to disclose that bribes and kickbacks caused Inari's consistent growth, commercial expansion, as well as the adoption and acceptance of its products, and that such bribes and kickbacks formed part and parcel of "personnel-related expenses," as well as "professional fees."

50.     Furthermore, in the risk factors portion of the Forms 10-K for fiscal years 2021 and 2022, filed with the SEC, the Company disclosed to prospective investors that it was subject to scrutiny by regulators under the Anti-Kickback Statute as well as the False Claims Act, among other laws, and warned that it may be subject to significant penalties, including exclusion from government programs, if found to be in violation thereof.

51.     On February 23, 2022 and February 27, 2023, Inari filed its Form 10-K with the SEC for fiscal years 2021 and 2022, respectively (the "2021 10-K" and "2022 10-K," respectively). In both filings, in the "Business" section, following a subheading titled "Healthcare Regulatory Laws," Defendants stated that:

Within the United States, our products and our customers are subject to extensive regulation by a wide range of federal and state agencies that govern business

practices in the medical device industry. ***These laws include federal and state anti-kickback, fraud and abuse, false claims***, transparency and anti-corruption statutes and regulations. Internationally, other governments also impose regulations in connection with their healthcare reimbursement programs and the delivery of healthcare items and services.

U.S. federal healthcare fraud and abuse laws generally apply to our activities because our products are covered under federal healthcare programs such as Medicare and Medicaid. ***The Anti-Kickback Statute is particularly relevant because of its broad applicability. Specifically, the Anti-Kickback Statute prohibits persons or entities from knowingly and willfully soliciting, offering, receiving, or providing remuneration, directly or indirectly, in exchange for, or to induce, either the referral of an individual, or the furnishing, arranging for or recommending a good or service for which payment may be made in whole or part under federal healthcare programs, such as the Medicare and Medicaid programs***. Further, a person or entity does not need to have actual knowledge of the Anti-Kickback Statute or specific intent in order to violate it. The term remuneration has been interpreted broadly to include anything of value.

52.     The 2021 10-K and 2022 10-K also included the following language in the portion of the filings titled "Risk Factors"), below a subheading titled "Risks Related to Government Regulation" :

> ***We are subject to certain federal, state and foreign fraud and abuse laws and physician payment transparency laws that could subject us to substantial penalties. Additionally, any challenge to or investigation into our practices under these laws could cause adverse publicity and be costly to respond to, and thus could harm our business.***

There are numerous U.S. federal and state, as well as foreign, laws pertaining to healthcare fraud and abuse, including anti-kickback, false claims and physician transparency payment laws. Our business practices and relationships with providers are subject to scrutiny under these laws. The healthcare laws and regulations that may affect our ability to operate include, but are not limited to:

- The federal Anti-Kickback Statute, which prohibits, among other things, persons and entities from knowingly and willfully soliciting, offering, receiving or providing remuneration, directly or indirectly, in cash or in kind, to induce either the referral of an individual or furnishing or arranging for a good or service, for which payment may be made, in whole or in part, under federal healthcare programs, such as Medicare and Medicaid. The U.S. government has interpreted this law broadly to apply to the marketing and sales activities of manufacturers. In addition, a person or entity does not need to have actual knowledge

of the statute or specific intent to violate it to have committed a violation;

- The federal civil and criminal false claims laws and civil monetary penalties laws, including the federal civil False Claims Act, which prohibit, among other things, individuals or entities from knowingly presenting, or causing to be presented, claims for payment from Medicare, Medicaid or other federal healthcare programs that are false or fraudulent. These laws can apply to manufacturers who provide information on coverage, coding, and reimbursement of their products to persons who bill third-party payors. Private individuals can bring False Claims Act "qui tam" actions, on behalf of the government and such individuals, commonly known as "whistleblowers," may share in amounts paid by the entity to the government in fines or settlement. Moreover, the government may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the federal civil False Claims Act[.]

