**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHIANA AREA ELECTRICAL WORKERS' PENSION FUND, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>INARI MEDICAL, INC., WILLIAM HOFFMAN, ANDREW HYKES, and MITCHELL C. HILL,<br><br>Defendants. | No. 1:24-cv-03686-GHW-JW<br><br>(Consolidated with No. 1:24-cv-04662-GHW-JW)<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT**

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036

50 California Street
San Francisco, California 94111

*Attorneys for Defendants Inari*
*Medical, Inc., William Hoffman,*
*Andrew Hykes, and Mitch C. Hill*

September 4, 2025

## TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT..................................................................................................... 1

SUMMARY OF ALLEGATIONS ................................................................................................ 3

    A.    Inari Develops Market-Leading Treatments for Venous and Other Diseases......... 3

    B.    Inari Prioritizes Key Growth Drivers.................................................................... 4

    C.    Inari Disclosed the Risks of Operating in a Highly Regulated Industry................ 5

    D.    Inari Receives a CID, and Plaintiffs File This Lawsuit ......................................... 6

LEGAL STANDARDS.................................................................................................................. 7

ARGUMENT ................................................................................................................................. 8

    A.    The Complaint Fails to Plead Any Actionable Misstatements or
    Omissions.............................................................................................................. 8

        1.    Plaintiffs Fail to Plead Any AKS Violation. ........................................... 8

        2.    The Complaint Fails to Plead Any False or Misleading
        Statement with Particularity.....................................................................11

        3.    The Deutsche Bank Report Does Not Support a Finding of
        Falsity.................................................................................................... 25

        4.    Plaintiffs' Confidential Witnesses Do Not Support a Finding of
        Falsity.................................................................................................... 26

    B.    Plaintiffs Fail to Plead a Strong Inference of Scienter........................................ 28

        1.    The Nonfraudulent Inference Is More Compelling. .............................. 29

        2.    The Individual Defendants' Stock Sales and Compensation Do
        Not Support Scienter. ........................................................................... 30

        3.    Plaintiffs' Confidential Witness Allegations Do Not Support
        Scienter................................................................................................. 32

        4.    Plaintiffs' "Core Operations" Allegations Do Not Support
        Scienter................................................................................................. 34

    C.    Plaintiffs Fail to Plead a Scheme Under Rule 10b-5. .......................................... 35

    D.    Plaintiffs Fail to Plead a Claim under Sections 20(a) or 20A.............................. 35

CONCLUSION..............................................................................................................................35

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Am. Express Co. Sec. Litig.*,
2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008)............................................................................33

*In re AppHarvest Secs. Litig.*,
684 F. Supp. 3d 201 (S.D.N.Y. 2023)...............................................................................3, 22

*In re Aratana Therapeutics Inc. Sec. Litig.*,
315 F. Supp. 3d 737 (S.D.N.Y. 2018)........................................................................30

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) ..................................................................................3, 30

*In re BISYS Sec. Litig.*,
397 F. Supp. 2d 430 (S.D.N.Y. 2005)....................................................................31, 32

*Born v. Quad/Graphics, Inc.*,
521 F. Supp. 3d 469 (S.D.N.Y. 2021).........................................................................12

*Buhrke Family Revocable Trust v. U.S. Bancorp*,
726 F. Supp. 3d 315 (S.D.N.Y. 2024)..............................................................18, 20, 35

*United States ex rel. Cairns v. D.S. Med. LLC*,
42 F.4th 828 (8th Cir. 2022) ....................................................................................11

*United States ex rel. Camburn v. Novartis Pharm. Corp.*,
124 F.4th 129 (2d Cir. 2024) ...................................................................................8, 9

*Campo v. Sears Holdings Corp.*,
635 F. Supp. 2d 323 (S.D.N.Y. 2009)......................................................................33

*In re Citigroup, Inc. Sec. Litig.*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004).................................................................11, 19

*City of Brockton Ret. Sys. v. Avon Prods., Inc.*,
2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014).............................................................35

*City of Omaha Police & Firefighters Ret. Sys. v. Cognyte Software Ltd.*,
2024 WL 4349289 (S.D.N.Y. Sept. 30, 2024).............................................................24

*United States ex rel. Colquitt v. Abbott Lab'ys.*,
858 F.3d 365 (5th Cir. 2017) ...................................................................................9

*In re CRM Holdings, Ltd. Sec. Litig.*,
   2012 WL 1646888 (S.D.N.Y. May 10, 2012) ........................................................................31

*DeLuca v. AccessIT Grp., Inc.*,
   695 F. Supp. 2d 54 (S.D.N.Y. 2010).......................................................................................3

*Diabat v. Credit Suisse Grp. AG*,
   2024 WL 4252502 (S.D.N.Y. Sept. 19, 2024).......................................................................19

*Donoghue v. Patterson Cos., Inc.*,
   990 F. Supp. 2d 421 (S.D.N.Y. 2013).....................................................................................3

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009).................................................................................................32

*Eden Alpha CI LLP v. Polished.com Inc.*,
   763 F. Supp. 3d 270 (E.D.N.Y. Jan. 24, 2025) ......................................................................3

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
   2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015)........................................................................28

*In re FBR Inc. Sec. Litig.*,
   544 F. Supp. 2d 346 (S.D.N.Y. 2008)..............................................................................11, 18

*Fecteau v. Mount Vernon*,
   2025 WL 754043 (S.D.N.Y. Mar. 10, 2025) ..........................................................................3

*U.S. ex rel. Foreman v. AECOM*,
   19 F.4th 85 (2d Cir. 2021) ......................................................................................................3

*Francisco v. Abengoa, S.A.*,
   481 F. Supp. 3d 179 (S.D.N.Y. 2020)....................................................................................27

*In re FuboTV Inc. Sec. Litig.*,
   2023 WL 2711826 (S.D.N.Y. Mar. 30, 2023) .......................................................................12

*Gagnon v. Alkermes PLC*,
   368 F. Supp. 3d 750 (S.D.N.Y. 2019)....................................................................................31

*Gamm v. Sanderson Farms, Inc.*,
   944 F.3d 455 (2d Cir. 2019)................................................................................................7, 8

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011)....................................................................................33

*Goel v. Bunge, Ltd.*,
   820 F.3d 554 (2d Cir. 2016)....................................................................................................3

*Gray v. Alpha & Omega Semiconductor Ltd.*,
  2021 WL 4429499 (S.D.N.Y. Sept. 27, 2021)..........................................................................10

*United States ex rel. Hart v. McKesson Corp.*,
  96 F.4th 145 (2d Cir. 2024) ..............................................................................................10, 33

*In re Hertz Global Holdings Inc.*,
  905 F.3d 106 (3d Cir. 2018)...................................................................................................31

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.*,
  32 F.3d 697 (2d Cir. 1994).....................................................................................................35

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001)...................................................................................................32

*In re Keyspan Corp. Sec. Litig.*,
  383 F. Supp. 2d 358 (E.D.N.Y. 2003) ...................................................................................31

*Khatskevich v. Shapiro*,
  2025 WL 833872 (S.D.N.Y. Mar. 17, 2025) ...........................................................................3

*Knurr v. Orbital ATK Inc.*,
  272 F. Supp. 3d 784 (E.D. Va. 2017) ....................................................................................32

*Kramer v. Time Warner Inc.*,
  937 F.2d 767 (2d Cir. 1991).....................................................................................................3

*Lewis v. YRC Worldwide Inc.*,
  2020 WL 1493915 (N.D.N.Y. Mar. 27, 2020) ......................................................................28

*Lipow v. Net1 UEPS Techs., Inc.*,
  131 F. Supp. 3d 144 (S.D.N.Y. 2015)....................................................................................34

*Local No. 38 IBEW Pension Fund v. Am. Exp. Co.*,
  724 F. Supp. 2d 447 (S.D.N.Y. 2010)..............................................................................33, 34

*Long Miao v. Fanhua, Inc.*,
  442 F. Supp. 3d 774 (S.D.N.Y. 2020)...............................................................................26, 27

*Lozada v. TaskUs, Inc.*,
  710 F. Supp. 3d 283 (S.D.N.Y. 2024).......................................................................................3

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014)..........................................................................12, 27, 30

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
  601 U.S. 257 (2024)...........................................................................................................11, 12

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
26 F. Supp. 3d 278 (S.D.N.Y. 2014)...................................................................33

*United States ex rel. Martin v. Hathaway*,
63 F.4th 1043 (6th Cir. 2023) .........................................................................11

*In re MBIA, Inc. Sec. Litig.*,
700 F. Supp. 2d 566 (S.D.N.Y. 2010)................................................................33

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
164 F. Supp. 3d 568 (S.D.N.Y. 2016)................................................................22

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*,
2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) ......................................................26

*Micholle v. Ophthotech Corp.*,
2019 WL 4464802 (S.D.N.Y. Sept. 17, 2019)......................................................31

*U.S. ex rel. Mooney v. Americare, Inc.*,
2013 WL 1346022 (E.D.N.Y. Apr. 3, 2013) ........................................................9

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010).............................................................................22

*U.S. ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*,
519 F. App'x 890 (5th Cir. 2013) ......................................................................9

*In re Omega Healthcare Invs., Inc. Sec. Litig.*,
563 F. Supp. 3d 259 (S.D.N.Y. 2021)......................................................18, 19, 20

*In re Plug Power, Inc. Sec. Litig.*,
2022 WL 4631892 (S.D.N.Y. Sept. 29, 2022)................................................31, 32

*Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*,
2023 WL 3569068 (S.D.N.Y. May 19, 2023) .....................................................12

*Plymouth Cnty. Ret. Assoc. v. ViewRay, Inc.*,
556 F. Supp. 3d 772 (N.D. Ohio 2021)...............................................................32

*Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014)..............................................................................22

*Reilly v. U.S. Physical Therapy, Inc.*,
2018 WL 3559089 (S.D.N.Y. July 23, 2018) ......................................................31

*In re Renewable Energy Grp. Sec. Litig.*,
2022 WL 14206678 (2d Cir. Oct. 25, 2022)........................................................34

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)...................................................................................12

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009)......................................................................................28

*Saskatchewan Healthcare Emps.' Pension Plan v. KE Holdings Inc.*,
    718 F. Supp. 3d 344 (S.D.N.Y. 2024) (Woods, J.)...............................32, 33, 34, 35

*Sinay v. CNOOC Ltd.*,
    554 F. App'x 40 (2d Cir. 2014) ..............................................................................35

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019).........................................................................23, 24, 25

