# EXHIBIT 1

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

## FORM 10-K

**(Mark One)**

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2022

OR

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE TRANSITION PERIOD FROM_____
TO_____**

**Commission File Number 001-39293**

# Inari Medical, Inc.

**(Exact name of Registrant as specified in its Charter)**

| | |
|---|---|
| **Delaware** | **45-2902923** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **6001 Oak Canyon, Suite 100** **Irvine, California** | **92618** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code: (877) 923-4747**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, $0.001 par value per share | NARI | The Nasdaq Global Select Market |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. YES ☒ NO ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.  YES ☐ NO ☒

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  YES ☒ NO ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files).  YES ☒ NO ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.  ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report.  ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements.  ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b).  ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes ☐ No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the Registrant, based on the closing price of the shares of common stock on The NASDAQ Stock Market on June 30, 2022, the last business day of the Registrant's most recently completed second fiscal quarter was approximately $3.28 billion.

The number of shares of Registrant's Common Stock outstanding as of February 24, 2023 was 54,313,676.

DOCUMENTS INCORPORATED BY REFERENCE

The Registrant intends to file a definitive proxy statement pursuant to Regulation 14A within 120 days of the end of the fiscal year ended December 31, 2022. Portions of such definitive proxy statement are incorporated by reference into Part III of this Annual Report on Form 10-K.

**Table of Contents**

|  |  | **Page** |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 24 |
| Item 1B. | Unresolved Staff Comments | 64 |
| Item 2. | Properties | 64 |
| Item 3. | Legal Proceedings | 65 |
| Item 4. | Mine Safety Disclosures | 65 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 66 |
| Item 6. | [Reserved] | 67 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 68 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 80 |
| Item 8. | Financial Statements and Supplementary Data | 80 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 80 |
| Item 9A. | Controls and Procedures | 80 |
| Item 9B. | Other Information | 83 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 83 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 84 |
| Item 11. | Executive Compensation | 84 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 84 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 84 |
| Item 14. | Principal Accountant Fees and Services | 84 |
| **PART IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 85 |
| Item 16 | Form 10-K Summary | 89 |

**Forward-Looking Statements**

This Annual Report on Form 10-K contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 that are subject to substantial risks and uncertainties. We intend such forward-looking statements to be covered by the safe harbor provisions for forward-looking statements contained in Section 27A of the Securities Act of 1933, as amended, or the Securities Act, and Section 21E of the Securities Exchange Act of 1934, as amended, or the Exchange Act. All statements other than statements of historical facts contained in this Annual Report on Form 10-K may be forward-looking statements. In some cases, you can identify forward-looking statements by terms such as "may," "will," "should," "expects," "plans," "anticipates," "could," "intends," "targets," "projects," "contemplates," "believes," "estimates," "forecasts," "predicts," "potential" or "continue" or the negative of these terms or other similar expressions. Forward-looking statements contained in this Annual Report on Form 10-K include, but are not limited to statements regarding our future results of operations and financial position, industry and business trends, stock compensation, business strategy, plans, market growth, regulatory climate, competitive landscape and our objectives for future operations.

The forward-looking statements in this Annual Report on Form 10-K are only predictions. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our business, financial condition and results of operations. Forward-looking statements involve known and unknown risks, uncertainties and other important factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements, including, but not limited to, the important factors discussed in Part I, Item 1A. "Risk Factors" in this Annual Report on Form 10-K for the year ended December 31, 2022. The forward-looking statements in this Annual Report on Form 10-K are based upon information available to us as of the date of this Annual Report on Form 10-K, and while we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all potentially available relevant information. These statements are inherently uncertain and investors are cautioned not to unduly rely upon these statements.

You should read this Annual Report on Form 10-K and the documents that we reference in this Annual Report on Form 10-K and have filed as exhibits to this Annual Report on Form 10-K with the understanding that our actual future results, levels of activity, performance and achievements may be materially different from what we expect. We qualify all of our forward-looking statements by these cautionary statements. These forward-looking statements speak only as of the date of this Annual Report on Form 10-K. Except as required by applicable law, we do not plan to publicly update or revise any forward-looking statements contained in this Annual Report on Form 10-K, whether as a result of any new information, future events or otherwise.

**Summary Risk Factors**

Our business is subject to numerous risks and uncertainties, including those described in Part I, Item 1A. "Risk Factors" in this Annual Report on Form 10-K. You should carefully consider these risks and uncertainties when investing in our common stock. The principal risks and uncertainties affecting our business include, but are not limited to, the following:

• We may incur operating losses in the future and we may not be able to sustain profitability;

• Our business is dependent upon the broad adoption of our solutions and catheter-based thrombectomy procedures by hospitals, physicians and patients;

• The market for our solutions is highly competitive, and our competitors may have longer operating histories, more established products and greater resources than we do;

• We face a number of manufacturing risks that may adversely affect our manufacturing abilities;

• We depend on a limited number of single source suppliers, which makes us vulnerable to supply shortages and price fluctuations;

• The use, misuse or off-label use of our solutions may result in enforcement action by the FDA or injuries that lead to product liability suits or regulatory action, either of which could be expensive, divert management's attention and harm our reputation and business;

• We may not be able to maintain adequate levels of third-party coverage and reimbursement or third parties may rescind or modify their coverage or delay payments related to our solutions;

• If the quality of our solutions does not meet the expectations of physicians or patients, then our brand and reputation or our business could be adversely affected;

• Our long-term growth depends on our ability to enhance our solutions, expand our indications and develop and commercialize additional new solutions in a timely manner and if we fail to do so we may be unable to grow our business;

• We may be unable to manage the anticipated growth of our business;

• We operate our business, including manufacturing our solutions, out of a single site in Irvine, California, and we may experience delays in production or an increase in costs if this facility is damaged or becomes inoperable;

• Our solutions and operations are subject to extensive government regulation and oversight in the United States and in foreign countries;

• We may not receive, or may be delayed in receiving, the necessary clearances, certifications or approvals for our future solutions or modifications to our current solutions, and failure to timely obtain necessary clearances, certifications or approvals for our future solutions or modifications to our current solutions would adversely affect our ability to grow our business; and

• Our success will depend on our, and any of our current and future licensors', ability to obtain, maintain and protect our intellectual property rights.

