# EXHIBIT 8

**Exhibit 2.1**

**EXECUTION VERSION**

**SHARE PURCHASE AGREEMENT**

by and among

**LimFlow S.A.,**

**the Sellers,**

**Shareholder Representative Services LLC, solely in its capacity as the Seller Representative,**

**Inari Medical, Inc., solely for the purposes of Section 13.16,**

and

**Lombardi Sub, LLC**

**DATED AS OF OCTOBER 31, 2023**

**SHARE PURCHASE AGREEMENT**

THIS SHARE PURCHASE AGREEMENT is entered into as of October 31, 2023 (this "Agreement"), by and among (a) LimFlow S.A., a French limited company (*société anonyme*), having its registered office at 15, rue Traversière – 75012 Paris, identified under number 820 710 267 R.C.S. Paris (the "Company"), (b) the Persons listed on Schedule A attached hereto together with those Persons, other than the Purchaser, who hold Equity Interests of the Company (as defined below), those Persons who hold Virtual Shares (as defined below) and those Persons who hold Cancelled Company Options (as defined below) and have agreed or will agree to adhere to this Agreement prior to Closing pursuant to the terms hereof (each a "Seller", and collectively, the "Sellers"), (c) Shareholder Representative Services LLC, a Colorado limited liability company, solely in its capacity as the Sellers' representative, agent and attorney-in-fact (together with any successor appointed in accordance with Section 7.9, the "Seller Representative"), (d) Inari Medical, Inc., a Delaware corporation, solely for the purposes of Section 13.16 ("Parent") and (e) Lombardi Sub, LLC, a Delaware limited liability company (together with its assigns and successors, the "Purchaser"). The Company, the Sellers, the Seller Representative and the Purchaser shall each be referred to in this Agreement, unless the context otherwise requires, as a "Party," and collectively, as the "Parties."

**W I T N E S E T H:**

WHEREAS, as of the date hereof, the Equity Interests of the Company are allocated as set forth on Part I of Schedule A attached hereto and, prior to the Closing, the Sellers will collectively own 100% of the outstanding Equity Interests of the Company (representing 100% of the share capital of the Company on a fully diluted basis, excluding those shares in the Company held as of the date hereof by Inari Medical International, Inc., a Delaware corporation and parent company of the Purchaser), as set forth on Part II of Schedule A attached hereto (the "Shares");

WHEREAS, the Company currently owns and will own immediately prior to the Closing 100% of the outstanding Equity Interests of (i) LimFlow Inc., a Delaware corporation ("LimFlow US") and (ii) LimFlow GmbH, a German company with limited liability (*Gesellschaft mit beschränkter Haftung*) ("LimFlow Germany" and together with the Company and LimFlow US, each a "Company Entity" and collectively the "Company Entities");

WHEREAS, prior to the date hereof, the Company has received approval from the U.S. Food and Drug Administration for marketing and sale of the Eligible Product (as defined herein);

WHEREAS, at the Closing, on the terms and subject to the conditions set forth herein, the Sellers holding Shares desire to sell the Shares to the Purchaser, and the Purchaser desires to purchase the Shares from the Sellers holding Shares free and clear from any Liens (the "Transactions");

WHEREAS, in order to induce Purchaser to enter into this Agreement, simultaneously with the execution of this Agreement, certain Sellers have executed and delivered to Purchaser a non-solicitation agreement, attached hereto as Exhibit F-1, or a non-competition and non-solicitation agreement, attached hereto as Exhibit F-2 (collectively, the "Restrictive Covenants

Agreements"), and the Company shall use its reasonable best efforts to have other Sellers execute a non-solicitation agreement, attached hereto as Exhibit F-1, after the execution of this Agreement but prior to Closing, which Restrictive Covenant Agreements shall become effective only at the Closing; and

**WHEREAS**, each of the Parties acknowledges and agrees that its obligations contained in this Agreement are a material inducement to the other Parties to enter into this Agreement and to perform their respective obligations hereunder, and that the other Parties would not obtain the benefit of the bargain set forth in this Agreement as specifically negotiated if such Party breached any of the provisions of this Agreement binding upon such Party.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I

## PURCHASE AND SALE

1.1     Purchase and Sale.

(a)     Upon the terms and subject to the conditions of this Agreement, at the Closing, each Seller holding Shares shall sell, transfer, assign and deliver to the Purchaser, and Purchaser shall purchase and acquire from each Seller holding Shares, the full ownership of the Shares held by such Seller, free and clear of all Liens, together with all rights attaching to such Shares as at Closing (including all dividends and distributions declared or to be paid or made in respect of the Shares), for the consideration specified in Section 1.2.

