**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  | | |
|---|---|---|
| MICHIANA AREA ELECTRICAL WORKERS' PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | : : : | No. 1:24-cv-03686-GHW-JW |
| Plaintiff, | : : | (Consolidated with No. 1:24-cv-04662-JHR-JW) |
| vs. | : : | CLASS ACTION |
| INARI MEDICAL, INC., WILLIAM HOFFMAN, ANDREW HYKES, and MITCHELL C. HILL, | : : : : | ORAL ARGUMENT REQUESTED |
| Defendants. | : : : | |

## LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

4909-9365-9505.v2

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ..................................................................................................1

II.    STATEMENT OF FACTS ....................................................................................3

      A.    Overview of Inari's Business................................................................3

      B.    Inari's Aggressive Sales and Marketing Tactics Violated the Very Healthcare Laws with Which Inari Purported to Comply ......................4

III.   LEGAL STANDARD...........................................................................................7

IV.  THE COMPLAINT PLEADS ACTIONABLE MISREPRESENTATIONS AND OMISSIONS .......................................................................................................8

      A.    The Complaint Adequately Alleges Improper Kickbacks .....................9

      B.    Defendants' Statements Concerning Inari's Compliance with Federal Law Were False and Misleading...................................................................14

      C.    Defendants' Statements Concerning Inari's Revenue Growth Were False and Misleading.....................................................................................15

      D.    Defendants' Statements Concerning Inari's SG&A Expenses Were False and Misleading.....................................................................................17

V.   THE COMPLAINT ALLEGES A STRONG INFERENCE OF SCIENTER .................19

      A.    Defendants Had Actual Knowledge that Inari Was Paying Kickbacks.................19

      B.    Motive and Opportunity Further Support Scienter ................................24

      C.    The Core Operations Doctrine Further Supports Scienter....................29

      D.    Defendants' Proffered Nonfraudulent Inference of "Individual Carelessness" Is Unsupported and Not Compelling ..............................31

VI.  THE COMPLAINT SUFFICIENTLY PLEADS SCHEME LIABILITY ........................32

VII. THE COMPLAINT STATES A §20(a) CONTROL PERSON CLAIM ..........................34

VIII. THE COMPLAINT STATES A §20A INSIDER TRADING CLAIM ...........................34

IX.  CONCLUSION...................................................................................................34

4909-9365-9505.v2

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Allison v. Oak Street Health, Inc.*,
2023 WL 1928119 (N.D. Ill. Feb. 10, 2023) ...........................................................................11

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co., Ltd.*,
19 F.4th 145 (2d Cir. 2021) ...................................................................................................7

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) ...........................................................................................25, 28

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..............................................................................................................7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..............................................................................................................7

*Bond v. Clover Health Invs., Corp.*,
587 F. Supp. 3d 641 (M.D. Tenn. 2022).................................................................................11

*Boston Ret. Sys. v. Alexion Pharms., Inc.*,
556 F. Supp. 3d 100 (D. Conn. 2021).....................................................................................34

*Buhrke Family Revocable Trust v. U.S. Bancorp*,
726 F. Supp. 3d 315 (S.D.N.Y. 2024).....................................................................................32

*Campo v. Sears Holdings Corp.*,
635 F. Supp. 2d 323 (S.D.N.Y. 2009),
*aff'd*, 371 F. App'x 212 (2d Cir. 2009)...................................................................................23

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012)....................................................................................24

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat., PLC*,
423 F. Supp. 2d 348 (S.D.N.Y. 2006)....................................................................................30

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020)....................................................................................26

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
928 F. Supp. 2d 705 (S.D.N.Y. 2013)....................................................................................34

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
433 F. Supp. 3d 515 (S.D.N.Y. 2020).....................................................................................9

4909-9365-9505.v2

**Page**

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
  323 F. Supp. 3d 393 (S.D.N.Y. 2018)................................................................................16

*Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015).................................................................................25, 26, 28

*Farruggio v. Kraft Heinz Food Co.*,
  747 F. Supp. 3d 420 (N.D.N.Y. 2024)................................................................................32

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)................................................................................16

*Gagnon v. Alkermes PLC*,
  368 F. Supp. 3d 750 (S.D.N.Y. 2019)................................................................................27

*Gamm v. Sanderson Farms, Inc.*
  944 F.3d 465 (2d Cir. 2019)................................................................................12

*Gauquie v. Albany Molecular Rsch., Inc.*,
  2016 WL 4007591 (E.D.N.Y. July 26, 2016)................................................................24

*George v. China Auto. Sys., Inc.*,
  2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012)................................................................27

*Gimpel v. The Hain Celestial Grp., Inc.*,
  2025 WL 2749562 (2d Cir. Sep. 29, 2025).................................................................28, 29, 30

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011)................................................................................23

*Guevoura Fund v. Sillerman*,
  2016 WL 4939372 (S.D.N.Y. Sep. 12, 2016)................................................................32

*Halford v. AtriCure, Inc.*,
  2010 WL 8973625 (S.D. Ohio Mar. 29, 2010)................................................................12

*In re Alibaba Grp. Holding Ltd. Sec. Litig.*,
  2023 WL 2601472 (S.D.N.Y. Mar. 22, 2023) ................................................................8

*In re Am. Express Co. Sec. Litig.*,
  2008 WL 4501928 (S.D.N.Y. Sep. 26, 2008),
  *aff'd*, *Slayton v. Am. Express Co.*, 604 F.3d 758 (2d Cir. 2010) ................................................23

4909-9365-9505.v2

**Page**

*In re AppHarvest Sec. Litig.*,
 684 F. Supp. 3d 201 (S.D.N.Y. 2023)....................................................................13

*In re Aratana Therapeutics Inc. Sec. Litig.*,
 315 F. Supp. 3d 737 (S.D.N.Y. 2018)....................................................................28

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
 324 F. Supp. 2d 474 (S.D.N.Y. 2004)....................................................................30

*In re Avon Sec. Litig.*,
 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019).........................................................23

*In re BISYS Sec. Litig.*,
 397 F. Supp. 2d 430 (S.D.N.Y. 2005)....................................................................27

*In re Braskem S.A. Sec. Litig.*,
 246 F. Supp. 3d 731 (S.D.N.Y. 2017)....................................................................20

*In re Deutsche Bank AG Sec. Litig.*,
 2016 WL 4083429 (S.D.N.Y. July 25, 2016) ...........................................................8

*In re Didi Glob. Inc. Sec. Litig.*,
 2024 WL 1119483 (S.D.N.Y. Mar. 14, 2024) .........................................................14

*In re Electrobras Sec. Litig.*,
 245 F. Supp. 3d 450 (S.D.N.Y. 2017)....................................................................32

*In re Estée Lauder Co., Inc. Sec. Litig.*,
 2025 WL 965686 (S.D.N.Y. Mar. 31, 2025) .....................................................17, 18

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
 986 F. Supp. 2d 487 (S.D.N.Y. 2013)..............................................................14, 15

*In re GigaCloud Tech. Inc. Sec. Litig.*,
 2025 WL 307378 (S.D.N.Y. Jan. 27, 2025) ...........................................................13

*In re Hertz Glob. Holdings Inc.*,
 905 F.3d 106 (3d Cir. 2018)...............................................................................25

*In re Hi-Crush Partners L.P. Sec. Litig.*,
 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ..........................................................30

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
 251 F. Supp. 3d 596 (S.D.N.Y. 2017).....................................................................8

4909-9365-9505.v2

**Page**

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014)...............................................................................28

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
26 F. Supp. 3d 278 (S.D.N.Y. 2014)...............................................................................21

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010)...........................................................................................15

*In re Omega Healthcare Invs., Inc. Sec. Litig.*,
563 F. Supp. 3d 259 (S.D.N.Y. 2021)............................................................................17

*In re Openwave Sys. Sec. Litig.*,
528 F. Supp. 2d 236 (S.D.N.Y. 2007)............................................................................34

*In re Oxford Health Plans, Inc.*,
187 F.R.D. 133 (S.D.N.Y 1999) ....................................................................................25

*In re Philip Morris Int'l Inc. Sec. Litig.*,
89 F.4th 408 (2d Cir. 2023) .............................................................................................7

*In re Plug Power, Inc. Sec. Litig.*,
2022 WL 4631892 (S.D.N.Y. Sep. 29, 2022).................................................................27

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996)...................................................................................15

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001).............................................................................................13

*In re SolarEdge Tech., Inc. Sec. Litig.*,
2024 WL 4979296 (S.D.N.Y. Dec. 4, 2024) .................................................................29

*In re SolarEdge Techs., Inc. Sec. Litig.*,
2025 WL 1031154 (S.D.N.Y. Apr. 6, 2025).............................................................23, 29

*In re Sotheby's Holdings, Inc.*,
2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000)................................................................20

*In re St. Paul Travelers Sec. Litig. II*,
2006 WL 2735221 (D. Minn. Sep. 25, 2006) ................................................................29

*In re STMicroelectronics N.V. Sec. Litig.*,
2025 WL 2644241 (S.D.N.Y. Sep. 15, 2025).................................................................20

- v -

**Page**

*In re Supercom Inc. Sec. Litig.*,
  2018 WL 4926442 (S.D.N.Y. Oct. 10, 2018) ..............................................................30

*In re Virtu Fin., Inc. Sec. Litig.*,
  770 F. Supp. 3d 482 (E.D.N.Y. 2025) .......................................................................24

*In re Vivendi Universal, S.A.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003) .......................................................................29

*In re Weight Watchers Int'l, Inc. Sec. Litig.*,
  2016 WL 2757760 (S.D.N.Y. May 11, 2016) ...........................................................21

*Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*,
  620 F.3d 137 (2d Cir. 2010).......................................................................................13

*Knurr v. Orbital ATK Inc.*,
  272 F. Supp. 3d 784 (E.D. Va. 2017) ........................................................................27

*Lewy v. SkyPeople Fruit Juice, Inc.*,
  2012 WL 3957916 (S.D.N.Y. Sep. 10, 2012).............................................................13

*Loc. No. 38 IBEW Pension Fund v. Am. Express Co.*,
  724 F. Supp. 2d 447 (S.D.N.Y. 2010)...................................................................21, 23

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015).........................................................................................7

*Lorenzo v. Sec. & Exch. Comm'n*,
  587 U.S. 71 (2019).....................................................................................................32

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
  601 U.S. 257 (2024)....................................................................................................17

*Mart v. Tactile Sys. Tech., Inc.*,
  595 F. Supp. 3d 788 (D. Minn. 2022)...................................................................25, 34

*Mauss v. NuVasive, Inc.*,
  2015 WL 10857519 (S.D. Cal. Aug. 28, 2015) .........................................................11

