P8DEMICC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MICHIANA AREA ELECTRICAL
WORKERS' PENSION FUND,

                 Plaintiffs,

          v.                           24 Civ. 3686 (GHW)(JEW)

INARI MEDICAL, INC. ET AL,
                                       Conference

                 Defendants.

------------------------------x
                                       New York, N.Y.
                                       August 13, 2025
                                       3:00 p.m.

Before:

                    HON. GREGORY H. WOODS,

                                       District Judge

                         APPEARANCES

GRANT & EISENHOFER, PA
     Attorney for Plaintiffs
BY:  JAMES S. NOTIS

     -and-

ROBBINS GELLER RUDMAN & DOWD LLP
     Attorney for Plaintiffs
BY:  LUCAS F. OLTS

KING & SPALDING LLP
     Attorneys for Defendants
BY:  LISA BUGNI
     CHRISTOPHER E. DUFFY
     ALVINA PILLAI

P8DEMICC

(Case called)

THE COURT: I'm going to begin by taking appearances from the parties. If there's more than one lawyer on the line for either side, I would like for the principal spokesperson to identify him or herself and the members of their team rather than having each lawyer introduce themselves individually.

So I'm going to be speaking with counsel for plaintiff. Who is on the line for plaintiff?

MR. NOTIS: Good afternoon, your Honor. I'm James Notis from Grant & Eisenhofer, and I'll be the principal spokesperson for plaintiffs this afternoon.

THE COURT: Good. Thank you.

MR. OLTS: And this is Lucas Olts from Robbins Geller, also on behalf of the plaintiff.

THE COURT: Thank you. Good. So let me turn to counsel for defendants. Who is on the line for defendants?

MS. BUGNI: Good afternoon, your Honor.

Lisa Bugni from King & Spalding for defendants, and with me are Christopher Duffy and Alvina Pillai.

THE COURT: Thank you.

I'm going to begin with a few brief instructions with the rules that I'd like the parties to follow during the course of today's conference. At the outset, please remember that this is a public proceeding. Any member of the public or press is welcome to dial into this conference. I am not currently

monitoring whether third parties are auditing the conference but they're perfectly welcome to do so, so you should keep that possibility in mind.

Second, please keep your phones on mute at all times. Everyone who has dialed into the call should affirmatively place their phones on mute. Only take your phone off mute if you are intentionally speaking to me or to the representative of a party.

Third, please state your name each time that you speak. Please do that even if you've spoken previously. It will help our court reporter who is transcribing the conference.

Fourth, if our court reporters asks you to do something that will help her do her job, please do it to the extent that you can.

And finally, I am ordering that there be no recording or rebroadcast of all or any portion of today's conference.
A.   So, counsel, with all of that out of the way, let's turn to the substance of today's proceeding. This is a premotion conference with respect to a proposed motion to dismiss the complaint in this case. Counsel, I've read each of your letters in connection with the proposed motion to dismiss. Still, it's helpful for me to hear from the parties about the grounds for the proposed motion, and so I'll hear from each of you in turn if there's anything about the motion that you'd

P8DEMICC

like to highlight.  Starting first with counsel for defendants.

Counsel, what's the basis for the proposed motion to dismiss?

MS. BUGNI:  Thank you, your Honor.

Lisa Bugni.

I think it's important, on the motion, to have a little bit of background about Inari's business because it helps frame things.  So, Inari is a medical device company that has developed innovative devices to treat blood clots in the vein.  Prior to Inari's development of these devices, the typical approach to treating blood clots was the use of blood thinners, but blood thinners simply prevent future clots, they don't actually treat existing ones.  Inari's devices, by contrast change how blood clots are treated, and they remove them from the vein.

Because it was a new treatment, Inari had to educate medical professionals, both those who would be using the device as well as those who were on the front lines and were seeing instances of blood clots to then refer to specialists.  It is a common, accepted, and legal practice for medical device companies to conduct educational or marketing events at which companies inform healthcare professionals about their products.  And in connection with these events, companies are permitted to cover the costs of healthcare professionals.  Now, Inari reported these expenses publicly through a forum called CMS

P8DEMICC

Open Payments, and they publicly discussed with investors their education effort at length in both public files and on public earnings calls.