53.     These statements in the 2021 10-K and 2022 10-K were false and misleading because, in fact, Inari was already violating the Anti-Kickback Statute and False Claims Act. Thus, Defendants "warned" of a risk that had already materialized.

## VI.     THE TRUTH IS REVEALED

54.     On February 28, 2024, the Company reported its financial results for its fiscal year that ended on December 31, 2023 after the close of market hours.  In its Form 10-K filed with the SEC filed on the same date (the "2023 10-K"), the Company disclosed that in December 2023 it had received a civil investigative demand from the U.S. Department of Justice, Civil Division (the "Civil Investigative Demand" or "CID"), in connection with an investigation under the federal Anti-Kickback Statute and Civil False Claims Act (the "Investigation"), requesting information and documents primarily relating to meals and consulting service payments provided to health care professionals.

55.     The 2023 10-K further stated, "[w]e are unable to express a view at this time regarding the likely duration, or ultimate outcome, of the Investigation or estimate the possibility

of, or amount or range of, any possible financial impact. Depending on the outcome of the Investigation, there may be a material impact on our business, results of operations, or financial condition."

56.     On February 28, 2024, during an earnings conference call with investors , an analyst from Bank of America asked for further information about the Civil Investigation Demand. Defendant Hykes responded:

> [A]s you likely understand from some of the precedent examples of other companies navigating these same waters, we're not going to have a lot of additional background we're going to be able to share beyond what's in the disclosure. We got the CID back in December, so it's still relatively early. We are cooperating with the DOJ. We take compliance seriously. Today we always have at every step of our commercial activity here in the U.S. going back to 2018. We do not expect that this will have any impact on our ability to execute commercially. The focus of the CID is described in the 10-K, it's a couple of very specific areas related to healthcare professional relationships. Going forward, we'll update you as we can, but again based on the precedent I think the timeline is most likely going to be measured in years as opposed to months and quarters.

57.     Analysts reacted negatively to this news, with Piper Sandler downgrading Inari from overweight to neutral and lowering its price target from $85 per share to $55 per share.

58.     As a result of this news, Inari's stock price dropped $17.44 per share over the next several trading days on unusually heavy trading volume, from a closing price of $58.26 per share on February 28, 2024 to a closing price of $40.82 per share on March 5, 2024, representing a decline of almost 30%.

## VII.   SCIENTER

59.     Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued or disseminated to the investing public during the Class Period were materially false or misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as

well as actions intended to manipulate the market price of Inari common stock, as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Inari, their control over, receipt, and/or modification of Inari's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

60.     Defendants knew or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetuated during the Class period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants. Given their positions with Inari, the Individual Defendants controlled the contents of Inari's public statements during the Class Period. The Individual Defendants were each provided with, or had access to, the statements alleged herein to be false and misleading prior to, or shortly after their issuance, and had the ability as well as the opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were false and misleading. As a result, each of the Defendants is responsible for the accuracy of Inari's corporate statements, and is, therefore, responsible and liable for the representations contained therein.

## VIII.   LOSS CAUSATION/ECONOMIC LOSS

61.     Plaintiff and other class members were damaged as a result of Defendants' fraudulent conduct as alleged herein. During the Class Period, Defendants engaged in a scheme to

deceive investors by issuing a series of material misrepresentations and omitting material facts, trends, commitments, and uncertainties required to be disclosed relating to Inari's operations, business, financial performance, and future prospects.

62.     As a direct result of Defendants' scheme, misrepresentations of material fact, and omissions of material fact, the price of Inari's common stock was artificially inflated throughout the Class Period.

63.     Class members unknowingly and in reliance on Defendants' materially false or misleading statements and/or omissions purchased Inari common stock at artificially inflated prices on the NASDAQ. But for Defendants' misrepresentations, omissions, and fraudulent scheme, Plaintiff and other class members would not have purchased Inari common stock at the artificially inflated prices at which it traded during the Class Period.