*In re Skechers USA, Inc. Sec. Litig.*,
    444 F. Supp. 3d 498 (S.D.N.Y. 2020)......................................................................30

*In re SolarEdge Techs., Inc. Sec. Litig.*,
    2024 WL 4979296 (S.D.N.Y. Dec. 4, 2024) (Woods, J.).........................................34

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................................................28

*United States v. Regeneron Pharms., Inc.*,
    128 F.4th 324 (1st Cir. 2025)..................................................................................11

*Villare v. Abiomed, Inc.*,
    2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021)..........................................................30

*In re Weight Watchers Int'l, Inc. Sec. Litig.*,
    2016 WL 2757760 (S.D.N.Y. May 11, 2016) ..........................................................33

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ................................................................................33

*Woolgar v. Kingstone Cos.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020)................................................27, 28, 30, 31

*Yates v. Mun. Mortg. & Equity, LLC*,
    744 F.3d 874 (4th Cir. 2014) ..................................................................................31

**Statutes & Rules**

PSLRA, 15 U.S.C. § 78u-4 ......................................................................... *passim*

15 U.S.C. § 78t...........................................................................................................35

31 U.S.C. § 3729......................................................................................................23

42 U.S.C. § 1320a ................................................................................................10, 11, 23

Section 10(b), Securities Exchange Act of 1934 .................................................. *passim*

Section 20(a), Securities Exchange Act of 1934 ...................................................7, 35

Section 20A, Securities Exchange Act of 1934 ....................................................7, 35

Federal Rule of Evidence 201 ....................................................................................3

Federal Rule of Civil Procedure 9(b) ...................................................................7, 12, 26

**PRELIMINARY STATEMENT**

Inari Medical, Inc.[1] offers innovative solutions to individuals suffering from a variety of severe venous diseases involving blood clots. Before Inari's devices, the typical approach to treating blood clots—anticoagulant medications often referred to as "blood thinners"—was preventative rather than curative. Blood thinners prevent future clots but do not eliminate existing ones, and most patients must continue using them for the duration of their lives. Inari's devices, by contrast, *remove* blood clots, thus providing a cure for patients facing an otherwise life-threatening medical condition.

Because Inari's devices represent an advance over traditional treatments, Inari has invested significant resources into educating healthcare professionals on their uses and advantages. Within the healthcare industry, it is a common, accepted, and legal practice for healthcare companies to host educational or marketing events at which companies inform doctors and other healthcare professionals about their products. In connection with these events, companies are permitted to cover some costs for healthcare professionals, including for travel, lodging, meals, and refreshments. Such expenditures facially do not violate the federal Anti-Kickback Statute ("AKS"), which prohibits providing healthcare professionals with remuneration to fraudulently induce the purchase or provision of healthcare services.

After Inari publicly announced that it received a request for documents from the Department of Justice regarding its expenditures, Plaintiffs filed suit on the theory that Inari violated the Securities Exchange Act of 1934 ("Exchange Act") by failing to inform investors that Inari was violating the AKS. This theory fails to state a viable claim.

At the most basic level, Plaintiffs do not adequately allege that Inari violated the AKS.

---

[1] All Defendants are referred to collectively as "Inari." When the former executives are referenced separately from the company, they are called the "Individual Defendants."

1

Plaintiffs must plead an AKS violation with particularity under the Private Securities Litigation Reform Act ("PSLRA"), but they do not identify any specific unlawful action here. They simply allege in general and conclusory terms that Inari paid illegal kickbacks, without providing any details about individual kickbacks as courts in this Circuit require. Plaintiffs' failure to allege the details of a single improper payment or the value of any purported "kickback" received in return is fatal to the Complaint's survival. Without alleging specific details about specific alleged kickbacks, Plaintiffs cannot meet the threshold requirement of pleading with particularity that any particular payment by Inari crossed the line separating a permissible educational or marketing expense from an illegal kickback.

Moreover, as courts have repeatedly held, the Exchange Act imposes no duty to affirmatively disclose alleged wrongdoing, and Plaintiffs do not identify any statement by Inari that was materially misleading as a result of any failure to disclose purported AKS violations. Instead, Plaintiffs rely on lengthy block-quotes from Inari's statements paired with rote assertions that those statements were misleading—the sort of vague and conclusory allegations that courts in this Circuit agree are insufficient to meet the particularity requirement for a securities claim.

Finally, Plaintiffs do not satisfy the PSLRA's requirement to plead particularized facts giving rise to a strong inference that Inari acted with scienter—that is, that Inari made its allegedly fraudulent statements intentionally or with conscious recklessness. Courts in this Circuit have consistently rejected each of the theories of scienter on which Plaintiffs try to rely, including routine stock sales by executives, vague confidential witness allegations, and the so-called "core operations" theory. Taken together or separately, none of Plaintiffs' allegations can make a fraudulent explanation of Inari's conduct as plausible as the nonfraudulent explanation that Inari designed and executed a permissible program for training and educating physicians, and that any

2

excessive or improper expenses resulted from individual carelessness rather than fraud.

For these reasons and others discussed below, the Court should dismiss Plaintiffs' Consolidated Class Action Complaint (the "Complaint") in full.

## SUMMARY OF ALLEGATIONS

### A.   Inari Develops Market-Leading Treatments for Venous and Other Diseases

Inari is a medical device company that develops and commercializes products to treat venous and other diseases, including venous thromboembolism, deep vein thrombosis ("DVT"), and pulmonary embolism ("PE"). (¶¶ 20, 27.)[2] Before Inari entered the market, physicians had limited tools to treat these and other venous diseases. The traditional conservative approach was

---

[2] Unless otherwise noted, ¶ citations refer to the Complaint, and Exhibit citations refer to the exhibits to the Declaration of Craig Carpenito ("Carpenito Declaration"). Defendants submit the exhibits for judicial notice under Federal Rule of Evidence 201. Exhibits 1-11 are each incorporated by reference into the Complaint and integral to the Complaint's allegations. A document is incorporated by reference when a complaint makes a "clear, definite and substantial reference to the documents." *Khatskevich v. Shapiro*, 2025 WL 833872, at \*5 (S.D.N.Y. Mar. 17, 2025) (quotations and citation omitted). Even when a document is not incorporated by reference, it is "a fair object of consideration on a motion to dismiss" if it is "integral" to the complaint. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). "A document is integral to the complaint where the complaint relies heavily upon its terms and effect," *id.* (quotations and citation omitted), and where "there is no serious dispute as to the document's authenticity," *U.S. ex rel. Foreman v. AECOM*, 19 F.4th 85, 107 (2d Cir. 2021). To be integral to a complaint, a plaintiff "must have (1) 'actual notice' of the extraneous information and (2) 'relied upon th[e] documents in framing the complaint.'" *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (citation omitted). Here, the Complaint incorporates Exhibits 1-8 by reference because it explicitly and repeatedly refers to those Exhibits to support Plaintiffs' claims. Exhibits 1-5 and 8 contain the statements that Plaintiffs challenge as false or misleading. (¶¶ 66-78, 117-20.) Courts routinely find documents incorporated by reference in securities complaints in such circumstances. *E.g., Lozada v. TaskUs, Inc.*, 710 F. Supp. 3d 283, 297 n.6, 300 n.11 (S.D.N.Y. 2024); *Eden Alpha CI LLP v. Polished.com Inc.*, 763 F. Supp. 3d 270, 293-94 (E.D.N.Y. 2025). Plaintiffs also cite Exhibit 6 to support their theories of falsity and scienter. (*See* ¶¶ 52, 141-42.) Plaintiffs likewise extensively cite Exhibit 7 as evidence of falsity and scienter. (*E.g.*, ¶¶ 58, 68, 71, 74, 79, 92, 97, 110, 120, 125.) Accordingly, Exhibits 1-8 are all incorporated into and integral to the Complaint. The same is true of Exhibits 9-11. Those Exhibits are SEC Forms 4 reflecting the stock sales of the Individual Defendants. Plaintiffs rely on those stock sales to support their allegations of scienter and thus necessarily rely on the related Forms 4. (¶¶ 153-54 & n.6, 155-56 & n.7, 157-58 & n.8, 159-63.) By doing so, Plaintiffs have at least rendered the Forms 4 integral to the Complaint, if not incorporated them by reference. *See Donoghue v. Patterson Cos., Inc.*, 990 F. Supp. 2d 421, 423 (S.D.N.Y. 2013) (considering Form 4 as "integral to [the] plaintiff's claims"). Distinct from the doctrine of incorporation by reference, judicial notice extends to "public documents." *Fecteau v. Mount Vernon*, 2025 WL 754043, at \*7 (S.D.N.Y. Mar. 10, 2025) (quotations and citation omitted). Each of Exhibits 1-5 and 8-11 is properly subject to judicial notice. Exhibits 1-5 and 8-11 are all either SEC filings (Exs. 1, 3-5, 9-11) or were submitted to the SEC as an attachment to an SEC filing (Exs. 2, 8). Courts routinely take judicial notice of such filings in securities cases. *E.g.*, *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *In re AppHarvest Secs. Litig.*, 684 F. Supp. 3d 201, 238-39 (S.D.N.Y. 2023). Exhibit 7 is a Deutsche Bank analyst report, which courts may also judicially notice. *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352 (2d Cir. 2022).

to prescribe blood thinners, which do not remove existing clots but merely prevent new clots from forming. (Ex. 1 at 4-5.) For patients with severe venous disease, the alternatives to blood thinners were flawed: clot-dissolving (or "thrombolytic") drugs came with serious bleeding risks, lengthy ICU stays, and limited effectiveness on older clots. (*Id.* at 4.) Meanwhile, the only available clot-removal (or "thrombectomy") devices were repurposed from arterial devices and designed for soft, small blood clots in narrow vessels. (Ex. 2 at 4.) These devices struggled to remove larger clots and posed safety risks when used in the venous system. (*Id.*)

Inari set out to offer a better solution. Inari's founding team, convinced that the traditional conservative treatments were driven more by limited technology than by clinical preference, developed mechanical thrombectomy tools purpose-built for the venous system. (*Id.* at 5.) The ClotTriever® system was designed to treat DVT by mechanically removing clots from peripheral blood vessels. (*Id.* at 15-17.) The FlowTriever® system was the first FDA-cleared device for treating PE without thrombolytic drugs. (Ex. 1 at 8.) Together, these products offer a safer, faster, and more effective option for patients, allowing shorter single-session treatments that reduce hospital stays and avoid the complications of drugs or multi-step procedures. (*Id.* at 6-7.)