3

**PART I**

**Item 1. Business.**

**Overview**

Patients first. No small plans. Take care of each other. These are the guiding principles that form the ethos of Inari Medical. We are committed to improving lives in extraordinary ways by creating innovative solutions for both unmet and underserved health needs. In addition to our purpose-built solutions, we leverage our capabilities in education, clinical research, and program development to improve patient outcomes. We are passionate about our mission to establish our treatments as the standard of care for venous thromboembolism and beyond. We are just getting started.

We purpose build minimally invasive, novel, catheter-based mechanical thrombectomy systems for the unique characteristics of specific disease states. The key elements of our growth strategy are:

- Continuing to expand our sales force;

- Driving deeper penetration of our solutions with our hospital customers;

- Building clinical evidence to support changes to current standard of care;

- Innovating new solutions to address unmet needs; and

- Expanding into new markets.

We have experienced significant growth since we began commercializing our products in the United States. We generated revenue of $383.5 million, with a gross margin of 88.4% and net loss of $29.3 million for the year ended December 31, 2022, compared to revenue of $277.0 million, with a gross margin of 91.1% and net income of $9.8 million for the year ended December 31, 2021.

**Our Opportunities**

***Venous Thromboembolism – Pulmonary Embolism and Deep Vein Thrombosis***

Venous thromboembolism, or VTE, is a disease caused by blood clot formation in the veins of the body and is a leading cause of death and disability worldwide. VTE includes both deep vein thrombosis, or DVT, and pulmonary embolism, or PE. Our first two solutions, ClotTriever and FlowTriever, were developed to treat the debilitating effects of VTE and this remains a core focus of our business.

The current standard of care for treating VTE is conservative medical management with anticoagulants, which are drugs designed to prevent further blood clotting but that do not break down or eliminate existing clots. Anticoagulants are intended to stop further clot formation while the body attempts to break down and remove clots using natural mechanisms. Nearly all patients receive this treatment, many of whom remain on anticoagulants for the remainder of their lives. In addition to anticoagulants, some patients also receive thrombolytic drug therapy. Thrombolytic drugs accelerate the body's natural mechanisms for breaking down clot but have limited effectiveness due to the chronic nature of most venous clots. These drugs also are associated with a risk of spontaneous major bleeding, including catastrophic bleeding in the brain. In addition, these drugs are expensive and require monitoring in a critical care setting, such as the intensive care unit, or ICU.

Patients with DVT can experience swelling, cramping and unexplained pain in the foot, ankle or leg, warm skin and discoloration of the skin. Symptoms can persist and worsen over time if left untreated and can ultimately progress into chronic venous disease. If DVT is treated with conservative therapies only, patients can develop painful, debilitating ulcers, and up to 50% of patients will develop post-thrombotic syndrome, or PTS, a severe, lifestyle-limiting disease that is characterized by chronic pain, swelling and skin ulcers.

4

PE represents the third leading cause of cardiovascular death in the United States after myocardial infarction and stroke. Patients with PE can experience trouble breathing, chest pain, coughing blood, rapid heartbeat, passing out and, ultimately, death. Up to 50% of patients who survive have long-term residual pulmonary vascular obstruction due to the body's inability to break down and eliminate the clot. These patients may experience significant impaired function of the heart and lungs, shortness of breath, reduced exercise capacity and lifestyle limitations, and have a statistically higher rate of recurrent PE, pulmonary hypertension, heart failure and death. PE is a leading cause of preventable deaths in hospitals. For example, high-risk PE has a mortality rate of up to 50%, with approximately 5% of all PE patients considered high risk. Intermediate risk PE has a 12% to 15% mortality rate and represents approximately 45% of all PE patients.

We believe the best way to treat VTE and improve the quality of life for patients suffering from this disease is to safely and effectively remove the blood clot. Through our clinical evidence, we have proven that removing all or almost all of the clot matters. We purpose built our clot-removing ClotTriever and FlowTriever systems to effectively treat DVT and PE.

We estimate that approximately 1.6 million people present with VTE in the United States each year, with approximately 1.0 million patients diagnosed with DVT and approximately 560,000 patients diagnosed with PE each year. Based on our recent reassessment of the total addressable market for VTE in the United States, of these estimated annual DVT and PE diagnoses, we believe approximately 410,000 DVT patients and approximately 280,000 PE patients could benefit from safe and effective treatment with our ClotTriever and FlowTriever systems each year, respectively. In addition, we believe there are approximately 20,000 patients with clot in transit in the right atrium who could benefit from treatment with our FlowTriever system. Taken together, these patients represent a potential annual addressable U.S. market opportunity for these solutions of approximately $5.8 billion. We also believe there is a substantial market opportunity internationally.

*Chronic Venous Disease*

Chronic venous disease, or CVD, often progresses from DVT and includes scarred vein walls and wall-adherent obstructions. If these obstructions are left unaddressed, patients can develop painful, debilitating ulcers and ultimately progress to PTS. Up to 50% of patients suffering from DVT that are treated with conservative therapies will develop CVD, which is often caused by chronic scarring and occlusion of vessels. Because of the severity and lifestyle-limiting nature of CVD symptoms, approximately 90% of patients with PTS are unable to work 10 years after diagnosis.