(b)     Without prejudice to any other rights and remedies the Purchaser may have, the Purchaser shall not be obliged to complete the sale and purchase of any of the Shares unless the sale and purchase of all of the Shares/Equity Interests of the Company representing 100% of the share capital of the Company on a fully diluted basis (save for the Company shares held as of the date hereof by the Purchaser) is completed simultaneously.

1.2     Purchase Price. The aggregate consideration to be paid in cash by Purchaser to the Sellers for the acquisition of the Shares, the cancellation of the Cancelled Company Options and the Virtual Shares shall be an amount equal to that portion of the Purchase Price allocable to the Sellers in accordance with the Seller Payment Allocation Principles. The Parties acknowledge that the Closing Purchase Price and each Contingent Payment shall be reduced by the portion of such amount to which any Person who is a Virtual Share Holder or a Cancelled Options Holder would be entitled to receive by virtue of such Person's ownership of Cancelled Options and/or Virtual Share Awards of the Company immediately prior to the Closing, which amount shall be determined in accordance with the Seller Payment Allocation Principles.

2

1.3     <u>Treatment of Options; Closing Payments; Payment Procedures</u>.

(a)     On the Closing Date, the Purchaser shall pay to a bank account designated in writing by the Company no later than two (2) Business Days prior to the Closing Date, on behalf of each of the Exercising Options Holders, for all exercised Company Options that are properly exercised by the applicable holder, who also timely executes and delivers a Joinder (such options, the "<u>Exercised Company Options</u>"), an aggregate amount, equal to (i) the total number of ordinary shares of the Company underlying the applicable Exercised Company Option held as of immediately prior to the Closing (the "<u>Options Shares</u>"), multiplied by (ii) the exercise price per ordinary share for such Exercised Company Option (such aggregate amount, the "<u>Options Price</u>"). Upon payment of the Options Price and execution of a copy of the Joinder by each Exercising Options Holder, the board of directors of the Company will (i) acknowledge receipt of the Options Price, (ii) acknowledge that such Options Price represents the full payment for the Options Shares with respect to each Exercised Company Option, (iii) discharge the Exercising Options Holders for the payment of the Options Price, and (iv) authorize the issuance of the Options Shares and the corresponding modifications to the Company's share capital. In exchange for payment of the Options Price, the Purchaser will hold against the Exercising Options Holders a receivable in the same amount allocated against each of the Exercising Options Holders as set forth in  Schedule A (the "<u>Purchaser Receivable</u>"). The Purchaser Receivable shall be repaid by the Exercising Options Holders to the Purchaser as provided in <u>Section 1.3(d)(i)</u>. If a portion of the Options Price applicable to an Exercised Company Option is greater than such holder's portion of the Sellers' Closing Consideration with respect to such Exercised Company Option (determined in accordance with the allocation principles set forth in <u>Schedule B</u> hereto) (such portion, the "<u>Options Price Delta</u>"), then a portion of such holder's Transaction Bonus shall be deemed repaid as part of the Purchaser Receivable on or around the Closing Date in satisfaction of the Options Price Delta.

(b)     On the Closing Date, each Cancelled Company Option shall be canceled in exchange for the right to receive an amount equal to the positive difference between (i) the portion of the Sellers' Closing Consideration and Contingent Payment in accordance with the allocation principles set forth in  Schedule B hereto, minus (ii) the exercise price per ordinary share for such Cancelled Company Option (such exercise price, the "<u>Cancelled Option Exercise Price</u>") and such aggregate amount, the "<u>Cancelled Options Price</u>"), subject to the holder's execution and delivery of the Cancellation and Adherence Agreement. If a portion of the Cancelled Options Price applicable to a Cancelled Company Option is greater than such holder's portion of the Sellers' Closing Consideration with respect to such Cancelled Company Option (determined in accordance with the allocation principles set forth in <u>Schedule B</u> hereto) (such portion, the "<u>Cancelled Company Options Price Delta</u>"), then a portion of such holder's Transaction Bonus shall be deemed paid to the Company on or around the Closing Date in satisfaction of the Cancelled Company Options Price Delta.