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
  164 F. Supp. 3d 568 (S.D.N.Y. 2016).......................................................................15

*Micholle v. Ophthotech Corp.*,
  2019 WL 4464802 (S.D.N.Y. Sep. 17, 2019)............................................................27

4909-9365-9505.v2

**Page**

*Middlesex Ret. Sys. v. Quest Software Inc.*,
527 F. Supp. 2d 1164 (C.D. Cal. 2007) .................................................................................27

*Moshell v. Sasol Ltd.*,
481 F. Supp. 3d 280 (S.D.N.Y. 2020).....................................................................................20

*Nguyen v. New Link Genetics Corp.*,
297 F. Supp. 3d 472 (S.D.N.Y. 2018).....................................................................................21

*Noto v. 22nd Century Grp., Inc.*,
650 F. Supp. 3d 33 (W.D.N.Y. 2023) ................................................................................12, 22

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)........................................................................................12, 19, 28

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019).......................................................................................29

*Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
595 F.3d 86 (2d Cir. 2010).......................................................................................................18

*Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*,
2019 WL 2360942 (S.D.N.Y. Mar. 4, 2019) ..........................................................................26

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*,
89 F. Supp. 3d 602 (S.D.N.Y. 2015)..................................................................................22, 23

*Plymouth Cnty. Ret. Assoc. v. ViewRay, Inc.*,
556 F. Supp. 3d 772 (N.D. Ohio 2021)..............................................................................27, 28

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004).....................................................................................................15

*Ronzani v. Sanofi S.A.*,
899 F.2d 195 (2d Cir. 1990).....................................................................................................35

*S.E.C. v. Gabelli*,
653 F.3d 49 (2d Cir. 2011), *rev'd on other grounds*, 568 U.S. 442 (2013)............................16

*S.S. Trade Ass'n of Baltimore-Intl. Longshoreman's Ass'n Pension Fund v. Olo Inc.*,
2023 WL 4744197 (S.D.N.Y. July 25, 2023) ...........................................................................8

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
732 F. Supp. 3d 300 (S.D.N.Y. 2024)......................................................................................30

4909-9365-9505.v2

**Page**

*Saskatchewan Healthcare Emps.' Pension Plan v. KE Holdings Inc.*,
 718 F. Supp. 3d 344 (S.D.N.Y. 2024)......................................................................................29

*Singh v. Cigna Corp.*,
 918 F.3d 57 (2d Cir. 2019)......................................................................................................8

*Skiadas v. Acer Therapeutics Inc.*,
 2020 WL 3268495 (S.D.N.Y. June 16, 2020) ..................................................................22, 23

*Slayton v. Am. Express Co.*,
 604 F.3d 758 (2d Cir. 2010)...................................................................................................12

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
 547 F.3d 406 (2d Cir. 2008).....................................................................................................3

*Stevelman v. Alias Rsch. Inc.*,
 174 F.3d 79 (2d Cir. 1999).....................................................................................................25

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
 551 U.S. 308 (2007).........................................................................................7, 19, 31, 32

*U.S. ex rel. Camburn v. Novartis Pharm. Corp.*,
 124 F.4th 129 (2d Cir. 2024) .................................................................................................11

*U.S. ex rel. Hart v. McKesson Corp.*,
 96 F.4th 145 (2d Cir. 2024) ...................................................................................................11

*U.S. ex rel. Mooney v. Americare, Inc.*,
 2013 WL 1346022 (E.D.N.Y. Apr. 3, 2013) ..........................................................................11

*Villare v. Abiomed, Inc.*,
 2021 WL 4311749 (S.D.N.Y. Sep. 21, 2021)..........................................................................28

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
 845 F.3d 384 (8th Cir. 2016) .................................................................................................34

*Wochos v. Tesla, Inc.*,
 985 F.3d 1180 (9th Cir. 2021) ...............................................................................................21

*Woolgar v. Kingstone Cos Inc.*,
 477 F. Supp. 3d 193 (S.D.N.Y. 2020).....................................................................................25

*Zornberg v. NAPCO Sec. Techs., Inc.*,
 778 F. Supp. 3d 516 (E.D.N.Y. 2025) .....................................................................................25

4909-9365-9505.v2

**Page**

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
    §78j(b).................................................................................................................3, 7, 34
    §78t(a)......................................................................................................................34
    §78t-1 ......................................................................................................................34
    §78u-4 ......................................................................................................................12
    §78u-4(b)(1)(B)........................................................................................................8

Federal Rules of Civil Procedure
    Rule 9(b) ...............................................................................................................7, 8

17 C.F.R
    §240.10b-5(a).........................................................................................................32
    §240.10b-5(b)....................................................................................................18, 32
    §240.10b-5(c).........................................................................................................32
    §250.10b5-1 ...........................................................................................................27

4909-9365-9505.v2

Lead Plaintiffs Oklahoma Law Enforcement Retirement System, Local 353, I.B.E.W. Pension Fund, and City of Pontiac Reestablished General Employees' Retirement System (collectively, "Plaintiffs"), respectfully submit this Memorandum of Law in Opposition to Defendants' Motion to Dismiss.[1]

## I.   INTRODUCTION

This case centers on Defendants' false and misleading statements to investors regarding the Company's kickback scheme designed to boost sales of its medical devices. Defendants created a network of *quid pro quo* relationships with healthcare professionals ("HCPs") by comping meals and travel, and paying for consulting services, gift cards, and speaking engagements to inflate sales, and then tracked those payments to how much business was generated by the HCP, even where it could be dangerous to the patient. ¶¶2-3, 8, 56, 74, 134. Inari operates in a highly regulated industry, and its business practices are governed by federal healthcare laws such as the Anti-Kickback Statute ("AKS") and the False Claims Act ("FCA"). Those statutes prohibit companies like Inari from paying kickbacks or bribes to HCPs in exchange for referrals or the purchase of the Company's products. ¶¶3, 36-44, 47.

Former employees describe Inari's practice of doing ***whatever physicians wanted in order to keep the physicians' business***. ¶59. This included paying for their travel to vacation destinations under the guise of specialty training that was intended for nurses rather than physicians, arranging for physicians to attend events such as NASCAR races by creating a pretext training event to coincide with the race, and otherwise spending tens of thousands of dollars per month on improper dining and entertainment expenses, all in violation of the AKS. ¶¶2, 56, 59. After an employee and

---

[1]   "Inari" or the "Company" refers to Inari Medical, Inc. The "Individual Defendants" refers collectively to William Hoffman ("Hoffman"), Andrew Hykes ("Hykes"), and Mitchell C. Hill ("Hill"). "Defendants" refers collectively to Inari and the Individual Defendants. Citations to "Mem." refer to ECF 74 (Memorandum of Law in Support of Defendants' Motion to Dismiss) (the "Motion"). Citations to "¶" or "¶¶" are to ECF 55 (the "Complaint"). Unless otherwise noted, all emphasis is added and citations are omitted throughout.

- 1 -

4909-9365-9505.v2

their supervisor reported Inari's misconduct to then-CFO Hykes, the supervisor was terminated and replaced by someone who told the employee to disregard the Company's misconduct. ¶¶4, 60, 142.

During the Class Period, Inari represented that it was "in compliance with all Health Care Laws," and that it had "not engaged in activities which are . . . cause for false claims liability [or] civil penalties." ¶¶67-77. Defendants repeatedly attributed Inari's revenue growth to organic factors such as "continued US commercial expansion and increased product adoption," and "the expansion of the field team and the methodical addition of new reps and territory expansion." ¶¶80-84. Defendants also attributed Inari's rising Sales, General, and Administrative ("SG&A") expenses to innocuous factors, such as hiring "sales professionals at a very rapid clip," and claimed that "SG&A as a percentage of revenue consumed, is much lower than almost anybody who's grown as fast ever." ¶¶127, 148. These statements were all false and misleading. The kickback scheme meant that Defendants were not complying with all healthcare laws; the kickback scheme was the reason for Inari's revenue growth, not "building awareness and driving deeper adoption;" and SG&A expenses were ballooning because Inari was expending considerable sums of money on the kickback scheme. ¶¶1, 66-128.

On February 28, 2024, Inari announced that it had received a Civil Investigative Demand ("CID") from the Department of Justice ("DOJ") in December 2023, regarding an investigation into violations of the AKS and FCA. ¶¶6, 129. Investors dumped their Inari shares, driving the stock price down 21% and erasing $700 million in market capitalization in a single day. ¶¶131, 173-74. The Individual Defendants spared themselves, however, as they had cashed out substantial percentages of their personal holdings of Inari stock at record highs during the Class Period, for profits of more than $155 million. ¶153.

4909-9365-9505.v2

Faced with these and other particularized allegations, Defendants' Motion responds to the Complaint by challenging only two elements of Plaintiffs' Section 10(b) claims: falsity and scienter. They do not even attempt to contest loss causation, as it is indisputable that the revelation of the truth regarding Inari's kickback scheme caused a massive decline in Inari's stock and thus Plaintiffs' damages.

Defendants' dismissal bid wrongly attempts to contort the pleading standard for a securities fraud case into that for an AKS claim, an attempt that has been rejected by numerous courts that have held that in pleading a false statement under the securities laws, it is the falsity of Defendants' statements at issue, not the underlying illegal activity. Nevertheless, Defendants' Motion rests largely on the flawed premise that the Complaint does not sufficiently allege that Inari paid improper kickbacks to HCPs, and, even if Inari did engage in kickbacks, "any excessive or improper expenses . . . arose from individual carelessness rather than intentional or consciously reckless misconduct." Mem. at 29. These arguments ignore the well-pleaded allegations that the kickbacks were a Company-wide practice discussed and encouraged at national meetings and that Inari tracked money spent on HCPs to revenue generated by the HCPs.

Defendants' attempt to shift the burden onto Plaintiffs to prove out their case in full before discovery, summary judgment, and trial is improper, and the Court should deny the Motion.[2]

## II.    STATEMENT OF FACTS

### A.    Overview of Inari's Business

For years, patients suffering from venous blood clots (a condition known as venous thromboembolism or "VTE") were prescribed inexpensive anticoagulant drugs that treat but do not

---

[2]    Defendants have also requested that this Court take judicial notice of certain documents. *See* Mem. at 3 (seeking to judicially notice the exhibits set forth in the Decl. of Craig Carpenito). While Plaintiffs do not oppose this request, they do note that the exhibits attached thereto should not be considered "'for the truth of the matters asserted in them, but rather to establish that the matters [had] been publicly asserted.'" *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 424 (2d Cir. 2008).