Inari, like many medical device companies, received a civil investigative demand from the Department of Justice that requested documents and information related to meal and consulting service payments to healthcare professionals.  Inari publicly disclosed that it had received that civil investigative demand, and when Inari stock rates declined, we had plaintiffs who filed suit, relying primarily on the government's request for information as somehow being an indication that there was fraud.

What plaintiffs allege here is the conclusion that Inari's educational expenses were unlawful kickbacks under the Anti-Kickback Statute, and that Inari's failure to disclose that it was engaged in an alleged illegal kickback scheme rendered its public statements misleading.  That theory fails for two overriding reasons:

First, the complaint does not allege an actionable misstatement.

And second, it does not allege the requisite strong inference of scienter.

On the first part about not alleging an actual misstatement, plaintiffs state in their premotion letter that there are three categories of alleged misstatements:  The first

P8DEMICC

is compliance with healthcare laws, the second is revenue growth, and the third is sales, general and administrative expenses, or SG&A expenses.

And so the first category, statements on compliance with healthcare laws, there are two alleged misstatements in the complaint:  The first is from paragraph 78.  That is not even a statement that Inari made.  It is a statement in a contract with the companies that Inari was buying where the acquisition target is the one that made that statement, so that statement is not actionable as to defendants.

The second statements on compliance with healthcare laws is, likewise, in a contract.  It's a contracted between Inari and certain underwriters for offerings.  And in that contracted, Inari represented to the underwriters that it was in compliance with healthcare laws except where instances of noncompliance would not be expected to result in a material adverse effect on the company.  And nowhere in the complaint does plaintiff allege that there was any material adverse effect on the company.  In fact, the Deutsche Bank report, which the plaintiffs heavily rely on in their complaint, specifically predicts that the Department of Justice's requests for information likely would not have any material impact on the business.  So the statements of compliance do not state a claim for securities fraud.

That takes us to the revenue and expense statements,

P8DEMICC

and I'll treat those together.  Plaintiffs nowhere allege that either the revenue or the expense numbers that Inari reported were false numbers; rather, they allege that the correctly reported numbers were somehow misleading because Inari failed to disclose that it was violating the Anti-Kickback Statute. That claim likewise fails to state a claim because Inari's compliance with the Anti-Kickback Statute does not have a sufficient nexus to the statements of revenue or expenses. That makes the claim a pure omission claim, and the Supreme Court has clearly held that you cannot have a pure omission claim.

And even if there was a sufficient nexus alleged, the complaint would still fail the stated claim because plaintiffs nowhere plead with the required detail that Inari did violate the Anti-Kickback Statute.  Where a securities fraud claim is based on the alleged failure to disclose uncharged illegal conduct, the underlying illegal acts must be pled with particularity, and the complaint does not even come close. Plaintiffs don't identify any specific events that constitute kickbacks, any dates of those events, any doctors or healthcare professionals that attended, or the name and location of any healthcare professional who allegedly received any kickbacks.

All plaintiffs have is the civil investigative demand, but wrongdoing cannot be inferred from the mere existence of an investigation.  Government investigations are just that,

P8DEMICC

they're investigations.  And here, the Department of Justice has not made any findings or even allegations of Anti-Kickback Statute violations, so the complaint does not plead an actual misstatement.

It also does not plead the requisite strong of scienter.  Here, as the Court is well aware, the Supreme Court requires that the Court consider whether the inference from well-pled allegations is cogent and at least as compelling as any imposing inference of non-fraudulent intent, and a complaint does not satisfy that standard as the non-fraudulent inference is more compelling.

The documents that are incorporated into the complaint by reference establish that Inari's products were innovative, that Inari had to educate healthcare professionals about their innovative products, that Inari adopted a code of ethics to govern those expenditures, and that Inari publicly reported those expenditures and openly discussed publicly the educational efforts it needed to undertake.  That establishes a compelling inference that Inari intended to design and execute a permissible program for training and educating healthcare professionals about its innovative products.

The Deutsche Bank report that plaintiffs rely on does not change that.  Plaintiffs characterize that analyst report as an investigation that concluded there were violations, but a read of the report establishes that it is no such thing.

P8DEMICC

Deutsche Bank, in fact, recommended that investors buy Inari stock. It would not have done that if it thought Inari was violating the law. The reference in the report to violation, it is very clear from the analyst. The analyst indicates that came from his discussion with one former employee that that analyst spoke to, and it was caveated with a notation that former employees' motives can give reason to discount what they say.