64.     The truth regarding Defendants' fraud was revealed in a corrective disclosure that was made on February 28, 2024. In response to this corrective disclosure, the price of Inari's stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct was removed from Inari's stock price.

65.     This decline in Inari's stock price following the corrective disclosure is directly attributable to the market absorbing information that disclosed the falsities in or misleadingly omitted from Defendants' material misrepresentations and omissions.

66.     Plaintiff and other class members suffered economic losses as the price of Inari's stock fell in response to the corrective disclosures. It was foreseeable that such disclosures would cause Inari's stock price to decline. Thus, Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiff and other class members.

## IX.     PLAINTIFF IS ENTITLED TO A PRESUMPTION OF RELIANCE

67.     At all relevant times, the market for shares of Inari common stock was an efficient market by virtue of the following reasons, among others: (i) shares of Inari common stock met the requirements for listing, was actually listed, and actively traded on the NASDAQ; (ii) according to the Company's 2023 10-K, Inari had 50,617,254 outstanding shares of common stock as of February 18, 2022, demonstrating a broad market for Inari common stock; (iii) as a registered and regulated issuer of securities, Inari filed periodic reports with the SEC and NASDAQ, in addition to the Company's frequent voluntary dissemination of information; (iv) Inari regularly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services, the Internet, and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; (v) Inari was followed by securities analysts employed by major brokerage firms, who wrote reports that were distributed to the customers of their respective brokerage firms and made such reports publicly available; (vi) the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Inari common stock; and (vii) without knowledge of the misrepresented or omitted facts, Plaintiff and the members of the class purchased or otherwise acquired Inari common stock between the time Defendants made the material misrepresentations and omissions and the time the truth was revealed, during which period the price of Inari's common stock was artificially inflated as a result thereof.

68.     The market for Inari common stock promptly digested current information regarding Inari from all publicly available sources and reflected such information in the price of Inari common stock. Under these circumstances, all purchasers of Inari common stock during the Class Period who relied upon the integrity of the market price of Inari common stock, including

Plaintiff, suffered similar injury through their purchase of Inari common stock at artificially inflated prices, and a presumption of reliance under the fraud-on-the-market doctrine applies.

## X. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

69. The Private Securities Litigation Reform Act's statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

70. None of the statements complained of herein were forward-looking statements. Rather, each was a historical statement or statement of purportedly current facts and conditions at the time each statement was made.

71. To the extent that any materially false or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement or portion thereof. As set forth above, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants do not insulate Defendants from liability for their materially false or misleading statements or omissions.

72. To the extent that the statutory safe harbor applies to any materially false or misleading statement alleged herein, or any portion thereof, Defendants are liable for any such materially false or misleading forward-looking statement because at the time such statement was made the speaker knew the statement was materially false or misleading, or the statement was authorized and approved by an executive officer of Inari who knew that the forward-looking statement was materially false or misleading.

## XI.     CLASS ACTION ALLEGATIONS

73.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), individually and on behalf of a Class consisting of all persons and entities that purchased or otherwise acquired the publicly traded common stock of Inari between February 23, 2022 and February 28, 2024.

74.     Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of Inari, members of Inari's Board, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; (iv) any entity in which Defendants have or had a controlling interest; and (v) any affiliate of Inari.

75.     The members of the class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Inari's securities were actively traded on the NASDAQ. While the exact number of class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery from Defendants, Plaintiff believes that there are at least hundreds, if not thousands, of members in the proposed class. Class members may be identified from records maintained by Inari or its transfer agent and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

76.     Plaintiff's claims are typical of all other class members' claims, as all class members are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws complained of herein.

77.     Plaintiff will fairly and adequately protect the interests of the class members and has retained counsel competent and experienced in class and securities litigation.

78.     Common questions of law and fact exist as to all class members and predominate over any questions solely affecting individual class members. Among the questions of law and fact

common to the class are: (i) whether Defendants' acts and omissions as alleged herein violated the federal securities laws; (ii) whether Defendants' statements to the investing public during the Class Period misrepresented or omitted material facts about Inari's operations, business, performance, and future prospects; (iii) to what extent the class members have sustained damages; and (iv) the proper measure of such damages.