### B.    Inari Prioritizes Key Growth Drivers

After Inari introduced its groundbreaking devices to treat DVT and PE, it focused on establishing those devices as the new standard of care. Inari prioritized five key growth drivers: (1) expanding its U.S. sales force, (2) "increasing penetration in existing accounts," (3) further developing its base of clinical evidence, (4) expanding its offering of venous products, and (5) identifying and pursuing strategically adjacent and international markets that could benefit from its products. (¶ 104.) To grow its business, Inari sought to increase awareness and adoption of its products in existing and future hospital customers. (Ex. 2 at 7.)

Inari consistently executed on these growth drivers year-over-year. For example, Inari grew

4

its commercial footprint from 200 sales territories in 2021 to 270 sales territories in 2022. (Ex. 3 at 9; Ex. 4 at 1.) Inari also expanded its product offerings to include new technologies that furthered its mission of addressing unmet health needs. (¶¶ 27, 87.) In 2022, Inari began commercializing InThrill®, a thrombectomy system designed to remove emboli and thrombi from small vessels without thrombolytics. (¶ 27.) The following year, Inari acquired LimFlow, S.A., the first and only FDA-approved system for transcatheter arterialization of deep veins, designed to treat chronic limb-threatening ischemia patients who have exhausted all other therapeutic options. (¶ 27; Ex. 5 at 7, 10.)

Because Inari was new and its devices were unlike traditional treatments, Inari recognized that their adoption required awareness and buy-in from healthcare professionals. (*Id.* at 5.) As a pioneer in mechanical thrombectomy, Inari faced an entrenched clinical preference for conservative treatment using blood thinners alone. Physician-facing education and marketing were thus critical to Inari's growth. (¶¶ 59-63, 88, 110; Ex. 5 at 12-13.) Inari's physician-facing efforts reflected common industry practice and supported the company's broader growth strategy: educating physicians and other healthcare professionals on the limitations of existing treatments and the benefits of modern clot-removal technology. As a result of these initiatives, Inari's revenue grew significantly from 2020 to 2023. (Ex. 2 at 5; ¶ 170.)

### C.    Inari Disclosed the Risks of Operating in a Highly Regulated Industry

Inari operates within a highly regulated legal framework. Inari's products are often reimbursed through federal healthcare programs, and it generates revenue from selling products to hospitals and medical centers, which may submit reimbursement claims to third-party payors such as Medicare, Medicaid, and private insurers. (¶ 3.) Given this structure, Inari's interactions with healthcare providers are subject to federal healthcare fraud and abuse laws, including the AKS and the False Claims Act ("FCA"). (¶¶ 37, 44.)

Inari has long acknowledged the importance of these laws and the risks addressed by them. Inari has repeatedly warned investors about possible investigations or enforcement actions, noting that such proceedings can be costly, generate adverse publicity, and negatively impact operations. (*E.g.*, Ex. 5 at 56-57; Ex. 1 at 55-56.) Inari's 2020 Form 10-K cautioned that the AKS is "interpreted broadly," and it flagged "increased … scrutiny of interactions between healthcare companies and healthcare providers, which has led to a number of investigations, prosecutions, convictions and settlements in the healthcare industry." (Ex. 2 at 34, 82.) Inari also acknowledged that FCA cases are often initiated by employees who may be motivated by financial incentives to pursue claims regardless of the merit. (*Id.* at 35, 81.) Inari explained that even meritless accusations could result in reputational harm and financial burden. (*Id.* at 82.) These warnings continued in Inari's later filings throughout the Class Period. (*E.g.*, Ex. 3 at 15-17, 50-51; Ex. 1 at 19-20, 56-57; Ex. 5 at 21-22, 56-58.)

Not only did Inari publicly disclose the risks, but it also established a "Comprehensive Compliance Program" to ensure "material compliance with federal and state laws and industry standards relating to the promotion and marketing of medical devices." (¶ 51.) As part of this program, Inari adopted AdvaMed's Code of Ethics on Interactions with Healthcare Professionals ("AdvaMed Code"). (¶ 52.) According to the AdvaMed Code, a company "occasionally may provide Health Care Professionals with modest meals and refreshments," so long as they are "provided in a setting that is conducive to bona fide scientific, educational, or business discussions." (Ex. 6 at 26.) Companies may also pay for healthcare professionals' travel, lodging, and other expenses related to scientific, educational, or business discussions. (*Id.* at 24-25.)

### D.    Inari Receives a CID, and Plaintiffs File This Lawsuit

In December 2023, Inari received a civil investigative demand ("CID") from the Department of Justice ("DOJ"), as part of an inquiry into Inari's meals and consulting payments

6

to physicians. (¶ 6; Ex. 5 at 67.) Inari publicly disclosed the CID in its Form 10-K filed on February 28, 2024. (*Id.*) Inari explained that it was cooperating with the DOJ's inquiry and warned that, depending on the outcome, there "may be a material impact on [its] business, results of operations, or financial condition." (¶ 130; Ex. 5 at 67.) The DOJ's investigation is ongoing, and the DOJ has not made any findings or allegations of wrongdoing by Inari. Plaintiffs do not and could not allege otherwise.

Plaintiffs initiated two lawsuits against Inari in May and June 2024, several months after Inari disclosed the CID. (ECF 1.) After this Court consolidated those two actions (ECF 40), Plaintiffs filed their operative consolidated complaint (ECF 55). Plaintiffs assert three claims under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934, based on numerous public statements between March 10, 2021, and February 28, 2024 (the "Class Period"). As explained below, the Complaint fails to allege an actionable claim and should be dismissed.

## LEGAL STANDARDS

To state a claim under the Exchange Act, Plaintiffs must allege that Inari "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 463 (2d Cir. 2019) (quotations and citation modified). Plaintiffs must plead these elements with particularity under Federal Rule of Civil Procedure 9(b) and the PSLRA. *Id.* at 462. Specifically, Plaintiffs must "(1) specify the statements that [they] contend[] were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* (quotations and citation modified). Plaintiffs must also "state with particularity facts giving rise to a strong inference that [Inari] acted with" scienter. *Id.*

7

## ARGUMENT

The Court should dismiss Plaintiffs' Complaint in full because it fails to plead with particularity either (1) a material misstatement or omission or (2) a strong inference of scienter.

### A.    The Complaint Fails to Plead Any Actionable Misstatements or Omissions.

Plaintiffs sue Inari under Section 10(b), alleging that a broad swath of Inari's public statements were false or misleading because Inari did not disclose that it was allegedly violating the AKS. But that theory cannot support a Section 10(b) claim because (1) Plaintiffs do not even plead that there was an AKS violation in the first place; (2) Plaintiffs do not plead with particularity that any statement was false, and none of the challenged statements were rendered false by an alleged failure to disclose AKS violations; (3) the Deutsche Bank report on which Plaintiffs rely heavily does not show or infer any misleading statements; and (4) the three confidential witnesses do not demonstrate any challenged statements were misleading.

### 1.    Plaintiffs Fail to Plead Any AKS Violation.

The PSLRA requires Plaintiffs to plead with particularity the reasons why the challenged statements are misleading. 15 U.S.C. § 78u-4(b)(1)(B). Every paragraph that purports to meet that requirement alleges that Inari's public statements were misleading because Inari allegedly did not disclose that it was violating the AKS. ¶¶ 68, 71, 74, 77, 79, 83, 85, 89, 92, 94, 97, 100, 102, 106, 108, 110, 114, 116, 120, 122, 125, 128. Plaintiffs' claims fail for a fundamental reason: Plaintiffs do not adequately plead that Inari *did* violate the AKS.

Where, as here, "a complaint claims that statements were rendered false or misleading through the non-disclosure of illegal activity, the facts of the underlying illegal acts must also be pleaded with particularity." *Gamm*, 944 F.3d at 465. Plaintiffs thus must plead that Inari violated the AKS by "stat[ing] with the requisite particularity that at least one purpose of the alleged scheme was to induce fraudulent conduct." *United States ex rel. Camburn v. Novartis Pharm. Corp.*, 124

8

F.4th 129, 133 (2d Cir. 2024). And to do that, Plaintiffs must identify specific events that constitute kickbacks, including by identifying the dates of those events, "the doctors and attendees involved," and the "name and location" of physicians who allegedly received kickbacks. *Id.* at 137-39. Allegations lacking such "specific details" are insufficient to create "a strong inference" that the defendant acted "to induce higher prescription-writing." *Id.* at 139; *see U.S. ex rel. Mooney v. Americare, Inc.*, 2013 WL 1346022, at *4 (E.D.N.Y. Apr. 3, 2013) (complaint did not plead AKS violation with particularity where plaintiff did "not identify the specific payers or recipients of the[] kickbacks" and did "not identify what specific roles [alleged participants] played").[3]

Plaintiffs fail to plead the required details of Inari's alleged AKS scheme. Plaintiffs make general allegations about Inari's "spending" (¶ 56) and "training sessions" (¶ 59), but they do not identify any specific improper event or plead details of what happened at the event, when or where it occurred, which physicians attended, what those physicians received, or the value of any alleged kickback. The absence of such details is particularly striking when even the AdvaMed Code on which Plaintiffs rely (¶¶ 52, 141) makes clear that a company can appropriately conduct training and marketing programs with physicians and pay for physicians' travel, lodging, meals, and refreshments connected with those programs. (Ex. 6 at 22-26.) Without alleging details about specific alleged kickbacks, Plaintiffs cannot plead with particularity that any particular payment by Inari crossed the line separating a permissible educational or marketing expense from an illegal kickback. *Camburn*, 124 F.4th at 139; *Mooney*, 2013 WL 1346022, at *4.