The current standard of care for treating CVD is conservative medical management with anticoagulants, compression therapy and superficial treatment of wounds and leg ulcers. Nearly all patients receive this treatment, many of whom remain on anticoagulants for the remainder of their lives. The poor outcomes for many patients with DVT described above occur despite being treated with conservative medical management.

We believe the best way to treat CVD and improve the quality of life for patients suffering from this disease is to safely and effectively restore the flow through opening the obstructed vein, including the removal of any chronic clot that may remain. In addition to treating CVD with our existing ClotTriever and FlowTriever systems, we purpose built our ClotTriever BOLD catheter to address a range of clot chronicity, including chronic clot. We plan to continue our efforts in treating the debilitating effects of CVD and related diseases through additional solutions to our ClotTriever toolkit in the near and medium term.

We estimate that approximately 100,000 people in the United States each year present with a new case of obstructive CVD, with an estimated prevalence of approximately 1.0 million patients. These patients represent a potential annual addressable U.S. market opportunity of approximately $1.0 billion, with a prevalence of approximately $10.0 billion. We also believe there is a substantial market opportunity internationally.

*Small Vessel Thrombosis*

5

Table of Contents

Small vessel thrombosis refers to clots that occur in the smaller vessels, including the upper extremities, below the knee, and arteriovenous (AV) thrombosis primarily in dialysis fistulas or grafts. Thrombosis that occurs at the AV access point in an AV fistula or graft can result in loss of access to life-saving dialysis.

Current treatments for small vessel thrombosis generally are limited due to conservative medical management similar to VTE. In addition, with respect to dialysis patients, current treatments are limited due to a number of factors, including that most methods for removing clot from the AV send clot to the lungs, exacerbating pulmonary hypertension in an already sick patient. In addition, thrombosis in the AV has a high recurrence rate and current treatments are not as effective for chronic or larger clot burdens.

We believe the best way to treat small vessel thrombosis and improve the quality of life for patients suffering from the underlying diseases is to safely and effectively remove as much clot as possible. We purpose built our InThrill system to effectively treat small vessel thrombosis generally, and AV thrombosis specifically. We plan to continue our efforts in treating the debilitating effects of clot in the small vessels through additional solutions or enhancements.

We estimate that approximately 200,000 patients in the United States each year present with AV thrombosis and another approximately 80,000 patients present with thrombosis below the knee or in the upper extremities. These patients represent a potential annual addressable U.S. market opportunity of approximately $1.0 billion. We also believe there is a substantial market opportunity internationally.

*Arterial Thromboembolism*

Acute limb ischemia (ALI), acute visceral ischemia, and certain cases of chronic limb ischemia are all acute embolization events that can cause extensive damage if not treated quickly. Due to the emergent nature of these diseases and because there are no purpose-built solutions, over 50% of patients often require open surgical procedures which can result in distal embolization and vessel trauma. If a patient is not a candidate for open embolectomy, they are often treated with thrombolytic drugs or other conservative forms of medical treatment.

We believe the best way to treat ALI and related diseases is to quickly, safely and effectively remove the clot. We are purposefully designing our Artix system to effectively remove thrombosis to alleviate the symptoms of these underlying and emergent diseases, and we plan to continue developing solutions for these disease states.

We estimate that approximately 80,000 patients in the United States each year present with ALI or other arterial thromboembolism in the peripheral vasculature. These patients represent a potential annual addressable U.S. market opportunity of approximately $600.0 million. We also believe there is a substantial market opportunity internationally.

**Our Solutions**

We believe our products are transformational because they provide the following key benefits:

- Simple, intuitive and easy to use solutions to physicians;

- Enable short, single-session treatment with improved hospital and physician efficiency;

- Offer positive clinical outcomes for patients and economic value to hospitals;

- Capture and remove clot burden from vessels with tools designed to fit the vessel size, including large bore catheters for the venous system;

- Liberate clot mechanically where aspiration technology may not be as effective;

- Eliminate the need for thrombolytic drugs; and

Table of Contents

- • Remove clot safely with minimal blood loss and return blood to patients when treating PE using our proprietary FlowSaver blood return system.

We believe the historical bias for conservative medical management is largely due to the ineffectiveness of, and risks associated with, current alternative treatments, and the lack of purpose-built solutions. The standard of care for treatment of other thrombotic diseases, such as myocardial infarction and stroke, has evolved from the use of anticoagulants alone to anticoagulants together with thrombolytic drugs and eventually to anticoagulants together with definitive catheter-based interventions. We believe our solutions could be the catalyst to drive the same evolution of treatment for our target opportunities, establishing our solutions as the standard of care.

All of our systems are designed as single-use, sterile systems, to be deployed over a wire. They do not require capital equipment. Procedures are typically performed in a catheterization laboratory, or cath lab, interventional suite or operating room. Each component of a system is packaged separately, and we generally price our systems on a per procedure basis instead of charging for each component used in a procedure. Our sales representatives generally target interventional radiologists, interventional cardiologists, and vascular surgeons in selling each of our systems.

***ClotTriever and Other Systems***

*ClotTriever System*

The ClotTriever system is a comprehensive solution for DVT and peripheral thrombus. The ClotTriever system was designed to core, capture, and remove large clots from large vessels. The ClotTriever is 510(k) cleared for the non-surgical removal of thrombi and emboli from blood vessels, and for the injection, infusion, and/or aspiration of contrast media and other fluids into or from a blood vessel, is intended for use in the peripheral vasculature including in patients with DVT, and is CE marked for the treatment of DVT. We began commercializing our ClotTriever system in 2017 and continue to expand the system through indication expansions, component enhancements and new solutions.