(c)     On the Closing Date, each Virtual Share Holder shall receive an amount equal to the positive difference between (i) the portion of the Sellers' Closing Consideration and Contingent Payment in accordance with the allocation principles set forth in <u>Schedule B</u> hereto, minus (ii) the Virtual Share Payment Price (such aggregate amount, the "<u>Virtual Share Price</u>"), subject to such Virtual Share Holder's execution and delivery of the Cancellation and Adherence Agreement.

3

(q)    Since January 1, 2023, no Company Entity that is classified as a foreign corporation for U.S. federal income tax purposes has been owned (within the meaning of Section 958(a) of the Code) by a "United States shareholder" (as defined in Section 951 of the Code). No Company Entity that is subject to U.S. income Tax is or has been a shareholder of a "passive foreign investment company" within the meaning of Section 1297 of the Code (or any similar provision of state, local or non-U.S. Law).

(r)    No Company Entity is or was a "surrogate foreign corporation" within the meaning of Section 7874(a)(2)(B) of the Code or is treated as a U.S. corporation under Section 7874(b) of the Code or was created or organized in the United States such that such entity would be taxable in the United States as a domestic entity pursuant to Treasury Regulations Section 301.7701-5(a).

(s)    To the Knowledge of the Company, no Company Entity that is classified as a controlled foreign corporation for U.S. federal income tax purposes holds assets that constitute U.S. property (other than stock of a Company Entity that is a domestic corporation) within the meaning of Section 956 of the Code.

(t)    None of the Company Entities has engaged in any "extraordinary disposition" or "extraordinary reduction" as such terms are defined in Treasury Regulations Section 1.245A-5, nor is a successor to any "extraordinary disposition account" pursuant to Treasury Regulations Section 1.245A-5.

(u)    No Company Entity or predecessors by merger or consolidation has been a party to any transaction intended to qualify under Section 355 of the Code at any time in the two years prior to the date of this Agreement.

(v)    No Company Entity benefits or has benefited from any material Tax advantage (including a carry forward or a deferment), material favorable Tax regime or any material aid, subsidy or other similar material measure obtained in exchange for existing undertakings of the Company Entities or against an additional Tax burden, past, present or future.

(w)    No Tax liability (that has not been paid before the completion date of the Transaction or reserved for or otherwise shown as a debt, provision or liability in the Interim Balance Sheet) has or will arise as a result of the Company Entities having (i) taken part in any scheme which may be successfully challenged by the relevant Tax Authorities on the basis of articles L64 and L64 A of the French Tax Procedure Code or article 205 A of the French Tax Code, and (ii) concluded any transaction with other Company Entities or with the Sellers or any of their Affiliates that was not made on an arm's length basis and in compliance with its corporate interest.

3.20    Customers; Suppliers.

(a)    Customers. Schedule 3.20(a) of the Company Entities Disclosure Schedule sets forth the twenty (20) largest customers, determined based on the trailing twelve (12) months' revenue, of the Company Entities (i) as of December 31, 2022 and (ii) for the eight (8) month period ended August 31, 2023 (collectively, the "Material Customers"). The Company has made

46

available to the Purchaser a true, correct and complete copy of each Contract with a Material Customer.

(b)    Suppliers. Schedule 3.20(b) of the Company Entities Disclosure Schedule sets forth the ten (10) largest suppliers, vendors, subcontractors and service providers, by aggregate dollar value of sales made or services provided to the Company Entities by such suppliers, vendors, subcontractors and service providers (i) as of December 31, 2022, and (ii) the eight (8) month period ended August 31, 2023 (collectively, the "Material Suppliers"). The Company has made available to the Purchaser a true, correct and complete copy of each Contract with a Material Supplier.