- 3 -

4909-9365-9505.v2

remove blood clots. ¶¶1, 26. Inari offers a surgical alternative with two products used to remove blood clots instead of just treating them with blood thinners. *Id.* The Company's two products are single-use devices – ClotTriever and FlowTriever – which cost $11,900 and $7,500, respectively. ¶27. Inari's success hinged on its ability to convince medical professionals to adopt the use of these newer surgical products in lieu of traditional blood thinners. ¶28.

Inari operates in a highly competitive industry, which it routinely acknowledged in its public filings. *See* ¶31 ("the market for our solutions is highly competitive" and "[m]any of our competitors have longer, more established operating histories"). Recognizing that its competitors had greater resources and name recognition, Inari dedicated significant resources to its sales and marketing efforts, which it recorded in its financial reports as SG&A expenses. ¶33. In an effort to gain market share, Inari spent $840 million in SG&A over the course of the Class Period. *Id.* Since fiscal year ("FY") 2021, Inari's SG&A expenditures exceeded 68.7% of its revenues each year, a percentage far greater than the SG&A spend of its competitors over the same period, which averaged SG&A spend of only 50% or less of yearly revenues. ¶34.

**B.     Inari's Aggressive Sales and Marketing Tactics Violated the Very Healthcare Laws with Which Inari Purported to Comply**

Inari was subject to extensive regulations designed to protect patients and government-funded programs such as Medicare and Medicaid from fraud and abuse. ¶36. In particular, the AKS and FCA strictly regulate the sales activities of medical device companies and proscribe companies like Inari from providing, directly or indirectly, anything of value in exchange for patient referrals or recommendations. *See* ¶¶1, 36-45. These laws and regulations are aimed at "curtailing the corrupting influence of money on health care decisions" and provide for civil and/or criminal penalties for activities that may be common and acceptable in other industries. ¶36. Under the AKS, it is a crime for a company to knowingly and willfully solicit, offer, receive, or provide

- 4 -

remuneration, *i.e.*, ***anything of value***, in exchange for a referral. ¶39; *see also* ¶41 ("***In some industries, it is acceptable to reward those who refer business to you. However, in the Federal health care programs, paying for referrals is a crime***.") (emphasis in the original). Inari was also subject to the FCA, which proscribes making a false or fraudulent claim, record, or statement to the government for payment or approval. ¶44.

Throughout the Class Period, Defendants flouted this strict regulatory scheme by engaging in a litany of unlawful sales and marketing practices while simultaneously representing that Inari was "in compliance with all Health Care Laws." ¶¶5, 55, 76. Those practices included Inari's *quid pro quo* relationships with HCPs wherein sales reps would spend tens of thousands of dollars per month on meals, travel, consulting service payments, gift cards, and speaking engagements for HCPs and correlate the amount of money spent on those HCPs with the amount of business they generated for Inari. ¶¶8, 56, 59, 62, 134.

These improper practices are confirmed by several former Inari employees who personally observed Inari's kickback scheme in action. *See* ¶¶58-64. FE-1, the Director of the Inari Solutions Group ("ISG") from May 2022 through July 2023, directly observed and discussed with other Inari employees and executives that Inari paid for physicians to attend training sessions in vacation destinations where the physician's specialty was unrelated to the training or the training was intended for nurses rather than physicians. ¶59. Inari likewise arranged for physicians to attend events like NASCAR races and dinners upon the physicians' request by arranging training events around the desired event in order to compensate the physicians and their staff nurses for their travel, all in violation of the AKS. *Id*. FE-1 further reported that Inari generally did whatever the physicians wanted to keep the physicians' business, and that Inari correlated that amount of money spent on a physician with the amount of business that physician generated for Inari, which is itself an

4909-9365-9505.v2

AKS violation. *Id.* FE-2 confirmed this was a Company-wide practice, noting that internal sales presentations directly correlated how much money a sales representative generated with how much time and money that representative spent with his physicians and other HCPs on a private basis. ¶¶62, 64. FE-2 attended a quarterly sales meeting wherein an Inari sales representative who spent $50,000 on dinners in a three-month time period was "congratulated and rewarded" and used as a "good example." ¶62. FE-1 stated that Hykes and other Inari executives personally participated in the kickback scheme by, for instance, flying to and participating in physician events and dinners. ¶60. FE-3 confirmed that Inari removed physicians from its speakers-and-dinners lists if, after a period of time building a sales relationship, the physicians did not use a substantial amount of Inari products. ¶63. Finally, FE-2 and FE-3 independently reported that they attended regular national sales meetings where Inari distributed slides showing that the amount of money spent on physicians' dinners was the functional equivalent to the value of Inari products purchased by the physicians who attended those dinners. ¶64.

FE-1 reported the improper kickbacks to their supervisor, the former Vice President of ISG, who agreed with FE-1 that these practices were unlawful and needed to stop. ¶60. FE-1, together with that supervisor, informed Hykes in the fall of 2022 that they were uncomfortable with the kickback scheme and that it violated ethical and legal standards. *Id.* The VP of ISG was fired days later and replaced with another individual who instructed FE-1 to ignore the kickback scheme and told FE-1 that FE-1 did not know the rules. *Id.* Yet, FE-1 continued to voice their concerns to their new supervisor who relayed such concerns to Hykes. *Id.* FE-1's concerns about the kickbacks were discussed with Hykes and other Inari executives during meetings. *Id.* FE-1 left Inari in July 2023, contacted the DOJ to report Inari's kickback scheme, and was informed that an investigation regarding the scheme was already in progress. ¶61.

4909-9365-9505.v2

While engaged in these fraudulent and improper sales practices during the Class Period, the Individual Defendants sold shares of their personally held Inari stock at fraud-inflated prices for profits of more than $155 million.  ¶153.

## III.    LEGAL STANDARD

In assessing a defendant's motion to dismiss, courts consider a complaint "in its entirety," "accept all factual allegations . . . as true," and construe those allegations in the light most favorable to the plaintiff.  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007).

Although Rule 9(b) requires that fraud be alleged with "particularity," the "alleged fraud need only be ***plausible***," not "more likely than" alternatives.  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 174 (2d Cir. 2015) (emphasis in original).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  "Although pleading standards are heightened for securities fraud claims, we must be careful not to mistake heightened pleading standards for impossible ones."  *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co., Ltd.*, 19 F.4th 145, 150 (2d Cir. 2021).

To properly state a Section 10(b) claim, a complaint must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"  *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 417 (2d Cir. 2023).  Defendants in their Motion only challenge the first two elements: falsity and scienter.

4909-9365-9505.v2

IV.    **THE COMPLAINT PLEADS ACTIONABLE MISREPRESENTATIONS AND OMISSIONS**

The Complaint "specif[ies] each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. §78u-4(b)(1)(B).  Whether a public statement is misleading, however, is "generally a question reserved for the trier of fact."  *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017).  Accordingly, disputes over falsity cannot be resolved on a motion to dismiss "'unless the Court, drawing all reasonable inferences in favor of plaintiff, determines that reasonable minds could not differ on the question of whether the statements alleged in the complaint were misleading in light of the circumstances under which they were made.'"  *S.S. Trade Ass'n of Baltimore-Intl. Longshoreman's Ass'n Pension Fund v. Olo Inc.*, 2023 WL 4744197, at *4 (S.D.N.Y. July 25, 2023).

To comply with Rule 9(b), a plaintiff need only: "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  *In re Deutsche Bank AG Sec. Litig.*, 2016 WL 4083429, at *20 (S.D.N.Y. July 25, 2016).  Whether a statement is actionable should be "evaluated not only by [the] 'literal truth,' but by 'context and manner of presentation.'" *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019).

By hiding the kickback scheme from investors, Defendants "'creat[ed] an impression of a state of affairs'" that Inari was in compliance with applicable healthcare laws.  *In re Alibaba Grp. Holding Ltd. Sec. Litig.*, 2023 WL 2601472, at *9 (S.D.N.Y. Mar. 22, 2023); *see also* ¶¶55-79.  That false impression materially differed "'from the one that actually exist[ed].'"  *Alibaba*, 2023 WL 2601472, at *9.  Defendants also materially misled investors that Inari's revenue growth was the result of legitimate sales practices by attributing such growth to "continued US commercial expansion and increased product adoption," rather than Inari's improper kickback scheme.

- 8 -

4909-9365-9505.v2

¶¶80-125. Finally, Defendants attributed growing SG&A expenses to hiring more sales reps at a "rapid clip," yet omitted other cost factors such as improper kickbacks and bribes used to induce sales of Inari's medical devices. ¶¶126-28. In reality, Defendants concealed that payments to HCPs in violation of the AKS and FCA were the Company's real growth driver and that such payments put the Company at risk of investigation and prosecution under those statutes. ¶¶35-128.[3]

### A.     The Complaint Adequately Alleges Improper Kickbacks

Defendants' Motion is premised on the faulty argument that the Complaint does not sufficiently allege that Inari paid improper kickbacks to physicians and other HCPs in order to drive adoption of Inari's products. Mem. at 1, 8-11. The Complaint more than sufficiently alleges that Inari created *quid pro quo* relationships with HCPs "by spending thousands of dollars on meals, travel, consulting service payments, gift[] cards, and speaking engagements" with the express purpose of inducing HCPs to utilize Inari products over other VTE treatments in violation of the AKS and FCA. ¶¶35-50, 55-64. These kickback payments exposed Inari to liability and enforcement actions under the healthcare fraud and abuse laws, including the AKS and FCA, and rendered Defendants' Class Period statements false and misleading. *Id.*

The AKS prohibits anyone from "knowingly and willfully" soliciting, offering, receiving, or providing remuneration, directly or indirectly, in exchange for, or to induce, either (1) the referral of an individual, or (2) the furnishing, arranging for, or recommending of a good or service for which payment may be made, in whole or part, under federal healthcare programs such as Medicare and Medicaid. ¶¶37-43. The AKS has been broadly interpreted, and "remunerations include anything of

---

[3]     Defendants' criticism that the Complaint contains lengthy block quotes is frivolous. Mem. at 12. As is customary in securities fraud complaints, Plaintiffs have bolded the portions of the statements that they challenge and *intentionally* retained the surrounding sentences for contextual purposes. Defendants' glib contention that Plaintiffs only offer "generalized explanations of how the statements were false or misleading" fares no better. *Id.* So as to "'avoid[] placing the burden on the Court to sort out the alleged misrepresentations,'" Plaintiffs have alleged "'what portion of each quotation constitutes a false representation'" and have "'match[ed] them with the corresponding adverse facts.'" *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 530 (S.D.N.Y. 2020).