The stock sales that are referenced in the complaint likewise do not change that the non-fraudulent inference is the more compelling one. Inari was a startup that went public after developing its devices. That executives sold stock pursuant to predetermined 10b5-1 trading plans in a regular cadence throughout the 35 months of the alleged class period does not give rise to a strong inference of scienter.

And finally, the allegations related to former employees does not change that the more compelling inference here is the non-fraudulent one. There are three former employees alleged, two of them are not alleged to have even had any contact with any of the individual defendants. The third one is alleged to have had contact with one of the individuals and allegedly shared his opinion on the expenditures. The complaint alleges that his supervisor was terminated after, but there's no indication the supervisor was terminated for anything related to the expression of this opinion regarding

P8DEMICC

the expenditures.  That means that the allegations from this former employee boil down to an expression of a non-lawyer's opinion on compliance, and the law provides that that is not enough to allege a claim for securities fraud.

So, defendants request that we be able to file a motion to raise and discuss these and other arguments as to why the complaint fails to state claim.  And I'm happy to address any questions your Honor may have.

THE COURT:  Okay.  Thank you very much.  I'll start by turning back, however, to counsel for plaintiff.

Counsel, again, I've seen your letter but I welcome any comments that you'd like to make regarding the arguments that you expect to present in opposition to defendant's motion.

Counsel for plaintiff.

MR. NOTIS:  Yes, your Honor.

It's James Notis for the plaintiffs.

I want to spend a minute to talk about the regulatory environment that Inari operates in and how it's so vastly different from businesses that don't participate in the federal healthcare programs.  Because while what the Anti-Kickback Statute considers an unlawful kickback for companies like Inari may be perfectly legitimate for businesses who would wine and dine clients and their spouses based on the importance of that client or ask for referrals to generate sales.  That's fair game in the general business world, but that's outlawed under

P8DEMICC

the Anti-Kickback Statute, and that's what Inari was doing here.

The one big thing under the Anti-Kickback Statute is that a company cannot provide remuneration to a physician, directly or indirectly, for the purpose of inducing a referral or generating a sale. So, a company can hold educational programs, as counsel for defendants explained, but as we've alleged, the educational programs weren't there just to educated physicians or ER staff or other healthcare professionals about treatment for VTE, it was specifically for the purpose of getting those individuals to refer patients to somebody who they know is going to use Inari's products, and that's unlawful under the Anti-Kickback Statute, that Inari was setting up these referral networks, and that's what this VTE network is about.

It's not a very high bar to trip a violation for the Anti-Kickback Statute. It doesn't have to be the primary purpose or the sole purpose, but if one of the purposes is to generate revenue, then there's a violation with potential civil and criminal liability.

Now, defendants criticize us for not identifying specific physicians who attended the NASCAR races that we allege made illicit payments to, but we do have the allegations that the company tracked the money spent on individual physicians to the business generated by those individual

P8DEMICC

physicians, and that in itself is a violation of the Anti-Kickback Statute because it shows that the money was spent based on revenue generated. It's kickbacks based on the volume of business, and that's the report from Former Employee 1. And I understand why defendants would want to talk about it was just an opinion from Former Employee 1 or that there's not enough detail, but Former Employee 1 is someone who spent 30 years in this business and was personally hired by the CEO of the company at the time. That's Defendant Hykes who later became the CEO. And the report from Former Employee 1, and also consistent with the reports from Former Employee 2 and Former Employee 3 was that it was a company-wide practice to use payments to physicians to incentivize sales. And again, payment can be anything of value: Meals, trips, speaking fees. That the amount the company would pay was based on what the doctor generated in sales.

The Deutsche Bank report supports those former employee reports. A few things to note about the Deutsche Bank report: It was issued after the class period in August of 2024, but it's a comprehensive report that you see when an analyst initiates new coverage, and it does report on what happened during the class period, and it shows that, "Sales reps are encouraged to create a quid pro quo with referring physicians," and my friend says that that's based on one employee. The report says that they spoke with multiple

P8DEMICC

employees, and that one employee was "especially critical." So, nonetheless, that's what Deutsche Bank found.