79.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable. Furthermore, as the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it impossible for class members to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.    CAUSES OF ACTION

### COUNT I

**Violation of Section 10(b) of the Exchange Act
Against All Defendants**

80.     Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein. This claim is brought against Defendants pursuant to § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

81.     During the Class Period, Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange to make materially false or misleading statements and omissions of material fact alleged herein to: (i) deceive the investing public, including Plaintiff; (ii) cause the market price of Inari common stock to trade above its true value; and (iii) cause Plaintiff as well as other class members to purchase or otherwise acquire Inari common stock at artificially inflated prices that did not reflect the stock's

true value during the Class Period. In furtherance of their unlawful scheme, plan, or course of conduct, Defendants took the actions alleged herein.

82. While in possession of material adverse non-public information, Defendants, individually and in concert, directly or indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made false or misleading statements of material fact and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Inari common stock, in violation of § 10(b) and Rule 10b-5. Defendants are alleged as primary participants in the wrongful conduct alleged herein.

83. Defendants acted with knowledge or a reckless disregard for the truth of the materially misrepresented and omitted facts alleged herein in that they failed to disclose such facts even though such facts were readily available to them, if not known. Defendants' material misrepresentations and omissions were made knowingly and/or recklessly for the purpose and effect of concealing the truth regarding Inari's operations, business, performance, and future prospects from the investing public and supporting the artificially inflated price of its common stock.

84. As set forth above, the dissemination of the materially false or misleading information and failure to disclose material facts artificially inflated or maintained artificial inflation already incorporated in the market price of Inari common stock during the Class Period. Plaintiff and other class members purchased or otherwise acquired Inari common stock during the

Class Period at artificially inflated prices in direct or indirect reliance on: (i) the materially false or misleading statements made by Defendants; (ii) the efficiency and integrity of the market in which the Company's common stock trades; and (iii) the absence of material adverse information that Defendants knew of or recklessly disregarded but did not publicly disclose. As the previously misrepresented and/or concealed material facts eventually emerged, the price of Inari common stock substantially declined, causing losses to Plaintiff and other class members.

85.     At the time of the material misrepresentations and omissions alleged herein, Plaintiff and other class members were not aware of their falsity and believed them to be true. Had Plaintiff and other class members known the relevant truth regarding Inari's financial results, operations, business, and prospects, which was misrepresented and/or concealed by Defendants, Plaintiff and other class members would not have purchased or otherwise acquired Inari common stock at artificially inflated prices.

86.     By virtue of the foregoing, Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other class members suffered damages in connection with their transactions in the Company's common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

87.     Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein. This claim is brought against the Individual Defendants pursuant to § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

88.     Prior to and during the Class Period, the Individual Defendants, by virtue of their high-level positions, were privy to, and monitored, confidential and proprietary information

concerning Inari, its business, operations, performance, and future prospects, including its compliance with applicable federal, state, and local laws and regulations.

89.    In their respective roles, the Individual Defendants had regular access to non-public information about Inari's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other of Inari's corporate officers and employees, attendance at management meetings and meetings of the Company's Board of Directors and committees thereof, as well as reports and other information provided to them in connection therewith.

90.    Each of the Individual Defendants was a controlling person of Inari within the meaning of § 20(a), as alleged herein. By virtue of their high-level positions, their participation in or awareness of the Company's day-to-day operations and finances, and/or knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants each had the power and authority to influence and control, and did influence and control, directly or indirectly, the day-to-day decision-making of the Company,  including the content and dissemination of the statements Plaintiff alleges were materially false and misleading.