Nor do Plaintiffs adequately plead that Inari acted "knowingly and willfully" in providing

---

[3] *See also United States ex rel. Colquitt v. Abbott Lab'ys.*, 858 F.3d 365, 372 (5th Cir. 2017) (same, where plaintiff referenced "'vascular specialists' who received dinners, training, and fellowships" but did not allege "details … about the scheme"); *U.S. ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 894 (5th Cir. 2013) (same, where plaintiff did not plead "the contents of th[e] [kickback] agreements, the identity of any physicians, actual inducements, or improper referrals").

any alleged kickbacks, as the AKS requires. 42 U.S.C. § 1320a-7b(b)(2)(B). To satisfy that requirement, Plaintiffs must plead specific facts giving rise to a strong inference that Inari "act[ed] with knowledge that [its] conduct was unlawful." *United States ex rel. Hart v. McKesson Corp.*, 96 F.4th 145, 157 (2d Cir. 2024) (quotations and citation omitted). Plaintiffs allege no such facts. Plaintiffs allege that FE-1 expressed concerns with Inari's practices to Inari's executives (¶ 4), but the Second Circuit rejected equivalent allegations in *Hart*. There, the plaintiff alleged that he told his supervisor and coworkers that he believed the defendant's conduct was unlawful. 96 F.4th at 161. The Second Circuit held that allegation "suggest[ed] only that [*the plaintiff*] believed" that the defendant was violating the law. *Id.* The plaintiff did not allege that his "belief was shared by others" or could "be imputed to [the defendant] as a whole." *Id.* Likewise here, Plaintiffs do not allege that any Inari executive *agreed* with FE-1's opinion. Therefore, Plaintiffs' allegation about *FE-1*'s opinion is not sufficient to plead that *Inari* knew its alleged conduct violated the AKS.

Plaintiffs cannot plead a willful AKS violation based on the mere existence of the DOJ's CID, which is what they try to do. For one thing, Plaintiffs must plead that Inari knew its conduct was unlawful *at the time* it was engaging in that conduct, *Hart*, 96 F.4th at 162, but the CID was issued *after* the conduct at issue. So even if the CID could support a conclusion that Inari's conduct was illegal, it could only support that conclusion in hindsight; it would not show that Inari knew its conduct was illegal at any particular time *before* receiving the CID. Further, the mere existence of the CID is *not* sufficient to support a conclusion that Inari's conduct was unlawful. Wrongdoing cannot be inferred "from the mere existence of an investigation" because "government investigations are just that, investigations." *Gray v. Alpha & Omega Semiconductor Ltd.*, 2021 WL 4429499, at *9 (S.D.N.Y. Sept. 27, 2021) (quotations and citation omitted). Here, the DOJ has not made any findings or even allegations of AKS violations. It is just an investigation.

10

Finally, Plaintiffs suggest that Inari violated the FCA, but they allege no facts establishing a violation. Plaintiffs allege "violations of the AKS are *per se* violations of the FCA" (¶ 47), but that is incorrect as a matter of law. An AKS violation constitutes an FCA violation only for reimbursement claims "resulting from" the AKS violation. 42 USC § 1320a-7b(g). That imposes a requirement of but-for causation, meaning a claim violates the FCA only if the particular services at issue would not have been ordered in the absence of the kickback. *United States v. Regeneron Pharms., Inc.*, 128 F.4th 324, 328-36 (1st Cir. 2025); *United States ex rel. Martin v. Hathaway*, 63 F.4th 1043, 1052-55 (6th Cir. 2023); *United States ex rel. Cairns v. D.S. Med. LLC*, 42 F.4th 828, 834-37 (8th Cir. 2022). Plaintiffs, however, do not identify any instance of Inari submitting a claim for services purchased because of an AKS violation. This is independently fatal to their claims.

### 2.     The Complaint Fails to Plead Any False or Misleading Statement with Particularity.

Even if Plaintiffs had adequately pleaded an AKS violation, the Complaint should still be dismissed because it fails to plead that any challenged statement was false. To be clear, Plaintiffs' theory is not that any statement was affirmatively false. Rather, Plaintiffs allege Inari failed to disclose that it was allegedly violating the AKS. But, as a threshold matter, Section 10(b) does "not require a company to accuse itself of wrongdoing," *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), so a "corporation does not have a duty to disclose information simply because it … suggests that the corporation or its employees engaged in uncharged illegal conduct," *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 353 (S.D.N.Y. 2008).

Moreover, as the Supreme Court has made clear, Section 10(b) does not prohibit "pure omissions" or "create an affirmative duty to disclose any and all material information." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024). Rather, to state a Section 10(b) claim on an omission theory, Plaintiffs must plead with particularity that Inari's alleged

11

omission "render[ed] affirmative statements made misleading." *Macquarie*, 601 U.S. at 265. To satisfy that burden, Plaintiffs "must do more than say that the statements … were false and misleading; they must demonstrate with specificity *why* and *how* that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (emphasis added); *accord In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (cleaned up). Plaintiffs, however, simply quote lengthy paragraphs from multiple public statements, then repeat the same unexplained assertion that those statements were misleading because Inari did not disclose that it was allegedly violating the AKS. That is insufficient. Courts agree that such "use of large block quotes … followed by generalized explanations of how the statements were false or misleading are not sufficient to satisfy the heightened pleading requirements" of Rule 9(b) and the PSLRA. *In re FuboTV Inc. Sec. Litig.*, 2023 WL 2711826, at *11 (S.D.N.Y. Mar. 30, 2023) (quotations and citation omitted); *accord Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*, 2023 WL 3569068, at *9 (S.D.N.Y. May 19, 2023); *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 478-79 (S.D.N.Y. 2021).

Even if the Court looks past this insufficiency, the four categories of statements that Plaintiffs challenge are still inactionable because Plaintiffs do not identify any statement that was rendered materially misleading by Inari's alleged failure to accuse itself of violating the AKS, as addressed below for the following categories of statements: (1) statements about Inari's revenue, (2) statements about Inari's SG&A expenses, (3) Inari's risk disclosures, and (4) contractual provisions in two of Inari's contracts.

***Revenue Statements***. The statements Plaintiffs challenge about Inari's revenues are as follows:

| ¶ | Date & | Alleged Statement[4] | Summary of Reasons |
|---|---|---|---|

---

[4] In this and other charts of challenged statements, all emphases are from the Complaint. Where emphasis was in the Complaint, just the emphasized portion is quoted.

|  | Source |  | Misstatement Not Alleged |
|---|---|---|---|
| 80 | 3/9/21 Q4 2020 press release | "*The increase over prior year figures was driven by continued US commercial expansion and increased product adoption*." | No AKS violation is alleged (*supra* at 8-12); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |
| 81 | 3/9/21 Q4 2020 earnings call | Hoffman stated that the following five factors contributed to the Company's Q4 2020 revenue growth (up 144% from the same quarter last year at $48.6 million) and procedure growth (up 156% from the same quarter last year at 4,600 procedures): (i) the expansion of Inari's sales organization; (ii) "building awareness" and driving deeper adoption at existing hospital customers (which Inari primarily executed through its "VTE Excellence" program); (iii) building upon Inari's base of clinical evidence; (iv) continuing to expand Inari's product portfolio; and (v) expansion into adjacent and international markets. | No AKS violation is alleged (*supra* at 8-12); accurate statements of past earnings (*infra* at 18-19); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |
| 82 | 3/9/21 Q4 2020 earnings call | "So *it's the expansion of the field team and the methodical addition of new reps and territory expansion.*" | No AKS violation is alleged (*supra* at 8-12); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |
| 84 | 5/11/21 Q1 2021 Form 8-K and Form 10-Q | The Company attributed the increase in revenue to "*continued U.S. commercial expansion and increased production adoption*" and Hoffman touted that Inari "treated a record number of patients and *significantly expanded [its] commercial footprint*." | No AKS violation is alleged (*supra* at 8-12); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |
| 86 | 8/10/21 Q2 2021 Form 8-K and Form 10-Q | Inari attributed this revenue growth to "*continued U.S. commercial expansion and new product introductions*." | No AKS violation is alleged (*supra* at 8-12); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |
| 87 | 8/10/21 | [T]he Company's "second quarter was highly successful . . . [w]e treated a record number of | No AKS violation is alleged (*supra* at 8-12); |

| | | | |
|---|---|---|---|
| | Q2 2021 Form 8-K | patients" and "***continue to invest aggressively to expand our capabilities to treat even more patients and address more unmet needs***." | no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |
| 88 | 8/10/21 Q2 2021 earning call | "The increase in density of our sales organization and the resulting smaller territories provide opportunity to more effectively address our second growth driver, which is ***building awareness and driving deeper adoption at existing hospital customers***." | No AKS violation is alleged (*supra* at 8-12); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |
| 90 | 11/9/21 Q3 2021 Form 8-K and press release | Hoffman stated that "[o]ur third quarter was as successful as it was exciting. We again treated a record number of patients and made important progress in all five of our growth drivers." The press release reported that revenue "was $72.9 million for the third quarter of 2021, compared to $63.5 million for the prior quarter and $38.7 million for the third quarter of 2020." The Company attributed this increase in reported revenue to "continued U.S. commercial expansion and new product introductions." | No AKS violation is alleged (*supra* at 8-12); accurate statements of past earnings (*infra* at 18-19); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |
| 91 | 11/9/21 Q3 2021 earnings call | We "***nearly tripled our quarterly production of both cases and revenue. We added 500 new customer accounts***, . . . ." "***Our first growth driver is the expansion of our sales organization to target new hospitals and physicians***. . . ." "***Our second growth driver is building awareness and driving deeper adoption at existing hospital customers***." | No AKS violation is alleged (*supra* at 8-12); accurate statements of past earnings (*infra* at 18-19); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |
| 93 | 2/18/22 Conference | "What I think increasingly, ***our growth is coming from expanding the market and putting patients onto the table that would have been treated with conservative medical management***." | No AKS violation is alleged (*supra* at 8-12); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |
| 95 | 2/23/22 FY 2021 Form 8-K, press release, and Form | "Revenue was $83.2 million for the fourth quarter of 2021, compared to $72.9 million for the prior quarter and $48.6 million for the fourth quarter of 2020. ***The increase over prior quarter was driven by continued U.S. commercial expansion and new product introductions***." | No AKS violation is alleged (*supra* at 8-12); accurate statements of past earnings (*infra* at 18-19); no nexus between statement and alleged omission of |