Each component is packaged separately and may be sold individually or as part of a system. The ClotTriever system consists of the following primary components:



**ClotTriever** Sheath          **ClotTriever Bold** Catheter          **ClotTriever** Catheter          **ProTrieve** Sheath

*Chronic Venous Disease Toolkit*

We are currently designing a toolkit for treating CVD. The first device in the toolkit is the ClotTriever BOLD which also forms part of our DVT toolkit. The ClotTriever BOLD is similar to the original ClotTriever catheter and is designed to core, capture and remove large clots from large vessels and address a range of clot chronicity, including chronic clot. The ClotTriever BOLD is 510(k) cleared for the non-surgical removal of thrombi and emboli from blood vessels, and for the injection, infusion, and/or aspiration of contrast media and other fluids into or from a blood vessel, is intended for use in the peripheral vasculature, including in patients with DVT, and is CE marked for the treatment of DVT. We began commercializing the ClotTriever BOLD in early 2022, and we are continuing to expand our CVD toolkit to include a recanalization device, crossing device and stent cleaner device among other enhancements

Table of Contents

and expansions. We expect the CVD toolkit devices to be packaged separately and sold individually or as a part of the ClotTriever system.



**ClotTriever Bold** Catheter

*InThrill System*

The InThrill system was purpose-built to treat small vessel thrombosis. The InThrill system is 510(k) cleared for the non-surgical removal of emboli and thrombi from blood vessels, and the injection, infusion, and/or aspiration of contrast media and other fluids into or from a blood vessel, and is intended for use in the peripheral vasculature but not intended for use in DVT treatment. We began commercializing the InThrill system in the fourth quarter of 2022. Each component is packaged separately and sold individually.



**InThrill** Catheter and Sheath

**FlowTriever System**

The FlowTriever is a large bore catheter-based aspiration and mechanical thrombectomy system designed to remove large clots from large vessels in the peripheral vasculature and specifically to treat PE, although it is also used by physicians to treat other complex venous thromboembolism cases. The FlowTriever is 510(k)-cleared by the FDA for the non-surgical removal of emboli and thrombi from blood vessels, and injection, infusion, and/or aspiration of contrast media and other fluids into or from a blood vessel, is intended for use in the peripheral vasculature and for the treatment of PE, and is CE marked for the treatment of PE. Triever catheters, a component of the FlowTriever system, are also intended for use in the treatment of clot in transit from the right atrium. We began commercializing our FlowTriever system in 2017 and continue to expand the system through indication expansions, component enhancements and new solutions.

The FlowTriever system consists of the following components, which are included in the price of the system:

**Table of Contents**

- establishment registration and device listing with the FDA;

- QSR requirements, which require manufacturers, including third-party manufacturers, to follow stringent design, testing, control, documentation and other quality assurance procedures during all aspects of the design and manufacturing process;

- labeling regulations and FDA prohibitions against the promotion of investigational products, or the promotion of "off-label" uses of cleared or approved products;

- requirements related to promotional activities;

- clearance or approval of product modifications to 510(k)-cleared devices or devices authorized through the *de novo* process that could significantly affect safety or effectiveness or that would constitute a major change in intended use of one of our cleared devices, or approval of certain modifications to PMA-approved devices;

- medical device reporting regulations, which require that a manufacturer report to the FDA if a device it markets may have caused or contributed to a death or serious injury, or has malfunctioned and the device or a similar device that it markets would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur;

- correction, removal and recall reporting regulations, which require that manufacturers report to the FDA field corrections and product recalls or removals if undertaken to reduce a risk to health posed by the device or to remedy a violation of the FDCA that may present a risk to health;

- the FDA's recall authority, whereby the agency can order device manufacturers to recall from the market a product that is in violation of governing laws and regulations; and

- post-market surveillance activities and regulations, which apply when deemed by the FDA to be necessary to protect the public health or to provide additional safety and effectiveness data for the device.

Manufacturing processes for medical devices are required to comply with the applicable portions of the QSR, which cover the methods and the facilities and controls for the design, manufacture, testing, production, processes, controls, quality assurance, labeling, packaging, distribution, installation and servicing of finished devices intended for human use. The QSR also requires, among other things, maintenance of a device master file, device history file, and complaint files. Manufacturers are subject to periodic scheduled or unscheduled inspections by the FDA. Failure to maintain compliance with the QSR requirements could result in the shut- down of, or restrictions on, manufacturing operations and the recall or seizure of marketed products. The discovery of previously unknown problems with products, including unanticipated adverse events or adverse events of increasing severity or frequency, whether resulting from the use of the device within the scope of its clearance or off-label by a physician in the practice of medicine, could result in restrictions on the device, including the removal of the product from the market or voluntary or mandatory device recalls.

The FDA has broad regulatory compliance and enforcement powers. If the FDA determines that a manufacturer has failed to comply with applicable regulatory requirements, it can take a variety of compliance or enforcement actions, which may result in any of the following sanctions:

- warning letters, untitled letters, fines, injunctions, consent decrees and civil penalties;

- recalls, withdrawals, or administrative detention or seizure of our products;

- operating restrictions or partial suspension or total shutdown of production;

- refusing or delaying requests for 510(k) marketing clearance or PMA approvals of new products or modified products;

- withdrawing 510(k) clearances or PMA approvals that have already been granted;

- refusal to grant export approvals for our products; or

- criminal prosecution.