(c)    Except as set forth on Schedule 3.20(c) of the Company Entities Disclosure Schedule, during the twenty-four (24) month period prior to the date hereof (and including the date hereof), no Material Customer or Material Supplier (i) has terminated or, to the Knowledge of the Company, threatened to terminate, its relationship with the Company, (ii) has decreased or limited materially or, to the Knowledge of the Company, threatened to decrease or limit materially, the services, supplies or materials provided or sold by or supplied to or purchased by, as applicable, any Company Entity, or (iii) has materially changed (outside of the ordinary course of business) or, to the Knowledge of the Company threatened to change materially, its business relationship with the applicable Company Entity in any respect. As of the date hereof, there are no pending disputes between any Company Entity, on the one hand, and any Material Customer or Material Supplier, on the other hand.

3.21    Insurance. Schedule 3.21 of the Company Entities Disclosure Schedule sets forth a list of all current insurance policies or binders maintained by the Company Entities and relating to the assets, business, equipment, properties, operations, employees, officers and directors of each Company Entity (collectively, the "Insurance Policies"), all of which are in full force and effect. The coverage pursuant to the Insurance Policies is sufficient for compliance with Law and for compliance with any obligation under any Contract to which any Company Entity is a party. To the Knowledge of the Company, no Company Entity is in default under any such policy or binder the effect of which would reasonably be expected to jeopardize coverage (whether generally or with respect to a specific claim) thereunder, and no Company Entity has received written notice of cancellation of any such policy or binder. All premiums due on such Insurance Policies have been paid. There are no material claims by any Company Entity pending under any of such Insurance Policies as to which coverage has been denied by the underwriters of such policies. No Company Entity has received written notice of (a) a termination or material reduction of coverage with respect to any of such Insurance Policies, (b) a refusal of any coverage or rejection of any claim under any of such Insurance Policies, (c) a material change in coverage of any of such Insurance Policies, (d) a premium audit with respect to any of such Insurance Policies, or (e) a mid-policy period adjustment in the amount of the premiums payable with respect to any of such Insurance Policies. The Company has made available to the Purchaser true, complete and accurate copies of all such Insurance Policies. Schedule 3.21 of the Company Entities Disclosure Schedule sets forth a list of all claims pending against any Company Entity under any Insurance Policies. No Company Entity maintains any self-insurance or co-insurance programs.

47

3.22    <u>FDA and Regulatory Matters</u>.

(a)    The Company Entities are, and in the past three (3) years have been, in compliance in all material respects with all Healthcare Laws applicable to such Company Entity, or by which any property, any Products or other asset of the Company Entities is bound or affected. The design, manufacture, testing, sale, marketing, promotion and distribution of the Products by or on behalf of the Company Entities is being, and in the past three (3) years has been, conducted in compliance with all applicable Healthcare Laws in all material respects, including, without limitation, the FDA's current good manufacturing practice regulations at 21 C.F.R. Part 820 for medical device products and, to the extent applicable to the Company or any of its Subsidiaries, counterpart Laws in the European Union and the United Kingdom and all other countries where compliance is required. The Company Entities and any contract manufacturers assisting in the manufacture of the Products are, and at all times have been, in compliance with FDA's registration and listing requirements to the extent required by applicable Healthcare Laws, and the Products, to the extent required by Healthcare Laws, are in conformance in all material respects with all applicable "CE" marking certifications and declarations of conformity. No Company Entity has received written notification of any pending or threatened claim, suit, proceeding, hearing, enforcement, audit, investigation, arbitration or other Legal Proceeding from any Governmental Authority, including, without limitation, the FDA, the Centers for Medicare & Medicaid Services, and the U.S. Department of Health and Human Services Office of Inspector General, the U.S. Department of Justice, or any comparable state, federal or foreign Governmental Authority alleging non-compliance in any material respect by, or liability of, any Company Entity under any Healthcare Law.