4909-9365-9505.v2

value and can take many forms besides cash, such as free rent, expensive hotel stays and meals, and excessive compensation for medical directorships or consultancies." ¶40.

Here, FE-1 reported that (1) Inari paid for physicians to attend unnecessary training sessions at vacation destinations, in which the "training" was a mere pretext by which Inari provided HCPs and their staff with free vacations, (2) Inari indulged and paid for HCPs' specific and sometimes extravagant requests, including dinners and even travel to and accommodations for NASCAR races, and (3) "physicians with high volumes of sales were constantly wined and dined and Inari would do whatever they wanted to keep their business." ¶59.

FE-2 and FE-3 confirmed that Defendants' improper kickbacks were not isolated instances but rather systemic misconduct. ¶¶62-64. FE-2 reported that Inari sales representatives throughout the country were congratulated and rewarded for spending tens of thousands of dollars on physician dinners quarterly, and that they were instructed to continue spending those amounts. ¶62. FE-3 reported that physicians were hired as consultants or "Key Opinion Leaders" and, in return, compensated with trips and dinners to induce those physicians to use Inari products and evangelize those products to other HCPs. ¶¶62-63.

These FE accounts are corroborated by the August 9, 2024 Deutsche Bank report (the "Deutsche Bank Report"), where Deutsche Bank spoke with multiple Inari sales reps and "provided a summary of some of the critical comments":

- A significant portion of [Inari's] organic growth is driven by sales reps being pressured to upsell unnecessary tech upgrades to hospitals, which gets baked into the PPP sales model. ¶8.

- ***Sales reps are encouraged to create a quid pro quo with referring physicians by spending $1,000s on meals, gift cards, and offering hefty fees for speaking engagements.*** *Id.*

- Inari solutions group (ISG): will pay NP, Pas, and physicians directly and teach them how to mine hospital data to drive referrals within the hospital system. *Id.*

- 10 -

- NARI's '***bigger is better' marketing has resulted [in] sales reps being pressured to push the 24F catheter even in cases where it can be dangerous,*** which has resulted in unnecessary deaths.  *Id.*

Contrary to Defendants' mischaracterization of the law, the Complaint provides ample and sufficient detail concerning the underlying kickbacks.  Mem. at 8-9.  Defendants insist that Plaintiffs must plead "the dates" of any payments, "'the doctors and attendees involved'" and the "'name and location' of physicians who allegedly received kickbacks" in order to plead AKS violations.  *Id.* at 9.  But this is not the law for securities fraud claims, where courts routinely reject such hyper-technical pleading demands.[4]  And the Complaint alleges specific facts concerning the kickbacks.  ¶¶55-64.  As the court in *Mauss v. NuVasive, Inc.*, 2015 WL 10857519, at *8 (S.D. Cal. Aug. 28, 2015), held in rejecting this exact argument:

> However, while Defendants baldly assert that Plaintiff must allege a *per se* violation of the Anti–Kickback Statute or False Claims Act to adequately plead a claim for securities fraud, they did not cite any authority to support that proposition.  Moreover, their proposed rule, taken to its logical conclusion, would mean that no company could ever be sued for misleading investors about its compliance, or lack thereof, with respect to these statutes.  That would undoubtedly be convenient for Defendants, but they have not provided any authority showing that any court has ever imposed such a requirement.

Other courts have held the same.  *See Allison v. Oak Street Health, Inc.*, 2023 WL 1928119, at *2 (N.D. Ill. Feb. 10, 2023) (upholding securities fraud claims based on alleged violations of the AKS where plaintiffs alleged generally that defendants "began to pay external insurance agents and brokers $200 per patient for referrals" but did not identify any specific transactions involving specific people on specific dates); *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 659

---

[4]    Defendants conflate the elements of a securities law claim with those of an AKS claim.  *See* Mem. at 8-9.  In so doing, Defendants cite to multiple *qui tam* cases – not securities fraud cases – all brought by relators who claimed damages for specific AKS violations and which arose from internal whistleblower complaints.  *See U.S. ex rel. Hart v. McKesson Corp.*, 96 F.4th 145, 157 (2d Cir. 2024); *U.S. ex rel. Camburn v. Novartis Pharm. Corp.*, 124 F.4th 129, 133 (2d Cir. 2024); *U.S. ex rel. Mooney v. Americare, Inc.*, 2013 WL 1346022, at *4 (E.D.N.Y. Apr. 3, 2013).  Notably, each of these *qui tam* plaintiff-relators had the opportunity to conduct discovery, including over multiple-year periods where the federal government had the opportunity to investigate and intervene.

4909-9365-9505.v2

(M.D. Tenn. 2022) (allegations that defendants provided gift cards to HCPs and their staff in exchange for "'buy-in[s],'" sufficed to plead AKS violations without allegations of specific transactions); *see also Noto v. 22nd Century Grp., Inc.*, 650 F. Supp. 3d 33, 43 (W.D.N.Y. 2023) (the PSLRA heightened pleading standards "'do not require the pleading of detailed evidentiary matter in securities litigation'"). As demonstrated *infra*, the Company's undisclosed kickbacks to HCPs rendered their public statements materially false and misleading. "It is the falsity of Defendants' statements which is critical, not whether the underlying activity is found to be illegal . . . ." *Halford v. AtriCure, Inc.*, 2010 WL 8973625, at *9 (S.D. Ohio Mar. 29, 2010).[5]

Instead of denying that these improper kickbacks occurred, Defendants resort to minimizing their import and speculating that "any excessive or improper expenses … arose from individual carelessness rather than intentional or consciously reckless misconduct." Mem. at 29. But this argument asks the Court to ignore the Complaint's allegations and make a factual determination (based only on Defendants' word) that Inari's improper payments to HCPs were done in good faith. That is not the law. *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010) ("In considering a motion to dismiss a 10(b) action, [courts] must accept all factual allegations in the complaint as true and must consider the complaint in its entirety.").

Contrary to Defendants' assertion (Mem. at 26-28), the allegations attributable to former Inari employees are sufficiently detailed to support a finding of falsity because "they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314

---

[5]   *Gamm v. Sanderson Farms, Inc.*, the single Exchange Act case Defendants cite, is also readily distinguishable because there, while the Second Circuit required plaintiffs to plead information concerning the underlying antitrust conspiracy, plaintiffs offered "virtually no explanation as to how th[e] collusive conduct occurred, and whether and how it affected trade." 944 F.3d 455, 465 (2d Cir. 2019); Mem. at 8-9. Here, on the other hand, Plaintiffs allege in detail how the systematic, Company-wide kickbacks occurred and whether and how they affected Inari's business.

4909-9365-9505.v2

(2d Cir. 2000); *see also In re GigaCloud Tech. Inc. Sec. Litig.*, 2025 WL 307378, at \*7-8 (S.D.N.Y. Jan. 27, 2025) (rejecting defendants' argument that the FE allegations were too generic to support falsity and finding that allegations describing each witness's position, length of employment, and job responsibilities sufficed to demonstrate how they would have been in a position to observe the business process at issue).  The Complaint alleges, in detail, each FE's title, dates of employment, and specific role at the Company.  ¶¶59, 62-63.  The FEs are precisely the types of witnesses who would have had access to the information demonstrating the falsity of Defendants' statements.  Two served as account managers who regularly interacted with HCPs and attended meetings wherein Inari employees were instructed and encouraged to carry out the kickback scheme, and FE-1 – the Director of the ISG – ***personally informed*** Hykes of the kickback scheme, its illegality, and FE-1's discomfort with it.  ¶¶59-60, 62-64.

Finally, the FE accounts are mutually corroborating.  Each FE separately confirmed that Inari had a widespread practice of improper kickbacks in violation of the AKS and that Inari encouraged its sales representatives to make improper payments.  ¶¶59, 62-64.  FE-1 confirms that Inari's executives had knowledge of the scheme.  ¶¶59-60.  "'As a general matter, courts consider and take as true the statements of [confidential] witnesses at [the pleading] stage . . . .'"  *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 261 (S.D.N.Y. 2023).  The Complaint's FE allegations thus suffice at this stage.[6] *See Lewy v. SkyPeople Fruit Juice, Inc.*, 2012 WL 3957916, at \*13-14 (S.D.N.Y. Sep. 10, 2012) ("A motion to dismiss is not the proper vehicle to test the credibility of witnesses or the manner in which the plaintiffs will attempt to prove their allegations.").

---

[6]   Defendants argue that the FE accounts are not contemporaneous with the alleged false statements.  *See* Mem. at 27. Not so.  The FEs detail Inari's business practices over the course of the Class Period, *i.e.*, at the time of Defendants' misstatements.  In any event, Defendants overstate the law.  Allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period.  *See Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 143 n.13 (2d Cir. 2010); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

- 13 -

###### B.    Defendants' Statements Concerning Inari's Compliance with Federal Law Were False and Misleading

During the Class Period, Defendants made specific representations that Inari was "in compliance with all Health Care Laws." ¶76. Defendants also routinely warned of risks that ***could*** cause material harm to Inari in their Forms 10-K and Forms 10-Q. *See, e.g.*, ¶67 ("***If*** our operations are found to be in violation of any of the federal . . . [Anti-Kickback Statute and Civil False Claims Act] or any other current or future fraud and abuse or other healthcare laws and regulations that apply to us, we ***may*** be subject to significant penalties, including significant criminal, civil, and administrative penalties, . . . .").[7] These statements were false and misleading because,

> by speaking about the AKS and FCA, Defendants created an affirmative duty to speak the whole truth regarding Inari's compliance with those statutes, *i.e.*, that Inari was already violating the AKS and the FCA by providing improper kickbacks to HCPs in the form of free meals, consulting service payments, and speaking engagement fees.

¶68. These false statements, which elided the fact of Inari's kickback payments, were repeated every year in Inari's Forms 10-K, and repeated every quarter when incorporated by reference into Inari's Forms 10-Q. ¶¶67, 69.

Defendants' argument that the risk disclosure statements are not actionable because they warned investors of the precise risk that materialized fails. Mem. at 6, 22. "[R]isk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized. *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013); *see also In re Didi Glob. Inc. Sec. Litig.*, 2024 WL 1119483, at *8 (S.D.N.Y. Mar. 14, 2024) ("Just as [c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired,' so too the amorphous discussion of a generic risk cannot insulate an issuer from liability when it fails to disclose a specific known risk.").

---

[7]    The full compliance statements Plaintiffs allege as false and misleading are in ¶¶67, 69-70, 72-73, 75-76.