And the fact that Deutsche Bank issued a buy recommendation doesn't really matter because, again, this was after the class period, this was after the stock had dropped and hundreds and millions of dollars had been wiped out of market capitalization, and so it's not unusual for a cell site analyst at Deutsche Bank to issue a buy recommendation once the stock had been at a price that was less than half of the high it was during the class period.

In terms of the falsity of the statements, it's not a pure omissions case. This is a classic case of half truths. I guess we could argue on the motion about what constitutes a material adverse effect or whether that was an affirmative representation, but I think that the material adverse effect may be seen in the fact that the stock dropped 21 percent upon disclosure of the CID and that there was a problem with this company's potential violations of the Anti-Kickback Statute and the False Claims Act. Twenty one percent, which would, generally speaking, among transaction lawyers, is more than enough to trigger a MAE clause -- excuse me, material adverse effect clause.

So, you have misrepresentations in the 8-Ks about compliance with healthcare laws, and then you have --

THE COURT: I'm sorry, counsel. Can I pause you on

P8DEMICC

that?  Thank you for first addressing the MAE issue.

Can you also address why these statements contained in documents attached to the 8-Ks, which I understand to be representations in the case of paragraph 78 from an acquired company to the company, and in the case of 76 from the company to the underwriters.  Why are those misleading statements to the investors?

MR. NOTIS:  Well, for one thing, they're public statements to investors.  So whether the company issue as press release saying we're in compliance with all healthcare laws or the company issues a contract with its underwriters which includes representations that they're in compliance with all healthcare laws, I don't know if there's much difference other than the investor would have to look a little harder to find out what the disclosure is.  But given the market efficiency, all of this information would have been included in the market price.  Defendants are not making any argument about loss causation.

THE COURT:  Can I just pause on that, counsel?

Why is attaching a document to the 8-K an assertion to the market of anything more than here is this document that we entered into?  Why does that, in your view, mean that the company is also stating to the market all of the representations contained in this document are true as you represented to the third party?  So what are they saying other

P8DEMICC

than here is a document that we entered into?

MR. NOTIS:  Well, I think that the content of the document is obviously relevant.  Any time the company makes a public representation, the contents are relevant and factored into the price of shares.  I don't think it makes a difference about whether those public representations are either made during an animus conference call or in an earnings report or in a contract.  It's a representation from the company.  And if the company is going to make representations and those representations are going to be made public, those representations have to be true.

THE COURT:  Thank you.

You can proceed.

MR. NOTIS:  So, you have those affirmative representations, and then we have allegations about the risk disclosures, that you can't just warn of potential risks of violating -- your regulations of violating the Anti-Kickback Statute when you know that the risk had actually materialized.  That's not a pure omission, that's a half truth, and that's actionable.

And the last bucket of actionable statements are about the company's sales and sales expense.  We don't challenge that the numbers that they reported were accurate, but the problem is that once defendants talk about the reasons behind the sales and sales expense, then they have a duty to speak truthfully

P8DEMICC

about it.  And so when they're talking about that the reason the company has reported increased revenues or increased sales expense was not about the efficiency of the sales team or the efficacy of this VTE program, it was because they were engaged in an illicit kickback program.  And so those statements are half truths, they're actionable, and false as pleaded.

Turning to scienter, the reports from the former employees support a strong inference of scienter.  Again, Former Employee 1 was hired by Defendant Hykes, that former employee reported about the kickbacks and made up junkets and how Inari tracked appointments to the revenues generated, all violations of the Anti-Kickback Statute.  I don't think that could be fairly characterized.  It's just an opinion when it comes from an employee who has been doing this for 30 years.

And what happens is a few days later, excuse me, that the former employee and the former employee's supervisor go to Hykes directly, inform Hykes of the problems, and a few days later the supervisor is fired, and the new supervisor who replaced that person tells Former Employee 1 to ignore the problems.  And it was not an isolated incident.  Former Employee 1 continued to report other violations, continued to be ignored, and after that person left the company, that employee contacted the Department of Justice.  This is an interaction that indicates knowledge of fraud and not just carelessness or mismanagement, it's not an isolated incident.

P8DEMICC

And Former Employee 2 and Former Employee 3 also reported that these were company-wide practices, not individual carelessness.

And again, the Deutsche Bank report does support the former employees. It is unusual to have an animus report, a third party report, come out and issue statements reporting that former employees found the company to have been engaged in unlawful practices.