91.    Each of the Individual Defendants is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of Inari common stock during the Class Period, which included the dissemination of materially false or misleading financial statements and statements (both affirmative statements and statements rendered misleading because of material omissions) set forth above. The scheme: (i) deceived the investing public regarding Inari's operations and the true value of Inari's common stock; and (ii) caused Plaintiff and other class members to purchase Inari common stock at artificially inflated prices,

which plummeted in value when the truth concerning Inari's business, operations, performance, and future prospects was revealed.

92.     The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements Plaintiff alleges were materially misleading prior to and/or shortly after these statements were issued and had the ability and ultimate authority to prevent the issuance of these statements or cause these statements to be corrected. In particular, the Individual Defendants maintained direct and supervisory involvement in the day-to-day operations of the Company and therefore had, or are presumed to have had, the power to control or influence the particular public statements or omissions giving rise to the securities violations as alleged herein and exercised the same.

93.     As set forth above, Defendants violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged herein. By virtue of the Individual Defendants' status as controlling persons and their respective participation in the underlying violations of § 10(b) and Rule 10b-5, the Individual Defendants are liable under § 20(a). As a direct and proximate result of the Individual Defendants' culpable conduct, Plaintiff and other class members suffered damages in connection with their transactions in Inari's common stock during the Class Period.

## XIII.  PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for relief and judgment, including:

1.     Certification of this action as a class action;

2.     Awarding compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon, as allowed by law;

3.      Awarding Plaintiff its costs and expenses incurred in this action, including

reasonable counsel fees and expert fees; and

4.      Awarding such other and further relief as may be just and proper.

## XIV.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: May 13, 2024                           Respectfully submitted,

**GRANT & EISENHOFER, P.A.**

 _/s/ Daniel L. Berger_____
Daniel L. Berger
Caitlin M. Moyna
Timothy Clark B. Dauz
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (610) 722-8501
dberger@gelaw.com
cmoyna@gelaw.com
tdauz@gelaw.com

*Counsel for Michiana Area Electrical
Workers' Pension Fund*

## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

MICHIANA AREA ELECTRICAL WORKERS' PENSION FUND, ("MAEW") hereby declares that:

1.      We, Eric Grounds and Kevin Stewart, are respectively the Chairman and Secretary of the Board of Trustees of MAEW. We are familiar with the matters set forth herein and are duly authorized to make this certification on behalf of MAEW.

2.      We have reviewed a complaint styled *Michiana Area Electrical Workers' Pension Fund v. Inari Medical, Inc., et al.,* (the "Action"), and authorized its filing.

3.      MAEW did not purchase or acquire the securities that are the subject of this action at the direction of counsel, or in order to participate in any private action or any other litigation under the federal securities laws.

4.      MAEW is willing to serve as a representative party on behalf of the proposed class, including providing testimony at deposition and trial, if necessary.

5.      MAEW has made the following transactions during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

6.      MAEW did not make any purchases of the securities that are the subject of this action except as listed in Schedule A.

7.      MAEW has not sought to serve as a representative party in a class action arising under the federal securities laws that was filed during the three-year period preceding the date on which this Certification is signed.

8.      MAEW will not accept any payment for serving as a representative party on behalf of the proposed class beyond its *pro rata* share of any recovery, except such reasonable costs and

expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

We declare under penalty of perjury that the foregoing is true and correct.

Executed this 13 day of May, 2024.

<div style="margin-left:40%;">

**MICHIANA AREA ELECTRICAL
WORKERS' PENSION FUND**

By:

_____
Eric Grounds
Chairman

By:

_____
Kevin Stewart
Secretary

</div>

## SCHEDULE A

**Inari Medical, Inc.**
**Michiana Area Electrical Workers' Pension Fund**

**Cusip:** 45332Y109
**Ticker:** NARI
**Class Period:** February 24, 2022 through February 28, 2024

**Beginning Holdings:** 731 shares

| Purchases | | | | Sales | | |
|---|---|---|---|---|---|---|
| Trade Date | Quantity | Price | | Trade Date | Quantity | Price |
| 07/26/22 | 15 | $73.13 | | | | |
| 07/24/23 | 458 | $59.41 | | | | |