14

| | | | |
|---|---|---|---|
| | 10-K | | purported AKS violation (*infra* at 18-19). |
| 96 | 2/23/22<br><br>FY 2021 earnings call | "*Our second growth driver is building awareness and driving deeper adoption at existing hospital customers.*" | No AKS violation is alleged (*supra* at 8-12); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |
| 98 | 5/4/22<br><br>Q1 2022 Form 8-K and press release | Hoffman stated that "[w]e executed crisply across all five of our growth drivers during a highly productive first quarter." The Company attributed its revenue growth to continued U.S. commercial expansion and new product introductions. | No AKS violation is alleged (*supra* at 8-12); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |
| 99 | 5/4/22<br><br>Q1 2022 earnings call | "*Our first growth driver is the expansion of our sales organization.*" | No AKS violation is alleged (*supra* at 8-12); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |
| 101 | 8/3/22<br><br>Q2 2022 Form 8-K and press release | [T]he Company reported an increase in reported revenue as well as the expansion of its commercial footprint and attributed its results to "continued U.S. commercial expansion and new product introductions." Hoffman was quoted in the press release saying that the Company continued to "execute crisply across all five of [its] growth drivers despite the ongoing challenges to the med tech operating environment," "produced robust revenue growth," and "hired its largest class of new sales professionals." | No AKS violation is alleged (*supra* at 8-12); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |
| 103 | 11/2/22<br><br>Q3 2022 Form 8-K and press release | The press release quoted Hoffman as stating "*[o]ur aggressive investment in our growth drivers is paying off for our mission.*" | No AKS violation is alleged (*supra* at 8-12); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |
| 104 | 11/2/22<br><br>Q3 2022 earnings | "*Our revenue in Q3 was $96.2 million, up $23.3 million or 32% from the same quarter last year. Results in our core business were driven by strong procedural growth across*" | No AKS violation is alleged (*supra* at 8-12); accurate statements of past earnings (*infra* at |

| | | | |
|---|---|---|---|
| | call | *both ClotTriever and FlowTriever product line . . ..*"<br>"Our *first growth driver is the expansion of our sales organization*. You will recall that we committed to at least 275 territories by the end of 2022." | 18-19); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |
| 105 | 11/2/22<br><br>Q3 2022 earnings call | "Compared to Q3 of 2021, *our revenue growth was due to continued efforts to open new customer accounts, expand our sales force and deepen our relationship with existing customers*." | No AKS violation is alleged (*supra* at 8-12); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |
| 107 | 1/11/23<br><br>Conference | "Yes. So it was a nice quarter and a nice way to finish the year. It was *driven primarily by strength in the core franchise and procedural growth with both ClotTriever and FlowTriever*. . . . So *a really strong quarter driven by procedural growth*, and I think *that reflects the continued productivity gains we're seeing in our sales organization*. I think it reflects *the continued progress we're making in our second growth driver, VTE Excellence, in developing these programs and driving adoption*." | No AKS violation is alleged (*supra* at 8-12); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |
| 109 | 2/27/23<br><br>Q4 and FY 2022 Form 8-K and press release | The Company reported double-digit growth and attributed it to continued U.S. commercial expansion, increased adoption of procedures, and introduction of new products. Inari further stated that "[c]risp execution across all five of our growth drivers generated robust revenue growth in the fourth quarter." | No AKS violation is alleged (*supra* at 8-12); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |
| 111 | 5/3/23<br><br>Q1 2023 Form 8-K and press release | Hykes stated that "*[o]ur strong financial performance in the first quarter reflected consistent execution across all of our growth drivers*." | No AKS violation is alleged (*supra* at 8-12); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |
| 112 | 5/3/23<br><br>Q1 2023 earnings call | "*Our first growth driver is the expansion of our sales organization*." | No AKS violation is alleged (*supra* at 8-12); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |

| 113 | 5/3/23 Q1 2023 earnings call | "*Compared to Q1 of 2022, our revenue growth was due to our continued efforts to open new customer accounts, expand our sales force and deepened our relationship with existing customers.*" | No AKS violation is alleged (*supra* at 8-12); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |
|---|---|---|---|
| 115 | 5/9/23 Conference | "So I think *there's a number of catalysts* that are kind of shaping up nicely across the board for the second half. *Continued productivity gains from the existing sales organization and some incremental territory adds along the way* as well, *another quarter or 2 of continued progress in our VTE Excellence program development efforts, new data that we'll be able to leverage and new readouts coming, more execution on our clinical studies.*" | No AKS violation is alleged (*supra* at 8-12); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |
| 118 | 8/2/23 Q2 2023 earnings call | "*Our first growth driver is expanding our U.S. commercial footprint.*" | No AKS violation is alleged (*supra* at 8-12); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |
| 119 | 8/2/23 Q2 2023 earnings call | "Inari's revenues for the fourth quarter of 2022 were $107.8 million, up $24.6 million or 30% from $83.2 million for the same period of the prior year and up 12% or $11.6 million sequentially over the third quarter 2022. Compared to Q4 of 2021, *our revenue growth was due to our continued efforts to open new customer accounts, expand our sales force and deepen our relationship with existing customers.*" | No AKS violation is alleged (*supra* at 8-12); accurate statements of past earnings (*infra* at 18-19); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |
| 121 | 9/11/23 Conference | "I think *it's [profitability] been driven by probably three factors*. . . . And then, we've been able to kind *of level our spending in the R&D part of the company in terms of clinical and product development, and also in the infrastructure side of the company*. So, *think about the SG&A, think about the G&A part. We feel like we've got a pretty good platform in place there to support future growth*. We are *still investing on the S side, so the sales side, but at a slower pace than we did in 2022*." | No AKS violation is alleged (*supra* at 8-12); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |

| 123 | 11/1/23<br><br>Q3 2023<br>Form 8-K<br>and press<br>release | Hykes stated that the "*core business is thriving*, and we are confident in *our ability to continue to grow sustainably* for years to come." | No AKS violation is alleged (*supra* at 8-12); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |
|---|---|---|---|
| 124 | 11/1/23<br><br>Q3 2023<br>earnings<br>call | "During Q3, *we also made progress across our five growth drivers. . . . Our broad commercial footprint and methodical approach to expansion results in focused areas of coverage, positioning us well to introduce new products to the market and to execute on our second growth driver, increasing penetration of existing accounts*." | No AKS violation is alleged (*supra* at 8-12); no nexus between statement and alleged omission of purported AKS violation (*infra* at 18-19). |

None of these statements are actionable. Plaintiffs do not allege that Inari misstated any of its revenues or that the identified growth drivers were fabricated. Such "*[a]ccurate* statements of past earnings figures are not themselves actionable under Section 10(b)." *FBR*, 544 F. Supp. 2d at 356 (citing cases) (emphasis in original). Plaintiffs' theory seems to be that it was misleading for Inari to truthfully discuss its revenue without *also* disclosing that it allegedly earned revenue through kickbacks, but a majority of courts have rejected that theory of fraud. *Id.* at 356 & n.6. Even if that could be a valid theory, however, it applies only when there is "a sufficiently close nexus between the affirmative statement[s] and the alleged omission to demonstrate that" the statements put Inari's AKS compliance "'in play.'" *In re Omega Healthcare Invs., Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 272-73 (S.D.N.Y. 2021) (citation omitted). "In other words, the subject matter of the alleged statement must relate closely enough to the allegedly omitted information such that a reasonable investor might have drawn inferences about the omitted information because of the statement." *Buhrke Family Revocable Trust v. U.S. Bancorp*, 726 F. Supp. 3d 315, 340 (S.D.N.Y. 2024).

Plaintiffs identify no such "close nexus" between Inari's revenue statements and its alleged

18

AKS violations. *Omega*, 563 F. Supp. 3d at 272-73. The statements do not discuss Inari's physician training or marketing efforts, and the statements contain no representation about Inari's compliance with the AKS. No investor reading Inari's statements would have inferred anything one way or the other about whether Inari was satisfying the AKS. Accordingly, the challenged statements did not put Inari's AKS compliance "'in play,'" *id.*, making any alleged failure to disclose AKS violations a "pure omission" to which Section 10(b) does not apply. *Diabat v. Credit Suisse Grp. AG*, 2024 WL 4252502, at *12, 15-16 (S.D.N.Y. Sept. 19, 2024); *see Citigroup*, 330 F. Supp. 2d at 378 (rejecting theory that defendant's alleged failure to disclose "that its conduct was fraudulent" rendered its accurate revenue reporting "misleading").

**<u>SG&A Statements.</u>** Plaintiffs challenge two statements about Inari's SG&A expenses:

| ¶ | Date & Source | Alleged Statement | Summary of Reasons Misstatement Not Alleged |
|---|---|---|---|
| 121 | 9/11/23 Conference | "I think **it's [profitability] been driven by probably three factors**. . . . . And then, we've been able to kind **of level our spending in the R&D part of the company in terms of clinical and product development, and also in the infrastructure side of the company**. So, **think about the SG&A, think about the G&A part. We feel like we've got a pretty good platform in place there to support future growth**. We are **still investing on the S side, so the sales side, but at a slower pace than we did in 2022**. So, that's all of those things kind of taken together are helping us on that journey." | No AKS violation is alleged (*supra* at 8-12); no nexus between statement and alleged omission of purported AKS violation (*supra* at 18-19). |
| 127 | 5/12/22 Conference | "And **the efficiency of our sales organization, if you look at the SG&A as a percentage of revenue consumed, is much lower than almost anybody who's grown as fast ever**. And that's one of the reasons we've been able to operate 5 out of 8 quarters as a public company in the black. We doubled our spend in R&D, we continue to add sales professionals at a very rapid clip. **They don't consume cash like most do because they become productive very, very** | No AKS violation is alleged (*supra* at 8-12); no nexus between statement and alleged omission of purported AKS violation (*supra* at 18-19). |

19

| | | *quickly*." | |
|---|---|---|---|

These statements are not actionable. Again, Plaintiffs do not allege that any of the disclosed SG&A data or other representations were *inaccurate*, and Plaintiffs identify no language that put Inari's AKS compliance "'in play.'" *Omega*, 563 F. Supp. 3d at 272-73. Inari did not represent, either explicitly or implicitly, that it was complying with the AKS, and no reasonable investor would "draw inferences about" AKS compliance from Inari's SG&A disclosures. *Buhrke*, 726 F. Supp. 3d at 340. Here too, then, any alleged failure to disclose AKS violations was a "pure omission" that cannot support a Section 10(b) claim.