*Healthcare Regulatory Laws*

Within the United States, our products and our customers are subject to extensive regulation by a wide range of federal and state agencies that govern business practices in the medical device industry. These laws include federal and state anti-kickback, fraud and abuse, false claims, transparency and anti-corruption statutes and regulations. Internationally, other governments also impose regulations in connection with their healthcare reimbursement programs and the delivery of healthcare items and services.

U.S. federal healthcare fraud and abuse laws generally apply to our activities because our products are covered under federal healthcare programs such as Medicare and Medicaid. The Anti-Kickback Statute is particularly relevant because of its broad applicability. Specifically, the Anti-Kickback Statute prohibits persons or entities from knowingly and willfully soliciting, offering, receiving, or providing remuneration, directly or indirectly, in exchange for, or to induce, either the referral of an individual, or the furnishing, arranging for or recommending a good or service for which payment may be made in whole or part under federal healthcare programs, such as the Medicare and Medicaid programs. Further, a person or entity does not need to have actual knowledge of the Anti-Kickback Statute or specific intent in order to violate it. The term remuneration has been interpreted broadly to include anything of value. There are a number of statutory exceptions and regulatory safe harbors protecting some common activities from prosecution. The exceptions and safe harbors are drawn narrowly and practices that involve remuneration that may be alleged to be intended to induce prescribing, purchasing, or recommending may be subject to scrutiny if they do not qualify for an exception or safe harbor. Failure to meet all of the requirements of a particular applicable statutory exception or regulatory safe harbor does not make the conduct per se illegal under the Anti-Kickback Statute. Instead, the legality of the arrangement will be evaluated on a case-by-case basis based on a cumulative review of all of its facts and circumstances.

Many states have adopted laws similar to the Anti-Kickback Statute. Some of these state prohibitions apply to referral of patients for healthcare items or services reimbursed by any payor, not only the Medicare and Medicaid programs. Insurance companies may also bring a private cause of action for treble damages against a manufacturer for a pattern of causing false claims to be filed under the federal Racketeer Influenced and Corrupt Organizations Act, or RICO.

Another development affecting the healthcare industry is the increased use of the federal Civil False Claims Act and, in particular, actions brought pursuant to the False Claims Act's "whistleblower" or "qui tam" provisions. The False Claims Act imposes liability on any person or entity that, among other things, knowingly presents, or causes to be presented, a false or fraudulent claim for payment by a federal healthcare program. The qui tam provisions of the False Claims Act allow a private individual to bring actions on behalf of the federal government alleging that the defendant has submitted a false claim to the federal government, and to share in any monetary recovery. In recent years, the number of suits brought against healthcare providers by private individuals has increased dramatically. In addition, the government may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the federal False Claims Act. Various states have also enacted false claim laws analogous to the Civil False Claims Act, although many of these state laws apply where a claim is submitted to any third-party payor and not merely a federal healthcare program.

The federal Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, or HIPAA, among other things, created two new federal crimes: healthcare fraud and false statements relating to healthcare matters. The HIPAA healthcare fraud statute prohibits, among other things, knowingly and willfully executing, or attempting to execute, a scheme to defraud any healthcare benefit program, including private payors. A violation of this statute is a felony and may result in fines, imprisonment and/or exclusion from government sponsored programs. The HIPAA false statements statute prohibits, among other things, knowingly and willfully falsifying, concealing or covering up a material fact or making any materially false, fictitious or fraudulent

19

statement or representation in connection with the delivery of or payment for healthcare benefits, items or services. Similar to the federal Anti-Kickback Statute, a person or entity does not need to have actual knowledge of these statutes or specific intent in order to violate them.

Additionally, the federal Physician Payments Sunshine Act and its implementing regulations, require that certain manufacturers of drugs, devices, biological and medical supplies for which payment is available under Medicare, Medicaid, or the Children's Health Insurance Program (with certain exceptions) annually report information related to certain payments or other transfers of value made or distributed to physicians (as defined by statute), certain other non-physician practitioners and teaching hospitals, certain ownership and investment interests held by physicians and their immediate family members.

Additional laws and regulations have also been enacted by the federal government and various states to regulate the sales and marketing practices of medical device and pharmaceutical manufacturers. The laws and regulations generally limit financial interactions between manufacturers and healthcare providers; require pharmaceutical and medical device companies to comply with voluntary compliance standards issued by industry associations and the relevant compliance guidance promulgated by the U.S. federal government; and/or require disclosure to the government and/or public of financial interactions (so-called "sunshine laws"). Many of these laws and regulations contain ambiguous requirements or require administrative guidance for implementation.

Given the lack of clarity in laws and their implementation, our activities could be subject to the penalty provisions of the pertinent federal and state laws and regulations. If our operations are found to be in violation of any of the federal and state healthcare laws described above or any other governmental regulations that apply to us, we may be subject to penalties, including without limitation, civil, criminal and/or administrative penalties, damages, fines, disgorgement, exclusion from participation in government programs, such as Medicare and Medicaid, injunctions, private "qui tam" actions brought by individual whistleblowers in the name of the government, or refusal to allow us to enter into government contracts, contractual damages, reputational harm, administrative burdens, diminished profits and future earnings, and the curtailment or restructuring of our operations, any of which could adversely affect our ability to operate our business and our results of operations.

***Foreign Regulation***

*General*

International sales of medical devices are subject to a variety of foreign government regulations, which may vary substantially from country to country. We expect this global regulatory environment will continue to be complex and evolving, which could impact the cost, the time needed to approve, and our ability to maintain existing approvals or certifications or obtain future approvals or certifications for our products and require extensive compliance and monitoring obligations in the countries where we sell or distribute our products. In addition, our international operations, distribution and sales require us to comply with: the U.S. Foreign Corrupt Practices Act and similar anti-bribery laws in other jurisdictions; U.S. and foreign export control, trade embargo and customs laws; U.S. and foreign tax laws; employment, immigration and labor laws; local intellectual property laws, which may not protect intellectual property rights to the same extent as U.S. law; and privacy laws such as the European General Data Protection Regulation (GDPR).