(b)    Each Company Entity holds, and is and for the past three (3) years has been operating in material compliance with, such Permits of the FDA and any similar federal, state, local or foreign Governmental Authority required for the conduct of its business as currently conducted (collectively, the "<u>Regulatory Permits</u>"), and all such required Regulatory Permits are in full force and effect. Each Company Entity has fulfilled and performed all of its material obligations with respect to the Regulatory Permits, and no event has occurred which allows, or after notice or lapse of time would allow, revocation or termination thereof or results in any other material impairment of the rights of the holder of any required Regulatory Permit. No Company Entity has received any communication from any Governmental Authority regarding, and, to the Knowledge of the Company, there are no facts or circumstances that are likely to give rise to, (i) any material change in any such Permit, or any failure to materially comply with any applicable Healthcare Laws with respect to, or any term or requirement of, any such Permit or (ii) any revocation, withdrawal, suspension, cancellation, limitation, termination or material modification of any such Permit.

(c)    No Company Entity has received any information or notification from the FDA or any other Governmental Authority with jurisdiction over the testing, marketing, sale, use, handling and control, safety, efficacy, reliability, or manufacturing of medical devices which would reasonably be expected to lead to the denial of any application for marketing approval, clearance or certification currently pending before the FDA or any other Governmental Authority.

(d)    All applications, filings, reports, documents, claims, submissions and notices required to be filed, maintained, or furnished to FDA, state, other federal or non-United

48

States equivalent agencies or Notified Bodies by the Company Entities have been so filed, maintained or furnished and were complete and correct in all material respects on the date filed (or were corrected in or supplemented by a subsequent filing), including adverse event reports and medical device reports, with regard to the Products. Except for those adverse event reports and complaints described in Schedule 3.22(d) of the Company Entities Disclosure Schedule, the adverse event reports related to the Products and the complaint review and analysis reports of the Company and each of its Subsidiaries do not contain any information that would reasonably be expected to result in any material liabilities to the Company Entities.

(e)     All applications, notifications, submissions, information, claims, reports and statistics, filings, and other data and conclusions derived therefrom utilized as the basis for or submitted in connection with any and all requests for a Regulatory Permit, including from the FDA or other Governmental Authority under any Healthcare Laws, relating to the Company or any of its Subsidiaries, their respective businesses, or any Products marketed or developed by the Company Entities, when submitted to the FDA or any other Governmental Authority, whether oral, written or electronically delivered, were true, accurate and complete as of the date of submission. Any necessary or required updates, changes, corrections or modifications to such applications, notifications, submissions, information, claims, reports, filings, and other data have been submitted to the FDA or other Governmental Authority and as so updated, changed, corrected or modified remain true, accurate and complete, and do not materially misstate any of the statements or information included therein, or omit to state a material fact necessary to make the statements therein not misleading.

(f)     No Company Entity has received any written notice or other written communication from the FDA or any other Governmental Authority contesting the pre-market clearance, approval or certification of the uses of or the labeling and promotion of any of the Products. No manufacturing site which assists in the manufacture of the Products (whether Company- or Subsidiary-owned or operated, or that of a contract manufacturer for the Products) has been subject to a Governmental Authority (including FDA) shutdown or import or export prohibition. None of the Company, its Subsidiaries, nor any manufacturing site which assists in the manufacture of the Products (whether Company- or Subsidiary-owned or operated, or that of a contract manufacturer for the Products) has received any Form FDA-483 or other Governmental Authority notice of inspectional observations or adverse findings, "warning letters," "untitled letters" or similar correspondence or notice from the FDA or other Governmental Authority alleging or asserting noncompliance with any applicable Healthcare Laws or Regulatory Permits or alleging a lack of safety from the FDA or any other Governmental Authority, and there is no action or proceeding pending or, to the Knowledge of the Company, threatened and neither the FDA nor any Governmental Authority is considering such action.

(g)     During the last three (3) years, there have been no recalls (either voluntary or involuntary), field notifications, field corrections, market withdrawals or replacements, warnings, "dear doctor" letters, investigator notices, safety alerts or other notices of action relating to an alleged lack of safety, efficacy, or regulatory compliance of any Product ("Safety Notices"), or seizures ordered or adverse regulatory actions taken (or, to the Knowledge of the Company, threatened) by the FDA or any other Governmental Authority with respect to any of the Products or any facilities where any such Products are tested, produced, processed, packaged or stored. There have been no material product complaints with respect to any of the Company Entities'