4909-9365-9505.v2

Defendants' statements concerning the AKS and FCA, in conjunction with the risk to Inari and investors as a result of the Company's ongoing violations of those laws, created a legal obligation to disclose the fact of Inari's noncompliance.  Inari's risk factor statements are themselves misleading because at the time these statements were made, Inari was ***already*** engaging in improper sales practices in violation of the AKS and FCA and thus the risk of noncompliance had already materialized.  *See Facebook*, 986 F. Supp. 2d at 516.

Likewise, Defendants' assertion that they "accurately identif[ied] the risk that [they] could face investigation in the future" is unavailing because, as stated *supra*, "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."  Mem. at 22; *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).  The law offers "no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away."  *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996).  Defendants' warnings failed to inform investors that the improper sales practices were already occurring and had already put at risk a significant portion of Inari's business.  *See e.g.*, ¶67 ("Any of the foregoing consequences will negatively affect our business, financial condition and results of operations.").[8]

### C.  Defendants' Statements Concerning Inari's Revenue Growth Were False and Misleading

Defendants reported an increase in revenues each quarter during the Class Period, but misleadingly represented that Inari's revenue growth was due in part to "the expansion of [their]

---

[8]     The cases Defendants cite are unavailing.  *See* Mem. at 22.  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 364-65 (2d Cir. 2010), is inapposite because there, the problematic activities were carried out by a "broker-dealer with only a limited role in the issuance of the securities that are the focus of this case" which the court held the defendant had no duty to disclose.  *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 580-82 (S.D.N.Y. 2016), is likewise distinguishable because there, the statements "transparency was a 'competitive strength'" and defendants "actively managed reputational risks" were mere puffery, and defendants had no duty to disclose any wrongdoing because the statements did not put at issue the sources of the company's success.  As demonstrated *supra* §IV(B), the opposite was precisely the case here.

- 15 -

4909-9365-9505.v2

sales organization to target new hospitals and physicians" and "building awareness and driving deeper adoption at existing hospital customers." *See, e.g.*, ¶91.[9]  In truth, Defendants concealed that Inari's reported revenues were partially derived from improper sales practices that drove growth through the use of kickbacks to HCPs.  ¶¶83, 85, 89, 92, 94, 97, 100, 102, 106, 108, 110, 114, 116, 120, 122, 125.

"The law is well settled . . . that so-called 'half-truths' – literally true statements that create a materially misleading impression – will support claims for securities fraud." *S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*, 568 U.S. 442 (2013) (statute of limitations). "[A] duty to disclose uncharged wrongdoing can arise when a corporation puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices." *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 441 (S.D.N.Y. 2018).  "[S]tatements that put the source of the revenue at issue" are "actionable if they fail to disclose the impropriety of the source." *Id.* at 442.  Here, because Inari put "the topic of the cause of its financial success at issue," "it [wa]s obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information.'" *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010).

Defendants' contention that "Plaintiffs identify no such 'close nexus' between Inari's revenue statements and its alleged AKS violations" is unavailing.  Mem. at 18-19.  Throughout the Class Period, Defendants routinely attributed Inari's revenue growth to innocuous factors like "continued US commercial expansion and increased product adoption," "the expansion of the field team and the methodical addition of new reps and territory expansion," and "driving deeper adoption

---

[9]    The full revenue growth statements Plaintiffs allege as false and misleading are in ¶¶80-81, 82, 84, 86-88, 90-91, 93, 95-96, 98-99, 101, 103-105, 107, 109, 111-113, 115, 118-119, 121, 123-124.

4909-9365-9505.v2

at existing hospital customers." ¶¶80, 82, 88. In so doing, Defendants put the source of Inari's revenues ""'in[to] play"'" and were thus obligated to tell the "'whole truth.'" *In re Estée Lauder Co., Inc. Sec. Litig.*, 2025 WL 965686, at *2 (S.D.N.Y. Mar. 31, 2025). Had Defendants told the whole truth, they would have informed investors that Inari's revenue growth was driven by the Company's system of improper kickbacks to HCPs in exchange for their purchase and promotion of Inari products.[10]

### D.    Defendants' Statements Concerning Inari's SG&A Expenses Were False and Misleading

Defendants' statements concerning the reasons for Inari's growing SG&A expenses are also actionable half-truths.[11] *See Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024). By deciding to speak about the reasons for Inari's growing SG&A expenses, Defendants created a duty to disclose the whole truth about what Inari's SG&A expenses entailed – that is, free meals, speaker engagement fees, and consulting service fees, among other expenses ¶128. However, by eliding these facts, Defendants told half-truths and thus misled investors, and by concealing their improper kickbacks within SG&A expenses, also misled investors. ¶¶126-28. Specifically, Defendants claimed that

> the efficiency of our sales organization, if you look at the SG&A as a percentage of revenue consumed, is much lower than almost anybody who's grown as fast ever. . . . We doubled our spend in R&D, we continue to add sales professionals at a very rapid clip. They don't consume cash like most do because they become productive very, very quickly.

---

[10]    *In re Omega Healthcare Invs., Inc. Sec. Litig.*, 563 F. Supp. 3d 259 (S.D.N.Y. 2021), relied on by Defendants, is distinguishable. *See* Mem. at 19. There, plaintiffs alleged as false statements regarding the financial health of the defendant company yet failed to allege any facts challenging the accuracy of those statements. Thus, there was no more than a "tenuous connection between the affirmative statement and the specific information . . . that plaintiffs claim should have been disclosed." *Omega*, 563 F. Supp. 3d at 272-73. Here, in contrast, the Complaint alleges facts directly at odds with Defendants' statements concerning the source of Inari's revenue growth – that revenue growth was, in fact, driven by kickbacks to HCPs. *See* ¶¶80-125.

[11]    The full SG&A statements Plaintiffs allege as false and misleading are in ¶¶126-28.

4909-9365-9505.v2

¶127. In making this statement, Defendants "put at issue the sources of" Inari's increased SG&A spend "while omitting the company's reliance" on its improper kickback scheme. *Estée Lauder*, 2025 WL 965686, at *3 (finding actionable Estée Lauder's statements attributing increases in travel retail sales to company's brand strength rather than improper resale practices).

Defendants' retort that "Plaintiffs identify no language that put Inari's AKS compliance '"in play"'" fails. Mem. at 20. *Estée Lauder* is instructive here. There, this Court held that Estée Lauder's statement that "[n]et sales increased in our travel retail business in both periods, reflecting continued strength of our brands with the Chinese consumer" was an actionable half-truth because the company elected to speak about the reasons for its increase in net sales yet omitted the true source of its growing net sales – that it was selling its products through a gray market. *Estée Lauder*, 2025 WL 965686, at *2. Additionally, the court noted that "omitted sources of revenue don't need to be 'fraudulent or otherwise illegal' for a statement to be misleading under Rule 10b-5(b)." *Id.* at *3. As in *Estée Lauder*, Inari's statements concerning its growing SG&A expenses, *e.g.*, "[w]e doubled our spend in R&D, we continue to add sales professionals at a very rapid clip" are half-truths – not pure omissions as Defendants claim – rendered actionable by Defendants' omission of the true sources of Inari's growing SG&A. ¶¶127-28.

As with the revenue statements, Defendants claim that the SG&A statements are not actionable because Plaintiffs did not allege that the actual data was inaccurate. Mem. at 20. However, as noted *supra*, Plaintiffs need not allege the data itself was inaccurate to state a claim under the securities laws. "The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010). Additionally, Defendants' contention that "Inari did not represent, either explicitly or implicitly, that

- 18 -

it was complying with the AKS" is factually incorrect and contradicts the Complaint's well-pled allegations. Mem. at 20; *see* ¶76 (Inari stating that: "The Company and its subsidiaries are and have been in compliance with all Health Care Laws" and defining "Health Care Laws" as including the "Anti-Kickback Statute.").

## V.    THE COMPLAINT ALLEGES A STRONG INFERENCE OF SCIENTER

Courts consider scienter allegations holistically and examine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 323. An inference of scienter need not be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. Rather, the relevant inquiry is: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326. A strong inference of scienter may be established through (1) "'strong circumstantial evidence of conscious misbehavior or recklessness'" or (2) "'motive and opportunity to commit fraud.'" *Novak*, 216 F.3d at 307.

### A.    Defendants Had Actual Knowledge that Inari Was Paying Kickbacks

Defendants knew from their own actions, conversations with Inari's employees, and internal reports and presentations that Inari was systematically offering improper kickbacks and bribes to HCPs in exchange for their business and tracking those payments to revenue generated. ¶¶59-60. Defendants likewise knew that revenues were growing not because of organic factors like the "expansion of the field team and the methodical addition of new reps," or from "building awareness," but because sales representatives were incentivizing HCPs to purchase Inari's products in exchange for kickbacks, which artificially pumped the Company's revenues. ¶¶82, 88, 91. Defendants also knew that Inari's SG&A expenses were growing not because Inari was hiring "sales

- 19 -

4909-9365-9505.v2

professionals at a very rapid clip," but because Inari was expending ever-increasing sums of money improperly compensating HCPs in exchange for their business. ¶¶127-28.

*Hykes Personally Participated in AKS Violations*. Hykes participated in Inari's kickback scheme by flying to and attending physician events and dinners that violated the AKS. ¶60. Hykes continued to participate in these improper activities even after FE-1 and their supervisor informed him that tying dinners, entertainment, and travel directly to HCPs' purchase of Inari products was improper conduct. ¶77. Hykes's personal participation in the underlying fraudulent conduct demonstrates his actual knowledge of the kickback scheme. *See In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 764-65 (S.D.N.Y. 2017) (that executives "were directly involved in the bribery scheme" supported a finding that they had actual knowledge that their statements were false or misleading); *In re Sotheby's Holdings, Inc.*, 2000 WL 1234601, at *8 (S.D.N.Y. Aug. 31, 2000) (that defendants were "directly involved in arranging the illegal price-fixing agreement, and . . . each of them signed 10-Ks that, in light of the illegal agreement, they knew were false or misleading" demonstrated their scienter). That FE-1's supervisor was fired after notifying Hykes of the illicit kickbacks and replaced with someone who instructed FE-1 to ignore the kickback scheme also strongly supports scienter. *See* ¶¶60, 142; *see also In re STMicroelectronics N.V. Sec. Litig.*, 2025 WL 2644241, at *2 (S.D.N.Y. Sep. 15, 2025) (former employee who warned CEO of concerning business trend and was ultimately fired for objecting to such conduct "corroborate[d] Plaintiffs' claims").

*Reports from FEs Demonstrate Defendants' Scienter*. The corroborating accounts of three FEs who worked at Inari during the Class Period further strengthen the inference of scienter. *See Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 289 (S.D.N.Y. 2020) (former employees "'describe[] . . .