And of course, when you view it holistically between the reports of former employees, the insider selling, including selling options that did not expire for years, no insider buying, that compliance with the Anti-Kickback Statute was so critical to the company's liability, this company would not have been able to operate if they did not follow the regulations, that we've alleged scienter with particularity.

And I hope that covers the points raised in the letter but I can answer any questions your Honor may have.

THE COURT: Thank you. That's helpful. You responded to the questions I had.

Let me turn back to counsel for defendant.

Counsel, I'm happy to grant you leave to file the proposed motion. I'm going to ask you now when you would propose to file the motion, just a couple of brief notes about the briefing structure.

This case among securities cases appears to have a relatively small number of specific statements that are

P8DEMICC

asserted to be actionable. That, I hope, will streamline the process. The principal thing that I wanted to remind the parties of is that the Court has to consider each of the statements that are alleged to be actionable as I'm evaluating the proposed motion to dismiss. I say this because sometimes motions to dismiss are written, I'll call it, by bucket of statement rather than describing the issues raised by buckets of statements rather than specifically addressing each allegedly actionable statement, and why it is that the statements is, in defendant's view, not actionable.

Again, the number of statements at issue here is relatively discrete, but I just ask you, counsel for defendants and plaintiffs, as you're framing your briefing, to please keep in mind that I have to look at each statement, and I invite you to provide an analysis with respect to each of the statements. I won't dictate how that should be formulated, I just ask you to please help me do my job.

The second thing that I wanted to say is that it's rare in my experience that my default page limit of 25 pages suffices to permit the parties to present sufficiently, I'll call it, thoughtful and thorough briefing in a securities case such as this. As a result, I am happy to entertain an application to extend that default page limit. You should just let me know what your proposal is. If the parties want to make a proposal today, I will happily hear from you. If, instead,

P8DEMICC

the parties want to meet and confer about an appropriate page limitation for the motion opposition and reply and to write to me about that separately, feel free to propose that as well.

So, with that set of introductory comments, let me turn to counsel for defendant.

Counsel, when would you propose to file your motion to dismiss?

MS. BUGNI:  Your Honor, we could file two weeks from today, or by August 27.  And in light of your Honor's instruction about addressing each statement, we would ask that the default pages be extended to 35 pages for our motion.

THE COURT:  Thank you.  That's fine.

Counsel for plaintiff, any concerns about that proposal?

MR. NOTIS:  No, the 35 pages is fine.

One question I do have for your Honor is whether --

THE COURT:  Please.

MR. NOTIS:  -- your Honor counts it as page numbers or under local Rule 7.1 as a word count.

THE COURT:  Thank you.

MR. NOTIS:  I have no preference for one or the other, I just want to make sure we have the grounds down.

THE COURT:  Thank you.  That's fine.

So, as the parties know, our local rules recently changed.  They've changed to word counts instead of page

numbers. For purposes of what we're talking about right now, let's use page numbers because I can't translate the adjustment into a word count on the fly, so 35 pages is the page limit, using the formal font and spacing conventions. The reply, by default, should not exceed 20 pages in length.

I'm going to set the briefing schedule now. Rather than having the motion due right before the Labor Day holiday, I am going to have it due right after. So the motion will be due no later than September 4.

Counsel for plaintiff, do you need more than four weeks to oppose?

MR. NOTIS: Your Honor, normally I would ask for about 45 days.

THE COURT: That's fine.

MR. NOTIS: Okay.

THE COURT: And this also straddles a number of holidays, including Rosh Hashanah. So the motion schedule will be as follows: The motion itself will be due on September 4. Any opposition will be due no later than six weeks following the date of service of the motion. Any reply will be due no later than three weeks after the service of the opposition. I look forward to seeing your submissions. I think the briefing limitation that's been proposed is reasonable, but again, please feel free to reach out to me if you think that the page limits that I've just described do not permit the parties to

P8DEMICC

adequately address the issues presented here.

I think that's all that I have for today's conference. Is there anything else that either party wishes to raise with the Court?

First, counsel for plaintiff.

MR. NOTIS:  No, your Honor.  Thank you.

THE COURT:  Thank you.

Counsel for defendants?

MS. BUGNI:  No, your Honor.  Thank you.

THE COURT:  Thank you all.  This proceed is adjourned.

(Adjourned)