**_Risk Disclosures._** Plaintiffs challenge the following statements Inari allegedly made about the regulations applicable to its business:

| ¶ | Date & Source | Alleged Statement | Summary of Reasons Misstatement Not Alleged |
|---|---|---|---|
| 67 | 3/9/21, 2/23/22, and 2/27/23 FY 2020, 2021, and 2022 Forms 10-K | "*If* our operations are found to be in violation of any of the federal . . . [Anti-Kickback Statute and Civil False Claims Act] or any other current or future fraud and abuse or other healthcare laws and regulations that apply to us, we *may* be subject to significant penalties, including significant criminal, civil, and administrative penalties, damages, fines, exclusion from participation in government programs, such as Medicare and Medicaid, imprisonment, contractual damages, reputation harm and disgorgement and we could be required to curtail, restructure or cease our operations. Any of the foregoing consequences will negatively affect our business, financial condition and results of operations." | No AKS violation is alleged (*supra* at 8-12); warnings of future regulatory risk are not actionable (*infra* at 22); no obligation to confess uncharged, unadjudicated wrongdoing (*infra* at 22). |
| 70 | 3/9/21, 2/23/22, and 2/27/23 FY 2020, 2021, and 2022 | "Within the United States, *our products and our customers are subject to extensive regulation by a wide range of federal and state agencies that govern business practices in the medical device industry. These laws include federal and state antikickback, fraud and abuse, false claims*, . . . . *The Anti-Kickback Statute is particularly relevant because of its broad applicability. Specifically, the Anti-Kickback Statute prohibits persons or entities from knowingly and willfully* | No AKS violation is alleged (*supra* at 8-12); warnings of future regulatory risk are not actionable (*infra* at 22); no obligation to confess uncharged, unadjudicated |

20

| | | | |
|---|---|---|---|
| | Forms 10-K | *soliciting, offering, receiving, or providing remuneration, directly or indirectly, in exchange for, or to induce, either the referral of an individual, or the furnishing, arranging for or recommending a good or service for which payment may be made in whole or part under federal healthcare programs, such as the Medicare and Medicaid programs.* Further, a person or entity does not need to have actual knowledge of the Anti-Kickback Statute or specific intent in order to violate it. The term remuneration has been interpreted broadly to include anything of value." | wrongdoing (*infra* at 22). |
| 73 | 3/9/21, 2/23/22, and 2/27/23 FY 2020, 2021, and 2022 Forms 10-K | "*We are subject to certain federal, state and foreign fraud and abuse laws and physician payment transparency laws that could subject us to substantial penalties.* Additionally, *any challenge to or investigation into our practices under these laws could cause adverse publicity and be costly to respond to, and thus could harm our business.*"<br><br>"There are numerous U.S. federal and state, as well as foreign, laws pertaining to healthcare fraud and abuse, including *anti-kickback, false claims and physician transparency payment laws. Our business practices and relationships with providers are subject to scrutiny under these laws. The healthcare laws and regulations that may affect our ability to operate include*, but are not limited to:<br><br>• "The federal Anti-Kickback Statute, which prohibits, among other things, persons and entities from knowingly and willfully soliciting, offering, receiving or providing remuneration, directly or indirectly, in cash or in kind, to induce either the referral of an individual or furnishing or arranging for a good or service, for which payment may be made, in whole or in part, under federal healthcare programs, such as Medicare and Medicaid. The U.S. government has interpreted this law broadly to apply to the marketing and sales activities of manufacturers. In addition, a person or entity does not need to have actual knowledge of the statute or specific intent to violate it to have committed a violation";<br><br>• "*. . . These laws can apply to manufacturers who provide information on coverage, coding, and reimbursement of their products to persons who bill third-party payors. . . .* Moreover, *the government may assert that a claim including* | No AKS violation is alleged (*supra* at 8-12); warnings of future regulatory risk are not actionable (*infra* at 22); no obligation to confess uncharged, unadjudicated wrongdoing (*infra* at 22). |

21

| | | *items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the federal civil False Claims Act*[.]" | |
|---|---|---|---|

Inari's risk disclosures are not actionable because they explicitly warned investors of the *precise risk* that ultimately materialized: that Inari could face "adverse publicity," "civil or criminal liability," or other regulatory consequences under the AKS. (¶¶ 67, 73.) Those risk disclosures were accurate, not false or misleading. Plaintiffs contend that the warnings were misleading because the alleged kickback scheme was already underway, but the warnings did not suggest that no risk existed and did not state that the risks had not materialized. Such "[g]eneral or boilerplate disclosures of future regulatory risk" are not actionable because they would "not cause a reasonable investor to believe that the company faced no current regulatory risks." *AppHarvest*, 684 F. Supp. 3d at 267-69 (quotations and citation omitted). Moreover, "disclosure is not a rite of confession," and Inari had no obligation to confess "uncharged, unadjudicated wrongdoing" in advance, beyond accurately identifying the risk that it could face investigation in the future. *Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (quotations and citation omitted).[5]

For the same reasons, Inari's statement that it operates in a highly regulated environment (¶ 70) is not actionable. Plaintiffs do not and could not allege that it was false for Inari to say it faced "extensive regulation" under federal healthcare laws, since Inari undeniably *did* face extensive regulation. Inari did not represent or imply that it was perfectly complying with those regulations; to the contrary, Inari's "acknowledgements of the complexity and numerosity of applicable regulations … suggests caution (rather than confidence) regarding the extent of [its]

---

[5] *See also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 364-65 (2d Cir. 2010) (defendant had no obligation to disclose that affiliate's "employees may have engaged in activities that might later be determined to run afoul of the securities laws"); *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 580 (S.D.N.Y. 2016) (defendant "had no duty to announce to investors that it was violating the law").

compliance." *Singh v. Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019). In the absence of any confident "assurances of actual compliance" paired with "detailed descriptions" of specific "compliance efforts," statements describing "the complex, evolving regulatory environment that [a company] faced" cannot be "materially misleading." *Id.* at 63-64.

**_Contract Provisions._** Finally, Plaintiffs challenge two provisions in Inari's commercial contracts, which were attached to two of Inari's Forms 8-K:

| ¶ | Date & Source | Alleged Statement | Summary of Reasons Misstatement Not Alleged |
|---|---|---|---|
| 76 | 3/15/22 Underwriting Agreement with Bank of America | "Compliance with Health Care Laws. **The Company and its subsidiaries are and have been in compliance with all Health Care Laws** (as hereinafter defined), except where instances of non-compliance would not, singly or in the aggregate, reasonably be expected to result in a Material Adverse Effect. For purposes of this Agreement, **'Health Care Laws' means all health care laws applicable to the Company, including**, but not limited to: the Federal Food, Drug, and Cosmetic Act, **the Anti-Kickback Statute (42 U.S.C. Section 1320a-7b(b))**, the Civil Monetary Penalties Law (42 U.S.C. § 1320a-7a), the Physician Payment Sunshine Act (42 U.S.C. § 1320a-7h), the **Civil False Claims Act (31 U.S.C. Section 3729 et seq.)**, . . . . **The Company and its subsidiaries have not engaged in activities which are, as applicable, cause for false claims liability, civil penalties** or mandatory or permissive exclusion from Medicare, Medicaid, or any other state health care program or federal health care program, except where such noncompliance, false claims liability or civil penalties would not reasonably be expected to, singly or in the aggregate, result in a Material Adverse Effect." | No AKS violation is alleged (*supra* at 8-12); too generic to be materially misleading (*infra* at 24-25); no allegations of Material Adverse Effect (*infra* at 24). |
| 78 | 11/2/23 LimFlow Purchase | "The **Company Entities are, and in the past three years have been, in compliance in all material respects with all Healthcare Laws** | Not a statement by Inari (*infra* at 24); no AKS violation is alleged |

23

| | Agreement | *applicable to such **Company Entity***, or by which any property, any Products or other asset of the Company Entities is bound or affected." | (*supra* at 8-12); too generic to be materially misleading (*infra* at 24-25). |
|---|---|---|---|

Plaintiffs mischaracterize these contract provisions, neither of which guaranteed that Inari was fully compliant with all applicable regulations. The first provision appeared in an underwriting agreement with two banks, which represented compliance "***except*** where instances of non-compliance would not, singly or in the aggregate, reasonably be expected to result in a Material Adverse Effect" in the context of the underlying agreement. (¶ 76 (emphasis added).) Plaintiffs do not allege that Inari touted absolute compliance without exception or that Inari's purported "instances of non-compliance" would have "result[ed] in a Material Adverse Effect," as that term was defined in the contract. (*Id.*) To the contrary, the Deutsche Bank report that Plaintiffs repeatedly cite predicted that the DOJ's CID likely would *not* have any "material impact on the business." (Ex. 7 at 3.)

The second provision challenged by Plaintiffs was not even made by or about Inari. (¶ 78.) That statement appeared in a purchase agreement related to Inari's purchase of LimFlow, S.A, which represented that "[t]he ***Company Entities*** are, and in the past three years have been, in compliance in all material respects with all Healthcare Laws applicable to such ***Company Entity***." (*Id.*) The "Company Entities" were LimFlow, S.A., LimFlow Inc., and LimFlow GmbH—*i.e.,* the companies Inari sought to purchase, ***not Inari***. (Ex. 8 at 3.) The statement made no representations about *Inari's* compliance.

Moreover, both of the challenged provisions on their face are nothing more than "simple and generic assertions" of compliance, not the sort of "detailed descriptions" required to state a cognizable claim. *Singh*, 918 F.3d at 63-64; *see City of Omaha Police & Firefighters Ret. Sys. v. Cognyte Software Ltd.*, 2024 WL 4349289, at *5 (S.D.N.Y. Sept. 30, 2024) (finding representations

24

that defendant "complies with the law" and "with all applicable governmental laws, rules, and regulations" too "generic" to be materially misleading). That is particularly true in light of the statements' "context and manner of presentation." *Singh*, 918 F.3d at 63 (quotations and citation omitted). The statements appeared in private contracts governing private commercial transactions, were not directed to investors, and were not highlighted in the SEC filings to which the contracts were attached. Plaintiffs allege no factual basis to believe that any investor would reasonably rely on those statements to conclude that Inari perfectly complied with the AKS.

### 3.      The Deutsche Bank Report Does Not Support a Finding of Falsity.

Unable to plead falsity, Plaintiffs persistently mischaracterize the August 2024 Deutsche Bank report about the DOJ's CID, published more than five months after the end of the Class Period. Plaintiffs cite the report more than 30 times, asserting it made "findings" about Inari's AKS compliance. (*E.g.*, ¶¶ 83, 85, 89, 92.) But the report made no such findings. The report simply provided a "summary" of some "critical comments" made by "one ex-sales rep." (Ex. 7 at 3.) The report did not endorse any of those statements as true, and in fact disclaimed that "former employees can have a strong negative bias toward their old company, hence, we view this experience as a single datapoint." (*Id.*) In contrast to that single employee's statements, the report explained that the "commentary provided in the majority of our conversations ranged from benign to positive." (*Id.*)

The report even acknowledged that "subpoenas relating to selling practices aren't uncommon in medtech, and if past is prologue, other predicate investigations lend comfort around the Inari investigation ultimately proving to be manageable with no material impact on the business." (*Id.*) Indeed, the report gave Inari a ***buy*** rating (*id.*), which it surely would not have done if its investigation had uncovered any actual wrongdoing. The Deutsche Bank report, therefore, does not support a conclusion that Inari violated the AKS or made any false statements.