*Regulation of Medical Devices in the European Union*

The European Union, or EU, has adopted specific directives and regulations regulating the design, manufacture, clinical investigation, conformity assessment, labeling and adverse event reporting for medical devices.

Until May 25, 2021, medical devices were regulated by Council Directive 93/42/EEC, or the EU Medical Devices Directive, which has been repealed and replaced by Regulation (EU) No 2017/745, or the EU Medical Devices Regulation. Our current certificates have been granted under the EU Medical Devices

20

Table of Contents

***The clinical study process is lengthy and expensive with uncertain outcomes. Results of earlier studies may not be predictive of future clinical trial results, or the safety or efficacy profile for such solutions.***

Clinical testing is difficult to design and implement, can take many years, can be expensive and carries uncertain outcomes. We are currently enrolling patients in our first two randomized controlled trials, and we may in the future conduct additional clinical studies for future solutions. The results of preclinical and clinical studies of our solutions conducted to date and ongoing or future studies of our current, planned or future solutions may not be predictive of the results of later clinical studies, and interim results of a clinical study do not necessarily predict final results. Our interpretation of data and results from our clinical studies do not ensure that we will achieve similar results in future clinical studies. In addition, preclinical and clinical data are often susceptible to various interpretations and analyses, and many companies that have believed their products performed satisfactorily in preclinical and earlier clinical studies have nonetheless failed to produce strong results in later clinical studies. Products in later stages of clinical studies may fail to show the desired safety and efficacy despite having progressed through nonclinical and earlier clinical studies. We incur substantial expense for, and devote significant time to, clinical studies but cannot be certain that the trials will continue to result in commercial revenue. Failure can occur at any stage of clinical testing. Our clinical studies may produce negative or inconclusive results, and we may decide, or regulators may require us, to conduct additional clinical and non-clinical testing in addition to those we have planned.

The initiation and completion of any of clinical studies may be prevented, delayed, or halted for numerous reasons. We may experience delays in our ongoing clinical trials for a number of reasons, which could adversely affect the costs, timing or successful completion of our clinical studies, including related to the following:

- we may be required to submit an investigational device exemption, or IDE, application to FDA, or similar application to foreign regulatory authorities which must become effective prior to commencing certain human clinical studies of medical devices, and FDA may not approve our IDE application and notify us that we may not begin clinical studies;

- regulators and other comparable foreign regulatory authorities may disagree as to the design or implementation of our clinical studies;

- regulators and/or institutional review boards, or IRBS, or other reviewing bodies may not authorize us or our investigators to commence a clinical study, or to conduct or continue a clinical study at a prospective or specific study site;

- we may not reach agreement on acceptable terms with prospective contract research organizations, or CROs and clinical study sites, the terms of which can be subject to extensive negotiation and may vary significantly among different CROs and study sites;

- clinical studies may produce negative or inconclusive results, and we may decide, or regulators may require us, to conduct additional clinical studies or abandon product development programs;

- the number of subjects or patients required for clinical studies may be larger than we anticipate, enrollment in these clinical studies may be insufficient or slower than we anticipate, and the number of clinical studies being conducted at any given time may be high and result in fewer available patients for any given clinical study, or patients may drop out of these clinical studies at a higher rate than we anticipate;

- our third-party contractors, including those manufacturing products or conducting clinical studies on our behalf, may fail to comply with regulatory requirements or meet their contractual obligations to us in a timely manner, or at all;

- we might have to suspend or terminate clinical studies for various reasons, including a finding that the subjects are being exposed to unacceptable health risks;

53

Table of Contents

- we may have to amend clinical study protocols or conduct additional studies to reflect changes in regulatory requirements or guidance, which we may be required to submit to an IRB and/or regulatory authorities for re-examination;

- regulators, IRBs, or other parties may require or recommend that we or our investigators suspend or terminate clinical research for various reasons, including safety signals or noncompliance with regulatory requirements;

- the cost of clinical studies may be greater than we anticipate;

- clinical sites may not adhere to the clinical protocol or may drop out of a clinical study;

- we may be unable to recruit a sufficient number of clinical study sites;

- regulators, IRBs, or other reviewing bodies may fail to approve or subsequently find fault with our manufacturing processes or facilities of third-party manufacturers with which we enter into agreement for clinical and commercial supplies, the supply of devices or other materials necessary to conduct clinical studies may be insufficient, inadequate or not available at an acceptable cost, or we may experience interruptions in supply; and/or

- our current or future solutions may have undesirable side effects or other unexpected characteristics.

In addition, disruptions caused by the COVID-19 pandemic may increase the likelihood that we encounter such difficulties or delays in initiating, enrolling, conducting or completing our planned and ongoing clinical studies. Any of these occurrences may significantly harm our business, financial condition and prospects.

Furthermore, patient enrollment in clinical studies and completion of patient follow-up depend on many factors, including the size of the patient population, the nature of the study protocol, the proximity of patients to clinical sites, the eligibility criteria for the clinical study, patient compliance, competing clinical studies and clinicians' and patients' perceptions as to the potential advantages of the product being studied in relation to other available therapies, including any new treatments that may be approved for the indications we are investigating. For example, patients may be discouraged from enrolling in our clinical studies if the study protocol requires them to undergo extensive post-treatment procedures, monitoring or follow-up to assess the safety and efficacy of a product candidate, or they may be persuaded to participate in contemporaneous clinical studies of a competitor's product candidate. In addition, patients participating in our clinical studies may drop out before completion of the study or experience adverse medical events unrelated to our solutions. Delays in patient enrollment or failure of patients to continue to participate in a clinical study may delay commencement or completion of the clinical study, cause an increase in the costs of the clinical study and delays, or result in the failure of the clinical study.