- 20 -

4909-9365-9505.v2

with sufficient particularity'" facts "'to support the probability that a person in the position occupied by the source[s] would possess the information alleged'").

Defendants' attacks on the FE allegations fail. *See* Mem. at 32-34. ***First***, Defendants contend that FE-1's concerns about the kickback scheme are "irrelevant to scienter" because FE-1 is not a lawyer and the Complaint does not allege that the Individual Defendants shared FE-1's "mere opinion" about the kickback scheme. Mem. at 33. These contentions are unsupported in fact or law. FE-1 was Director of the ISG, had more than 30 years of experience in the medical field, had experience at other large medical device businesses, and was personally hired by Hykes to engage with hospitals across the United States that were establishing thrombectomy programs and educating and training hospital personnel on Inari products. ¶59; *see also Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 484-85 (S.D.N.Y. 2018) (noting that a witness's "knowledge and credibility regarding the relevant information can be tested in discovery" but that "at the pleadings stage, 'Plaintiff[s] [are] only required to show that the source of the belief is someone in a position to have had personal knowledge.'"). Even accepting Defendants' characterization that FE-1's report was an "opinion," it was an extremely well-informed opinion based on FE-1's decades of industry experience and regulatory knowledge, first-hand knowledge of Inari's practices, and that it was an opinion that FE-1's supervisor agreed with. None of the cases Defendants cite support the argument that FE-1 need have been a lawyer in order for Hykes to have credited their concerns.[12] Similarly,

---

[12] The cases cited by Defendants are inapposite. *See* Mem. at 33 n.11, 34. In *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1194 (9th Cir. 2021), the former employee warned defendants of potential issues with Tesla's production timeline while defendants were still in the process of choosing suppliers. Those defendants thus had reason to remain optimistic about the timeline, unlike here, where FE-1 and their supervisor alerted Hykes to conduct that already existed, not hypothetical predictions. ¶60. In *In re Weight Watchers Int'l, Inc. Sec. Litig.*, 2016 WL 2757760, at *6 (S.D.N.Y. May 11, 2016), the former employee failed to offer "'discrete factual representations'" and only vaguely reported that the company's business app was not competitive enough. Conversely, here, the FEs offered specific factual details of Defendants' kickback scheme. *See* ¶¶58-64. Likewise, contrary to this case, in *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 295, 298-99 (S.D.N.Y. 2014), the former employee never communicated any criticisms to any defendant and plaintiffs only vaguely alleged that the problems were widely "known" to accounting staff. Finally, *Loc. No. 38 IBEW Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010), is inapposite because the former

- 21 -

Defendants' novel argument that FE-1's report is "irrelevant" because none of the Defendants are alleged to have agreed with FE-1 is devoid of any supporting caselaw and ignores the allegations that FE-1's supervisor agreed with FE-1, and was fired after reporting the misconduct to Hykes. *See* Mem. at 33; ¶¶60, 142. That FE-1 presented Defendants with information that "contradict[ed] their public statements" suffices to demonstrate knowledge. *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *10 (S.D.N.Y. June 16, 2020) (Woods, J.) ("'Securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.'"). Even assuming that Defendants' contention that Hykes disagreed with FE-1's conclusion is correct, that FE-1 provided Hykes with "information contradicting [Defendants'] public statements" demonstrates the requisite recklessness required to survive a motion to dismiss. *See* Mem. at 33; *Skiadas*, 2020 WL 3268495, at *10. Regardless, whether Defendants agreed with FE-1's concerns is an issue not appropriate for resolution at this stage. *See Noto*, 650 F. Supp. 3d at 49-50 ("[T]he Court cannot weigh" the defendants' belief "against Plaintiffs' allegations of fraudulent intent at the motion to dismiss stage.").

*Second*, the accounts of FE-2 and FE-3 further strengthen the inference of scienter, as the kickback scheme was a systemic, Company-wide policy where wining and dining HCPs was tracked to business generated by the HCPs and discussed at regular national sales meetings attended by FE-2 and FE-3. *See* ¶¶62-64. These facts support the probability that FE-2 and FE-3 were in a position to possess the information alleged. *See Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615-16 (S.D.N.Y. 2015).

---

employees there were low-level employees or outside contractors who lacked access to all relevant data, whereas here, FE-1 was a high-level employee hired personally by Hykes, with first-hand knowledge of the misconduct identified.

- 22 -

Defendants rely on *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590, 594 (S.D.N.Y. 2011), and a handful of other inapt cases to argue that the accounts of "FE-2 and FE-3 cannot support a strong inference of scienter" because they did not "'communicate[] with the individual defendants.'" Mem. at 32-33.[13]  But direct communication is not required; a former employee's statements can support scienter notwithstanding the absence of actual contact with an individual defendant. *See In re Avon Sec. Litig.*, 2019 WL 6115349, at *21 (S.D.N.Y. Nov. 18, 2019) ("The notion that the CWs cannot be believed because none had direct contact with any individual defendant is contrary to law."); *Orthofix*, 89 F. Supp. at 615-16 ("Although several courts within this District have declined to credit the allegations of confidential witnesses where they do not specifically allege 'contact' with the individual defendants, there is no baseline requirement of such contact in order to allege 'sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'").

***Defendants' Public Statements Support a Strong Inference of Scienter***.  An executive's public statements concerning a certain topic demonstrates their scienter because such statements "show[] that [the executive] was aware of the reports – to which he had access." *In re SolarEdge Techs., Inc. Sec. Litig.*, 2025 WL 1031154, at *13 (S.D.N.Y. Apr. 6, 2025) (Woods, J.) (defendant who made public statements about the very data at issue had the requisite scienter); *Skiadas*, 2020 WL 3268495, at *10 (executives' statements about FDA drug approval which "'was the *sin[e] qua*

---

[13]    The other cases Defendants cite for this proposition are likewise inapposite. *See* Mem. at 33 n.10. Unlike here, in *Loc. No. 38 IBEW*, 724 F. Supp. 2d at 460-61, the confidential witnesses were "employed in rank-and-file positions or by outside contractors" and thus not in a "'position to have knowledge regarding communications . . . with senior management.'"  In *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 335 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2009), two of the confidential witnesses left the company prior to the class period and the accounts of the third witness (who was not even a company employee) were premised on a document which concerned less than one third of the company's stores and had been produced about one year before the beginning of the class period.  Finally, in *In re Am. Express Co. Sec. Litig.*, 2008 WL 4501928, at *8 (S.D.N.Y. Sep. 26, 2008), *aff'd, Slayton v. Am. Express Co.*, 604 F.3d 758 (2d Cir. 2010), the complaint altogether lacked allegations sufficient to show that the confidential sources would have known what information was communicated to defendants.

4909-9365-9505.v2

*non*'" for the Company's success were themselves "probative evidence of 'a strong inference of scienter'"). Indeed, "[a]ctively communicating with the public about [an] issue demonstrates defendants' sensitivity to it." *Gauquie v. Albany Molecular Rsch., Inc.*, 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016). Here, Defendants' regular statements about the federal healthcare regulations governing Inari's business, and the drivers behind its growing revenues and SG&A expenses, demonstrate that they had actual knowledge of, or, at base, reckless disregard for, the truth of their statements on those topics. *See* ¶¶67, 70 (Inari emphasizing in SEC filings that it is "subject to extensive regulation" such as the AKS and FCA because it operates in the medical device industry); ¶91 (Hoffman touting that Inari "nearly tripled our quarterly production of both cases and revenue" and "added 500 new customer accounts"); ¶82 (Hykes attributing Inari's revenue inflection to the "expansion of the field team and the methodical addition of new reps and territory expansion"); ¶127 (Hoffman crediting Inari's SG&A expenses as a percentage of revenue consumed as an example of "the efficiency of our sales organization").[14] That these statements were specific provides "strong circumstantial evidence" that Defendants were "receiving some form of specific information" about the matter at issue. *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).

### B.    Motive and Opportunity Further Support Scienter

Allegations that each of the Individual Defendants engaged in significant insider selling and received significant incentive-based compensation are consistent with and further supports the finding that they acted with scienter.

---

[14]    In *In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482, 525 (E.D.N.Y. 2025), the court found that specific statements in SEC filings signed by defendants that addressed the "centerpiece" of the litigation constituted strong circumstantial evidence that the executives were "'receiving some form of specific information'" regarding the matters discussed, and thus, that the defendants had scienter. As in *Virtu*, Defendants' specific pronouncements in SEC filings regarding compliance with healthcare laws such as the AKS and FCA provide strong circumstantial evidence that Defendants were receiving specific information about such topics. *See* ¶¶67, 70, 73, 76.

4909-9365-9505.v2

The sheer magnitude of the Individual Defendants' $155 million in collective insider trading profits is itself suspicious. *See, e.g.*, *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 140 (S.D.N.Y 1999) ($78 million in combined profit was "massive by any measure"); *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 302-03 (2d Cir. 2015) ($49 million in combined profit supported scienter); *Zornberg v. NAPCO Sec. Techs., Inc.*, 778 F. Supp. 3d 516, 526 (E.D.N.Y. 2025) ($108 million in stock sales weighed in favor of motive).[15]   The percentage of holdings sold by the Individual Defendants is likewise suspicious.  Hoffman sold over 1.5 million shares of Inari common stock; Hill sold 267,500 shares; and Hykes sold 200,000 shares, accounting for 59.7%, 53.5%, and 24.4% of their respective Class Period stockholdings.  ¶¶154-59.  Percentages of this magnitude have been deemed "hefty" and compelled an inference of scienter.  *See Zornberg*, 778 F. Supp. 3d at 526 ("The Second Circuit has held that stock sales of more than 40% of holdings are sufficient to establish a motive.") (citing *Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 85-86 (2d Cir. 1999)).

Defendants contend that sales over a 35-month period lessen the scienter inference.  Mem. at 31.  Not so.  Allegations of insider trading over class periods of comparable lengths have supported an inference of scienter.  *See, e.g.*, *Mart v. Tactile Sys. Tech., Inc.*, 595 F. Supp. 3d 788, 816 n.21 (D. Minn. 2022) (discrediting defendants' argument that the class period length undermined the suspiciousness of the stock sales in light of allegations that defendants engaged in numerous sales during the course of a "long class period").[16]

Moreover, the timing of the sales was inherently suspicious where such sales were made following Defendants' positive statements about Inari's revenue growth – an order of events that

---

[15]   Defendants' reliance on *Woolgar v. Kingstone Cos Inc.*, 477 F. Supp. 3d 193, 236 (S.D.N.Y. 2020), is misplaced because there, aside from allegations that the company's CEO received net proceeds rather than profits of $1.3 million from his stock sales, the complaint was entirely devoid of any other insider trading factors.  *See* Mem. at 31.