25

**4.      Plaintiffs' Confidential Witnesses Do Not Support a Finding of Falsity.**

Plaintiffs finally try to bolster their falsity allegations through three alleged confidential witnesses ("CWs")—FE-1, FE-2, and FE-3—but their allegations fall short of the specificity required to plead falsity with particularity. Most fundamentally, Plaintiffs rely on the CWs only to establish that Inari was violating the AKS, but (as explained above) none of Inari's challenged statements would be false or misleading *even if* Plaintiffs had adequately pleaded an underlying AKS violation. That aside, Plaintiffs do not allege sufficient information about the CWs or the source of their supposed knowledge to satisfy Rule 9(b) and the PSLRA.

First, the Complaint "does not contain any independent well-pled factual allegations that corroborate the confidential sources' statements." *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 803 (S.D.N.Y. 2020) (quotations and citation omitted). Plaintiffs' factual allegations about Inari's supposed AKS violations rely entirely on the Deutsche Bank report and the CWs. As explained, the Deutsche Bank report reflects no independent evidence of wrongdoing, leaving Plaintiffs' CW allegations standing alone.

Second, FE-2's and FE-3's "positions and job responsibilities are not described at a sufficient level of particularity to indicate a high likelihood that they actually knew facts underlying their allegations." *Long Miao*, 442 F. Supp. 3d at 803. FE-2 and FE-3 are each described merely as "a former Inari employee who worked as an account manager." (¶¶ 62-63.) Plaintiffs do not allege what their job responsibilities as "account managers" were and allege no facts suggesting that they would have first-hand knowledge of any AKS violation. *See Long Miao*, 442 F. Supp. 3d at 803 (insufficient to describe CWs as a "former employee" in a "financial role," a "sales agent," and a "manager"). Indeed, FE-2's and FE-3's statements are all either conclusory assertions of wrongdoing or second-hand reports of hearsay from unidentified third parties. (¶¶ 62-63.) Such nonspecific allegations are not sufficient to plead falsity with particularity. *See Menora*

26

*Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at *12 (S.D.N.Y. Mar. 30, 2021) (rejecting CW's "hearsay that was sourced second- or even thirdhand" and "vague on the details of any specific transaction"); *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 208 (S.D.N.Y. 2020) (rejecting CW's "'second-hand information'" from meetings when CW did not "state who was at these leadership meetings, or who provided her with this information") (citation omitted).

Finally, the allegations related to all three CWs are "unmoored in time." *Long Miao*, 442 F. Supp. 3d at 803. Section 10(b) requires "*contemporaneous* falsity," meaning that the "alleged material misstatement was false *at the time it was made*." *Lululemon*, 14 F. Supp. 3d at 571 (emphasis in original). Accordingly, confidential witness allegations that do not identify the specific date of the conduct alleged cannot plead contemporaneous falsity with particularity. *Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 221-22 (S.D.N.Y. 2020). That is the case here, because Plaintiffs provide no temporal details for their CW allegations.

Although Plaintiffs provide the CWs' alleged "dates of employment," the "critical deficiency is that the CWs' *allegations* are largely undated." *Woolgar*, 477 F. Supp. 3d at 221 (emphasis in original). FE-1 allegedly worked at Inari for barely a year from May 2022 to July 2023, yet he provides no detail about ***when*** any alleged misconduct specifically occurred or whether it coincided with the dates of the challenged statements. (¶ 59.) Similarly, FE-2 and FE-3 allegedly worked at Inari from December 2020 to February 2023 (FE-2) (¶ 62), and from March 2021 to November 2023 (FE-3) (¶ 63), but they offer only generalized impressions of internal practices without connecting those alleged practices to specific time periods or specific challenged statements. For example, Plaintiffs allege that "FE-2 and FE-3 attended regular national sales meetings," but they do not identify any specific meeting or explain when that meeting occurred.

27

(¶ 64.) Without such temporal allegations, none of Plaintiffs' confidential witness allegations plead with particularity "that any of the challenged statements were false or misleading *at the time they were made.*" *Woolgar*, 477 F. Supp. 3d at 221-22 (emphasis in original); *see In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL 4931357, at *19 (S.D.N.Y. Aug. 19, 2015) (holding confidential witness allegation "that defendants attended weekly meetings" was "insufficiently specific" because "plaintiff has not provided details about the timing of the meetings in relation to defendants' statements, or how discussions at those meetings were contradictory to defendants' public statements").[6]

### B.      Plaintiffs Fail to Plead a Strong Inference of Scienter.

Even if Plaintiffs had alleged falsity with particularity, their Section 10(b) claim should still be dismissed for failure to "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). Scienter requires either an "intent to deceive, manipulate, or defraud" or "a strong showing of reckless disregard for the truth." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 108-09 (2d Cir. 2009) (quotations and citation omitted). Recklessness means "an extreme departure from the standards of ordinary care" that indicates "conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." *Id.* at 109 (quotations and citation omitted). Under this standard, it is insufficient to allege facts from which "'a reasonable person *could* infer that the defendant acted with the required intent.'" *Id.* at 110 (quoting *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)). The inference must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

---

[6] At a minimum, the CWs cannot support falsity for periods during which they did not work at Inari. *Lewis v. YRC Worldwide Inc.*, 2020 WL 1493915, at *7 (N.D.N.Y. Mar. 27, 2020).

Plaintiffs' scienter allegations fail to satisfy the PLSRA and *Tellabs* standard because (1) the nonfraudulent inference is more compelling; (2) the stock sales do not give rise to a strong inference of scienter; (3) the CWs do not give rise to a strong inference of scienter; and (4) the core operations allegations do not give rise to a strong inference of scienter.

### 1.    The Nonfraudulent Inference Is More Compelling.

Plaintiffs' scienter allegations do not render an inference of scienter at least as compelling as the obvious nonfraudulent inference: Like many med-tech companies introducing a new way to treat a health issue, Inari had the permissible intent to host training and marketing sessions to educate healthcare professionals about its innovative devices. As Plaintiffs allege, because Inari's devices represented a departure from "long accepted and conservative treatment[s]," Inari's "success depended largely on its ability to convince physicians and other [healthcare professionals] who refer [venous thromboembolism] patients to forego more traditional anticoagulant drugs in favor of Inari's products." (¶¶ 26, 28.) Inari thus "dedicated significant resources to building a robust salesforce and developing training and education programs for" physicians and other healthcare providers. (¶ 32.) Inari adopted numerous practices to ensure that its training and marketing complied with legal and ethical requirements, and the sources Plaintiffs cite provide that companies may pay for healthcare professionals' travel, lodgings, meals, drinks, and other expenses in connection with education programs. (¶¶ 50-53; Ex. 6 at 10, 24-25.) Inari also reported its expenses to a publicly accessible federal reporting system, CMS Open Payments (¶¶ 48-49), which supports the inference that it did not view those expenses as improper.

From those allegations, the most plausible inference is that Inari intended to design and execute a permissible program for training and educating physicians, and that any excessive or improper expenses (none of which Plaintiffs plead with particularity) arose from individual carelessness rather than intentional or consciously reckless misconduct. None of Plaintiffs' scienter

29

allegations are as compelling as this nonfraudulent explanation of Inari's intent.

### 2.    The Individual Defendants' Stock Sales and Compensation Do Not Support Scienter.

Plaintiffs' primary theory of scienter is that the Individual Defendants sold stock during the class period (¶¶ 153-63), but "the mere fact that insider stock sales occurred does not suffice to establish scienter." *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 523 (S.D.N.Y. 2020) (quotations and citation omitted). Rather, "plaintiffs must establish that the sales at issue were 'unusual' or suspicious," which depends on, among other things, the timing and circumstances of the sales. *Id.* Plaintiffs fail to make that showing for at least four reasons.

***First***, Plaintiffs admit that the Individual Defendants made all of their stock sales pursuant to 10b5-1 trading plans. (¶¶ 154 n.6, 156 n.7, 158 n.8.) Such trades "pursuant to 10b5-1 plans do not raise a strong inference of scienter." *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *21 (S.D.N.Y. Sept. 21, 2021); *accord Ark. Pub. Emps. Ret. Sys*, 28 F.4th at 355-56; *Woolgar*, 477 F. Supp. 3d at 236. The fact that the Individual Defendants made their sales under 10b5-1 trading plans thus precludes any inference of scienter.

Plaintiffs try to avoid this conclusion by alleging that the Individual Defendants renewed their 10b5-1 plans on a yearly basis, including during the Class Period. (¶ 163.) But the Complaint has no allegations suggesting that the Individual Defendants renewed their 10b5-1 plans strategically or for any suspicious purpose. The Individual Defendants renewed their plans yearly before and/or after the Class Period (Ex. 9 at 1, 4-5; Ex. 10 at 3; Ex. 11 at 3, 14), and Plaintiffs allege no factual basis to believe those renewals were triggered by knowledge of fraud. Without such allegations, the renewals do not support scienter. *See Lululemon*, 14 F. Supp. 3d at 585 (no scienter where plaintiffs failed to plead facts suggesting defendants entered into 10b5-1 plan "strategically"); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 764 (S.D.N.Y.

30

2018) (no scienter where plaintiff "fail[ed] to raise any inference that the [10b5-1] plans were themselves suspect").

*Second*, Plaintiffs rely on the alleged magnitude of the Individual Defendants' stock sales (¶ 161), but "even a significant stock sale by a corporate insider is generally insufficient, without more, to support an inference of fraudulent intent." *Woolgar.*, 477 F. Supp. 3d at 234.[7] Plaintiffs allege no factors other than the amount of sales to suggest those sales were suspicious, and the circumstances of those sales strongly undermine any hint of suspicion. To begin, "[a]n inference of scienter from insider trading is lessened when … the class period is well over a year." *In re Hertz Global Holdings Inc.*, 905 F.3d 106, 120 (3d Cir. 2018) (29-month period).[8] Here, Plaintiffs allege a Class Period spanning over 35 months beginning shortly after Inari's IPO. It is not unusual or suspicious that Inari's top executives sold numerous shares across a three-year period.