Clinical studies must be conducted in accordance with the laws and regulations of the FDA and other applicable regulatory authorities' legal requirements, regulations or guidelines, and are subject to oversight by these governmental agencies and IRBs or ethics committees at the medical institutions where the clinical studies are conducted. In addition, clinical studies must be conducted with supplies of our devices produced under current good manufacturing practice, or cGMP, requirements and other regulations. Furthermore, we may rely on CROs, and clinical study sites to ensure the proper and timely conduct of our clinical studies and we may have limited influence over their actual performance. We depend on our collaborators and on medical institutions and CROs to conduct our clinical studies in compliance with good clinical practice, or GCP, requirements. To the extent our collaborators or the CROs fail to enroll participants for our clinical studies, fail to conduct the study to GCP standards or are delayed for a significant time in the execution of studies, including achieving full enrollment, we may be affected by increased costs, program delays or both. In addition, clinical studies that are conducted in countries internationally may subject us to further delays and expenses as a result of increased shipment costs, additional regulatory requirements and the engagement of non-U.S. CROs, as well as expose us to risks associated with clinical investigators who are unknown to the FDA, and different standards of diagnosis, screening and medical care.

Even if our future solutions are cleared or approved in the United States, commercialization of our solutions in foreign countries would require clearance, approval or certification by regulatory authorities or notified bodies in those countries. Clearance, approval or certification procedures vary among jurisdictions and can involve requirements and administrative review periods different from, and greater than, those in the United States, including additional preclinical or clinical studies. Any of these occurrences could have an adverse effect on our business, financial condition and results of operations.

***We are subject to certain federal, state and foreign fraud and abuse laws and physician payment transparency laws that could subject us to substantial penalties. Additionally, any challenge to or investigation into our practices under these laws could cause adverse publicity and be costly to respond to, and thus could harm our business.***

There are numerous U.S. federal and state, as well as foreign, laws pertaining to healthcare fraud and abuse, including anti-kickback, false claims and physician transparency payment laws. Our business practices and relationships with providers are subject to scrutiny under these laws. The healthcare laws and regulations that may affect our ability to operate include, but are not limited to:

- The federal Anti-Kickback Statute, which prohibits, among other things, persons and entities from knowingly and willfully soliciting, offering, receiving or providing remuneration, directly or indirectly, in cash or in kind, to induce either the referral of an individual or furnishing or arranging for a good or service, for which payment may be made, in whole or in part, under federal healthcare programs, such as Medicare and Medicaid. The U.S. government has interpreted this law broadly to apply to the marketing and sales activities of manufacturers. In addition, a person or entity does not need to have actual knowledge of the statute or specific intent to violate it to have committed a violation;

- The federal civil and criminal false claims laws and civil monetary penalties laws, including the federal civil False Claims Act, which prohibit, among other things, individuals or entities from knowingly presenting, or causing to be presented, claims for payment from Medicare, Medicaid or other federal healthcare programs that are false or fraudulent. These laws can apply to manufacturers who provide information on coverage, coding, and reimbursement of their products to persons who bill third-party payors. Private individuals can bring False Claims Act "qui tam" actions, on behalf of the government and such individuals, commonly known as "whistleblowers," may share in amounts paid by the entity to the government in fines or settlement. Moreover, the government may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the federal civil False Claims Act;

- The federal Civil Monetary Penalties Law, which prohibits, among other things, offering or transferring remuneration to a federal healthcare beneficiary that a person knows or should know is likely to influence the beneficiary's decision to order or receive items or services reimbursable by the government from a particular provider or supplier;

- The Health Insurance Portability and Accountability Act of 1996, or HIPAA, which created additional federal criminal statutes that prohibit, among other things, executing a scheme to defraud any healthcare benefit program and making false statements relating to healthcare matters. Similar to the federal Anti-Kickback Statute, a person or entity does not need to have actual knowledge of the statute or specific intent to violate it to have committed a violation;

- The federal Physician Payments Sunshine Act which requires certain applicable manufacturers of drugs, devices, biologics and medical supplies for which payment is available under Medicare, Medicaid or the Children's Health Insurance Program, or CHIP, to report annually to the DHHS Centers for Medicare and Medicaid Services, or CMS, information related to payments and other transfers of value to physicians (defined to include doctors, dentists, optometrists, podiatrists and chiropractors), certain non-physician practitioners (physician assistants, nurse practitioners, clinical nurse specialists, certified nurse anesthetists, anesthesiologist assistants and certified nurse midwives) and teaching hospitals, and applicable manufacturers and group purchasing

55

organizations, to report annually ownership and investment interests held by physicians and their immediate family members;

- The FDCA, which prohibits, among other things, the adulteration or misbranding of drugs, biologics and medical devices;

- Federal and state laws and regulations regarding billing and claims payment applicable to our solutions and regulatory agencies enforcing those laws and regulations; and

- Analogous state and foreign law equivalents of each of the above federal laws, such as anti-kickback and false claims laws which may apply to items or services reimbursed by any third-party payor, including commercial insurers or patients; state laws that require device companies to comply with the industry's voluntary compliance guidelines and the applicable compliance guidance promulgated by the federal government or otherwise restrict payments that may be made to healthcare providers and other potential referral sources; state laws that require device manufacturers to report information related to payments and other transfers of value to physicians and other healthcare providers or marketing expenditures; consumer protection and unfair competition laws, which broadly regulate marketplace activities and activities that potentially harm customers and state laws related to insurance fraud in the case of claims involving private insurers.