[16]   *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 120 (3d Cir. 2018), cited by Defendants, does not apply here because the insiders there did not sell their shares when the stock price was near the class period high, and only two of the five insiders sold stock at all, as opposed to ***all*** Defendants who sold here.

- 25 -

4909-9365-9505.v2

occurred many times during the Class Period. *See City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 137 (S.D.N.Y. 2020) ("'Unusual insider sales at the time of the alleged withholding of negative corporate news may permit an inference of bad faith and scienter.'"). For example, on May 5, 2022, just one day after Inari announced its first quarter 2022 earnings, Hoffman sold 30,000 shares of Inari stock for single-day proceeds of over $2 million. ¶154. On November 15, 2022, while Inari's stock was still riding the high from its third quarter FY 2022 earnings call, he sold another 55,000 shares for single-day proceeds of nearly $4.5 million. *Id.* And on January 17, 2023, a few days after Hykes touted that Inari saw "a really strong quarter driven by procedural growth" at the JPMorgan Conference, Hoffman sold another 55,000 shares for single-day proceeds of nearly $3.7 million. ¶¶107, 154. Hill also sold stock on the heels of positive statements. For instance, on January 12, 2023, the day after the aforementioned JPMorgan Conference, he sold 12,750 shares for proceeds of $842,013; on May 12, 2023, days after he told investors at the Bank of America Global Healthcare Conference that Inari was raising its revenue guidance because of "continued productivity gains from the existing sales organization," Hill sold an additional 12,750 shares for single-day proceeds of over $895,000. ¶¶115, 156. Finally, Hykes sold 20,000 shares for proceeds of over $1.8 million in the week immediately following Inari's February 23, 2022 press release and earnings call announcing its financial results for FY 2021. ¶158. *See Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*, 2019 WL 2360942, at *5 (S.D.N.Y. Mar. 4, 2019) (timing was unusual when the sales were within days of the company's positive earnings announcement); *see also Blanford*, 794 F.3d at 308-09 (timing suspicious where insider sales followed investor calls assuring continued business growth, even if made pursuant to trading plans).

Defendants insist that insider sales must be compared to prior or subsequent sales in order to be actionable. Mem. at 31. But such allegations are not necessary. *See Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1187 (C.D. Cal. 2007) (finding the lack of "trading history" a moot factor in "unusual" stock sale analysis and proceeding to hold that insider trading allegations still supported scienter). The totality of the insider trading factors here suffices to support a finding that Defendants possessed motive. And Defendants' argument that sales were "largely consistent" with "no change in trading volume for any of the Individual Defendants in the five months preceding the disclosure of the CID" ignores the fact that Hoffman and Hill abruptly stopped trading in December 2023 after Inari received the CID from the DOJ. Mem. at 31.[17,18]

Finally, Defendants' attempt to seek cover under their Rule 10b5-1 plans ignores the Complaint's allegations that Defendants entered into new trading plans throughout the Class Period. *See* ¶¶154 n.6, 156 n.7, 158 n.8; *see also George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *9 (S.D.N.Y. Aug. 8, 2012) (Where "10b5-1 [trading] plans are entered into during the class period,

---

[17]   Defendants cite several cases to argue that consistent stock sales negate any inference of scienter. *See* Mem. at 31. But in each of those cases, the plaintiffs' insider trading allegations were laden with other deficiencies not present here. For instance, in *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 773 (S.D.N.Y. 2019), the defendants did not sell any stock near the time the sole actionable misstatement was made. In *Micholle v. Ophthotech Corp.*, 2019 WL 4464802, at *15 (S.D.N.Y. Sep. 17, 2019), the plaintiffs failed to allege profits or that the stock "sales were suspiciously timed to occur soon after the allegedly misleading statements were made or shortly before any corrective disclosure or materialized risk." And in *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 445 (S.D.N.Y. 2005), the plaintiffs also improperly alleged proceeds rather than profits, did not allege the percentage of stockholdings sold by each defendant, and defendants purchased more stock during the class period than they sold.

[18]   Further, throughout the Class Period, Defendants accelerated option exercises many years ahead of expiration to maximize profits, further underscoring opportunism. ¶162. The cases Defendants cite in an attempt to refute this point are inapt. *See* Mem. at 32. In *In re Plug Power, Inc. Sec. Litig.*, 2022 WL 4631892, at *15 (S.D.N.Y. Sep. 29, 2022), the defendants' stock sales were not suspicious in large part because plaintiff failed to allege that the defendants entered into their trading plans during the class period and improperly attempted to shift the burden onto defendants by positing that "defendants failed to establish that they entered into the plans in good faith." *Plymouth Cnty. Ret. Assoc. v. ViewRay, Inc.*, 556 F. Supp. 3d 772, 799-800 (N.D. Ohio 2021), is likewise off base because there, only one of five named defendants sold stock during the class period, his trades were covered by his 10b5-1 trading plan, and he sold the company stock both before and after the stock price fell, which weighed against any inference of suspicion. In *Knurr v. Orbital ATK Inc.*, 272 F. Supp. 3d 784, 808-09 (E.D. Va. 2017), only two of four named defendants sold any stock, the CEO only sold 5% of his stockholdings, and the second defendant sold stock when the share price was lower than the stock's class period highs and in advance of his departure from the company, which the court held demonstrated motive to get rid of his stock before leaving, not an intent to defraud.

- 27 -

4909-9365-9505.v2

they 'are not a cognizable defense to scienter allegations on a motion to dismiss.'"); *Blanford*, 794 F.3d at 309 (declining to find that an insider's trades were shielded from liability where the executive entered into the plan during the class period).[19] Defendants' trading plans thus do not insulate them from liability.

***The Individual Defendants Received Incentive-Based Compensation***. Allegations that a defendant "benefitted in a concrete and personal way from the purported fraud," may support a finding of scienter. *Novak*, 216 F.3d at 311. The Second Circuit recently stated that "we may infer the defendants' 'motive to sweep problems under the rug' if the allegations support a 'direct link between the compensation package and the fraudulent statements.'" *Gimpel v. The Hain Celestial Grp., Inc.*, 2025 WL 2749562, at *14 (2d Cir. Sep. 29, 2025). Here, the Individual Defendants' executive compensation plans depended directly on the sales of Inari's catheter devices. *See* ¶169 (alleging that weighted revenue accounted for 80% of the Individual Defendants' performance goals in FY 2022). Indeed, there was a direct link between their compensation packages and the false and misleading statements they made. ¶¶167-70. The Individual Defendants were thus also motivated to engage in the unlawful kickback scheme in order to increase sales of Inari's medical devices so as to

---

[19]  Defendants' cases on this point are inapposite. *See* Mem. at 30. *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 585-86 (S.D.N.Y. 2014), does not apply because not only did the executive's trading plan state that his brokers had sole discretion to sell up to a certain amount of shares over the course of the plan, but also the executive retained 94% of his pre-class period holdings. *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 764 (S.D.N.Y. 2018), is likewise off base because, unlike here, plaintiffs did not connect the timing of defendants' stock sales to any of their allegedly false and misleading statements. In *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *21 (S.D.N.Y. Sep. 21, 2021), the plaintiffs failed to allege *when* defendants entered into their trading plans (*i.e.*, before or during the class period) and, like in *Plymouth*, *supra*, improperly sought to shift the burden to defendants to establish that they entered into their trading plans before they acquired insider information, not to mention, one of the defendants' stockholdings *increased* during the class period. Likewise, in *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355-56 (2d Cir. 2022), the court was unpersuaded by plaintiffs' insider trading allegations not because of the presence of trading plans (in fact, only one of four defendants had a 10b5-1 plan), but because all four of the defendants bought more shares than they sold during the class period.

4909-9365-9505.v2

ensure they would maximize their incentive compensation.[20]  During the Class Period, Hoffman received $8.6 million in cash and stock-based compensation, Hykes received $10.8 million, and Hill received $6.7 million.  ¶161.  These compensation incentives demonstrate that the Individual Defendants had the motive to defraud.  *See In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) (bonus of $3 million, which was two and a half times the executive's normal salary and obtained for boosting Vivendi's EBITDA by more than 30%, constituted a "'concrete and personal benefit'" which sufficed to demonstrate "an even greater motive for inflating the appearance of Vivendi's financial performance"); *see also Hain Celestial*, 2025 WL 2749562, at *14 ("Plaintiffs' allegations move the needle because the significant bonuses and stock awards that Simon and Carroll received in FY 2015 – a bonus of $5,565,725 and $8,787,355 in stock awards for Simon and a bonus of $711,711 and $1,119,854 in stock awards for Carroll – were tied to the metrics that Hain overstated, including Hain's net sales, net income, and earnings per share.").[21]

### C.    The Core Operations Doctrine Further Supports Scienter

"The inference of scienter is also buttressed by Plaintiffs' core operations allegations." *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019). This Court in *SolarEdge* declined to credit the core operations doctrine because "'[p]laintiff[s'] other allegations f[e]ll far short of supporting a compelling inference of scienter.'" *In re SolarEdge Tech., Inc. Sec. Litig.*, 2024 WL 4979296, at *15 (S.D.N.Y. Dec. 4, 2024).  Unlike the allegations rejected in *SolarEdge*, the core operations doctrine supports and is consistent with other scienter allegations pleaded in the Complaint, and thus provides a supplemental basis from which to infer scienter. *See*

---

[20]    Allegations of a kickback scheme when considered in tandem with executive compensation tied to performance, can support a "strong inference of scienter for the senior executives." *See In re St. Paul Travelers Sec. Litig. II*, 2006 WL 2735221, at *4 (D. Minn. Sep. 25, 2006).

[21]    *Saskatchewan Healthcare Emps.' Pension Plan v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 388-90 (S.D.N.Y. 2024) (Woods, J.), cited by Defendants, is readily distinguishable because there, the sole alleged motive was to maintain a high stock price.  Mem. at 31.  Plaintiffs here allege numerous facts underscoring Defendants' motive.  *See* ¶¶153-63.