*Third*, a defendant's sales within the class period must be "compared to [the] defendant's previous or subsequent sales," *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 444 (S.D.N.Y. 2005), and Plaintiffs do not make that required comparison. Indeed, even within the Class Period, the Individual Defendants' alleged sales were largely consistent, with no change in trading volume for any of the Individual Defendants in the five months preceding the disclosure of the CID. (¶¶ 154, 156, 158.) This context negates any inference of scienter. *See Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 773 (S.D.N.Y. 2019) (no scienter when "sales [we]re part of a consistent pattern of sales"); *Micholle v. Ophthotech Corp.*, 2019 WL 4464802, at *15-16 (S.D.N.Y. Sept. 17, 2019) (no scienter where defendants "sold their [] shares at regular monthly intervals," and their "trades

---

[7] *E.g.*, *In re Plug Power, Inc. Sec. Litig.*, 2022 WL 4631892, at *13 (S.D.N.Y. Sept. 29, 2022) (sales of 43% and 48% of shares insufficient for scienter); *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *15 (S.D.N.Y. July 23, 2018) (40% of shares); *In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *22-23 (S.D.N.Y. May 10, 2012) (100%, 36%, and 26% of shares).
[8] *Accord Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 891 (4th Cir. 2014) (44-month period); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 383 (E.D.N.Y. 2003) (63-week period).

were not 'dramatically out of line with [their] prior trading practices'") (citation omitted); *BISYS*, 397 F. Supp. 2d at 444-45 (no scienter where defendants' sales were "distributed fairly evenly").[9]

*Fourth*, Plaintiffs' allegations about the Individual Defendants' supposed financial motivations also do not support a strong inference of scienter. Plaintiffs allege that the Individual Defendants were "financially motivated" to "increase revenue" by their executive compensation plans (¶¶ 167-170), but Plaintiffs cannot plead scienter by identifying "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation," *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (citation omitted); *accord Saskatchewan Healthcare Emps.' Pension Plan v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 390 (S.D.N.Y. 2024) (Woods, J.). Plaintiffs' "generalized" compensation allegations do not allege any "concrete and personal benefit to the [I]ndividual [D]efendants resulting from the fraud," but contend only that the Individual Defendants "were motivated by a desire to maintain or increase executive compensation." *Kalnit v. Eichler*, 264 F.3d 131, 139-40 (2d Cir. 2001). That is insufficient. *Id.*

### 3.    Plaintiffs' Confidential Witness Allegations Do Not Support Scienter.

Plaintiffs also attempt to plead scienter through allegations about FE-1, FE-2, and FE-3, but none of those allegations supports a strong inference that any Defendant made any false statement intentionally or with conscious recklessness.

In addition to the other deficiencies discussed above with respect to falsity (*supra* at 11-12, 22-23, 25-28), FE-2 and FE-3 cannot support a strong inference of scienter because Plaintiffs do

---

[9] Allegations that the Individual Defendants exercised stock options "many years ahead of when those options were set to expire" (¶ 162) similarly do not support scienter. *Plug Power*, 2022 WL 4631892, at *15; *Plymouth Cnty. Ret. Assoc. v. ViewRay, Inc.*, 556 F. Supp. 3d 772, 799-800 (N.D. Ohio 2021); *Knurr v. Orbital ATK Inc.*, 272 F. Supp. 3d 784, 808-09 (E.D. Va. 2017).

not allege FE-2 or FE-3 ever "communicated with the individual defendants." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590, 594 (S.D.N.Y. 2011). [10] Although Plaintiffs allege that FE-1 communicated with Hykes, their allegations are inadequate to support a strong inference of scienter. Plaintiffs allege only that FE-1 told Hykes he was "uncomfortable" with Inari's conduct and opined that it "violated ethical and legal standards." (¶¶ 60, 142.) But FE-1 was not a lawyer qualified to opine on the lawfulness of Inari's conduct, and his mere opinion that Inari's conduct was improper is not sufficient to support a strong inference that the Individual Defendants *shared* that opinion. *Hart*, 96 F.4th at 157.[11] Plaintiffs do not allege that Hykes or any other Individual Defendant *agreed* with FE-1, which makes his opinion irrelevant to scienter.

Nor do Plaintiffs allege sufficient details about the information FE-1 reported to compel the inference that FE-1's negative opinion was the only reasonable conclusion that could be drawn from the available information. *See In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 590 (S.D.N.Y. 2010) (no scienter where plaintiff "failed to plead with particularity what reports or information concerning the [alleged fraud] were available to [individual defendants] so that the danger of misleading investors was either known . . . or so obvious that they must have been aware of it" (quotations and citation omitted)). Because Plaintiffs do not "specifically identify the reports or statements containing any contradictory information," FE-1's statements cannot support a strong inference of scienter. *Saskatchewan*, 718 F. Supp. 3d at 389.

---

[10] *See Local No. 38 IBEW Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010) (no scienter from CWs who "had no contact with the Individual Defendants") (citation omitted); *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 335 (S.D.N.Y. 2009) (same); *In re Am. Express Co. Sec. Litig.*, 2008 WL 4501928, at *8 (S.D.N.Y. Sept. 26, 2008) (same).

[11] *See Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1194 (9th Cir. 2021) (no scienter based on employees' complaints to executive because plaintiffs "failed to plead any facts showing that [executive] ever accepted those employees' views"); *In re Weight Watchers Int'l, Inc. Sec. Litig.*, 2016 WL 2757760, at *6 (S.D.N.Y. May 11, 2016) (CW's "personal view … simply is not enough to support a claim"); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 295, 298-99 (S.D.N.Y. 2014) (CWs' "litany of criticisms of accounting practices" did not support scienter); *Local No. 38*, 724 F. Supp. 2d at 460 (CWs' "anecdotes and conclusory statements of belief cannot form the basis for a finding of reckless disregard").

FE-1's allegations that Hykes and other unnamed "Inari executives" participated in "physician events" (¶ 60) also fail to support scienter. Plaintiffs allege no details that could establish with particularity that any of those events involved unlawful kickbacks or otherwise put Hykes or any other Inari executive on notice that Inari was violating the AKS. At most, FE-1's statements are the sort of mere "anecdotes and conclusory statements of belief" that cannot support a strong inference of scienter. *Local No. 38*, 724 F. Supp. 2d at 460.

### 4.    Plaintiffs' "Core Operations" Allegations Do Not Support Scienter.

Finally, Plaintiffs cannot plead a strong inference of scienter through a "core operations theory." (¶¶ 143-48, 164-66.) Courts in this Circuit have expressed doubts about the viability of the core operations theory under the PSLRA. *In re SolarEdge Techs., Inc. Sec. Litig.*, 2024 WL 4979296, at *15 (S.D.N.Y. Dec. 4, 2024) (Woods, J.). But even if the core operations theory remains viable, it is not "independently sufficient to raise a strong inference of scienter." *Id.* (quotations and citation omitted). It "at most constitutes supplemental support for alleging scienter" when *other* allegations "independently establish scienter." *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015) (quotations and citation omitted). "Because Plaintiffs' other allegations fall far short of supporting a compelling inference of scienter, Plaintiffs' core-operations allegations do not fill the gap." *SolarEdge*, 2024 WL 4979296, at *15 (cleaned up).

That aside, Plaintiffs do not adequately allege that the alleged kickback scheme "constituted a company-wide practice rising to the level of a core operation." *In re Renewable Energy Grp. Sec. Litig.*, 2022 WL 14206678, at *3 (2d Cir. Oct. 25, 2022). It is not enough for Plaintiffs to assert that the Individual Defendants' "high-level positions" gave them knowledge of "the Company's operations" or the "well-known regulatory framework" governing Inari. (¶¶ 143-44, 164-66.) Such allegations that "merely rely on the [Individual] Defendants' 'high-level positions' and involvement 'in the day-to-day operations'" are "insufficient." *Saskatchewan*, 718 F. Supp. 3d at 388-89; *accord*

34

*City of Brockton Ret. Sys. v. Avon Prods., Inc.*, 2014 WL 4832321, at \*19-20 (S.D.N.Y. Sept. 29, 2014). High-level knowledge of a company's operations does not equate to specific knowledge that those operations *were illegal*. *See Sinay v. CNOOC Ltd.*, 554 F. App'x 40, 42-43 (2d Cir. 2014) (no scienter when allegations did not "provide a factual basis for inferring that the problems … were apparent to [defendants]"). Nothing in Plaintiffs' "core operations" allegations establishes that the Individual Defendants knew or believed that Inari's practices constituted illegal kickbacks.

### C.   Plaintiffs Fail to Plead a Scheme Under Rule 10b-5.

Plaintiffs assert a claim for "scheme" liability under Rule 10b-5(a) and (c), but they do not allege any conduct to support that claim other than the alleged conduct underlying their misstatement claim. (¶¶ 190-96.) Accordingly, any claim for scheme liability must be dismissed for the same reasons as Plaintiffs' misstatement claim. *Buhrke*, 726 F. Supp. 3d at 362-63; *see supra* at 8-28.

### D.   Plaintiffs Fail to Plead a Claim under Sections 20(a) or 20A.

Plaintiffs' Section 20(a) and 20A claims fall along with their Section 10(b) claim. Both Section 20(a) and Section 20A require an underlying predicate violation of the Exchange Act. 15 U.S.C. §§ 78t, 78t-1(a). Because Plaintiffs fail to plead a predicate Section 10(b) violation, their Section 20(a) and 20A claims must be dismissed as well. *Saskatchewan*, 718 F. Supp. 3d at 391; *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F.3d 697, 703 (2d Cir. 1994).

### CONCLUSION

The Court should dismiss Plaintiffs' Complaint in full.

35

Dated: September 4, 2025

Respectfully submitted,

Lisa Bugni (admitted *pro hac vice*)
KING & SPALDING LLP
50 California Street, Suite 3300
San Francisco, California 94111
Tel: (415) 318-1200
LBugni@kslaw.com

*Of counsel*:

Matthew V.H. Noller
Emily Yonan

*/s/ Craig Carpenito*
Craig Carpenito
Christopher E. Duffy
Alvina Pillai
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Tel: (212) 556-2100
CCarpenito@kslaw.com
CDuffy@kslaw.com
APillai@kslaw.com

36

## Certificate of Word Count

I, Craig Carpenito, hereby certify that the forgoing memorandum of law is 35 pages in length, using the font and spacing requirements set forth in Rule 7.1(b) of the Local Rules of the United States District Court for the Southern District of New York, as stated on the record during the telephone conference held on August 13, 2025.  Additionally, the memorandum of law contains 12,515 words, exclusive of the caption, table of contents, table of authorities, signature blocks, and the certificate.

Dated: September 4, 2025                                                          */s/ Craig Carpenito*
                                                                                                  Craig Carpenito