These laws and regulations, among other things, constrain our business, marketing and other promotional and research activities by limiting the kinds of financial arrangements, including sales programs, we may have with hospitals, physicians or other potential purchasers of our solutions. We have entered into consulting agreements with physicians, including some who have ownership interests in us, which could be viewed as influencing the purchase of or use of our solutions in procedures they perform. Compensation under some of these arrangements includes the provision of stock or stock options. Due to the breadth of these laws, the narrowness of statutory exceptions and regulatory safe harbors available, and the range of interpretations to which they are subject, it is possible that some of our current or future practices might be challenged under one or more of these laws.

Any action brought against us for violations of these laws or regulations, even if successfully defended, could cause us to incur significant legal expenses and divert our management's attention from the operation of our business. We may be subject to private qui tam actions brought by individual whistleblowers on behalf of the federal or state governments, with potential liability under the federal False Claims Act including mandatory treble damages and significant per-claim penalties.

To enforce compliance with the healthcare regulatory laws, certain enforcement bodies have recently increased their scrutiny of interactions between healthcare companies and healthcare providers, which has led to a number of investigations, prosecutions, convictions and settlements in the healthcare industry. Responding to investigations can be time-and resource-consuming and can divert management's attention from the business. Additionally, as a result of these investigations, healthcare providers and entities may have to agree to additional compliance and reporting requirements as part of a consent decree or corporate integrity agreement. Any such investigation or settlement could increase our costs or otherwise have an adverse effect on our business, financial condition and results of operations. Even an unsuccessful challenge or investigation into our practices could cause adverse publicity, and be costly to respond to.

Our activities, including those relating to providing billing, coding, coverage and reimbursement information about procedures using our solutions to our customers and the sale and marketing of our solutions, may be subject to scrutiny under these laws. The growth of our business and sales organization and our expansion outside of the United States may increase the potential of violating these laws or our internal policies and procedures. Any action brought against us for violation of these or other laws or regulations, even if we successfully defend against it, could cause us to incur significant legal expenses and divert our management's attention from the operation of our business. If our operations are found to be in violation of any of the federal, state and foreign laws described above or any other current or future fraud and abuse or other healthcare laws and regulations that apply to us, we may be subject to

56

Table of Contents

significant penalties, including significant criminal, civil, and administrative penalties, damages, fines, exclusion from participation in government programs, such as Medicare and Medicaid, imprisonment, contractual damages, reputation harm and disgorgement and we could be required to curtail, restructure or cease our operations. Any of the foregoing consequences will negatively affect our business, financial condition and results of operations.

**Risks Related to Our Intellectual Property**

***Our success will depend on our, and any of our current and future licensors', ability to obtain, maintain and protect our intellectual property rights.***

Our commercial success will depend in part on our, and any of our current or future licensors', success in obtaining and maintaining issued patents, trademarks and other intellectual property rights in the United States and elsewhere and protecting our proprietary technology. If we, or any of our current or future licensors, do not adequately protect our intellectual property and proprietary technology, competitors may be able to use our technologies or the goodwill we have acquired in the marketplace and erode or negate any competitive advantage we may have, which could harm our business and ability to achieve profitability.

We rely on a combination of contractual provisions, confidentiality procedures and patent, copyright, trademark, trade secret and other intellectual property laws to protect the proprietary aspects of our solutions, brands, technologies and data. These legal measures afford only limited protection, and competitors or others may gain access to or use our intellectual property and proprietary information. Our success will depend, in part, on preserving our trade secrets, maintaining the security of our data and know-how and obtaining and maintaining other intellectual property rights. We may not be able to obtain or maintain intellectual property or other proprietary rights necessary to our business or in a form that provides us with a competitive advantage.

In addition, despite our efforts to enter into confidentiality agreements with our employees, consultants, clients and vendors who have access to such information, our trade secrets, data and know-how could be subject to unauthorized use, misappropriation, or disclosure to unauthorized parties, and could otherwise become known or be independently discovered by third parties. We may be unable to prevent the unauthorized disclosure or use of our technical knowledge or trade secrets by consultants, suppliers, vendors, former employees and current employees.

Failure to obtain and maintain intellectual property rights necessary to our business and failure to protect, monitor and control the use of our intellectual property rights could negatively impact our ability to compete and cause us to incur significant expenses. The intellectual property laws and other statutory and contractual arrangements in the United States and other jurisdictions we depend upon may not provide sufficient protection in the future to prevent the infringement, use, violation or misappropriation of our trademarks, data, technology and other intellectual property and services, and may not provide an adequate remedy if our intellectual property rights are infringed, misappropriated or otherwise violated.

We rely, in part, on our ability to obtain, maintain, expand, enforce, and defend the scope of our intellectual property portfolio or other proprietary rights, including the amount and timing of any payments we may be required to make in connection with the licensing, filing, defense and enforcement of any patents or other intellectual property rights. The process of applying for and obtaining a patent is expensive, time consuming and complex, and we may not be able to file, prosecute, maintain, enforce or license all necessary or desirable patent applications at a reasonable cost, in a timely manner, or in all jurisdictions where protection may be commercially advantageous, or we may not be able to protect our proprietary rights at all.

The patent positions of medical device companies, including our patent position, may involve complex legal and factual questions, and therefore, the scope, validity and enforceability of any patent claims that we may obtain cannot be predicted with certainty.

57