4909-9365-9505.v2

*Hain Celestial*, 2025 WL 2749562, at *16 n.19 (core operations doctrine "'can provide supplemental support for allegations of scienter'").  In *Hain Celestial*, "the alleged fraud touched on large swaths of Hain's U.S. business and areas of critical import to Hain and its executives," affected 2.4% of the company's net sales over a three-year period, and was of importance to Hain.  *Id.* at *16.  The court held that not only did those allegations bolster the inference of scienter, but also that "it would strain credulity to conclude that the Individual Defendants were unaware of channel stuffing and its potentially insidious implications for investors."  *Id.* at *16-17.  As in *Hain Celestial*, it is not credible to conclude that Hoffman, Hykes, and Hill – Inari's highest-level executives – were unaware of Inari's sales tactics for its key products, which necessarily "touched on large swaths of" Inari's business as those products accounted for 100% of the Company's revenues.  *Id.*; *see* ¶143; *see also In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 491 (S.D.N.Y. 2004) (by sheer virtue of his position, a high-level executive has a "duty to familiarize himself with the facts relevant to the core operations of the company").[22]  That sales of Inari's medical devices were "key to the company's profits," and the Defendants constantly touted as much, bolsters the inference of scienter.  *See San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 319 (S.D.N.Y. 2024) (core operations doctrine supported a finding of scienter where the business at issue was "key to the company's profits").  The Court may therefore "infer 'that [Inari] and its senior executives ha[d] knowledge of information concerning the core operations of [its] business.'"  *In re Supercom Inc. Sec. Litig.*, 2018 WL 4926442, at *31 (S.D.N.Y. Oct. 10, 2018).

---

[22]    Courts in this Circuit have sustained scienter allegations in part on the basis of the core operations doctrine where the fraudulent business activities at issue comprised a far smaller portion of the company's profits. *See, e.g., City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat., PLC*, 423 F. Supp. 2d 348, 362 (S.D.N.Y. 2006) ("nearly a third of [the Company's] entire profit"); *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *23-26 (S.D.N.Y. Dec. 2, 2013) (finding that core operations allegations strengthened the scienter inference where only 18% of company's revenues were affected).

4909-9365-9505.v2

D.    Defendants' Proffered Nonfraudulent Inference of "Individual Carelessness" Is Unsupported and Not Compelling

Defendants urge the Court to believe that they had "permissible intent" and that "any excessive or improper expenses . . . arose from individual carelessness rather than intentional or consciously reckless misconduct." Mem. at 29. But the nonfraudulent inference Defendants offer cannot be "rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314. Inari's improper practices were neither isolated nor the work of some rogue employee; rather, Defendants engaged in a systematic, Company-wide practice of providing kickbacks and bribes in exchange for business. This is most readily demonstrated by Inari's Company-wide tracking of expenditures on HCPs measured against the value of Inari products purchased by those HCPs. ¶64. That Inari's unlawful system of tying payments to HCPs to business generated by each HCP was addressed at national sales meetings demonstrates that this was an accepted and promoted practice at Inari, not some isolated, unsanctioned occurrence. ¶¶3, 64. The Complaint further alleges that Hykes was notified by FE-1 and FE-1's supervisor that Inari was engaging in conduct that violated ethical and legal standards, that Defendants were aware of and even actively participated in the kickback scheme, including by attending physician dinners themselves, and that Defendants possessed the motive and opportunity to defraud, as demonstrated by their $155 million in insider sales profits and $26 million in incentive-based compensation. ¶¶142, 153-63, 167-70.

Defendants' proffered inference, in contrast, is based on the naked assertion that because (1) the Company was introducing a "new way to treat a health issue" and had to spend money to "educate healthcare professionals," and (2) reported the amount of its expenses publicly through the Open Payments system, the inference must be that Inari's practices were proper. Mem. at 29. Defendants offer no caselaw or other support for their preferred inference. The fact that Inari's payments were reported does not address (let alone refute) that the Company still violated the AKS

- 31 -

4909-9365-9505.v2

by tracking those payments to sales. Viewed holistically, the Complaint presents a cogent inference of fraud that is at least as compelling as the opposing inference offered by Defendants. *See Tellabs*, 551 U.S. at 324.

## VI.    THE COMPLAINT SUFFICIENTLY PLEADS SCHEME LIABILITY

Rules 10b-5(a) and (c) "prohibit[] not only material misstatements but also manipulative acts," commonly known as scheme liability. *Guevoura Fund v. Sillerman*, 2016 WL 4939372, at *8 (S.D.N.Y. Sep. 12, 2016). "These provisions capture a wide range of conduct." *Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71, 79 (2019). "'To state a claim for scheme liability, a plaintiff must present facts showing "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance."'" *In re Electrobras Sec. Litig.*, 245 F. Supp. 3d 450, 470 (S.D.N.Y. 2017). Scheme liability "'hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement.'" *Id.*

Defendants argue that Plaintiffs' scheme liability allegations fail because the Complaint is devoid of any facts concerning a scheme claim aside from the underlying 10b-5(b) misstatement claim. Mem. at 35.[23] This argument directly conflicts with Supreme Court precedent. *See Lorenzo*, 587 U.S. at 80 (rejecting the argument that Rule 10b-5(a) and (c) govern "different, mutually exclusive, spheres of conduct" from Rule 10b-5(b), and holding that scheme liability and misstatement liability may "***overlap***"). Thus, by acknowledging "conduct underlying their misstatement claim," Defendants have effectively conceded that Plaintiffs have met the standard for pleading scheme liability under *Lorenzo*.[24]

---

[23]    Because Defendants failed to do so in their Motion, they are barred from raising any new arguments regarding other elements of a scheme claim on reply. *Farruggio v. Kraft Heinz Food Co.*, 747 F. Supp. 3d 420, 426 n.9 (N.D.N.Y. 2024) ("parties may not introduce arguments for the first time in reply").

[24]    Defendants' own authority rejects their incorrect standard, as it holds that "misstatements or omissions ***alone*** are not enough for scheme liability." *See Buhrke Family Revocable Trust v. U.S. Bancorp*, 726 F. Supp. 3d 315, 362-63 (S.D.N.Y. 2024); *see also* Mem. at 35.

- 32 -

Moreover, the Complaint sufficiently alleges the nature, purpose, and effect of the fraudulent conduct, *i.e.*, that "Defendants utilized a myriad of sales and marketing practices," namely, paying HCPs kickbacks and bribes in exchange for their using and recommending Inari's products, all of which were designed to boost sales of Inari products. ¶¶55-64.  In particular, the Complaint alleges the following fraudulent conduct:

- Inari "creat[ed]" quid pro quo relationships with HCPs by spending thousands of dollars on meals, travel, consulting service payments, gift[] cards [sic], and speaking engagements" (¶56);

- Inari encouraged HCPs to "push[] Inari's FlowTriever catheter even in cases where it could be dangerous" (*id.*);

- Inari "paid for physicians to attend training sessions in vacation destinations, despite that the training event was not for the physician's specialty, or that the training session was intended for nurses rather than physicians" (¶59);

- Inari allowed physicians to "tell their designated salesperson if there were specific events, such as a NASCAR race, or a dinner they wanted to attend" (*id.*);

- "certain physicians were hired as consultants, and referred to by the salesforce as Key Opinion Leaders ('KOLs')" and that "sales staff were instructed to compensate KOLs regularly with trips and dinners" in order to boost sales of FlowTriever (¶63);

- "Inari would remove physicians from their speakers and dinners list if . . . the physicians were not using substantial amounts of Inari products" (*id.*); and

- Inari tracked sales by specific physicians so that it could correlate the amount of revenue generated by that physician to the amount of money spent wining and dining that physician, and directed sales representatives to increase kickback spending on physicians who generated higher sales volumes (¶¶2-3, 71, 74).

The Complaint also alleges that Inari's executives were intimately involved in the kickback scheme as demonstrated by the following: Hykes flew to and participated in physician events and dinners; Inari executives attended meetings where concerns about kickbacks were discussed; and Hykes personally fired an employee after that employee and their subordinate voiced concerns to Hykes regarding the kickback scheme. ¶60.  Because Inari's executives were "deeply involved" in promoting sales of FlowTriever and in implementing and protecting the kickback scheme, they are

- 33 -

4909-9365-9505.v2

liable for scheme liability. Courts routinely hold that similar allegations suffice to state a claim for scheme liability. *See, e.g.*, *Tactile*, 595 F. Supp. 3d at 824 (allegations that defendants provided kickbacks in exchange for stays at luxury hotels and meals at expensive restaurants, and that they "dismissed" HCPs who failed to generate enough business, supported scheme liability claim); *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384, 393 (8th Cir. 2016) ("the ***act of paying physicians*** to induce their complicity is the allegation at the heart of the scheme liability claim"); *Boston Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 132, 142 (D. Conn. 2021) (upholding scheme where physicians were pushed to prescribe products even where there was a "good clinical reason" for not doing so).

## VII.   THE COMPLAINT STATES A §20(a) CONTROL PERSON CLAIM

The Complaint alleges that the Individual Defendants "participated in the alleged primary conduct" and thus were control persons under §20(a). *See City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 721 (S.D.N.Y. 2013). Because Plaintiffs adequately plead the primary §10(b) violation, the Court should sustain the §20(a) claim as well.

## VIII.   THE COMPLAINT STATES A §20A INSIDER TRADING CLAIM

The Complaint alleges that the Individual Defendants (1) sold $155 million worth of Inari stock while in possession of material, nonpublic information, (2) traded contemporaneously with Plaintiffs and the Class, and (3) committed the predicate Exchange Act violation, which is sufficient to allege that Defendants violated §20A. *See In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 255 (S.D.N.Y. 2007).

## IX.   CONCLUSION

For the reasons set forth above, Defendants' Motion should be denied in its entirety. Plaintiffs maintain the sufficiency of these allegations, but if the Court finds otherwise, Plaintiffs

- 34 -

4909-9365-9505.v2

respectfully request leave to amend.  *See Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198-99 (2d Cir. 1990).

DATED:  October 16, 2025

ROBBINS GELLER RUDMAN
  & DOWD LLP
LUCAS F. OLTS
JOHN M. KELLEY
JACK ABBEY GEPHART

s/ LUCAS F. OLTS
LUCAS F. OLTS

655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
lolts@rgrdlaw.com
jkelley@rgrdlaw.com
jgephart@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com

GRANT & EISENHOFER P.A.
JAMES S. NOTIS
VINCENT J. PONTRELLO
MICA A. COCCO
485 Lexington Avenue, 29th Floor
New York, NY  10017
Telephone:  646/722-8500
jnotis@gelaw.com
vpontrello@gelaw.com
mcocco@gelaw.com

*Lead Counsel for Lead Plaintiff and the Class*

- 35 -

4909-9365-9505.v2

ASHERKELLY
MICHAEL J. ASHER
JACQUELINE A. KELLY
CYNTHIA J. BILLINGS-DUNN
25800 Northwestern Highway, Suite 1100
Southfield, MI  48075
Telephone:  248/746-2710
cbdunn@asherkellylaw.com

*Additional Counsel*

- 36 -

4909-9365-9505.v2