UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHIANA AREA ELECTRICAL WORKERS' PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>INARI MEDICAL, INC., WILLIAM HOFFMAN, ANDREW HYKES, and MITCHELL C. HILL,<br><br>Defendants. | No. 1:24-cv-03686-GHW-JW<br><br>(Consolidated with No. 1:24-cv-04662-JHR-JW)<br><br><u>CLASS ACTION</u><br><br><u>JURY TRIAL DEMANDED</u> |

**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS


**Page**

I. INTRODUCTION ....... 2

II. JURISDICTION AND VENUE ....... 9

III. THE PARTIES ....... 9

A. Plaintiffs ....... 9

B. Defendants ....... 10

IV. BACKGROUND OF INARI AND ITS STRICTLY REGULATED OPERATIONS ....... 11

A. The Market for VTE Treatment and Inari's Efforts to Gain Market Share ....... 11

B. Inari Operated in a Highly Competitive Industry ....... 16

C. Inari's Business Depended on Its Ability to Participate in Federal Healthcare Programs ....... 17

V. DEFENDANTS GAVE KICKBACKS IN EXCHANGE FOR BUSINESS ....... 23

A. Inari's Remuneration to HCPs Increased in Tandem with Inari's Sales ....... 23

B. There Is Documented, Clearly Linked Evidence of Remuneration and Case-Volume Correlation for Inari's Payments to HCPs, in Violation of the AKS ....... 24

1. Dr. Misono ....... 25

2. Dr. Rishal Kaushal ....... 28

3. Jason Berger ....... 29

4. Erin Van Dyke ....... 30

5. Dr. Victor Tapson ....... 31

6. Dr. Brian Sherman ....... 32

7. Dr. Aparna Baheti ....... 32

8. Additional HCPs ....... 33

C. Former Employees Confirm That These Payments Were Kickbacks Paid to Induce Physicians' Use of Inari's Products ....... 35

**Page**


D. Inari Tracked, Reviewed, and Adjusted HCPs' Remuneration Based on Their Case Volume ....................40

E. No AKS Safe Harbor ....................41

F. Inari's Remuneration Was Not the Permissible Training or Modest Hospitality Allowed by the AdvaMed Code ....................41

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ....................42

A. Statements About Compliance with Healthcare Laws ....................42

1. The FY 2020, 2021, and 2022 Forms 10-K ....................43

2. The March 15, 2022 Shelf Offering Agreement ....................48

B. Statements About Inari's Revenue Growth ....................49

1. The March 9, 2021 Press Release and Earnings Call ....................49

2. The May 11, 2021 Press Release and Earnings Call ....................51

3. The August 10, 2021 Press Release and Earnings Call ....................52

4. The November 9, 2021 Press Release and Earnings Call ....................54

5. The February 18, 2022 SVB Leerink Conference ....................56

6. The February 23, 2022 Press Release and Form 10-K ....................57

7. The May 4, 2022 Press Release and Earnings Call ....................59

8. The August 3, 2022 Press Release and Form 10-Q ....................60

9. The November 2, 2022 Press Release and Earnings Call ....................61

10. The January 11, 2023 JPMorgan Conference ....................64

11. The February 27, 2023 Press Release, Earnings Call, and Form 10-K ....................65

12. The May 3, 2023 Press Release, Earnings Call, and Form 10-Q ....................66

13. The May 9, 2023 BofA Conference ....................68

**Page**


14. The August 2, 2023 Press Release and Earnings Call ....69

15. The September 12, 2023 Baird Global Conference ....71

16. The November 1, 2023 Press Release and Earnings Call ....73

VII. THE CID IS REVEALED ....74

VIII. ADDITIONAL SCIENTER ALLEGATIONS ....77

A. Former Inari Employees Personally Informed Defendant Hykes of Illicit Activities ....78

B. Sales of Inari's Products to HCPs, and Inari's Relationships with HCPs, Concerned Inari's Core Operations ....78

C. Defendants Knew Inari's Payments to HCPs Violated Federal Law and Were on Notice of the Financial and Reputational Consequences that Stemmed from Violating the AKS and FCA ....80

D. Motive and Opportunity ....82

1. The Individual Defendants' Stock Sales Were Unusual and Suspicious ....82

2. The Individual Defendants' High-Level Positions and Experience ....88

3. The Individual Defendants' Compensation Was Directly Tied to Metrics Manipulated by Their Fraud ....88

IX. LOSS CAUSATION ....89

X. CLASS ACTION ALLEGATIONS ....91

XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ....92

XII. APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD-ON-THE-MARKET DOCTRINE ....94

XIII. CLAIMS FOR RELIEF ....95

XIV. PRAYER FOR RELIEF ....101

XV. JURY TRIAL DEMANDED ....102

Lead Plaintiffs Oklahoma Law Enforcement Retirement System, Local 353, I.B.E.W. Pension Fund, and City of Pontiac Reestablished General Employees' Retirement System (collectively, "Lead Plaintiffs"), by and through their counsel Robbins Geller Rudman & Dowd LLP and Grant & Eisenhofer P.A. (together, "Lead Counsel"), bring this action under §§10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b), 78t(a), and 78t-1, on behalf of themselves and all persons or entities who purchased or otherwise acquired Inari Medical, Inc. ("Inari" or the "Company") common stock between March 10, 2021 and February 28, 2024, inclusive (the "Class Period"), and were damaged thereby.

Lead Plaintiffs allege the following based upon personal knowledge as to Lead Plaintiffs and Lead Plaintiffs' own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based upon, *inter alia*, Lead Counsel's investigation, which included review and analysis of: (a) regulatory filings made by Inari with the United States Securities and Exchange Commission (the "SEC"); (b) press releases, presentations, and media reports issued by and disseminated by the Company; (c) analyst and media reports concerning Inari; (d) the publicly filed pleadings in the qui tam action against Inari styled as, *United States ex rel. Bowen et al. v. Inari Medical, Inc.*, 2:22-cv-00451-JRG-RSP (E.D. Tex.) (the "Qui Tam Action"), including the First Amended Complaint in the Qui Tam Action (*see* Dkt. No. 28) (the "Qui Tam Complaint" or the "Qui Tam Compl."), the factual allegations of which Lead Counsel has independently investigated and corroborated as described herein; (e) payment data reported by Inari to the Centers for Medicare & Medicaid Services Open Payments database ("Open Payments"); (f) interviews with former Inari

employees with firsthand knowledge of the Company's business operations; and (g) other public information regarding the Company.[1]

## I. INTRODUCTION

1. Inari engineered and engaged in an unlawful kickback scheme by rewarding physicians and other healthcare professionals ("HCPs") for using or recommending Inari's $12,000 and $7,500 single-use clot removal devices – the FlowTriever and ClotTriever – instead of the long-established treatment of prescribing inexpensive blood thinners. This kickback scheme was effectuated to increase sales and inflate the Company's revenue. Patients with venous thromboembolism ("VTE"), a condition characterized by blood clots in the patient's veins, are regularly prescribed cheap anticoagulant drugs to prevent the further growth of blood clots rather than undergo a clot removal procedure. In recent years, medical device companies like Inari have introduced physical clot removal devices like Inari's FlowTriever and ClotTriever. However, clinical consensus has remained the same: traditional anticoagulants suffice to treat 95% of VTE patients and Inari's target demographic. Inari's clot removal devices are only necessary for about 5% of the VTE patient population and, worse yet, some studies even caution of adverse side effects

[1] Lead Plaintiffs do not merely repeat the Qui Tam Complaint's allegations. Lead Counsel conducted an independent investigation of the factual allegations drawn from the Qui Tam Complaint and incorporated herein, and has verified them to Lead Counsel's satisfaction. Those allegations are, moreover, corroborated by sources independent of the Qui Tam Action, including: (i) Inari's own payment data reported to Open Payments, which reflects the specific payments, dates, amounts, and payment categories to the HCPs identified below; (ii) the accounts of FE-1 through FE-4, former Inari employees whose positions, responsibilities, and tenures are described herein and who independently describe the same practices of tying remuneration to case volume; (iii) Inari's February 28, 2024 disclosure that the DOJ had issued a CID concerning "meals and consulting service payments provided to health care professionals"; and (iv) Deutsche Bank's August 9, 2024 report. The Qui Tam Complaint itself rests on the personal knowledge of Enrique "Jay" Sanchez ("Sanchez") and Michael Bowen ("Bowen"), whose positions, responsibilities, sales territories, and periods of employment at Inari are consistent with their having personal knowledge of the facts alleged, and who personally participated in many of the specific transactions it describes, including the dated events, venues, attendees, and per-person costs alleged below.

like reduced hemoglobin and intraoperative cardiovascular collapse (the sudden, critical loss of adequate circulation during a surgical procedure), which can be life threatening.

2. Defendants knew Inari's two clot-removal devices, which together accounted for 96.5% of the Company's revenues during the Class Period, lacked robust clinical support showing their effectiveness over long-established and cheaper treatments and that 95% of deep vein thrombosis ("DVT") and pulmonary embolism ("PE") – the two primary types of VTE – patients did not even need surgical intervention with Inari's products. Lacking this clinical support for its products, Inari turned to convincing physicians to use their high-cost clot removal devices (or to refer patients to doctors who did use their devices) by showering those HCPs with steakhouse dinners, resort stays, disproportionately generous consulting and speaker fees for talks some physicians never even gave, and free marketing support – conduct that violated the Anti-Kickback Statute ("AKS") and False Claims Act ("FCA").

3. Unlike most surgical supplies, where the hospital decides which brands and devices to stock, Inari's FlowTriever and ClotTriever are "physician preference items," meaning that the treating physician, not the hospital purchasing department, chooses the device to be purchased. Inari exploited this dynamic by treating individual physicians – not the hospitals which have strict AKS policies that preclude remuneration to induce purchases – as its "customers," and directing its remuneration to the very doctors who opted to use Inari's devices in each procedure. Determined to expand its patient population so as to generate more sales and higher revenue, Inari carried out a systematic and calculated kickback scheme by which it handsomely compensated its "***physician customers***" to induce them to use its medical devices. These physicians, in turn, pushed the Company's invasive mechanical devices onto VTE patients, even in cases where it could be dangerous to the patient.

4. Once physicians agreed to use Inari's devices for their VTE procedures, Inari would then continue to financially reward them to ensure their loyalty and remove from the Company's payroll those physicians who did not remain loyal "physician customers" of its medical devices. This quid pro quo relationship with physicians was in direct violation of the AKS and FCA. Those laws, which strictly regulate the sales activities of medical device companies, prohibited Inari from providing, directly or indirectly, anything of value in exchange for patient referrals or purchases of its products in a quid pro quo relationship with HCPs. Nevertheless, Inari violated the AKS and FCA regularly and pervasively, while affirmatively assuring investors that it was in compliance with all healthcare laws.

5. Inari's kickback scheme took several forms. ***First***, Inari routinely wined and dined high-volume physicians at lavish steakhouse dinners costing up to nearly $500 per person – often with spouses, dates and staff in tow, including one instance in which Inari paid for a room at the Terranea Resort in Rancho Palos Verdes, California, for one of its most prolific users and his girlfriend. ***Second***, Inari paid for HCPs to attend "training sessions" at vacation destinations, despite that the training was not for their specialty and/or paid for physicians to attend trainings that were intended only for nurses, arranged sham "training" sessions around events that physicians wanted to attend, such as NASCAR races, and paid for physicians and their staff's travel and accommodations. ***Third***, Inari retained via engagement contract high-volume physicians as "key opinion leaders" ("KOLs") who Inari routinely paid tens of thousands of dollars in consulting and speaker fees – whether or not the physician actually participated in the talk or lecture – magnitudes greater than the average fees received by physicians in their specialties, and these fees correlated with the physicians' procedure volume. ***Fourth***, Inari developed a system of improper referral networks at hospitals by which Company employees instructed HCPs, including many physician assistants and nurse

practitioners, to refer patients with VTE to surgeons known to use Inari's products rather than any available vascular surgeon. These abuses of dining, travel, entertainment, consulting, and speaker fees were kickbacks to HCPs in exchange for referrals and sales of Inari products and constituted regular violations of the AKS and FCA.

6. This First Amended Complaint is supported by detailed examples of Defendants' routine violations of the AKS and FCA throughout the Class Period, including those in the Qui Tam Complaint – the factual allegations of which Lead Counsel has independently verified – filed by two of Inari's former sales professionals who personally witnessed illicit remuneration payments made to HCPs in violation of the AKS, as confirmed by several other former employees, and data from Open Payments which corroborates many of the transactions the former employees have described.

7. For example, on October 18, 2021, Inari hosted three of its high-volume physicians, along with a nurse's spouse and a technician's date, at the Terranea Resort, and paid for one of its most prolific FlowTriever users to stay there with his girlfriend. Weeks earlier, on September 23, 2021, Inari Regional Sales Manager Ross Mulholland ("Mulholland"), told a sales representative that it "would be helpful" for Inari-funded physician dinners to "start going deep with referring docs and driving their case volume up," because the physicians had "only done 5 PE's last 3 months."

8. On December 7, 2021, an Inari sales representative and Inari's Vice President of Medical Affairs entertained Drs. Sherman, Baek, Ghaly, and Sinkowitz and five staff members at I-Naba Steak House in Torrance, California, at $489.17 per person; three of those physicians referred patients for FlowTriever procedures and the fourth performed them.

9. On March 28, 2022, Inari spent $9,046.31 entertaining Drs. So, Krauthamer, Sherman, Miura, Anhalt, and Misono, and ten nurses and technicians at The Rex Steakhouse in Redondo Beach, California; Drs. Sherman and Anhalt routinely referred patients for transcatheter

pulmonary embolectomy ("TPE") procedures utilizing the FlowTriever, and Drs. So, Krauthamer, and Misono routinely used the device in TPE procedures.

10. These were not the "modest" meals and travel tied to a company training program permitted by the AdvaMed Code of Ethics on Interactions with Healthcare Professionals ("AdvaMed Code"). The dinners cost between $243 and $489 per person; spouses, dates, and staff from outside the relevant clinical field attended; and Inari correlated its remuneration to individual physicians' procedure volume, and cut off physicians whose case volume lagged.

11. Inari's consulting and speaker fees followed the same logic: Inari paid Dr. Misono $164,681 in 2022 and $260,942 in 2023, many times the average for his specialty, and his FlowTriever and ClotTriever case volume rose in tandem with those payments, while Dr. Kaushal's largest single payment, $15,500 on December 3, 2022, coincided with his highest FlowTriever volume.

12. Those payments resulted in improper reimbursement claims being made to public healthcare funders, resulting in violations of the AKS and FCA. For example, Dr. Nazanin Azadi, for whom Inari created and printed advertising poster boards to drive referrals and who benefited from Inari-funded entertainment, performed a FlowTriever procedure on a Medicare beneficiary on or about September 2, 2021, for which Providence Little Company of Mary Medical Center billed Medicare under DRG 165 and was reimbursed $16,073. Drs. Kim, Yagnik, and Gad, each of whom received meals and entertainment from Inari, also performed FlowTriever procedures on Medicare beneficiaries between April and September 2021. Each of these claims was submitted on forms certifying that the claim complied with the federal AKS, and each claim resulting from a kickback is false as a matter of law. 42 U.S.C. §1320a-7b(g).

13. Inari tracked each of these payments using the expense tracking software SAP Concur. Inari also tracked the use of its products by specific physicians by correlating the amount of revenue generated by each physician with the amount of remuneration spent on each physician, a clear indication that Inari's payments to physicians were for the purpose of driving referrals and use of its products. With this data in hand, Inari management expressly directed its sales staff to reward physicians who generated considerable sales volume of Inari's products with expensive meals, entertainment, and travel – clear violations of the AKS and FCA – and to reduce or eliminate spending on physicians whose volume of sales or referrals had plateaued or was declining. Indeed, Inari regularly conducted a national sales meeting during which it would showcase a presentation correlating the amount of money spent on HCPs to the amount of business generated from those HCPs. While entertaining important clients and referral sources may be legitimate activities in other industries, the AKS explicitly and broadly prohibits such conduct for Inari and other businesses whose products are eligible for reimbursement through federal healthcare programs such as Medicare and Medicaid, as Inari repeatedly acknowledged in its public filings.

14. The conduct described above was not that of some rogue salesperson. Rather, these illicit and well-documented sales practices were the result of a deliberate and systematic effort by Defendants to do anything in their power to ensure physicians and other HCPs used Inari products – even when not medically necessary – and that physician assistants, nurse practitioners and other non-surgeons referred patients to physicians known to use Inari products. Inari's management knew this to be the case. Former Employee-1 ("FE-1") the former Director of the Inari Solutions Group ("ISG")[2] whose responsibilities included training HCPs on Inari's products and who was personally

---

[2] In an announcement by the Company in 2021, Inari described the Inari Solutions Group as "dedicated to helping hospitals develop clinical programs to identify, triage, and treat patients with

hired by then-Chief Operating Officer ("COO") Andrew Hykes ("Hykes"), confirmed that Inari's top management had actual knowledge of the kickbacks. FE-1 and FE-1's direct supervisor both agreed that Inari was engaging in an improper kickback scheme and personally met with Hykes to tell him their concerns about the kickbacks. Within days of that conversation, FE-1's supervisor was fired. Hykes was later promoted to Chief Executive Officer ("CEO").

15. While engaging in this improper kickback scheme which violated two key federal healthcare laws, the Company and its top executives, including Hykes, then-CEO William Hoffman ("Hoffman"), and Chief Financial Officer ("CFO") Mitchell C. Hill ("Hill"), affirmatively touted that "[t]he Company and its subsidiaries are and have been in compliance with all Health Care Laws." Inari also told investors that the Company's increase in revenue was attributed to legitimate sales efforts such as "building awareness" at hospitals and "expansion of the field team" of sales representatives and territories. These statements were patently false and artificially inflated the Company's stock allowing the Individual Defendants (defined below) to cash in their personal holdings of Inari stock for profits of ***more than $155 million***.

16. The truth was revealed on February 28, 2024, when Inari publicly disclosed that it had received a civil investigative demand ("CID") from the Department of Justice ("DOJ") in December 2023 "in connection with an investigation under the federal Anti-Kickback Statute and Civil False Claims Act." Inari also disclosed that the "CID request[ed] information and documents primarily relating to meals and consulting service payments provided to health care professionals." This news that Inari was subject to an AKS/FCA investigation caused the price of Inari's common

venous thromboembolism." https://evtoday.com/news/inari-medical-appoints-vps-of-medical-affairs-and-inari-solutions-group

stock to drop by 21%, wiping out $700 million in market capitalization in a single day. Analysts responded by downgrading the price of Inari common stock and lowering their price targets.

## II. JURISDICTION AND VENUE

17. The claims asserted herein arise under §§10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a), and 78t-1, and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

18. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.

19. Venue is proper in this District under §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b). A substantial part of the events or omissions giving rise to the claim occurred in this District, Inari's common stock traded on the Nasdaq in this District during the Class Period, and Inari's management team attended and presented at investor conferences in this District, including the 21st Annual Morgan Stanley Global Healthcare Conference on September 11, 2023, and the Baird Global Healthcare Conference on September 12, 2023.

20. In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and facilities of the national securities markets.

## III. THE PARTIES

### A. Plaintiffs

21. Lead Plaintiff Oklahoma Law Enforcement Retirement System ("OLERS") is a defined-benefit pension fund headquartered in Oklahoma City, Oklahoma. OLERS administers

retirement benefits on behalf of the law enforcement profession of the State of Oklahoma and manages more than $1.2 billion in assets.

22. Lead Plaintiff Local 353, I.B.E.W. Pension Fund ("Local 353 PF") is a defined-benefit pension fund headquartered in Ontario, Canada. Local 353 PF manages more than $2 billion in assets on behalf of over 10,000 active members, retirees, and beneficiaries who are members of the International Brotherhood of Electrical Workers working in a variety of electrical disciplines across central Ontario.

23. Lead Plaintiff City of Pontiac Reestablished General Employees' Retirement System ("PGERS") is a public retirement plan that provides retirement benefits to employees and beneficiaries of the City of Pontiac, Michigan. PGERS manages more than $410 million in assets.

24. OLERS, Local 353 PF, and PGERS are referred to collectively herein as "Lead Plaintiffs."

25. Lead Plaintiffs purchased Inari common stock at artificially inflated prices during the Class Period as set forth in the certifications previously filed with the Court and were damaged thereby. *See* Dkt. Nos. 20-1 & 20-2.

**B. Defendants**

26. Defendant Inari is a medical device company that, at all relevant times, developed, manufactured, and sold catheter-based technologies for treating VTE. Throughout the Class Period, Inari was incorporated in Delaware and had its principal executive offices located at 6001 Oak Canyon, Suite 100, Irvine, California. During the Class Period, Inari's common stock traded on the Nasdaq under the ticker symbol "NARI." Inari's fiscal year ("FY") began on January 1 and ended on December 31. On January 6, 2025, Stryker Corporation ("Stryker") and Inari jointly announced a

merger agreement whereby Stryker would acquire 100% of Inari for $80 per share, which was completed on February 18, 2025 (the "Acquisition").

27. Defendant Hoffman was Inari's President and CEO from February 2015 through December 2022. During this time, Hoffman was also a member of Inari's Board of Directors (the "Board"). At all relevant times after January 1, 2023, Hoffman continued to serve as a member of the Board.

28. Defendant Hykes was Inari's Chief Commercial Officer ("CCO") from September 2017 to September 2020, COO from October 2020 until December 2022, and on January 1, 2023 replaced Hoffman as CEO and was appointed as a member of the Board.

29. Defendant Hill was Inari's CFO from March 2019 until his retirement on October 1, 2024, just before the Board began to consider merger opportunities that eventually resulted in the Acquisition.

30. Defendants Hoffman, Hykes, and Hill are collectively referred to as the "Individual Defendants." The Individual Defendants, together with Inari, are referred to as "Defendants."

31. The Individual Defendants, because of their positions within the Company, possessed the power and authority to control the contents of Inari's quarterly and annual reports, shareholder letters, press releases, and presentations to securities analysts, money and portfolio managers, and investors.

## IV. BACKGROUND OF INARI AND ITS STRICTLY REGULATED OPERATIONS

### A. The Market for VTE Treatment and Inari's Efforts to Gain Market Share

32. Inari was founded in 2013 to break into a perceived untapped market for VTE treatment, and the Company completed its initial public offering on May 22, 2020. VTE is a

common vein condition; by some estimates, approximately 8% of all individuals will be diagnosed with VTE during their lifetime. The long accepted and conservative treatment for VTE is to prescribe anticoagulant drugs such as warfarin, heparin, or similar medications. Anticoagulant drugs do not remove existing blood clots but are designed to prevent further clot formation, are low cost, and are typically used by the patient for the rest of their lives. More invasive therapies include thrombolytic drug therapies, which are designed to remove blood clots but typically require the patient to undergo procedures in an intensive care unit setting, resulting in increased cost and risk to the patient.

33. During the majority of the Class Period, Inari's two main products were ClotTriever and FlowTriever, which are single-use catheter-based systems that capture and remove blood clots. ClotTriever is a device that removes clots from peripheral blood vessels (*i.e.*, blood vessels outside of the heart and the brain) and is used to treat patients suffering from DVT. ClotTriever costs approximately $12,000. FlowTriever is a thrombectomy system for treating PE and costs approximately $7,500. One hundred percent of Inari's revenues were derived from those two products until, in the fourth quarter of FY 2022, Inari began commercializing its InThrill thrombectomy system which is used to treat clogged arteries by non-surgically removing blood clots using a catheter and sheath to capture and extract clots. Later, in November 2023, Inari further expanded its product offerings when it acquired LimFlow, S.A., a company that focused on limb salvage for patients with chronic limb-threatening ischemia for $250 million. Inari began selling LimFlow on November 15, 2023. Inari classified both the InThrill and LimFlow devices as "emerging therapies" in its SEC filings and reported its revenue derived from those products separately from its revenue derived from its VTE therapies – FlowTriever and ClotTriever. As reported in the Company's FY 2024 Form 10-K, in fiscal year ended December 31, 2023, 96.5% of

Inari's revenues came from VTE therapies (FlowTriever and ClotTriever) whereas only about 3.5% of its revenues came from InThrill and LimFlow.

34. Inari sold its products to physicians: specifically, interventional cardiologists, radiologists, and vascular surgeons, who use Inari's medical devices during surgical procedures intended to remove blood clots. Inari's success depended largely on its ability to convince physicians and other HCPs who refer VTE patients to forego more traditional anticoagulant drugs in favor of Inari's products as their preferred treatment options, and to choose Inari products over those of its competitors, such as Penumbra Inc. ("Penumbra") and Boston Scientific Corporation ("Boston Scientific"). While mechanical thrombectomy – a catheter-based procedure used to physically remove a blood clot from a blocked artery or vein and the type of procedure the FlowTriever or ClotTriever is used for – is often appropriate for high-risk patients (who represent only 2% to 5% of the patient population) because comorbidities preclude anticoagulation therapies, thrombolytic medication, *i.e.*, an anticoagulant, is the standard of care for low risk-patients who account for at least 95% of the patient population. Knowing that only 5% of the relevant patient population would be appropriate for surgical intervention, Inari designed a systemic practice of inducing HCPs to push patients – whose conditions did not warrant surgical intervention, *i.e.*, they would be responsive to simpler, less-invasive treatment such as ingesting heparin or warfarin – for referrals to surgery. Inari achieved this by creating a referral network in which HCPs intercepted patients early in their prognosis and referred them to physicians known to use Inari's surgical devices.

35. Worse yet, the clinical evidence supporting the FlowTriever rather than traditional anticoagulants is thin. Between 2014 and 2023, only four FlowTriever studies enrolled more than twenty participants while reporting inclusion criteria, risk level, and patient age. Two of the studies



4919-0556-5659.v1

were small, nonrandomized retrospective studies. *See* Graif *et al.* and Buckley & Wible.[3] The other two studies were industry-sponsored, single-arm studies without control groups. *See* Tu *et al.* and Toma *et al.*[4] These studies are limited and there is no demonstrated mortality benefit, no reduction in pulmonary embolism recurrence, and no consistent advantage in patient-centered outcomes compared to catheter-directed thrombolysis. Most recently, a 2026 study found that mechanical thrombectomy offered no benefit over anticoagulation for the vast majority of PE patients. *See* Mark A. Creager *et al.*, 2026 AHA/ACC/ACCP/ACEP/CHEST/SCAI/SHM/SIR/SVM/SVN Guideline for the Evaluation and Management of Acute Pulmonary Embolism in Adults, 87 J. Am. Coll. Cardiol. 1626 (2026).

36. Recent real-world evidence confirms the limited clinical benefit to using Inari's devices over traditional anticoagulants. For instance, one study determined comparable long-term outcomes between catheter-directed thrombolysis – a procedure designed to dissolve rather than physically remove blood clots – and mechanical thrombectomy, with no clear indication that the mechanical thrombectomy is superior.[5] Another study discovered higher rates of hemoglobin reduction and transfusions among mechanical-thrombectomy patients than among patients treated

---

[3] Ariel Graif *et al.*, Large-Bore Aspiration Thrombectomy Versus Catheter-Directed Thrombolysis for Acute Pulmonary Embolism: A Propensity Score-Matched Comparison, 31 J. Vasc. Interv. Radiol. 2052 (2020); John R. Buckley & Brandt C. Wible, In-Hospital Mortality and Related Outcomes for Elevated Risk Acute Pulmonary Embolism Treated With Mechanical Thrombectomy Versus Routine Care, 37 J. Intensive Care Med. 877 (2022).

[4] Thomas Tu *et al.*, A Prospective, Single-Arm, Multicenter Trial of Catheter-Directed Mechanical Thrombectomy for Intermediate-Risk Acute Pulmonary Embolism: The FLARE Study, 12 JACC Cardiovasc. Interv. 859 (2019); Catalin Toma *et al.*, Acute Outcomes for the Full U.S. Cohort of the FLASH Mechanical Thrombectomy Registry in Pulmonary Embolism, 18 EuroIntervention 1201 (2023).

[5] Chilingarashvili Giorgi *et al.*, Long-Term Outcomes After Catheter-Directed Thrombolysis or Mechanical Thrombectomy in Intermediate-High-Risk Pulmonary Embolism: A Propensity-Matched Analysis From a TriNetX Database, 16 Pulm. Circulation e70329 (2026).

with catheter-directed thrombolysis.[6] Worse yet, another study cautioned that there exists real and non-negligible risks of intraoperative cardiovascular collapse in high-risk patients during mechanical thrombectomy procedures.[7]

37. Government health agencies have also addressed the minimal clinical evidence that exists for the mechanical thrombectomy devices like the FlowTriever and ClotTriever. In particular, in 2023, Austria's Institute for Health Technology Assessment determined the evidence "not sufficient to prove" that the FlowTriever is equally effective and safe as comparator procedures and ***recommended against coverage***. Likewise, Australia cautioned in a Policy Advisory Committee on Technology that ***the FlowTriever increased the "risk of major, life-threatening bleeding and the need for ICU admission***, with no significant decrease in hospital length of stay."[8] Finally, the United Kingdom's National Institute for Health and Care Excellence found that the evidence "has not demonstrated improvements in short- or long-term clinical outcomes" and recommended that mechanical thrombectomy for intermediate-risk PE – the patient population in which Inari most aggressively marketed the FlowTriever – ***be used "only in research***."

38. With mixed support for the Company's two main products, Inari resorted to paying kickbacks and engaging in other illicit conduct in violation of the AKS to build demand. According to Inari's SEC filings, the Company's "most important relationships are between [its] sales representatives and [its] treating physicians." Indeed, as confirmed by FE-4 (*infra* §V.B), Inari's

---

[6] *See* Peter Monteleone *et al.*, Modern Treatment of Pulmonary Embolism (USCDT vs MT): Results From a Real-World, Big Data Analysis (REAL-PE), 3 J. Soc'y Cardiovasc. Angiography & Interventions 101192 (2024).

[7] *See* Bright Benfor *et al.* Cardiovascular Collapse During Mechanical Thrombectomy for Acute Pulmonary Embolism: The Role of Extracorporeal Membrane Oxygenation in Patient Rescue, 11 J. Vasc. Surg. Venous & Lymphatic Disorders 979 (2023).

[8] All emphasis used herein is added unless otherwise noted.

front-line sales representatives are typically directed to attend the procedures during which physicians use Inari's medical devices, demonstrating the close relationship between the Company's salesforce and the surgeons who use the Company's products.

39. Although hospitals formally purchase Inari's devices, Inari treated surgeons as the customers because the surgeons are the ones who decide what product to use, not the hospital purchasing department. This is confirmed by the Qui Tam Action allegations that Inari's devices were "physician preference items" and a September 23, 2021 text message in which Inari referred to physicians as "customers." *See* Qui Tam Compl., ¶¶51-52. Inari recognized and exploited this dynamic by focusing its kickback scheme on the physicians who selected the devices used in each procedure rather than to the hospital purchasing departments.

40. During the Class Period, Inari sales professionals sold ClotTriever and FlowTriever devices to thousands of hospitals in the United States. In particular, in its Form 10-K for FY ended December 31, 2021 filed with the SEC on February 23, 2022 ("FY 2021 Form 10-K"), Inari reported that it sold its products to over 1,200 of the approximately 2,000 hospitals in the United States; in its Form 10-K for FY ended December 31, 2022 filed with the SEC on February 27, 2023 ("FY 2022 Form 10-K"), Inari reported that it sold its products to over 1,600 of the approximately 2,000 hospitals in the United States; and in its Form 10-K for FY ended December 31, 2023 filed with the SEC on February 29, 2024 ("FY 2023 Form 10-K"), Inari likewise reported that it sold its solutions to over 1,600 of the approximately 2,000 hospitals in the United States.

**B. Inari Operated in a Highly Competitive Industry**

41. Inari acknowledged in its SEC filings that "the market for our solutions is highly competitive" and "[t]he medical device industry is highly competitive, subject to rapid change and significantly affected by the introduction of new products and technologies and other activities of

industry participants." In its Form 10-K filings throughout the Class Period, Inari recognized that certain of its competitors had greater resources and name recognition, noting: "Many of our competitors have longer, more established operating histories, and significantly greater name recognition and financial, technical, marketing, sales, distribution and other resources." Inari further continued, "certain competitors have several competitive advantages, including established treatment patterns pursuant to which drugs are generally first-line or concurrent therapies for the treatment of VTE and established relationships with hospitals and physicians who prescribe their drugs or are familiar with existing interventional procedures for the treatment of VTE."

42. In response to this competitive landscape, Inari dedicated significant resources to building a robust salesforce and developing training and education programs for both interventional and non-interventional physicians, nursing staff, and other personnel involved with Inari procedures at the hospital level. However, as alleged herein, many of these educational programs such as peer-to-peer conversations and talks never took place and yet Inari still paid physicians for "speaking."

### C. Inari's Business Depended on Its Ability to Participate in Federal Healthcare Programs

43. Because Inari customers, such as hospitals and physicians, primarily relied on third-party reimbursement for the surgical and monitoring fees that they earned, inclusion in programs such as Medicare and Medicaid was critical to Inari's viability. As specifically detailed in the risk disclosures portion of Inari's Form 10-K for FY ended December 31, 2020 filed with the SEC on March 9, 2021 ("FY 2020 Form 10-K"), "sales of Inari's products depend, in part, on the extent to which the procedures using Inari products are covered by third-party payors, such as government healthcare programs, commercial insurance, and managed healthcare organizations." Thus, if hospitals and physicians are unable to recover adequate payments from programs like Medicare and Medicaid, then it is unlikely that they will use Inari's products and services.

44. Inari was subject to an extensive regulatory framework intended to protect patients and government-funded Medicare and Medicaid healthcare programs from fraud and abuse. Sales and marketing practices that may be common or accepted in other industries may be improper when soliciting business that is ultimately paid for in whole or in part by governmental healthcare programs. Indeed, in the medical device and related industries like pharmaceuticals, government programs like Medicare and Medicaid depend on physicians and other HCPs to exercise judgment in the best interests of the patient. As the Office of the Inspector General ("OIG") has explained, the purpose of these laws and regulations is "to protect patients and federal healthcare programs from fraud and abuse by curtailing the corrupting influence of money on health care decisions." Failure to adhere to these laws and regulations can result in civil and criminal penalties, in addition to exclusion from participation in governmental health care programs.

45. ***First***, Inari was subject to the AKS, 42 U.S.C. §1320a-7b(b), which was enacted in 1972 for the purpose of addressing concerns regarding conflicts of interest and unfair competition that resulted in abuses of federal healthcare programs. In addition to criminal and civil fines and penalties, violation of the AKS can also result in exclusion from participating in and receiving reimbursement from state and federal healthcare programs. For medical device companies like Inari, exclusion from these programs can be a corporate death sentence, because without reimbursement, healthcare providers would quickly turn to alternative products and services for which they can obtain reimbursement from Medicaid and Medicare.

46. The AKS provides, in relevant part:

> Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person–

> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

47. In other words, the AKS prohibits persons or entities from knowingly and willfully soliciting, offering, receiving, or providing remuneration, directly or indirectly, in exchange for, or to induce, either: (i) the referral of an individual; or (ii) the furnishing, arranging for, or recommending of a good or service for which payment may be made, in whole or part, under federal healthcare programs such as Medicare and Medicaid.

48. The AKS has been broadly interpreted. Indeed, the OIG has stated that "remunerations include ***anything*** of value and can take many forms besides cash, such as free rent, expensive hotel stays and meals, and excessive compensation for medical directorships or consultancies."

49. The AKS also includes broad prohibitions on the exchange of anything of value in return for referrals. According to the OIG: "***In some industries, it is acceptable to reward those who refer business to you. However, in the Federal health care programs, paying for referrals is a crime***." (Emphasis in the original.)

50. Efforts to circumvent kickbacks by labeling the payments as something more innocuous are still improper under the AKS. For instance, mislabeling a gift to make it appear less like an inducement for referrals is a violation of the AKS. While incentives of nominal value (not more than $15 per item or $75 in the aggregate per patient on an annual basis) may be appropriate, the OIG has cautioned that: "entertainment, recreation, travel, meals, or other benefits in association

with information or marketing presentations; and gifts, gratuities, and other business courtesies" are examples of remunerative agreements that "potentially implicate the anti-kickback statute if any one purpose of the arrangement is to generate business for the pharmaceutical company." This means that expenditures on meals, entertainment, and the like provided to HCPs are only permissible when devoted to educating HCPs about medical matters and education – not when promoting or selling products, services, or generating referrals. This illustrates the highly regulated nature of even something as common as a meal with an HCP, which must be focused on legitimate clinical or medical issues, and where attendance is limited to HCPs within the appropriate field and target audience; anyone who is not an HCP or who practices in a different field cannot attend. Simply put, paying for an HCP's meal for the purpose of generating business is an improper kickback under the AKS.

51. Consulting and advisory payments may also implicate the AKS. The OIG lists consulting and advisory payments as "problematic relationships between manufacturers and physicians." In particular, the OIG has advised that, "fair market value payments to small numbers of physicians for *bona fide* consulting or advisory services are unlikely to raise any significant concern." However, according to the OIG, "compensating physicians as 'consultants' when they are expected to attend meetings or conferences primarily in a passive capacity is suspect."

52. ***Second***, Inari was subject to the FCA, 31 U.S.C. §§3729-3733, which authorizes the federal government to recover losses due to fraud and abuse by persons seeking payment from the United States. The FCA imposes liability on any person or entity that, among other things, knowingly presents, or causes to be presented, a false or fraudulent claim for payment by a federal healthcare program. The FCA makes it unlawful for any person to knowingly present a false or

fraudulent claim, record, or statement to the government for payment or approval. *See* 31 U.S.C. §3729.

53. As it pertains to Medicare and Medicaid, claims may be false if they claim reimbursement for services or costs that either are not reimbursable or were not rendered as claimed. Medicare and Medicaid coverage is also limited to medical goods and services that are "reasonable and necessary" for the diagnosis and treatment of a patient. *See* 42 U.S.C. §1395y(a)(1)(A).

54. ***Third***, Congress has more recently enacted federal programs that tightened regulation and increased scrutiny of the medical industry, as bad actors continue to engage in misconduct and abuses of the Medicare and Medicaid systems notwithstanding the aforementioned regulations.

55. In particular, in 2010, Congress enacted the Patient Protection and Affordable Care Act (the "PPACA"), also commonly known as "Obamacare" or the "Affordable Care Act." Under the PPACA, violations of the AKS are *per se* violations of the FCA.

56. The PPACA contains a section titled the Physician Payments Sunshine Act (the "Sunshine Act" or "Open Payments Act"), which requires companies to report all transfers of value to physicians to the Department of Health and Human Services ("HHS") on an annual basis. Under the Sunshine Act, medical device manufacturers like Inari are required to report any compensation or benefit of value made to a physician. Subsequently, the HHS submits summary reports to Congress and to each state. The reports submitted by Inari must contain the receiving physician's name, address, national provider identifier, value of transfer, form, nature, and date of the payment. The payments in the reports include, among other things, compensation, food, entertainment, gifts, travel, and consulting fees. These payments are made public by HHS at openpaymentsdata.cms.gov.

57. Inari itself acknowledged its regulatory reporting requirements under the Sunshine Act in its FY 2020, 2021, and 2022 Forms 10-K under a section titled "Healthcare Regulatory Laws:"

> Additionally, the federal Physician Payments Sunshine Act and its implementing regulations, require that certain manufacturers of drugs, devices, biological and medical supplies for which payment is available under Medicare, Medicaid, or the Children's Health Insurance Program (with certain exceptions) annually report information related to certain payments or other transfers of value made or distributed to physicians (as defined by statute), certain other non-physician practitioners and teaching hospitals, certain ownership and investment interests held by physicians and their immediate family members.

58. Additionally, the OIG has a "General Compliance Program Guidance" ("OIG Guidance") which serves as a reference guide for the health care compliance community and other health care stakeholders. The OIG Guidance is intended to encourage Inari and other medical device companies to adhere to the foregoing laws and regulations. The OIG Guidance suggests that individuals and entities ask themselves the following questions to determine whether a potentially problematic arrangement exists under the AKS:

(a) "does the remuneration take into account, either directly or indirectly, the volume or value of business generated?"

(b) "Is the remuneration conditioned in whole or in part on referrals or other business generated by the parties?"

(c) "Is the remuneration fair market value in an arm's-length transaction for legitimate, reasonable, and necessary services that are actually rendered?"

59. Inari claimed to be committed to compliance with all government regulations and applicable laws. Indeed, it established a "Comprehensive Compliance Program," as called for by the OIG's guidance, to "ensure that we conduct our business ethically, responsibly and in material compliance with federal and state laws and industry standards relating to the promotion and

marketing of medical devices." Inari further stated that the "[p]rogram is designed to prevent and detect violations of law and company policies."

60. Inari also adopted AdvaMed Code, which it claimed was "integral" to its Compliance Program. The AdvaMed Code sets forth standards for ethical conduct between HCPs and Inari employees. Inari's Compliance Program prescribed an annual, per individual limit of $3,000 for gifts and promotional materials.

61. Inari also had an ethics hotline hosted by a third-party provider, Lighthouse Services, for investors, employees, and other interested parties to anonymously report any concerns or activities perceived to be in violation of Inari's policies.

62. Inari's public filings routinely acknowledged and disclosed the implication of these laws and their applicability to the Company's business operations.

## V. DEFENDANTS GAVE KICKBACKS IN EXCHANGE FOR BUSINESS

### A. Inari's Remuneration to HCPs Increased in Tandem with Inari's Sales

63. Throughout the Class Period, Defendants utilized a myriad of sales and marketing practices that exposed Inari to liability and enforcement under the healthcare fraud and abuse laws, including the AKS and FCA.

64. Defendants' illicit sales and marketing practices included: creating quid pro quo relationships with HCPs by spending tens and sometimes hundreds of thousands of dollars on their meals, travel, consulting service payments, gift cards, and speaking engagements, among other kickbacks; and pushing Inari's FlowTriever catheter even in cases where it could be dangerous.

65. Inari was statutorily required to report all payments made to HCPs under the Open Payments Act, as alleged *supra*. As reported on openpaymentsdata.cms.gov, Inari made over 76,000

payments to HCPs, totaling more than $15 million during the Class Period.[9] These payments fell under four different categories: (i) consulting fee; (ii) food and beverage; (iii) travel and lodging; and (iv) compensation for services other than consulting, including serving as faculty or as a speaker at a venue other than a continuing education program (referred to herein as "Speaker or Faculty Fees"). Inari's payments to HCPs increased substantially during the Class Period and correlated with Inari's increase in revenues. In particular, Inari's payments to HCPs grew from $2.5 million in 2021, to $5.19 million in 2022, to $6.74 million in 2023; and in just the first two months of 2024 – before it was publicly disclosed that the DOJ was investigating certain of Inari's payments made to HCPs – Inari made payments of $1.2 million.

### B. There Is Documented, Clearly Linked Evidence of Remuneration and Case-Volume Correlation for Inari's Payments to HCPs, in Violation of the AKS

66. As alleged *supra*, Inari made more than 76,000 payments to HCPs totaling more than $15 million during the Class Period. Below is a representative sample of some of Inari's top-paid HCPs for which there is documented, clearly linked evidence of remuneration and case-volume correlation.

67. Each example below identifies by name the specific HCP who received Inari's remuneration; the date, amount, and nature of the payment and, for meals and entertainment, the venue, the Inari personnel and other individuals in attendance; and the HCP's contemporaneous use of, or referral of patients for, FlowTriever or ClotTriever procedures, including on Medicare and Medicaid beneficiaries. Each payment below was reported by Inari itself on Open Payments or is alleged with particularity in the Qui Tam Complaint by Sanchez and Bowen, who personally

---

[9] Lead Plaintiffs believe that discovery would reveal additional payments to HCPs not publicly reported because, as alleged herein, former employees describe payments made to physicians during the Class Period that are not captured on the Open Payments website.

participated in the transactions described. And, for each example, the facts alleged – including Inari's policy of tying the remuneration to case volume, the escalation of payments in lockstep with procedure volume, Inari's practice of cutting off HCPs whose volume lagged, the attendance of spouses, dates, and other non-HCPs, excessively high, not "modest," per-person costs – establish that at least one purpose of the remuneration was to induce the purchase and use of Inari's devices, and push each payment well past the line separating permissible training and hospitality from an unlawful kickback.

### 1. Dr. Misono

68. Dr. Alexander Seiji Misono is the Chief of Interventional Radiology at Hoag Hospital in Irvine, California. Dr. Misono was Inari's highest-paid HCP during the Class Period, receiving a total of ***$580,714*** in payments, including ***$260,942 in 2023 alone***. Inari's payments to Dr. Misono were substantially greater than the average payments made to physicians in his specialty in the U.S. for those same years, as indicated in the below chart from Open Payments:






4919-0556-5659.v1

69. Specifically, according to Open Payments, in 2021, 2022, 2023, and 2024, the average payments to physicians within Dr. Misono's specialty (vascular and interventional radiology) were just $5,278, $11,172, $5,011, and $6,530, respectively. Meanwhile, for those same years, Inari paid Dr. Misono $67,183, $164,681, $260,942, and $233,386, respectively. According to the Qui Tam Complaint, "Dr. Misono was one of Inari's most prolific users of the FlowTriever, and ***his FlowTriever and ClotTriever case volume increased in tandem with Inari's escalating consulting-fee payments to him***: his procedure volume during 2022, the period encompassing his largest consulting-fee payments, substantially exceeded his procedure volume in 2021, before those payments escalated – a temporal and quantitative correlation reflecting that Inari's remuneration, not independent clinical judgment, caused Dr. Misono's continued and increased use of Inari's devices on Medicare and Medicaid beneficiaries." Qui Tam Compl., ¶74.

70. Dr. Misono routinely received substantial "consulting fees" from Inari including a single consulting payment of $17,708.33 on January 15, 2022, as well as considerable "speaker or faculty fees" including a single payment of $30,375 on February 12, 2023. Of the $580,714 Dr. Misono received in total compensation during the Class Period, $253,108 was for consulting fees. Below is a sample of some of the largest consulting and Speaker or Faculty Fees that Dr. Misono received during the Class Period:

| Amount of Payment | Date of Payment | Nature of Payment |
|---|---|---|
| $5,750 | 6/12/2021 | Consulting Fee |
| $5,750 | 6/26/2021 | Consulting Fee |
| $5,208 | 7/15/2021 | Consulting Fee |
| $8,208 | 12/4/2021 | Consulting Fee |
| $17,708 | 1/15/2022 | Consulting Fee |
| $9,250 | 1/20/2022 | Consulting Fee |
| $6,500 | 4/26/2022 | Consulting Fee |
| $5,000 | 4/26/2022 | Consulting Fee |
| $5,000 | 5/17/2022 | Consulting Fee |

| Amount of Payment | Date of Payment | Nature of Payment |
|---|---|---|
| $10,000 | 6/4/2022 | Consulting Fee |
| $5,250 | 6/12/2022 | Consulting Fee |
| $6,750 | 1/15/2023 | Speaker or Faculty Fee |
| $30,375 | 2/12/2023 | Speaker or Faculty Fee |
| $15,275 | 5/24/2023 | Speaker or Faculty Fee |
| $5,200 | 5/24/2023 | Speaker or Faculty Fee |
| $5,200 | 5/25/2023 | Speaker or Faculty Fee |
| $11,700 | 6/3/2023 | Speaker or Faculty Fee |
| $20,800 | 7/31/2023 | Speaker or Faculty Fee |
| $13,325 | 9/9/2023 | Consulting Fee |
| $9,750 | 9/9/2023 | Speaker or Faculty Fee |
| $5,700 | 9/9/2023 | Consulting Fee |
| $10,750 | 10/11/2023 | Speaker or Faculty Fee |
| $5,425 | 11/14/2023 | Speaker or Faculty Fee |
| $5,200 | 11/30/2023 | Consulting Fee |
| $20,150 | 1/26/2024 | Speaker or Faculty Fee |
| $7,700 | 1/26/2024 | Speaker or Faculty Fee |
| $7,600 | 1/26/2024 | Speaker or Faculty Fee |
| $12,350 | 2/22/2024 | Speaker or Faculty Fee |
| $5,037 | 2/22/2024 | Speaker or Faculty Fee |

71. Dr. Misono was also the beneficiary of lavish meals and entertainment paid for by Inari, receiving over $13,000 in food and beverage perks and $41,400 in travel and lodging perks during the Class Period. These perks included Inari feting Dr. Misono, along with five other physicians and ten nurses and technicians, at the Rex Steakhouse in Redondo Beach, California on March 28, 2022, at a total cost of $9,046.31, or $476.12 per person – and hotel and resort stays in vacation destinations, including a stay at the Terranea Resort in Rancho Palos Verdes, California, which Inari Regional Sales Manager Mulholland offered to secure for Dr. Misono and his girlfriend, and where Dr. Misono stayed with his girlfriend on October 18, 2021, at Inari's expense. *See* Qui Tam Compl., ¶¶80, 84. There was no educational or training purpose for paying for a resort room for a physician's romantic partner; the only purpose was to reward and secure the continued business of one of Inari's most prolific FlowTriever users.

### 2. Dr. Rishal Kaushal

72. Dr. Rishal ("Rishi") Kaushal is an interventional cardiologist at Torrance Cardiology and Vascular in Torrance, California. Dr. Kaushal was one of Sanchez's customers who received a total of $94,855 in compensation from Inari during the Class Period, including $65,275 in consulting payments. During the same period, Dr. Kaushal routinely used the FlowTriever in transcatheter pulmonary embolectomy ("TPE") procedures. Qui Tam Compl., ¶79. Dr. Kaushal's "consulting fees" included considerable one-time consulting fees of $15,500 on December 3, 2022, $6,750 on August 25, 2022, $6,250 on June 28, 2022, $5,625 on June 13, 2022, $4,250 on February 22, 2022, and $4,750 on August 8, 2023. Dr. Kaushal also received a fee of $17,375 on May 6, 2023 for Speaker or Faculty Fees.

73. During the Class Period, "Dr. Kaushal routinely used the FlowTriever device, and his case volume tracked the trajectory of Inari's payments to him: his largest single [consulting] payment, $15,500.00 on December 3, 2022, corresponded to the period of his highest FlowTriever case volume in Relator Sanchez's territory." Qui Tam Compl., ¶75. This demonstrates that Inari's remuneration – not independent clinical judgment – motivated Dr. Kaushal's decision to purchase Inari's FlowTriever. *Id.*

74. Dr. Kaushal also attended lavish dinners and other events hosted by Inari during the Class Period. For instance, on October 18, 2021, Sanchez, Dr. Victor Tapson (*see infra*), an Inari Regional Sales Manager, and an Inari Regional Sales Director entertained Dr. Kaushal and others including Dr. Misono, Dr. Anton Mlikotic,[10] an interventional radiology specialist based in Torrance, California, three nurses, two technicians, one nurse's spouse, and one technician's date at the

---

[10] Despite that, as alleged in the Qui Tam Complaint, Inari entertained Dr. Mlikotic on October 18, 2021, Inari failed to record ***any*** payments to Dr. Mlikotic during the Class Period on openpaymentsdata.cms.gov.

Terranea Resort in Rancho Palos Verdes, California at a cost of $6,277.75, or $448.41 per person. Qui Tam Compl., ¶81. And on May 24, 2022, Sanchez, Tapson, then-COO Hykes, and CMO Dr. Tom Ku entertained Dr. Kaushal and four hospital staff members at The Rex Steakhouse in Redondo Beach, California, for a total cost of $2,190, or $243.33 per person. *Id.*, ¶79.

75. Inari also provided Dr. Kaushal with free marketing support as an additional method of inducement. *Id.*, ¶85. Specifically, Inari created and printed advertising poster boards for Dr. Kaushal at Providence Medical Institute in Torrance, California, to drive referrals to his DVT and PE practice – procedures in which Inari's FlowTriever and ClotTriever are used. *Id.* These marketing materials violated the AKS because they served no other purpose than to induce the physicians whom Inari was marketing to purchase and utilize Inari's devices. John Borrell ("Borrell"), Inari's Senior Vice President of Sales from August 2017, approved the cost of the marketing materials for Kaushal; however, it appears Inari did not – as it was statutorily required to do under the Sunshine Act – report any of its marketing and advertising expenditures on behalf of doctors on Open Payments.

**3. Jason Berger**

76. Mr. Berger is just one of the non-physicians who Inari targeted and paid to refer patients to surgeons known to use FlowTriever or ClotTriever. As a physician assistant based in Clearwater, Florida, he was Inari's third highest-paid HCP during the Class Period. Inari paid Berger ***$317,605 during the Class Period***, including ***$229,684 in 2023 alone***. Of this total compensation, Berger received $55,777 in consulting fees, $189,460 in Speaker or Faculty Fees, $11,496 in food and beverage, and $60,872 in travel and lodging.

77. Consistent with Inari's practice of targeting HCPs who would refer patients to known Inari customers, Berger is a physician assistant who does not specialize in interventional radiology,

cardiology, or any other clinical specialty that would warrant him receiving $245,237 in consulting fees and Speaker or Faculty Fees.

78. Additionally, like Dr. Misono, Inari's payments to Jason Berger were of magnitudes greater than the national average, as demonstrated by the below chart taken from Open Payments. The chart also demonstrates that Inari's payments to Mr. Berger increased each year during the Class Period.




### 4. Erin Van Dyke

79. Erin Van Dyke ("Van Dyke") was a physician assistant based in Grand Rapids, Michigan. During the Class Period, Inari paid Van Dyke a total of $207,843 including $114,588 in consulting fees, $10,244 in food and beverage, $29,111 in travel and lodging, and $53,900 in Speaker or Faculty Fees. Inari paid Van Dyke substantial one-time consulting fees of $14,850 on May 24, 2022 and $11,700 on December 6, 2022, and significant one-time Speaker or Faculty Fees of $8,400 on March 17, 2023, and $9,000 on January 27, 2024. Van Dyke assisted Inari's marketing department and took on a sales role at the Company. Van Dyke would in turn invoice Inari for her time; she was on Inari's payroll.



4919-0556-5659.v1

#### 5. Dr. Victor Tapson

80. Dr. Victor Tapson was a pulmonologist at Cedars-Sinai Medical Center in Los Angeles. According to the Qui Tam Complaint, Dr. Tapson received $22,100 in consulting fees from Inari. *See* Qui Tam Compl., ¶88. However, data reported in Open Payments only includes $3,875 in total payments to Dr. Tapson during the Class Period and ***$0 in consulting fees***, revealing that Inari violated the Sunshine Act by failing to publicly report consulting fees paid to Dr. Tapson. Dr. Tapson routinely referred patients to Dr. Danny Ramsey, a cardiothoracic surgeon, for TPE procedures utilizing the FlowTriever. *Id.*, ¶71.

81. In September 2021, Dr. Tapson joined Inari as the Vice President of Medical/Clinical Affairs. As alleged in the Qui Tam Complaint, as VP of Medical/Clinical Affairs, Dr. Tapson "was expressly tasked, per Inari's own internal communications, with 'driving case volume' for physicians who had performed as few as five PE [pulmonary embolism] procedures in a three-month period, demonstrating that Inari's remuneration to and through Dr. Tapson was designed to, and did, increase FlowTriever case volume." Qui Tam Compl., ¶88. Also according to the Qui Tam Action, "the FlowTriever procedures referred by Dr. Tapson and performed by Dr. Ramsey included procedures performed on patients covered by Medicare, Medicaid, or other Government Programs…" *Id.*

82. Further, on September 23, 2021, Sanchez and Inari Regional Sales Manager Mulholland exchanged the following text message regarding scheduling Dr. Tapson to attend a dinner with physician customers: "It would be helpful if they [Dr. Tapson] can start going deep with referring docs and driving their [Dr. Tapson] case volume up. They [Dr. Tapson] have only done 5 PE's last 3 months." This exchange – in which Mulholland pressured a sales representative to use Inari-funded dinners to increase specific physicians' case volume – is direct evidence, in Inari's own

words and dated months before most of the alleged false and misleading statements were issued, that a purpose of the remuneration was to drive FlowTriever procedure volume rather than to educate or train, which constitutes an unlawful purpose in violation of the AKS.

**6. Dr. Brian Sherman**

83. Dr. Brian Sherman is an internist based in Torrance, California. During the Class Period, Inari paid Dr. Sherman $73,735 in total compensation. Dr. Sherman routinely referred patients for TPE procedures utilizing the FlowTriever. Qui Tam Compl., ¶80. In particular, on December 7, 2021, Inari entertained Dr. Sherman at I-Naba Steakhouse in Torrance, California for $489.17 per person. *Id.*, ¶78. On March 28, 2022, Sanchez and two additional Inari employees entertained Dr. Sherman at the Rex Steakhouse in Redondo Beach, California, at a cost of $476.12 per person. *Id.*, ¶80. Consistent with Inari's practice of targeting HCPs who would refer patients to known Inari customers, Dr. Sherman was a general internist who does not specialize in interventional radiology, cardiology, or any other clinical specialty that would warrant him receiving $65,850 in consulting and Speaker or Faculty Fees.

**7. Dr. Aparna Baheti**

84. Dr. Aparna Baheti was a Vascular and Interventional Radiologist for Tacoma Radiology Associates in Tacoma, Washington from August 2020 through December 2023. According to FE-4 (*see infra*), Dr. Baheti was a KOL for Inari. During the Class Period, Inari paid Dr. Baheti a total of $33,542 including $29,000 in Speaker or Faculty Fees. Inari's payments to Baheti included a single payment of $10,000 on April 22, 2023, $8,000 on December 6, 2023, and $7,000 on February 22, 2024. However, according to FE-4, ***Dr. Baheti was "unavailable" to actually give any talks or host peer-to-peer conversations with other physicians despite receiving payments from Inari every month***. In other words, these amounts Inari paid to Dr. Baheti were not

"Speaker or Faculty Fees" but actually payments made for Baheti to refer patients to surgeons who were known Inari customers, a violation of the AKS.

85. According to FE-4, Dr. Baheti was considered a "super user" of Inari's FlowTriever and ClotTriever in the Northwest region. FE-4 described a "super user" as a doctor that performs a lot of case volume with Inari's products, *e.g.*, 100-200 cases per year, and who has committed 100% of their device use to Inari rather than one of Inari's competitors like Penumbra.

### 8. Additional HCPs

86. Other HCPs who routinely used Inari's FlowTriever also received considerable consulting fees and perks from Inari during the Class Period. For instance, Bowen's customers, including Dr. Joseph Besho, Dr. Khaled Khalaf, and Dr. Stuart Harlin, were paid the following consulting fees during the Class Period: (i) Dr. Besho, $4,000 on October 18, 2021; (ii) Dr. Khalaf, $2,000 on September 8, 2021 and $2,100 on August 25, 2022; and (iii) Dr. Harlin, $3,000 on March 10, 2021. Qui Tam Compl., ¶76. Each of these physicians routinely used the FlowTriever in procedures performed on Medicare and Medicaid beneficiaries in Bowen's territory during the same periods in which they received these payments and "Inari's Regional Sales Managers reviewed each physician's case volume in determining whether, and in what amount, to continue paying consulting fees." *Id.* However, when Besho, Khalaf, and Harlin ceased using Inari's products, Inari stopped paying them or entertaining them at the direction of Borrell – direct evidence of Inari's quid pro quo relationship with physicians.

87. Inari's meals and entertainment for referring and treating physicians were likewise violations of the AKS. On December 7, 2021, Sanchez and Inari's Vice President of Medical Affairs, Dr. Tapson, entertained Drs. Sherman, Baek, Ghaly, and Sinkowitz and five staff members at I-Naba Steak House in Torrance, California, at a cost of $5,380.95, or $489.17 per person; Drs.

Sherman, Ghaly, and Sinkowitz all referred patients for TPE procedures utilizing the FlowTriever, and Dr. Baek routinely used the device in TPE procedures. Qui Tam Compl., ¶78. On March 28, 2022, Sanchez and two other Inari employees entertained Drs. So, Krauthamer, Sherman, Miura, Anhalt, and Misono, along with ten nurses and technicians, at The Rex Steakhouse at a cost of $9,046.31, or $476.12 per person; Drs. Sherman and Anhalt routinely referred patients for TPE procedures utilizing the FlowTriever, and Drs. So, Krauthamer, and Misono routinely used the device. *Id.*, ¶80. On October 18, 2021, Sanchez, Dr. Tapson, an Inari Regional Sales Manager, and an Inari Regional Sales Director entertained Drs. Misono, Kaushal, and Mlikotic, three nurses, two technicians, one nurse's spouse, and one technician's date at the Terranea Resort at a cost of $6,277.75, or $448.41 per person. *Id.*, ¶81. None of these events included any educational program, and each included attendees – spouses, dates, and staff from outside the relevant clinical field – whose presence is irreconcilable with a legitimate training purpose.

88. Inari's remuneration resulted in specific claims to federal healthcare programs. For example, Dr. Azadi – for whom Inari created and printed advertising poster boards to be placed in the lobby of Providence Medical Institute to drive referrals to Dr. Azadi's DVT and PE practice, and who, along with hospital staff, benefited from Inari-funded entertainment – performed a TPE procedure utilizing the FlowTriever on a Medicare beneficiary at Providence Little Company of Mary Medical Center on or about September 2, 2021, for which the hospital billed Medicare under DRG 165 and was reimbursed $16,073. Qui Tam Compl., ¶¶85, 98, 101. Similarly, Inari provided meals and entertainment to Drs. Jerry Kim, Vinay Yagnik, and Youhanna Gad, who used the FlowTriever on Medicare beneficiaries on or about July 2, 2021 (Pomona Valley Hospital Medical Center), April 1, 2021 (Providence St. Mary Medical Center-Apple Valley), and June 2 and September 3, 2021, respectively. *Id.*, ¶104. Under the DRG system, each such procedure generated

reimbursement of approximately $12,267 to $31,875, compared to $5,699 to $9,925 for anticoagulant treatment. *Id.*, ¶¶58-59.

89. Likewise, according to Bowen, Inari created and paid for poster boards, handouts, and flyers for two of Methodist Hospital's vascular surgeons based in Texas, Dr. Alan Lumsden and Dr. Thomas Loh. These marketing materials not only promoted services related to Inari, but whatever other services these two doctors offered even if unrelated to clotting, in violation of the AKS.

### C. Former Employees Confirm That These Payments Were Kickbacks Paid to Induce Physicians' Use of Inari's Products

90. Enrique "Jay" Sanchez is a relator in the Qui Tam Action. Mr. Sanchez is a former Senior Account Manager at Inari Medical who joined Inari in September 2020 and was promoted to Senior Account Manager in the fourth quarter of 2021. Mr. Sanchez was responsible for selling Inari's devices in California. Mr. Sanchez reported to Mulholland who, in turn, reported to Aaron McAthy, Area Director of Sales for Inari from January 2021 through 2025 and current Regional Sales Director of Inari Medical, who, in turn, reported to John Borrell, Inari's Senior Vice President of Sales from August 2017 until March 2024. Borrell reported directly to Inari's C-suite.

91. Michael Bowen is a relator in the Qui Tam Action. Mr. Bowen is a former Regional Sales Manager at Inari Medical with over twenty years in medical device sales and training. Mr. Bowen worked at Inari between January 2021 and August 2022, during which time he was responsible for selling Inari's devices in Texas and Louisiana. Mr. Bowen reported to Adam Kietzer, Inari's former Director of Sales from January 2018 through December 2023, who, in turn, reported to Borrell.

92. Together, Sanchez and Bowen filed the Qui Tam Complaint in the Eastern District of Texas, with the operative complaint made public on July 17, 2026.

93. As alleged in the Qui Tam Complaint, Bowen and Sanchez have personal knowledge concerning Inari's sales scheme, including the direct payments to HCPs for "consulting" or "speaking" fees, meals, lavish trips, and free marketing materials made to entice those HCPs to use Inari products as detailed above. The Qui Tam Complaint sets forth several detailed examples of those improper payments as discussed above, and further alleges that, when HCPs failed to use Inari products in proportion to the remuneration received from Inari, they were cut off the KOL and free meals circuit.

94. Several other former Inari employees ("FEs") provided information showing that Defendants' Class Period statements were false and misleading and that Defendants knew or recklessly disregarded the falsity or misleading nature of their statements. The FEs include individuals formerly employed at Inari before, during, and after the Class Period, whose accounts corroborate one another, and are consistent with the findings of the August 9, 2024 Deutsche Bank report regarding the DOJ's CID, as discussed *infra* at §VII. The former employees provided confidential information and are described by job description and responsibility and duration of employment, thereby providing sufficient detail to establish their reliability and personal knowledge. As set forth below, the information provided by the FEs supports a strong inference that Defendants' Class Period statements were false at the time they were made, and that Defendants acted with scienter.

95. Former Employee No. 1 ("FE-1") is a former Inari employee, hired by Hykes, who worked as Director of the Inari Solutions Group, a division within Inari that works with hospitals to develop clinical programs to identify, triage, and treat patients with venous thromboembolism, from May 2022 through July 2023 and has more than 30 years of experience in the medical field, including experience at large medical device and technology businesses overseeing interactions with

HCP customers. At Inari, FE-1 was responsible for engaging with hospitals across the United States that were establishing thrombectomy programs and educating hospital personnel on Inari products, including training and educating medical providers on, and incentivizing them to use, Inari's products. In this role, FE-1 directly saw – and discussed with other Inari employees and executives – actions that they[11] believed to be improper. For instance, FE-1 stated that physicians with high volumes of sales were constantly wined and dined and Inari would do whatever they wanted to keep their business. For example, FE-1 stated that Inari paid for physicians to attend training sessions in vacation destinations, despite that the training event was not for the physician's specialty, or that the training session was intended for nurses rather than physicians. During these training sessions in vacation destinations that were intended for nurses only, Inari would pay for physicians to go to multiple dinners and out to night clubs. FE-1 also stated that physicians would tell their designated salesperson if there were specific events, such as a NASCAR race, or a dinner they wanted to attend, and Inari would arrange a training event in order to compensate the physicians and their staff nurses for their travel, and that Inari would generally do whatever the physicians wanted. FE-1 stated that Inari correlated the money spent on a physician to the amount of business that physician generated for the Company.

96. FE-1 further stated that they personally informed Inari management of the improper kickbacks to doctors. They first told their direct supervisor, the Vice President of Inari Solutions Group, who was in complete agreement that the practices were improper and needed to stop. FE-1 and their direct supervisor then personally informed Hykes in the fall of 2022 that they were uncomfortable with the kickback scheme. After that conversation, FE-1's supervisor was fired just

[11] Former employees are referred to with gender neutral pronouns, *i.e.*, "their," "they," and "them," so as to mask their identities.

days later and replaced with another individual, who proceeded to instruct FE-1 to ignore the kickback scheme and tell them that they did not know the rules. Still, FE-1 stated that they continued reporting their concerns to the new supervisor who, per Inari's procedure, relayed those concerns to Hykes. FE-1 also stated that they were told of meetings during which FE-1's concerns and the kickbacks were discussed with Hykes and other Inari executives. FE-1 reported that Inari executives, including Hykes, were also aware of the kickback scheme because the executives personally participated in it, for example, by flying to and participating in physician events and dinners.

97. After leaving Inari in July 2023, FE-1 contacted the DOJ to report the kickback scheme that FE-1 had witnessed because they were so uncomfortable with the interactions and conduct taking place at Inari. FE-1 stated that, during that conversation, the DOJ informed FE-1 that an investigation was already in progress regarding the scheme.

98. Other former Inari employees have provided additional information regarding the kickback scheme. FE-2 is a former Inari employee who worked as an account manager from December 2020 to February 2023. FE-2 reported that the Company stated at internal sales presentations that there is a direct correlation between how much business you bring in and how much time you spend with your customers on a private basis. While in the account manager role, FE-2 spent approximately $5,000 on physician dinners in a three-month period. FE-2 was subsequently informed at a quarterly sales meeting that another rep, who was cited as a "good example," was "congratulated and rewarded" for spending approximately $50,000 on dinners in a similar time period. FE-2 was instructed to attempt to match those numbers – in effect multiplying their expenses by 1000% – by their direct supervisor, the district manager.

99. FE-3 is a former Inari employee who worked as an account manager from March 2021 through November 2023 in the Buffalo, New York area. In this role, FE-3 was responsible for selling Inari's DVT and PE products (*i.e.*, its FlowTriever and ClotTriever), engaging with customers, negotiating contracts with regional managers, building referrals, and increasing the Company's sales and revenue. FE-3 reported that certain physicians were hired as consultants, and referred to by the salesforce as Key Opinion Leaders ("KOLs"). FE-3 stated that sales staff were instructed to compensate KOLs regularly with trips and dinners, in order to incentivize the physicians to not only use Inari products but also to evangelize for Inari products to their co-workers. FE-3 reported that Inari's kickback scheme included advocacy by Inari to assist the KOLs by steering business among other Inari customers toward the KOLs. In addition, FE-3 stated that Inari would remove physicians from their speakers and dinners lists if, after a period of time building a sales relationship, the physicians were not using substantial amounts of Inari products.

100. FE-2 and FE-3 attended regular national sales meetings, either in person or via Zoom, which included discussion of Company-wide sales data. At these national sales meetings, slides were distributed which indicated that not only were sales professionals who sold the most Inari products compensated the most (a direct indication of the economics of Defendants' fraudulent kickback scheme), but also that the amount of money spent on physicians' dinners was functionally equivalent to the value of Inari products purchased by the physicians who attended those dinners.

101. FE-4 was an account manager at Inari from January 2022 through January 2023 in the Seattle area. In this role, FE-4 was responsible for selling Inari's medical devices and working directly with hospitals and physicians. FE-4 reported to a regional sales manager who reported to a Regional Manager. FE-4 had direct experience with Dr. Aparna Baheti ("Baheti"), one of Inari's KOLs. *See supra* at §V.A.7. According to FE-4, Dr. Baheti was engaged as a KOL and was paid

regularly, yet she was never available for any talks or had any peer-to-peer conversations with other physicians. FE-4 stated this was common practice at Inari, *i.e.*, for a physician to be engaged as a KOL for Inari to pay them, and for the physician would never actually conduct the talks.

102. FE-4 attended a national sales meeting in-person in mid-Spring 2022 in Dallas, Texas during which Inari displayed a slide highlighting that the sales reps who had spent the most money on physician dinners were the reps that had the highest sales. FE-4 stated that Inari correlated money spent on physicians with product usage and sales.

### D. Inari Tracked, Reviewed, and Adjusted HCPs' Remuneration Based on Their Case Volume

103. Consistent with the accounts of the FEs, the Qui Tam Complaint alleges, based on Sanchez's and Bowen's personal knowledge, that Inari had an internal practice of tracking, reviewing, and adjusting individual physicians' remuneration based on their case volume. *See* Qui Tam Compl., ¶92. According to FE-4, Inari tracked all HCP payments using SAP Concur, a software program used to manage expenses. Indeed, "Regional Sales Manager Ross Mulholland and National Accounts Manager Sean Morris discussed physicians' case volume and referral patterns in the same communications in which they arranged consulting engagements, dinners, and other remuneration for those physicians." *Id.* This corroborates the accounts of FE-1, FE-2, FE-3, and FE-4 that Inari directly linked its remuneration to physicians with their case volume.

104. The Qui Tam Complaint further alleges that Inari's sales management systematically reviewed the data demonstrating the relationship between the amount of remuneration paid to each physician and that physician's FlowTriever and ClotTriever case volume. *See* Qui Tam Compl., ¶¶87, 92. With that data, Inari increased individual physicians' consulting arrangements and compensation if their case volume met Inari's expectations – and decreased consulting compensation if not. *Id.*

### E. No AKS Safe Harbor

105. Inari's payments to HCPs during the Class Period are not protected under the AKS safe harbor available at 42 C.F.R. §1001.952. As alleged in the Qui Tam Complaint, none of Inari's payments to HCPs satisfy the requirements of the personal services and management contracts safe harbor, 42 C.F.R. §1001.952(d), because: (i) the aggregate compensation paid to physician-KOLs such as Dr. Misono and Dr. Kaushal was not set in advance but rather fluctuated from payment to payment in a manner that tracked, rather than remained independent of, the volume of FlowTriever and ClotTriever procedures those physicians performed or referred; (ii) the entertainment, hotel and resort stays, and marketing support alleged herein were not covered by any written agreement specifying the services to be provided in exchange, as required by the safe harbor; and (iii) Inari's own personnel discussed physicians' case volume in the same communications made to arrange consulting engagements and entertainment, confirming that the remuneration was not consistent with fair market value for bona fide services rendered. *See* Qui Tam Compl., ¶86.

### F. Inari's Remuneration Was Not the Permissible Training or Modest Hospitality Allowed by the AdvaMed Code

106. The AdvaMed Code permits device companies to pay for "modest and reasonable" travel and lodging for HCPs to attend a company-conducted program and to provide "modest meals and refreshments" in appropriate circumstances. The remuneration alleged here bears no resemblance to those permitted interactions, as: (i) the meals were not modest: the dinners alleged above cost between $243.33 and $489.17 per person, and the travel and lodging paid for by Inari included payments for a physician's girlfriend to stay at an oceanfront resort; (ii) the attendees included spouses and dates – individuals who are not HCPs and for whom no training or educational purpose could exist; (iii) none of the dinners or resort events are alleged to have included any actual program, presentation, or training, and the "training" events were scheduled around physicians'

personal entertainment requests and attended by physicians outside the intended audience; (iv) Inari's own personnel tied the remuneration to case volume in real time, as in Mulholland's September 23, 2021 text pressing for Inari-funded dinners to drive up physicians' case volume, and Inari discontinued providing speaker fees, dinners, and consulting payments to physicians whose volume lagged; and (v) Inari's consulting and speaker payments to its top users dwarfed the national average: Inari paid Dr. Misono $164,681 in 2022 and $260,942 in 2023, when the average payment to physicians in his specialty was $11,171.97 and $5,011.28, and those payments fluctuated in a manner that tracked his procedure volume rather than any fixed, pre-set compensation for bona fide services.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

107. Throughout the Class Period, Defendants made a series of materially false and misleading statements and omissions regarding Inari's compliance with healthcare laws, including the AKS and FCA and Inari's revenue growth and the reasons for such growth.

### A. Statements About Compliance with Healthcare Laws

108. Throughout the Class Period, Inari filed documents with the SEC and/or made public statements discussing the applicability of the AKS and FCA on its business, and included representations that Inari was in fact complying with both statutes. These statements were materially false and misleading. First, it was materially false and misleading for Inari to warn of hypothetical consequences of statutory violations when Inari knew that it was already violating the AKS and FCA. Second, Inari's repeated representations that it was in compliance with federal healthcare laws were knowingly false, given Defendants' knowledge of Inari's kickback scheme.

### 1. The FY 2020, 2021, and 2022 Forms 10-K

109. On March 9, 2021, February 23, 2022, and February 27, 2023, Inari filed its FY 2020, 2021, and 2022 Forms 10-K, respectively. The FY 2020 and 2021 Forms 10-K were signed and certified by Hoffman and Hill and the 2022 Form 10-K was signed and certified by Hykes and Hill. Each of the Forms 10-K filed with the SEC included the following statement under the "Risk Disclosures" section:

> ***If*** our operations are found to be in violation of any of the federal . . . [Anti-Kickback Statute and Civil False Claims Act] or any other current or future fraud and abuse or other healthcare laws and regulations that apply to us, we ***may*** be subject to significant penalties, including significant criminal, civil, and administrative penalties, damages, fines, exclusion from participation in government programs, such as Medicare and Medicaid, imprisonment, contractual damages, reputation harm and disgorgement and we could be required to curtail, restructure or cease our operations. Any of the foregoing consequences will negatively affect our business, financial condition and results of operations.

110. Inari's risk disclosure was false and misleading because by speaking about the AKS and FCA, Defendants created an affirmative duty to speak the whole truth regarding Inari's compliance with those statutes, *i.e.*, that Inari was already violating the AKS and the FCA by providing improper kickbacks to HCPs for the primary – and illicit purpose – of inducing the purchase, use, or referral of its products, as demonstrated by the following: (i) Inari provided lavish meals, vacations, and entertainment experiences to HCPs in order to convince them to use or refer the Company's mechanical thrombectomy devices; (ii) Inari paid for physicians to attend sham training sessions, but rather gathered at NASCAR races among other forms of entertainment; (iii) Inari created an extensive referral network whereby it would pay non-surgeons like Jason Berger to recommend that surgeons use Inari's clot retrieval devices during procedures; (iv) Inari retained physicians on KOL engagement contracts pursuant to which it regularly compensate them, yet some of those physicians, like Dr. Baheti, never actually gave the talks or lectures; (v) Inari created and

printed advertising materials for physicians like Drs. Kaushal, Lumsden, and Loh, to promote their services including their VTE procedures in which they used Inari's products; (vi) Inari paid considerable illicit remuneration to physicians to induce their purchase of the FlowTriever and ClotTriever in direct violation of the AKS; (vii) FE-1 and their supervisor reported to Defendant Hykes that Inari was paying improper kickback payments to HCPs, however, Hykes disregarded their concerns and continued to participate in such improper events, and FE-1's supervisor was fired days later; and (viii) Inari would cut off, *i.e.*, stop paying physicians who no ceased using its medical devices. That this statement was false and misleading is further demonstrated by the particularized allegations of the Qui Tam Complaint – which Lead Counsel independently investigated and corroborated, as set forth in ¶¶102-103 above – and (x) Deutsche Bank's findings in its August 9, 2024 report discussed *infra*.

111. Inari also filed quarterly reports on Form 10-Q with the SEC throughout the Class Period that incorporated by reference the above misleading statement in Inari's risk disclosures. Thus, Inari made the false and misleading statement alleged *supra* in ¶109 in its FY 2020, FY 2021, and FY 2022 Forms 10-K, as well as its Q1 through Q3 Quarterly Reports for 2021, 2022, and 2023.

112. Inari's FY 2020, FY 2021, and FY 2022 Forms 10-K also included the following statement, in the "Business" section, following a subheading titled "Healthcare Regulatory Laws:"

> Within the United States, ***our products and our customers are subject to extensive regulation by a wide range of federal and state agencies that govern business practices in the medical device industry. These laws include federal and state antikickback, fraud and abuse, false claims***, transparency and anti-corruption statutes and regulations. Internationally, other governments also impose regulations in connection with their healthcare reimbursement programs and the delivery of healthcare items and services. U.S. federal healthcare fraud and abuse laws generally apply to our activities because our products are covered under federal healthcare programs such as Medicare and Medicaid. ***The Anti-Kickback Statute is particularly relevant because of its broad applicability. Specifically, the Anti-Kickback Statute prohibits persons or entities from knowingly and willfully soliciting, offering, receiving, or providing remuneration, directly or indirectly, in***

> ***exchange for, or to induce, either the referral of an individual, or the furnishing, arranging for or recommending a good or service for which payment may be made in whole or part under federal healthcare programs, such as the Medicare and Medicaid programs***. Further, a person or entity does not need to have actual knowledge of the Anti-Kickback Statute or specific intent in order to violate it. The term remuneration has been interpreted broadly to include anything of value.

113. It was false and misleading for Defendants to state that "our products and our customers are subject to extensive regulation by a wide range of federal and state agencies that govern business practices in the medical device industry," including the AKS, while omitting that Inari was actively violating those very laws, as demonstrated by the Company's provision of free meals, consulting service payments, and speaking engagement fees to HCPs in contravention of the AKS. That this statement was false and misleading is further demonstrated by the particularized allegations of the Qui Tam Complaint – which Lead Counsel independently investigated and corroborated, as set forth above – that Inari paid considerable illicit remuneration to physicians to induce their purchase or referral of the FlowTriever and ClotTriever in direct violation of the AKS, as described in detail above. That this statement was false and misleading when made is further supported by the accounts of FE-1. As FE-1 reported, Inari routinely violated the AKS by wining and dining high-volume physicians, including paying for travel to sham "trainings" at vacation destinations, organizing events around personal requests like NASCAR races, tracking sales by individual physicians and equating sales representatives' expenditures on physicians with those physician's revenue generation. FE-1 and their supervisor even warned Hykes about the illicit nature of these practices, only for the supervisor to be terminated days later. That this statement was false and misleading is further demonstrated by Deutsche Bank's findings in its August 9, 2024 report.

114. Inari also filed quarterly reports on Form 10-Q with the SEC throughout the Class Period that incorporated by reference the misleading statement in Inari's "Business" section. Thus,

Inari also made the misleading statement alleged *supra* in ¶70 in each of its FY 2020, FY 2021, and FY 2022 Forms 10-K, as well as in its Q1 through Q3 Quarterly Reports for 2021, 2022, and 2023.

115. The FY 2020, 2021, and 2022 Forms 10-K also included the following language in the portion of the filings titled "Risk Factors" underneath a subheading titled "Risks Related to Government Regulation":

> ***We are subject to certain federal, state and foreign fraud and abuse laws and physician payment transparency laws that could subject us to substantial penalties***. Additionally, ***any challenge to or investigation into our practices under these laws could cause adverse publicity and be costly to respond to, and thus could harm our business***.
>
> There are numerous U.S. federal and state, as well as foreign, laws pertaining to healthcare fraud and abuse, including ***anti-kickback, false claims and physician transparency payment laws. Our business practices and relationships with providers are subject to scrutiny under these laws. The healthcare laws and regulations that may affect our ability to operate include***, but are not limited to:
>
> - The federal Anti-Kickback Statute, which prohibits, among other things, persons and entities from knowingly and willfully soliciting, offering, receiving or providing remuneration, directly or indirectly, in cash or in kind, to induce either the referral of an individual or furnishing or arranging for a good or service, for which payment may be made, in whole or in part, under federal healthcare programs, such as Medicare and Medicaid. The U.S. government has interpreted this law broadly to apply to the marketing and sales activities of manufacturers. In addition, a person or entity does not need to have actual knowledge of the statute or specific intent to violate it to have committed a violation;
>
> - The federal civil and criminal false claims laws and civil monetary penalties laws, including the federal civil False Claims Act, which prohibit, among other things, individuals or entities from knowingly presenting, or causing to be presented, claims for payment from Medicare, Medicaid or other federal healthcare programs that are false or fraudulent. ***These laws can apply to manufacturers who provide information on coverage, coding, and reimbursement of their products to persons who bill third-party payors***. Private individuals can bring False Claims Act "qui tam" actions, on behalf of the government and such individuals, commonly known as "whistleblowers," may share in amounts paid by the entity to the government in fines or settlement. Moreover, ***the government may assert that a claim including items or services resulting from a violation of the federal Anti-***

> ***Kickback Statute constitutes a false or fraudulent claim for purposes of the federal civil False Claims Act***[.]

116. Defendants' statements that federal anti-kickback and physician payment transparency laws "***could***" subject the Company to substantial penalties, and that any challenge or investigation under such laws "***could***" result in adverse publicity or business harm, were false and misleading because at the time those statements were made, Inari was already violating the AKS and FCA and thus the risk of incurring substantial penalties and adverse publicity due to such violations was much greater than investors had been led to believe. Moreover, by speaking about the AKS and FCA, Defendants created an affirmative duty to speak the whole truth regarding Inari's compliance with those statutes. That these statements were false and misleading is further demonstrated by the particularized allegations of the Qui Tam Complaint – which Lead Counsel independently investigated and corroborated – that Inari paid considerable illicit remuneration to physicians to induce their purchase of the FlowTriever and ClotTriever in direct violation of the AKS, as described in detail above. That these statements were false and misleading when made is further supported by the account of FE-1. FE-1 explained that Inari regularly provided lavish meals, entertainment, and travel to high-volume physicians and tracked physician-specific sales to justify the spending, a practice directly prohibited under the AKS. FE-1 also reported this improper conduct to Hykes, who not only disregarded the warnings, but also continued participating in these events. FE-1's account shows that Inari was violating the very laws it routinely referenced. That these statements were false and misleading is further demonstrated by Deutsche Bank's findings in its August 9, 2024 report.

117. Inari also filed quarterly reports on Form 10-Q with the SEC throughout the Class Period that incorporated by reference the misleading statement in Inari's risk disclosures. Thus, Inari also made the misleading statement alleged *supra* in ¶73 in each of its FY 2020, FY 2021, and

FY 2022 Forms 10-K, as well as in its Q1 through Q3 Quarterly Reports for 2021, 2022, and 2023. Those statements are false and misleading for the same reasons alleged in ¶116 *supra.*

### 2. The March 15, 2022 Shelf Offering Agreement

118. On March 15, 2022, Inari filed a Form 8-K, signed by Hill, which stated that on March 10, 2022, Inari entered into an underwriting agreement with Bank of America ("BofA") and Morgan Stanley in connection with a shelf offering of 2,000,000 shares of Inari common stock (the "Underwriting Agreement"). The Underwriting Agreement, attached as Exhibit 1.1 to the Form 8-K contained the following statement:

> Compliance with Health Care Laws. ***The Company and its subsidiaries are and have been in compliance with all Health Care Laws*** (as hereinafter defined), except where instances of non-compliance would not, singly or in the aggregate, reasonably be expected to result in a Material Adverse Effect. For purposes of this Agreement, ***"Health Care Laws" means all health care laws applicable to the Company, including***, but not limited to: the Federal Food, Drug, and Cosmetic Act, ***the Anti-Kickback Statute (42 U.S.C. Section 1320a-7b(b))***, the Civil Monetary Penalties Law (42 U.S.C. §1320a-7a), the Physician Payment Sunshine Act (42 U.S.C. §1320a-7h), the ***Civil False Claims Act (31 U.S.C. Section 3729 et seq.)***, the criminal False Claims Law (42 U.S.C. §1320a-7b(a)), all criminal laws relating to health care fraud and abuse, including but not limited to 18 U.S.C. Sections 286 and 287, and the health care fraud criminal provisions under the U.S. Health Insurance Portability and Accountability Act of 1996 ("HIPAA") (42 U.S.C. Section 1320d et seq.), the exclusion laws (42 U.S.C. §1320a-7), HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act (42 U.S.C. Section 17921 et seq.), Medicare (Title XVIII of the Social Security Act), Medicaid (Title XIX of the Social Security Act), and any and all other similar state, local or federal health care laws and the regulations promulgated pursuant to such laws, including, without limitation, the FDA's current good manufacturing practice regulations at 21 CFR Part 820, and all other laws and regulations applicable to ownership, testing, development, manufacture, packaging, processing, use, distribution, storage, import, export or disposal of the Company's products, each as amended from time to time. ***The Company and its subsidiaries have not engaged in activities which are, as applicable, cause for false claims liability, civil penalties*** or mandatory or permissive exclusion from Medicare, Medicaid, or any other state health care program or federal health care program, except where such noncompliance, false claims liability or civil penalties would not reasonably be expected to, singly or in the aggregate, result in a Material Adverse Effect. Neither the Company nor any of its subsidiaries have received written notice of any claim, action, suit, proceeding, hearing, enforcement, investigation, arbitration or other action from any court or



4919-0556-5659.v1

> arbitrator or governmental or regulatory authority or third party alleging a material violation of any Health Care Laws, and, to the Company's knowledge, no such claim, action, suit, proceeding, hearing, enforcement, investigation, arbitration or other action is threatened.

119. Inari and Hill's statement that "the Company and its subsidiaries are and have been in compliance with all Health Care Laws" was false and misleading because, in reality, Inari was violating at least two federal health care laws – the AKS and the FCA – as demonstrated by the fact that Inari was providing improper kickbacks and bribes to HCPs in the form of meals, gift cards, consulting service payments, and hefty fees for speaking engagements that some physicians never even participated in. That this statement was false and misleading is further demonstrated by the particularized allegations of the Qui Tam Complaint – which Lead Counsel independently investigated and corroborated – that Inari paid considerable illicit remuneration to physicians to induce their purchase or referral of the FlowTriever and ClotTriever in direct violation of the AKS and FCA, as described in detail above. That this statement was false and misleading when made is further supported by FE-1, who described a pervasive kickback scheme in which Inari provided physicians with expensive dinners, entertainment, and travel, which was, in turn, tied directly to the participating physician's purchase of Inari products. FE-1 even flagged these practices as improper to senior leadership, including Hykes, who disregarded FE-1's concerns and even continued to participate in such improper events. That this statement was false and misleading is further demonstrated by Deutsche Bank's findings in its August 9, 2024 report.

## B. Statements About Inari's Revenue Growth

### 1. The March 9, 2021 Press Release and Earnings Call

120. Following the close of trading on March 9, 2021, Inari announced its financial results for the fourth quarter and fiscal year ended December 31, 2020 in a press release and Form 8-K filed with the SEC (the "Q4 2020 Press Release"). The Q4 2020 Press Release contained the following

statement by Hoffman: "Revenue was $48.6 million for the fourth quarter of 2020, compared to $38.7 million for the prior quarter and $19.9 million for the fourth quarter of 2019. ***The increase over prior year figures was driven by continued US commercial expansion and increased product adoption***."

121. Also following the close of trading on March 9, 2021, Inari held an earnings call with investors during which Hoffman stated that the following five factors contributed to the Company's Q4 2020 revenue growth (up 144% from the same quarter last year at $48.6 million) and procedure growth (up 156% from the same quarter last year at 4,600 procedures): (i) the expansion of Inari's sales organization; (ii) "building awareness" and driving deeper adoption at existing hospital customers (which Inari primarily executed through its "VTE Excellence" program); (iii) building upon Inari's base of clinical evidence; (iv) continuing to expand Inari's product portfolio; and (v) expansion into adjacent and international markets.

122. Further, during the earnings call on March 9, 2021, Bob Hopkins, an analyst with BofA Securities asked, "if you could maybe take a little bit of a step back for us and just highlight what you think is driving the inflection now . . . because it really is quite a remarkable last 12 months in terms for your performance in the United States." Hykes responded:

> So ***it's the expansion of the field team and the methodical addition of new reps and territory expansion***. I think we are making progress in driving deeper and deeper penetration into our existing accounts. And some of the investments and programs we've developed along those lines, I think, are really starting to bear fruit.

123. It was false and misleading for Inari and Hoffman to state in the Q4 2020 Press Release that Inari's revenue and procedure growth was attributable to "continued US commercial expansions and increased product adoption," when in fact the growth was driven by Inari's practice of offering improper inducements to HCPs in violation of the AKS and FCA. Hoffman's statement regarding the five "growth drivers" on the earnings call was false and misleading for the same

reasons – Inari was not "building awareness" at existing hospital customers; it was engaged in a kickback scheme to get hospital personnel to refer VTE patients to physicians who used Inari products. Similarly, Hykes's statement attributing the financial results to the "expansion of the field team" and the "addition of new reps and territory expansion" was false and misleading. In reality, Inari's improper kickbacks provided to HCPs in the form of meals, consulting services, speaking engagement fees, among other improper gifts, in violation of the AKS and FCA, were the true factors "driving the inflection" in Inari's performance.

124. That these statements were false and misleading is further demonstrated by the particularized allegations of the Qui Tam Complaint – which Lead Counsel independently investigated and corroborated – that Inari paid considerable illicit remuneration to physicians to induce their purchase of the FlowTriever and ClotTriever in direct violation of the AKS, as described in detail above. In addition, according to FE-1, growth was actually driven by improper kickbacks, including luxury trips and events for high-volume physicians. That these statements were false and misleading is further demonstrated by Deutsche Bank's findings in its August 9, 2024 report.

**2. The May 11, 2021 Press Release and Earnings Call**

125. On May 11, 2021, Inari reported its financial results for the first quarter ended March 31, 2021 in a press release and Form 8-K signed by Hoffman as well as a Form 10-Q signed by Hoffman and Hill. In both the Forms 8-K and 10-Q, Inari reported an increase in revenue of 18% from the previous quarter as well as the expansion of its commercial footprint. The Company attributed the increase in revenue to "***continued U.S. commercial expansion and increased production adoption***" and Hoffman touted that Inari "treated a record number of patients and ***significantly expanded [its] commercial footprint***."

126. It was false and misleading for Inari and Hoffman to attribute the Company's 18% increase in revenue to "continued U.S. commercial expansion," "increased product adoption," and "significant expan[sion] [of its] commercial footprint" while omitting that Inari's revenue growth was driven by improper kickbacks provided to HCPs in the form of meals, consulting service fees, and speaking engagements fees, in violation of the AKS and FCA.

127. That these statements were false and misleading is further demonstrated by the particularized allegations of the Qui Tam Complaint – which Lead Counsel independently investigated and corroborated – that Inari paid considerable illicit remuneration to physicians to induce their purchase of the FlowTriever and ClotTriever in direct violation of the AKS, as described in detail above. In addition, FE-1's report demonstrates that growth was driven by a widespread kickback scheme in which Inari spent money on physicians in direct exchange for increased product use; and FE-3 reported that Inari incentivized physicians to promote and use its products through meals and trips, and that physicians who failed to use substantial amount of Inari products were cut off from these benefits – further showing that growth was purchased. That these statements were false and misleading is further demonstrated by Deutsche Bank's findings in its August 9, 2024 report.

**3. The August 10, 2021 Press Release and Earnings Call**

128. On August 10, 2021, the Company announced its financial results for its second quarter ended June 30, 2021 in a press release and Form 8-K signed by Hoffman and filed with the SEC, and in a Form 10-Q signed by Hoffman and Hill. In the Forms 8-K and 10-Q, Inari again reported increased revenue stating "[r]evenue was $63.5 million for the second quarter of 2021, compared to $57.4 million for the prior quarter and $25.4 million for the second quarter of 2020."

Inari attributed this revenue growth to "***continued U.S. commercial expansion and new product introductions***."

129. In the Form 8-K, Hoffman stated that the Company's "second quarter was highly successful . . . [w]e treated a record number of patients" and "***continue to invest aggressively to expand our capabilities to treat even more patients and address more unmet needs***."

130. Also on August 10, 2021, Inari hosted an earnings call with analysts and investors, during which Hoffman stated that:

> The increase in density of our sales organization and the resulting smaller territories provide opportunity to more effectively address our second growth driver, which is ***building awareness and driving deeper adoption at existing hospital customers***.

131. The August 10, 2021 statements were false and misleading for several reasons. First, it was false and misleading for Inari to attribute its revenue growth for its second quarter of 2021 to "continued U.S. commercial expansion and new product introductions" while failing to disclose that the Company's growth was, in substantial part, driven by improper sales and marketing practices, including kickbacks and bribes made to HCPs in violation of the AKS and FCA to induce usage and adoption of Inari's medical products. Second, it was false and misleading for Hoffman to attribute Inari's revenue growth to the Company's ability to "continue to invest aggressively to expand our capabilities" and to legitimate drivers such as "building awareness and driving deeper adoption." Specifically, Hoffman omitted the fact that the Company's revenue growth was driven by improper sales and marketing practices in violation of the AKS and FCA.

132. That these statements were false and misleading is further demonstrated by the particularized allegations of the Qui Tam Complaint – which Lead Counsel independently investigated and corroborated – that Inari paid considerable illicit remuneration to physicians to induce their purchase of the FlowTriever and ClotTriever in direct violation of the AKS, as

described in detail above. In addition, FE-1 reported that Inari's sales growth was not organic but rather stemmed from an improper kickback scheme, and that Hykes was directly involved in these efforts. This contradicts Hoffman's statement that revenue gains came from "building awareness"; and FE-3 stated that Inari's sales strategy involved paying physicians to use and promote its products and cutting off those who didn't generate sufficient sales, directly undermining the claim that deeper adoption at hospitals was achieved through building awareness. That these statements were false and misleading is further demonstrated by Deutsche Bank's findings in its August 9, 2024 report.

**4. The November 9, 2021 Press Release and Earnings Call**

133. On November 9, 2021, Inari filed its Form 8-K with the SEC, which was signed by Hoffman, attaching a press release announcing its earnings for the third quarter ended September 30, 2021. In the press release, Hoffman stated that "[o]ur third quarter was as successful as it was exciting. We again treated a record number of patients and made important progress in all five of our growth drivers." The press release reported that revenue "was $72.9 million for the third quarter of 2021, compared to $63.5 million for the prior quarter and $38.7 million for the third quarter of 2020." The Company attributed this increase in reported revenue to "continued U.S. commercial expansion and new product introductions."

134. Inari hosted an earnings call with analysts and investors that same day, during which Hoffman stated:

> Despite the continued questions about COVID and its impact on our business, we have made steady progress on all of our growth drivers, and we have grown in every single quarter since the pandemic began in Q1 of 2020. In fact, during the pandemic, we've completed over 30,000 procedures and ***nearly tripled our quarterly production of both cases and revenue. We added 500 new customer accounts***, hired and trained over 100 new sales professionals, developed our VTE excellence program to drive deeper adoption, created and executed our Clot Warrior Academy online training and education platform, which has now reached over 4,500 customers.



4919-0556-5659.v1

> ***Our first growth driver is the expansion of our sales organization to target new hospitals and physicians***. . . .
>
> ***Our second growth driver is building awareness and driving deeper adoption at existing hospital customers***. As you know, a high percentage of our target PE and DVT patient populations are currently treated with anticoagulation alone. Education and training of the noninterventional physicians who are often responsible for treatment decisions for these patients is important, and we continue to engage these physicians effectively.

135. It was false and misleading for Inari to attribute the Company's increase in reported revenue to "continued U.S. commercial expansion and new product introductions" when the revenue growth was materially driven by improper kickback and bribes made to HCPs in contravention of the AKS and FCA. Likewise, Hoffman's statements attributing Inari's revenue and procedure growth to drivers such as "expansion of our sales organization" and "building awareness and driving deeper adoption," but failing to disclose the material improper drivers of such growth, were false and misleading. Defendants' failure to disclose that this revenue and procedural volume was materially inflated by conduct prohibited under federal law rendered their public statements materially false and misleading.

136. That these statements were false and misleading is further demonstrated by the particularized allegations of the Qui Tam Complaint – which Lead Counsel independently investigated and corroborated – that Inari paid considerable illicit remuneration to physicians to induce their purchase of the FlowTriever and ClotTriever in direct violation of the AKS, as described in detail above. In addition, FE-1 reported that physicians using high-volumes of Inari's products were financially rewarded by the Company to incentivize product use, and that Hykes was aware and often personally involved in these events, contradicting claims that growth resulted from training or sales force expansion; and FE-3 described how Inari compensated certain physicians to promote its products and withdrew benefits when those physicians failed to deliver substantial sales,

showing that the Company's "growth" was purchased. That these statements were false and misleading is further demonstrated by Deutsche Bank's findings in its August 9, 2024 report.

#### 5. The February 18, 2022 SVB Leerink Conference

137. On February 18, 2022, Hoffman, Hykes, and Hill attended SVB Leerink's Global Healthcare Conference. During the conference, SVB analyst Danielle Antalffy asked, "How much do you see the near term growth profile being driven by, I think – I have my answer to this question but driven by market share moves versus market growth?" Hykes responded, "Our growth, we think, is coming certainly from taking share from the existing interventional segment of the market" and "What I think increasingly, ***our growth is coming from expanding the market and putting patients onto the table that would have been treated with conservative medical management***."

138. Hykes's February 18, 2022 statement that Inari's growth was driven by "expanding the market and putting patients onto the table" was false and misleading when, in actuality, Inari's revenue growth and sales and marketing success was driven by improper kickbacks provided to HCPs in contravention of the AKS and FCA. Moreover, by speaking about the drivers of the company's growth, Hykes created a duty for Defendants to disclose that its growth was being driven by improper kickbacks.

139. That this statement was false and misleading is further demonstrated by the particularized allegations of the Qui Tam Complaint – which Lead Counsel independently investigated and corroborated – that Inari paid considerable illicit remuneration to physicians to induce their purchase of the FlowTriever and ClotTriever in direct violation of the AKS, as described in detail above. In addition, FE-1 reported that Inari financially induced physicians to use its products, and that these inducements were directly tied to how much product the physician used, directly contradicting Hykes's statements about Inari's growth; and FE-3 stated that Inari paid

physicians to advocate for its products and steered referrals to them in exchange for product use, showing that volume increases were purchased through improper inducements rather than market expansion. That this statement was false and misleading is further demonstrated by Deutsche Bank's findings in its August 9, 2024 report.

**6. The February 23, 2022 Press Release and Form 10-K**

140. After the market closed on February 23, 2022, Inari announced its financial results for the FY ended December 31, 2021 in a press release filed with the SEC on Form 8-K, signed by Hoffman. There, Inari stated that: "Revenue was $83.2 million for the fourth quarter of 2021, compared to $72.9 million for the prior quarter and $48.6 million for the fourth quarter of 2020. ***The increase over prior quarter was driven by continued U.S. commercial expansion and new product introductions***." That same day, Inari also filed its annual report on Form 10-K with the SEC, which was signed and certified by Hoffman and Hill. The FY 2021 Form 10-K repeated the financial results reported in the press release.

141. During the February 23, 2022 earnings call with analysts and investors, Hoffman again claimed that the "five growth drivers" were responsible for the increased revenue and further explained that:

> ***Our second growth driver is building awareness and driving deeper adoption at existing hospital customers***. Most VTE patients continue to be treated with anticoagulation alone and in fact, a large percentage of these patients never even see a physician, who is a VTE expert. We continue to drive awareness of the benefits in our procedures with non-interventional physicians and we continue to work with hospital administrators to install more systematic processes to consistently identify and triage VTE patients to the physicians, who best understand the disease state.

142. Inari and Hoffman's February 23, 2022 statements were false and misleading. First, it was false and misleading for Inari to attribute its revenue growth to "continued U.S. commercial expansion and new product introductions" when such growth was driven by improper kickback to

HCPs. Second, it was false and misleading for Hoffman to attribute Inari's revenue and procedure growth for its fourth quarter and FY 2021 to legitimate drivers such as "building awareness and driving deeper adoption" while failing to disclose that the Company's growth was driven by improper sales and marketing practices in violation of the AKS and FCA to induce usage and adoption of Inari's medical products; by speaking about drivers of the Company's growth, Defendants created a duty to disclose that Inari's growth was, in fact, being driven by its payment of kickbacks to HCPs. Hoffman's failure to disclose that this revenue and procedural volume was inflated by conduct prohibited under federal law rendered his public statements materially false and misleading.

143. That these statements were false and misleading is further demonstrated by the particularized allegations of the Qui Tam Complaint – which Lead Counsel independently investigated and corroborated – that Inari paid considerable illicit remuneration to physicians to induce their purchase of the FlowTriever and ClotTriever in direct violation of the AKS, as described in detail above. In addition, FE-1, who was part of the Inari Solutions Group mentioned by Hoffman, confirmed that the Company's growth came from lavish spending on physicians, including vacations, nightclubs, and sham training events, often with no legitimate educational purposes, and that these practices were directly tied to sales volume and known to Hykes; and FE-3 explained that Inari maintained physician loyalty by regularly compensating "KOLs" with inducements and referrals, and dropped those who failed to continue using substantial Inari products, showing that so-called deeper adoption was forced and purchased by the Company. That these statements were false and misleading is further demonstrated by Deutsche Bank's findings in its August 9, 2024 report.

### 7. The May 4, 2022 Press Release and Earnings Call

144. On May 4, 2022, after the market closed, the Company reported its financial results for the first quarter ended March 31, 2022 in a press release and Form 8-K filed with the SEC, signed by Hoffman. In the press release, Hoffman stated that "[w]e executed crisply across all five of our growth drivers during a highly productive first quarter." The Company attributed its revenue growth to continued U.S. commercial expansion and new product introductions.

145. Also on May 4, 2022, Inari hosted an earnings call with analysts and investors, during which Hoffman again attributed the increased revenue to the oft-repeated five growth drivers and further explained:

> ***Our first growth driver is the expansion of our sales organization***. The size of our core TAM is large and our penetration remains under 5%. We're going to need a lot more sales professionals. We committed to at least 275 territories by the end of 2022 and we are on pace to achieve this goal. These increasingly smaller territories position us to execute our second growth driver, which is driving deeper adoption at existing hospital customers.

146. Inari and Hoffman's May 4, 2022 statements were false and misleading. Hoffman's statement that the Company "executed crisply across all five of our growth drivers" was false and misleading because Hoffman failed to disclose that the Company's growth was materially driven by Inari sales representatives inducing HCPs to use Inari's medical products through improper kickbacks and bribes in violation of the AKS and FCA. Likewise, Hoffman's statement that "[o]ur first growth driver is the expansion of our sales organization" is false and misleading for the same reason, and because it fails to disclose that the "patient pathways" were developed in violation of the AKS and FCA. By speaking about drivers of the Company's growth, Defendants created a duty to disclose that Inari's growth was, in fact, being driven by its payment of kickbacks to HCPs. Defendants' failure to disclose that this revenue and procedural volume was inflated by conduct prohibited under federal law rendered their public statements materially false and misleading.

147. That these statements were false and misleading is further demonstrated by the particularized allegations of the Qui Tam Complaint – which Lead Counsel independently investigated and corroborated – that Inari paid considerable illicit remuneration to physicians to induce their purchase of the FlowTriever and ClotTriever in direct violation of the AKS, as described in detail above. In addition, FE-1 reported that growth was driven by improper inducements to physicians; and FE-3 explained that Inari compensated physicians to promote its products and cut off those who failed to generate substantial sales. That these statements were false and misleading is further demonstrated by Deutsche Bank's findings in its August 9, 2024 report.

**8. The August 3, 2022 Press Release and Form 10-Q**

148. After the market closed on August 3, 2022, Inari reported its financial results for the second quarter ended June 30, 2022 in a press release and Form 8-K filed with the SEC, signed by Hoffman. In the press release, the Company reported an increase in reported revenue as well as the expansion of its commercial footprint and attributed its results to "continued U.S. commercial expansion and new product introductions." Hoffman was quoted in the press release saying that the Company continued to "execute crisply across all five of [its] growth drivers despite the ongoing challenges to the med tech operating environment," "produced robust revenue growth," and "hired its largest class of new sales professionals."

149. Inari and Hoffman's August 3, 2022 statements were false and misleading. First, Inari attributed the Company's second quarter 2022 revenue growth and commercial performance to purportedly legitimate business drivers such as "continued U.S. commercial expansion and new product introductions." This was false and misleading because Inari failed to disclose that the Company's growth was driven by improper sales practices in violation of the AKS and FCA. Similarly, Hoffman's statements that Inari continued to execute its "growth drivers," "produced

robust revenue growth," and "hired its largest class of new sales professionals" in support of the Company's growth were false and misleading because they omitted the fact that such growth was fueled, in substantial part, by improper sales practices in violation of the AKS and FCA. Failure to disclose that these improper inducements were driving Inari's reported revenue and adoption metrics rendered their statements materially false and misleading. By speaking about drivers of the Company's growth, Defendants created a duty to disclose that Inari's growth was, in fact, being driven by its payment of kickbacks to HCPs.

150. That these statements were false and misleading is further demonstrated by the particularized allegations of the Qui Tam Complaint – which Lead Counsel independently investigated and corroborated – that Inari paid considerable illicit remuneration to physicians to induce their purchase of the FlowTriever and ClotTriever in direct violation of the AKS, as described in detail above. In addition, FE-1 confirmed that growth stemmed from improper payments to physicians tied directly to product usage; and FE-3 reported that physicians were paid and induced to promote Inari products and were dropped if they didn't use enough of Inari's products. That these statements were false and misleading is further demonstrated by Deutsche Bank's findings in its August 9, 2024 report.

### 9. The November 2, 2022 Press Release and Earnings Call

151. On November 2, 2022, after the markets closed, Inari announced its financial results for the third quarter ended September 30, 2022 in a press release and Form 8-K filed with the SEC, signed by Hoffman. The press release quoted Hoffman as stating "***[o]ur aggressive investment in our growth drivers is paying off for our mission***." The press release also attributed the Company's reported revenue growth to continued U.S. commercial expansion, increased adoption of its procedures, and introduction of new products.

152. Also on November 2, 2022, Inari hosted an earnings call with analysts and investors during which Hykes stated: "Our revenue in Q3 was $96.2 million, up $23.3 million or 32% from the same quarter last year. Results in our core business were driven by strong procedural growth across both ClotTriever and FlowTriever product line. . . ." Hykes further repeated that Inari's five growth factors, *i.e.*: (i) the expansion of Inari's sales organization; (ii) increasing penetration in existing accounts; (iii) building upon the base of clinical evidence; (iv) expanding its product portfolio; and (v) expansion into international markets, contributed to the Company's growth, and further explained that:

> Our ***first growth driver is the expansion of our sales organization***. You will recall that we committed to at least 275 territories by the end of 2022.
>
> In Q2 we hired our largest sales class ever, nearly achieving this goal by midyear. . . . In Q3, we intentionally hired a smaller group and exited the quarter with just over 275 territories . . . Continued expansion of our sales organization results in smaller and smaller territories. This positions us well to execute on our second growth driver, which is increasing penetration in existing accounts.
>
> Despite our commercial success, the vast majority of VTE patients continue to be treated with anticoagulation alone and never see a physician with the skills and expertise to make the most informed clinical decisions. Our goal is to establish systems and processes similar to stroke and MI [myocardial infarction] that ensure patients are consistently identified, screened, and evaluated by a VT expert. Our VT[E] Excellence program is a comprehensive and repeatable approach to connecting VTE patients to VT experts. We have invested heavily in this effort, and we believe it is paying off. We are systematically moving customers to the most advanced stage of VT[E] Excellence, and TAM penetration rates at these centers are several times greater than our median customer.

153. Hill also stated during the earnings call that:

> Compared to Q3 of 2021, ***our revenue growth was due to continued efforts to open new customer accounts, expand our sales force and deepen our relationship with existing customers***.

154. Inari, Hykes and Hoffman's November 2, 2022 statements were false and misleading for several reasons. Hoffman's statement that Inari's "aggressive investment in our growth drivers is paying off for our mission" and attributing to the Company's third quarter 2022 revenue growth was

false and misleading because Hoffman failed to disclose that a significant portion of that growth was driven by improper sales practices employed to induce HCPs and hospitals to use Inari's medical devices. By speaking about drivers of the Company's growth, Defendants created a duty to disclose that Inari's growth was, in fact, being driven by its payment of kickbacks to HCPs. In addition, Hykes's November 2, 2022 statement that "[r]esults in our core business were driven by strong procedural growth across both ClotTriever and FlowTriever product line" was false and misleading because, in reality, Inari's performance was bolstered by the provision of improper inducements to HCPs in violation of the AKS and FCA. Likewise, Hykes's statements concerning Inari's five growth factors where he explained, among other things, that "[o]ur first growth driver is the expansion of our sales organization" is false and misleading. Specifically, by failing to disclose that these improper kickbacks materially contributed to Inari's reported revenue and adoption rates, Defendants misled investors and concealed the true source of the Company's financial performance.

155. That these statements were false and misleading is further demonstrated by the particularized allegations of the Qui Tam Complaint – which Lead Counsel independently investigated and corroborated – that Inari paid considerable illicit remuneration to physicians to induce their purchase of the FlowTriever and ClotTriever in direct violation of the AKS, as described in detail above. In addition, FE-1 confirmed that Inari's growth was driven by improper payments to physicians in violation of the AKS and FCA; and FE-3 reported that physicians were financially incentivized to promote Inari products and that Defendants would drop the physicians if they did not continue purchasing a substantial volume of Inari products. That these statements were false and misleading is further demonstrated by Deutsche Bank's findings in its August 9, 2024 report.

### 10. The January 11, 2023 JPMorgan Conference

156. On January 11, 2023, Inari attended JPMorgan's Healthcare Conference, during which Hykes stated:

> Yes. So it was a nice quarter and a nice way to finish the year. It was ***driven primarily by strength in the core franchise and procedural growth with both ClotTriever and FlowTriever***. We did have some stock in revenue as we always do. But actually, the stock in revenue on a percentage basis was less in Q4 than we've seen at any point previous in 2022. So ***a really strong quarter driven by procedural growth***, and I think ***that reflects the continued productivity gains we're seeing in our sales organization***. I think it reflects ***the continued progress we're making in our second growth driver, VTE Excellence, in developing these programs and driving adoption***.

157. Hykes's January 11, 2023 statement was false and misleading for several reasons. First, it was false and misleading for Hykes to attribute Inari's growth to its "core franchise and procedural growth," without disclosing that Inari's growth was actually materially driven by improper kickbacks and bribes made to HCPs in violation of the AKS and FCA. By speaking about drivers of the Company's growth, Defendants created a duty to disclose that Inari's growth was, in fact, being driven by its payment of kickbacks to HCPs. Second, Hykes's statement that the quarterly results reflected "continued productivity gains we're seeing in our sales organization" – Inari's so-called first growth driver – was false and misleading because the gains by the sales organization were not the result of legitimate sales productivity but, rather, were achieved though violations of the AKS and FCA. Third, Hykes's touting of Inari's second growth driver, advertised as "driving deeper adoption at existing hospital customers," was also false and misleading because the gains were achieved through illicit kickbacks in violation of the AKS and FCA.

158. That this statement was false and misleading is further demonstrated by the particularized allegations of the Qui Tam Complaint – which Lead Counsel independently investigated and corroborated – that Inari paid considerable illicit remuneration to physicians to

induce their purchase of the FlowTriever and ClotTriever in direct violation of the AKS, as described in detail above. In addition, FE-1 stated that Inari's volume was fueled by improper payments to physicians tied to the physicians' use of Company's products, and that FE-1 personally reported the illicit conduct to Hykes who was personally aware of and involved in the scheme; and FE-3 reported that physicians were paid to use and evangelize for Inari products. That this statement was false and misleading is further demonstrated by Deutsche Bank's findings in its August 9, 2024 report.

### 11. The February 27, 2023 Press Release, Earnings Call, and Form 10-K

159. On February 27, 2023, after the market closed, Inari announced its fourth quarter and full year 2022 financial results in a press release filed with the SEC on Form 8-K and signed by Hill. The Company reported double-digit growth and attributed it to continued U.S. commercial expansion, increased adoption of procedures, and introduction of new products. Inari further stated that "[c]risp execution across all five of our growth drivers generated robust revenue growth in the fourth quarter."

160. Inari and Hill's February 27, 2023 statement that "[c]risp execution across all five of our growth drivers generated robust revenue growth in the fourth quarter" was false and misleading because the Company's revenue and procedure growth were materially inflated by Defendants' improper sales practices of paying kickbacks to HCPs in the form of free meals, consulting services, and speaking engagements in violation of the AKS and FCA. Moreover, by speaking about the drivers of the Company's growth, Defendants created a duty to disclose that Inari's growth was, in fact, being driven by its payment of kickbacks to HCPs. Likewise, Hykes's statements were false and misleading by attributing Inari's revenue growth to legitimate business initiatives – such as "continued expansion of our sales organization" and execution of its so-called second "growth

driver, which is increasing penetration in existing accounts" – while omitting the material fact that the Company's reported growth was the result of improper conduct. By concealing the role these improper practices played in Inari's financial performance, Defendants misled investors and misrepresented the Company's reported success.

161. That these statements were false and misleading is further demonstrated by the particularized allegations of the Qui Tam Complaint – which Lead Counsel independently investigated and corroborated – that Inari paid considerable illicit remuneration to physicians to induce their purchase of the FlowTriever and ClotTriever in direct violation of the AKS, as described in detail above. In addition, FE-1 observed and reported to Hykes that Inari was engaged in improper kickbacks to HCPs, contradicting the statements "growth drivers" were the reason for revenue growth; and FE-3 stated that sales staff were instructed to incentivize physicians to use Inari products and that Inari would remove physicians from their speakers and dinners lists that were not using substantial amounts of Inari products, contradicting the organic growth driver statements. That these statements were false and misleading is further demonstrated by Deutsche Bank's findings in its August 9, 2024 report.

**12. The May 3, 2023 Press Release, Earnings Call, and Form 10-Q**

162. On May 3, 2023, Inari announced its financial results for the first quarter ended March 31, 2023 in a press release and Form 8-K filed with the SEC, signed by Hill. In the press release, Hykes stated that "***[o]ur strong financial performance in the first quarter reflected consistent execution across all of our growth drivers***." The press release attributed the Company's reported revenue growth to continued commercial expansion, increased adoption of Inari procedures, and introduction of new products.

163. Also on May 3, 2023, Inari hosted an earnings call with analysts and investors, during which Hykes repeated that the factors delineated above contributed to the Company's growth and further explained:

> ***Our first growth driver is the expansion of our sales organization***. Similar to our most recent quarters, we deliberately moderated the pace of our new sales territory additions exiting the quarter with just over 290 territories.

164. Hill also represented:

> ***Compared to Q1 of 2022, our revenue growth was due to our continued efforts to open new customer accounts, expand our sales force and deepened our relationship with existing customers***.

165. Inari, Hill, and Hykes's May 3, 2023 statements were false and misleading. First, it was false and misleading for Hykes to state that Inari's first quarter 2023 "strong financial performance" and "revenue growth" were attributable to continued "expansion of our sales organization," "strong underlying procedure growth," and the successful execution of the Company's so-called "growth drivers," when, in actuality, Inari's growth was in part the result of improper and unsustainable sales practices including kickbacks and bribes. Moreover, by speaking about the drivers of the Company's growth, Defendants created a duty to disclose that Inari's growth was, in fact, being driven by its payment of kickbacks to HCPs. Second, for these same reasons, it was false and misleading for Hill to state that "our revenue growth was due to our continued efforts to open new customer accounts, expand our sales force, and deepened our relationship with existing customers." In reality, Inari's performance was driven, in material part, by the provision of improper inducements to HCPs in violation of the AKS and FCA. By omitting the fact that these kickbacks contributed to Inari's growth, Defendants misrepresented the true drivers of Inari's success and also misled investors about the Company's compliance with applicable healthcare laws.

166. That these statements were false and misleading is further demonstrated by the particularized allegations of the Qui Tam Complaint – which Lead Counsel independently investigated and corroborated – that Inari paid considerable illicit remuneration to physicians to induce their purchase or referral of the FlowTriever and ClotTriever in direct violation of the AKS, as described in detail above. In addition, FE-1 confirmed that growth resulted from improper inducements to HCPs in the form of travel, entertainment, and sham training events; FE-3 reported that Inari's growth stemmed from the fact that its physicians were paid to promote Inari products and that the payments would cease if the physicians Inari product usage fell. That these statements were false and misleading is further demonstrated by Deutsche Bank's findings in its August 9, 2024 report.

**13. The May 9, 2023 BofA Conference**

167. On May 9, 2023, Hykes and Hill attended the Bank of America Global Healthcare conference during which analyst Travis Lee Steed asked: "But in terms of ***the revenue in the second half*** that you've raised the guide more than the beat this quarter, most of that's going in the second half. So just help us get comfortable with ***what you're seeing in the second half to raise the guidance at this point***." Hill responded:

> "So I think ***there's a number of catalysts*** that are kind of shaping up nicely across the board for the second half. ***Continued productivity gains from the existing sales organization and some incremental territory adds along the way*** as well, ***another quarter or 2 of continued progress in our VTE Excellence program development efforts, new data that we'll be able to leverage and new readouts coming, more execution on our clinical studies***.

168. Hill's May 9, 2023 statements were false and misleading. Hill falsely attributed Inari's raised revenue guidance to "[c]ontinued productivity gains" and "incremental territory adds" yet omitted that Inari's revenue growth – and increase in guidance – was due to improper kickbacks paid to HCPs in the form of free meals, consulting fees, and speaker engagement fees among other

impermissible gifts in violation of the AKS and FCA. These statements were false and misleading because the "productivity gains" and raised revenue guidance were achieved through Inari's improper kickbacks and bribes made to HCPs in violation of federal law, indeed, by speaking about the drivers of the Company's growth, Defendants created a duty to disclose that Inari's growth was, in fact, being driven by its payment of kickbacks to HCPs. It was also false and misleading for Hill to speak positively about the "continued progress" of Inari's VTE Excellence program, *i.e.*, its second business driver, when, in fact, Inari's continued market penetration was achieved through improper kickbacks in violation of the AKS and FCA.

169. That these statements were false and misleading is further demonstrated by the particularized allegations of the Qui Tam Complaint – which Lead Counsel independently investigated and corroborated – that Inari paid considerable illicit remuneration to physicians to induce their purchase or referral of the FlowTriever and ClotTriever in direct violation of the AKS, as described in detail above. In addition, FE-1 confirmed that Inari's growth relied on improper spending on HCPs, undermining Hill's statements that "continued productivity gains" and "territory adds" were the key drivers; and FE-3 reported that physicians were financially rewarded to use and promote Inari products, but only if they continued using substantial Inari products. That these statements were false and misleading is further demonstrated by Deutsche Bank's findings in its August 9, 2024 report.

### 14. The August 2, 2023 Press Release and Earnings Call

170. After the markets closed on August 2, 2023, Inari announced its financial results for the second quarter ended on June 30, 2023 in a press release and Form 8-K filed with the SEC.

171. During an earnings call with investors that took place the same day, Hykes elaborated on the Company's growth drivers delineated above:

> ***Our first growth driver is expanding our U.S. commercial footprint***. We continue to add head count in Q2 and remain on track to meeting our year-end goal. We are pleased with the leverage and productivity gains we are starting to recognize from a more measured pace of territory development.
>
> Continued expansion of our sales organization also results in more focused areas of coverage, positioning us well to introduce new products to the market and to execute on our second growth driver, increasing penetration of existing accounts. VTE Excellence is a highly differentiated, comprehensive and repeatable approach to help hospitals establish VTE programs and drive deeper penetration of our therapies.
>
> We continue to make progress with VTE Excellence. Importantly, we are successfully moving customers along the VTE Excellence continuum to more advanced phases of program development, where TAM penetration is 3x to 4x higher than in earlier phases. Our initiatives are building momentum, with increasing top-down traction across several IDN and GPOs, which is quite encouraging.

172. During the earnings call, Hill represented the following concerning the Company's financial results:

> Inari's revenues for the second quarter of 2023 were $119 million, up $26.3 million or 28% from $92.7 million for the same period of the prior year. Compared to Q2 of 2022, ***our revenue growth was due to our continued efforts to open new customer accounts, expand our sales force and deepen our relationship with existing customers***.

173. Hill and Hykes's August 2, 2023 statements were false and misleading. It was false and misleading for Hykes to attribute Inari's strong second quarter 2023 financial results – including double-digit revenue growth, a return to profitability, and increased revenue guidance – to "expanding [Inari's] U.S. commercial footprint" and "penetration of existing accounts" because Hykes failed to disclose that a material portion of this growth was driven by improper sales practices in violation of the AKS and FCA. Specifically, Inari's revenue and procedural growth were fueled, in part, by improper inducements to HCPs designed to boost utilization of Inari products. By speaking about the drivers of the Company's growth, Defendants created a duty to disclose that Inari's growth was, in fact, being driven by its payment of kickbacks to HCPs. For these same reasons, Hill's August 2, 2023 statement that Inari's "revenue growth was due to our continued

efforts to open new customer accounts, expand our sales force and deepen our relationship with existing customers" was false and misleading. By omitting these material facts, Hykes and Hill provided investors with a misleading impression of the sustainability and legitimacy of Inari's financial performance.

174. That these statements were false and misleading is further demonstrated by the particularized allegations of the Qui Tam Complaint – which Lead Counsel independently investigated and corroborated – that Inari paid considerable illicit remuneration to physicians to induce their purchase or referral of the FlowTriever and ClotTriever in direct violation of the AKS, as described in detail above. In addition, FE-1 confirmed that growth stemmed from improper physician inducements tied directly to the use of Inari's products, and that Hykes was aware of and participated in the scheme; and FE-3 explained that physicians were paid to promote Inari products and were dropped if they failed to continue using substantial Inari products. That these statements were false and misleading is further demonstrated by Deutsche Bank's findings in its August 9, 2024 report.

**15. The September 12, 2023 Baird Global Conference**

175. On September 12, 2023, Hill attended the Baird Global Healthcare Conference, during which he discussed the factors driving Inari's profitability:

> I think ***it's [profitability] been driven by probably three factors***. The growth of the top line, obviously the company's had a very high gross margin, 88% in Q2. We've guided towards sort of a mid-80s percent gross margin. So, I don't know, 84%, 85% longer term for the business. So, that's something that helps us a lot. And then, we've been able to kind ***of level our spending in the R&D part of the company in terms of clinical and product development, and also in the infrastructure side of the company***. So, ***think about the SG&A, think about the G&A part. We feel like we've got a pretty good platform in place there to support future growth***. We are ***still investing on the S side, so the sales side, but at a slower pace than we did in 2022***. So, that's all of those things kind of taken together are helping us on that journey.

176. Hill's September 12, 2023 statements were false and misleading. Specifically, it was false and misleading for Hill to state that Inari's profitability was "driven by probably three factors," including "growth of the top line" and "level[ing of] spending in [] R&D . . . and also in the infrastructure side of the company," without disclosing that the Company's growth and profitability was, in substantial part, driven by improper inducements made to HCPs in violation of the AKS and FCA. Indeed, by speaking about the drivers of the Company's growth and SG&A, Defendants created a duty to disclose that Inari's growth was, in fact, being driven by its payment of kickbacks to HCPs and its SG&A expenses included illegal kickback payments. Further, it was false and misleading for Hill to speak favorably about Inari leveling its spending and, in particular, its SG&A expenses, yet fail to disclose the negative reality that Inari's SG&A expenses included improper payments made to HCPs in violation of the AKS and FCA.

177. That these statements were false and misleading is further demonstrated by the particularized allegations of the Qui Tam Complaint – which Lead Counsel independently investigated and corroborated – that Inari paid considerable illicit remuneration to physicians to induce their purchase or referral of the FlowTriever and ClotTriever in direct violation of the AKS, as described in detail above. In addition, FE-1 reported that growth was fueled by lavish spending on doctors tied to procedure volume, and that Hykes personally participated, undermining the claim that SG&A spending supported profitability; and FE-3 confirmed that Inari compensated KOLs regularly with trips and dinners, in order to incentivize the physicians to use its products, showing sales growth wasn't organic. That these statements were false and misleading is further demonstrated by Deutsche Bank's findings in its August 9, 2024 report.

**16. The November 1, 2023 Press Release and Earnings Call**

178. On November 1, 2023, Inari reported its financial results for the third quarter ended September 30, 2023 in a press release and Form 8-K signed by Hill and Form 10-Q signed by Hykes and Hill and filed with the SEC. In the press release, Hykes stated: the Company "saw meaningful contributions from our core VTE business, new product launches, and international geographies." He further stated that the "***core business is thriving***, and we are confident in ***our ability to continue to grow sustainably*** for years to come."

179. Also on November 1, 2023, Inari held an earnings call with analysts and investors during which Hykes reported that Inari generated record revenue, executed across all of its growth drivers, and was profitable for the first time since 2021:

> Revenue in Q3 was $126.4 million, up 31% year-over-year. Our international business generated revenue of $6.5 million in Q3, up 151% year-over-year and 26% sequentially from Q2 In addition to our topline performance, we also made steady progress during the quarter on our bottom-line and returned to operating profitability for the first time since 2021. This achievement underscores our commitment to invest strategically in the business, while also driving operating leverage with revenue growing at double the rate of OpEx in the quarter.
>
> During Q3, ***we also made progress across our five growth drivers. . . .Our broad commercial footprint and methodical approach to expansion results in focused areas of coverage, positioning us well to introduce new products to the market and to execute on our second growth driver, increasing penetration of existing accounts***.

180. Hykes's November 1, 2023 statements were false and misleading. It was false and misleading for Hykes to state that Inari had the "ability to continue to grow sustainably" when, in truth, Inari was engaging in an improper and systematic practice of offering kickbacks to HCPs which were ***unsustainable*** and would thus thwart the Company's growth. Moreover, by speaking about the drivers of the Company's growth, Defendants created a duty to disclose that Inari's growth was, in fact, being driven by its payment of kickbacks to HCPs. Likewise, it was false and

misleading for Hykes to attribute the Company's 31% increase in revenue to Inari's commercial footprint and "methodical approach to expansion" as well as "increasing penetration of existing accounts," but omit that Inari's revenue growth was, in material part, due to the Company's improper kickbacks provided to HCPs in violation of the AKS and FCA.

181. That these statements were false and misleading is further demonstrated by the particularized allegations of the Qui Tam Complaint – which Lead Counsel independently investigated and corroborated – that Inari paid considerable illicit remuneration to physicians to induce their purchase or referral of the FlowTriever and ClotTriever in direct violation of the AKS, as described in detail above. In addition, FE-1 confirmed that growth was fueled by improper spending on physicians, and that Hykes was aware of and personally participated in the illicit scheme, undermining Hykes's "growth driver" statements; and FE-3 confirmed that physicians were financially incentivized to use and promote Inari products and were dropped if they failed to continue using Inari's products, contradicting assertions of organic growth. That these statements were false and misleading is further demonstrated by Deutsche Bank's findings in its August 9, 2024 report.

## VII. THE CID IS REVEALED

182. After the close of trading on February 28, 2024, Inari disclosed during an earnings call with analysts and investors that it had received the CID from the DOJ "requesting information primarily related to meals and consulting service payments provided to healthcare professionals." In response to Bank of America analyst Travis Steed's request for further information about the DOJ's investigation, Hykes admitted that Inari had received "the CID back in December." Hykes further claimed: "[w]e are cooperating with the DOJ", "[w]e take compliance seriously" and that "[w]e do not expect that this will have any impact on our ability to execute commercially." Hykes stated that

"[t]he focus of the CID is described in the 10-K, it's a couple of very specific areas related to healthcare professional relationships" and assured investors that "[g]oing forward, we'll update you as we can, but again based on the precedent I think the timeline is most likely going to be measured in years as opposed to months and quarters."

183. The next day, on February 29, 2024, Inari filed its FY 2023 Form 10-K with the SEC. Under Item 3 titled "Legal Proceedings," Inari disclosed:

> In December 2023, we received a civil investigative demand ("CID") from the U.S. Department of Justice, Civil Division, in connection with an investigation under the federal Anti-Kickback Statute and Civil False Claims Act (the "Investigation"). The CID requests information and documents primarily relating to meals and consulting service payments provided to health care professionals ("HCPs"). We are cooperating with the Investigation. We are unable to express a view at this time regarding the likely duration, or ultimate outcome, of the Investigation or estimate the possibility of, or amount or range of, any possible financial impact. Depending on the outcome of the Investigation, there may be a material impact on our business, results of operations, or financial condition.

184. Disclosure of the DOJ investigation caused an immediate and material drop in the price of Inari common stock. Specifically, Inari common stock dropped 21% in response to the news – from a closing price of $58.26 per share on February 28, 2024 to $46.12 per share on February 29, 2024 – wiping out $700 million in the Company's market capitalization in a single day.

185. Analysts responded to news of the DOJ investigation by downgrading the outlook for Inari and lowering price targets. For instance, on February 29, 2024, Piper Sandler downgraded Inari to "neutral" and lowered its price target of the Company's common stock from $85 to $55, citing the DOJ investigation as a factor. Piper Sandler noted: "we anticipate some investor consternation around this topic, which may present an overhand on shares." On March 1, 2024, BuySellSignals issued an analyst report titled: "Inari Medical wipes off $1.1 billion (30%) in MCap in 2024, steepest loss in Healthcare-Products sector" stating: "The stock had the steepest fall in the

Healthcare-Products Sector which is up 18.7% in 2024. Inari Medical's market cap slumped by $1.1 billion to $2.6 billion."

186. The following week, on March 7, 2024, BTIG issued another report discussing the fallout from the DOJ investigation, noting: "NARI's stock has pulled back ~30% since reporting Q4 results last Wednesday, with the stock now nearing all-time lows and trading around 3x 2025 sales. This is startling to us. . . ."

187. On August 9, 2024, Deutsche Bank initiated coverage of Inari by publishing a report containing a comprehensive analysis of the Company. In its report, Deutsche Bank classified the DOJ investigation as a "notable risk[]" and also as a "risk/overhang that investors should be cognizant of." Deutsche Bank further reported that it spoke with several Inari sales representatives to better understand the DOJ investigation and summarized its findings as follows:

- A significant portion of NARI's organic growth is driven by sales reps being pressured to upsell unnecessary tech upgrades to hospitals, which gets baked into the PPP sales model.
- Sales reps are encouraged to create a quid pro quo with referring physicians by spending $1,000's on meals, gift cards, and offering hefty fees for speaking engagements.
- Inari solutions group (ISG): will pay NP, Pas, and physicians directly and teach them how to mine hospital data to drive referrals within the hospital system.
- NARI's 'bigger is better' marketing has resulted [in] sales reps being pressured to push the 24F catheter even in cases where it can be dangerous, which has resulted in unnecessary deaths.

188. Significantly, the Deutsche Bank report describes its independent investigation of the CID and reports information that is consistent with the FE accounts described herein.

189. By December 2024, Inari's stock was trading around just $52 per share, representing a 58.7% decrease from its all-time high of $125.92 per share. Analysts continued to discuss the

potential risks associated with the ongoing DOJ investigation throughout the latter half of 2024 and into early 2025.

190. On January 6, 2025, Stryker and Inari jointly announced the Acquisition whereby Stryker would acquire 100% of Inari for $80 per share. Inari common stock had closed at $49.77 per share on January 3, 2025 (the last trading day prior to the merger announcement). While the Acquisition was priced to include a typical merger premium, analysts noted that the price Stryker agreed to pay to acquire Inari was negatively impacted by the ongoing DOJ investigation. For instance, on January 7, 2025, William Blair noted that the "ongoing DOJ civil investigation adds commercial and cash overhang" and on February 11, 2025, Zacks characterized the DOJ investigation as an "overhang." Hykes was among the Board members who approved the deal. All of Hykes's unvested options and Restricted Share Units would vest early upon completion of the Acquisition, amounting to roughly $25.3 million.

191. The Acquisition closed on February 18, 2025. As a result, Inari's stock was delisted and deregistered from the Nasdaq and all stockholders were cashed out, including stockholders who paid prices for their Inari shares during the Class Period far higher than the merger price Inari agreed to.

192. Today, Inari operates as a wholly owned subsidiary of its parent company, Stryker.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

193. Throughout the Class Period, Defendants knew they were engaged in blatant and persistent violations of the laws and regulations that governed Inari's industry, and that such violations rendered Inari's public statements on that topic false and misleading.

### A. Former Inari Employees Personally Informed Defendant Hykes of Illicit Activities

194. In the fall of 2022, FE-1 took steps to report their concerns about Inari's improper sales practices in accordance with the Company's stated Comprehensive Compliance Program and its adoption of the AdvaMed Code, which sets forth standards for ethical conduct between healthcare professionals and Inari employees.

195. Consistent with these obligations, FE-1 first reported Inari's improper kickback scheme to their direct supervisor, who agreed that Inari's kickback practices were improper and needed to stop. Together, FE-1 and their supervisor then personally informed Hykes that they were uncomfortable with the Company's conduct and that it violated ethical and legal standards. Within days of this report to Hykes, FE-1's supervisor was fired and replaced by someone who instructed FE-1 to ignore the Company's conduct. FE-1 further reported that Inari executives, including Hykes, were aware of the kickback scheme and actively participated in it, including by flying in to attend the physicians' dinners themselves.

### B. Sales of Inari's Products to HCPs, and Inari's Relationships with HCPs, Concerned Inari's Core Operations

196. Defendants' fraud concerns a critical component of Inari's business: the sale of Inari medical devices to HCPs and corresponding business relationships with HCPs. During the Class Period, 100% of Inari's revenues were derived from the sales of its four products, ClotTriever, FlowTriever, LimFlow, and InThrill, with 96.5% of its revenues in particular derived from the ClotTriever and FlowTriever – the two products underpinning Inari's kickback scheme. The sale of these products to HCPs was governed by a well-known regulatory framework that included the AKS and FCA. These governmental regulations and laws to which Inari was subject were thus central to Inari's continued viability. The Individual Defendants claimed to know about the relevant

regulations and compliance requirements during investor conference calls and other public conferences. Given that Inari was manufacturing, promoting, and selling medical products in a highly regulated industry, the Company's compliance with regulations was a subject of market concern and a topic on which the Defendants issued numerous public statements throughout the Class Period.

197. The Individual Defendants, the Company's highest-ranking executives, made numerous public statements about these subjects in direct response to analyst questions, and knew that the market was relying on the veracity of such statements. The Individual Defendants knew the Company was not in compliance with the regulations they professed to monitor, or, at a minimum, recklessly disregarded such regulations and laws when touting their commitment to compliance. Indeed, the Individual Defendants were intimately involved in the dissemination of Inari's medical products to HCPs, as demonstrated by Inari's statement in its FY 2021 Form 10-K, that the services of Hoffman, Hykes, and Hill "are essential to driving adoption of our products."

198. Inari relied heavily on its marketing and sales scheme by which its sales personnel provided improper gifts to HCPs, because nearly all of the Company's revenue was derived from direct sales to hospitals and physicians. The scheme was based upon those providers who had received kickbacks recommending, purchasing, and employing Inari products in their medical practices.

199. Inari's relationships with HCPs were critical to the Company's survival and the sole source of the Company's growth. Inari's Form 10-Q filed on November 2, 2022 stated:

> Our most important relationships are between our sales representatives and our treating physicians, which include interventional cardiologists, interventional radiologists and vascular surgeons. We recruit sales representatives who have substantial and applicable medical device and/or sales experience. ***Our front-line sales representatives typically attend procedures, which puts us at the intersection of the patients, products and physicians***.

200. Further, Defendants told investors that revenues were tied directly to product sales made to hospitals, and thus, to Inari's ability to convince HCPs to use Inari's products. For example, Defendants stated in Inari's November 2, 2022 Form 10-Q, "[w]e expect our revenue to increase in absolute dollars as we ***expand our sales organization*** and sales territories, add customers, ***expand the base of physicians*** that are trained to use our products, ***expand awareness of our products*** with new and existing customers and ***as physicians perform more procedures*** using our products."

201. Inari accounted for its "education and training" initiatives in the SG&A line item of its financial statements filed with the SEC. Throughout the Class Period, the Company's SG&A budget grew substantially, which Inari attributed to "increased commissions due to higher revenue," millions in "travel and related expenses," and drastic increases in marketing expenses. Specifically, from December 31, 2020 to December 31, 2023, Inari's SG&A increased 302%, from $89.7 million to $361 million, ballooning to over 80% of Inari's operating expenses and 76.4% of revenue.

### C. Defendants Knew Inari's Payments to HCPs Violated Federal Law and Were on Notice of the Financial and Reputational Consequences that Stemmed from Violating the AKS and FCA

202. Defendants knew that Inari was subject to a variety of federal laws and regulations that required the Company to monitor and report any payments being made to HCPs. The Individual Defendants knew about these regulations and the requirements they imposed on Inari. Given the existence of this comprehensive regulatory scheme and the potential significant penalties associated with non-compliance, it can be readily inferred that the Individual Defendants, and those working at or under their direction, closely monitored the Company's marketing, sales, and promotional activities during the Class Period.

203. The importance of compliance with these laws and regulations to Inari and the Individual Defendants is demonstrated by the fact that, prior to and throughout the Class Period, the

DOJ frequently initiated enforcement actions against healthcare companies for suspected and/or alleged violations of the AKS and FCA. In 2020 alone, the DOJ recovered $1.8 billion as a result of FCA enforcement actions in the healthcare industry, with a "significant portion of that amount result[ing] from cases predicated on violations of the Anti-Kickback Statute (AKS)," according to a lookback report released by Troutman Pepper Locke. Throughout 2021 and 2022, the DOJ continued to "devote[] significant resources" to enforcement actions involving AKS and FCA violations. Indeed, in 2021 alone, the DOJ recovered $5.6 billion in FCA enforcement actions, 90% of which was comprised of fines and penalties paid by noncompliant companies operating in the healthcare sector.

204. According to journalists covering the medical device industry, at the end of 2022, the "DOJ's biggest enforcement priority in the medical device industry" was "commercial corruption . . . which it targets through criminal and civil enforcement of the AKS." According to the DOJ, throughout 2023, "health care fraud remained a leading source of False Claims Act settlements and judgements" and the DOJ brought successful claims for violation of the AKS against numerous medical service providers and device manufacturers.

205. Moreover, industry analysts noted that such investigations and issuances of CIDs occur frequently in the medical device industry. For example, on February 28, 2024, BTIG analysts noted that there are "numerous CIDs open across many MedTech companies." And on March 6, 2025, Needham analysts published a non-exhaustive list of 48 CIDs or subpoenas issued to Inari's peers in the MedTech industry by the DOJ or other governmental regulators going back to July of 2006. Given the prevalence of such regulatory and enforcement actions in the industry in which Inari operated, Defendants were aware of, or, at a minimum, recklessly disregarded, the possibility

of a DOJ investigation into the Company as the result of its failure to comply with the AKS and FCA and would have closely monitored their payments to doctors to ensure compliance.

### D. Motive and Opportunity

#### 1. The Individual Defendants' Stock Sales Were Unusual and Suspicious

206. Defendants' continuous and affirmative misrepresentations and omissions to investors, analysts, and regulators artificially inflated the price of Inari's common stock. The Individual Defendants capitalized on Inari's inflated stock price by selling large portions of their personal shareholdings at fraudulently-inflated prices. Indeed, within the first few days of the Class Period, Hill, Hoffman, and Hykes sold tens of thousands of shares and continued to do so throughout the remainder of the Class Period, ultimately realizing gross profits of over $155 million.[12] None of the Individual Defendants purchased any Inari shares during the Class Period.

207. ***Hoffman***: During the Class Period, Hoffman sold more than 1.5 million shares of Inari stock for proceeds of over $120 million, nearly all of which was realized as profit:[13]

| **Hoffman's Stock Sales[14]** | | | |
|---|---|---|---|
| **Transaction Date** | **No. of Shares Sold** | **Average Stock Price** | **Proceeds** |
| 5-Apr-21 | 150,000 | $107.97 | $ 15,960,184.97 |

---

[12] Code F sales—*i.e.*, dispositions to satisfy tax withholding obligations upon the vesting of equity awards—were excluded from the Individual Defendants' stock sales as described herein. Likewise, Code S sales (open market sales) that included representations in footnotes to the Forms 4 that the sales were made to satisfy tax withholding obligations (notwithstanding the failure to report the sale under Code F) were also excluded.

[13] The Individual Defendants' profits realized from their stock sales were calculated by subtracting the option exercise cost (if any) from the proceeds of each respective sale.

[14] Hoffman's sales from the beginning of the Class Period through November 5, 2021 were made pursuant to a Rule 10b5-1 trading plan entered into on September 11, 2020. Hoffman's other trades were made pursuant to new Rule 10b5-1 trading plans entered into during the Class Period.

| Hoffman's Stock Sales[14] | | | |
|---|---|---|---|
| **Transaction Date** | **No. of Shares Sold** | **Average Stock Price** | **Proceeds** |
| 5-May-21 | 30,000 | $103.62 | $ 3,075,919.68 |
| 4-Jun-21 | 30,000 | $82.72 | $ 2,509,741.84 |
| 6-Jul-21 | 60,085 | $94.18 | $ 5,661,115.75 |
| 7-Jul-21 | 69,915 | $92.26 | $ 6,395,640.09 |
| 5-Aug-21 | 30,000 | $93.21 | $ 2,799,891.36 |
| 7-Sep-21 | 30,000 | $81.41 | $ 2,447,082.99 |
| 5-Oct-21 | 70,000 | $79.17 | $ 5,527,612.84 |
| 6-Oct-21 | 100 | $80.01 | $ 8,001.00 |
| 7-Oct-21 | 29,900 | $81.12 | $ 2,424,861.73 |
| 20-Oct-21 | 25,778 | $90.10 | $ 2,322,597.80 |
| 25-Oct-21 | 500 | $90.05 | $ 45,025.00 |
| 28-Oct-21 | 3,722 | $90.17 | $ 335,612.74 |
| 5-Nov-21 | 30,000 | $92.26 | $ 2,736,572.76 |
| 6-Dec-21 | 60,000 | $78.00 | $ 4,717,585.03 |
| 4-Jan-22 | 30,000 | $95.58 | $ 2,821,512.01 |
| 7-Feb-22 | 30,000 | $73.48 | $ 2,220,405.48 |
| 7-Mar-22 | 60,000 | $96.42 | $ 5,728,858.73 |
| 5-Apr-22 | 30,000 | $89.73 | $ 2,707,625.51 |
| 5-May-22 | 30,000 | $75.22 | $ 2,183,639.81 |
| 6-Jun-22 | 30,000 | $67.94 | $ 2,033,336.85 |
| 6-Jul-22 | 30,000 | $72.50 | $ 2,159,665.33 |
| 7-Jul-22 | 13,488 | $75.08 | $ 1,012,679.04 |
| 8-Jul-22 | 11,237 | $75.58 | $ 844,656.92 |
| 18-Jul-22 | 5,275 | $75.29 | $ 397,154.75 |
| 5-Aug-22 | 30,000 | $83.00 | $ 2,489,180.53 |
| 7-Sep-22 | 30,000 | $71.25 | $ 2,143,671.72 |
| 8-Sep-22 | 16,308 | $75.12 | $ 1,225,056.96 |
| 9-Sep-22 | 13,692 | $76.71 | $ 1,054,475.03 |
| 17-Oct-22 | 55,000 | $75.28 | $ 4,182,526.28 |
| 15-Nov-22 | 55,000 | $81.61 | $ 4,491,966.33 |
| 15-Dec-22 | 55,000 | $67.00 | $ 3,663,760.80 |
| 17-Jan-23 | 55,000 | $66.56 | $ 3,679,496.13 |
| 15-Feb-23 | 50,000 | $58.24 | $ 2,929,448.34 |
| 14-Mar-23 | 5,000 | $60.10 | $ 300,500.00 |
| 15-Mar-23 | 25,000 | $63.28 | $ 1,580,871.14 |
| 17-Apr-23 | 25,000 | $64.72 | $ 1,616,867.04 |
| 15-May-23 | 25,000 | $70.52 | $ 1,762,859.60 |
| 15-Jun-23 | 25,000 | $58.00 | $ 1,443,576.00 |
| 17-Jul-23 | 25,000 | $57.21 | $ 1,426,913.60 |
| 15-Aug-23 | 25,000 | $69.70 | $ 1,725,536.72 |

| **Hoffman's Stock Sales[14]** | | | |
|---|---|---|---|
| **Transaction Date** | **No. of Shares Sold** | **Average Stock Price** | **Proceeds** |
| 15-Sep-23 | 25,000 | $66.85 | $ 1,668,502.93 |
| 16-Oct-23 | 25,000 | $56.32 | $ 1,432,097.96 |
| 15-Nov-23 | 25,000 | $60.75 | $ 1,531,123.76 |
| 15-Dec-23 | 25,000 | $65.20 | $ 1,627,072.80 |
| **TOTAL:** | **1,505,000** | | **$121,052,484** |
| **PROFIT:** | | | **$121,039,483** |

208. Hoffman's Class Period sales represented 59.7% of his total holdings.

209. ***Hill***: During the Class Period, Hill sold 267,500 shares of Inari common stock, resulting in nearly $20 million in proceeds and profits.

| **Hill's Stock Sales[15]** | | | |
|---|---|---|---|
| **Transaction Date** | **Shares Sold** | **Average Stock Price** | **Proceeds** |
| 9-Apr-21 | 5,000 | $112.45 | $ 561,023.40 |
| 10-May-21 | 5,000 | $90.49 | $ 452,157.70 |
| 9-Jun-21 | 5,000 | $90.72 | $ 452,164.00 |
| 9-Jul-21 | 5,000 | $92.30 | $ 463,539.64 |
| 9-Aug-21 | 5,000 | $95.06 | $ 475,797.76 |
| 9-Sep-21 | 5,000 | $82.09 | $ 409,968.46 |
| 8-Oct-21 | 5,000 | $79.40 | $ 396,586.15 |
| 9-Nov-21 | 5,000 | $86.98 | $ 434,084.96 |
| 15-Dec-21 | 20,000 | $79.04 | $ 1,580,756.63 |
| 18-Jan-22 | 7,500 | $76.90 | $ 575,026.05 |
| 15-Feb-22 | 7,500 | $79.05 | $ 593,243.36 |
| 15-Mar-22 | 7,500 | $75.94 | $ 566,547.60 |
| 18-Apr-22 | 7,500 | $87.80 | $ 651,649.98 |
| 16-May-22 | 7,500 | $59.05 | $ 443,533.49 |
| 15-Jun-22 | 7,500 | $60.49 | $ 453,528.60 |
| 15-Jul-22 | 7,500 | $72.73 | $ 549,201.00 |
| 15-Aug-22 | 7,500 | $81.85 | $ 617,273.94 |
| 14-Oct-22 | 12,750 | $74.76 | $ 940,556.12 |
| 14-Nov-22 | 12,750 | $79.19 | $ 1,008,921.46 |

[15] Hill's stock sales from the beginning of the Class Period through November 9, 2021 were made pursuant to a Rule 10b5-1 trading plan entered into on September 11, 2020. All other trades were made pursuant to new Rule 10b5-1 trading plans entered into during the Class Period.

| **Hill's Stock Sales[15]** | | | |
|---|---|---|---|
| **Transaction Date** | **Shares Sold** | **Average Stock Price** | **Proceeds** |
| 12-Dec-22 | 12,750 | $69.30 | $ 887,145.00 |
| 12-Jan-23 | 12,750 | $66.23 | $ 842,013.20 |
| 13-Feb-23 | 12,750 | $53.95 | $ 686,143.01 |
| 13-Mar-23 | 12,750 | $58.03 | $ 747,585.00 |
| 12-Apr-23 | 12,750 | $64.76 | $ 819,432.49 |
| 12-May-23 | 12,750 | $70.30 | $ 895,805.33 |
| 12-Jun-23 | 6,500 | $59.63 | $ 385,088.00 |
| 12-Jul-23 | 6,500 | $56.60 | $ 365,540.00 |
| 14-Aug-23 | 6,500 | $70.03 | $ 458,052.73 |
| 12-Sep-23 | 6,500 | $67.55 | $ 441,040.20 |
| 12-Oct-23 | 6,500 | $56.34 | $ 362,340.30 |
| 13-Nov-23 | 6,500 | $56.20 | $ 364,366.00 |
| 12-Dec-23 | 6,500 | $62.70 | $ 407,855.44 |
| **TOTAL:** | **267,500** | | **$19,287,967** |
| **PROFIT:** | | | **$19,187,917** |

210. Hill's Class Period stock sales represented 53.5% of his total holdings.

211. ***Hykes***: During the Class Period, Hykes sold nearly 200,000 shares of Inari common stock, representing 24.4% of his holdings, for proceeds of over $15 million, nearly all of which represented profit:

| **Hykes's Stock Sales[16]** | | | |
|---|---|---|---|
| **Transaction Date** | **Shares Sold** | **Average Stock Price** | **Proceeds** |
| 19-Mar-21 | 9,000 | $109.30 | $ 983,204.28 |
| 19-Apr-21 | 9,000 | $103.26 | $ 928,624.08 |
| 19-May-21 | 9,000 | $82.58 | $ 744,967.61 |
| 18-Jun-21 | 7,999 | $91.85 | $ 738,243.28 |
| 21-Jun-21 | 1,001 | $91.41 | $ 91,501.41 |
| 19-Jul-21 | 9,000 | $85.28 | $ 766,861.66 |
| 19-Aug-21 | 9,000 | $72.80 | $ 653,883.00 |
| 17-Sep-21 | 9,000 | $80.89 | $ 726,750.45 |
| 19-Oct-21 | 9,000 | $87.49 | $ 789,858.96 |

[16] Hykes's stock sales from the beginning of the Class Period through October 19, 2021 were made pursuant to a Rule 10b5-1 trading plan entered into on November 16, 2020. All other trades were made pursuant to new Rule 10b5-1 trading plans entered into during the Class Period.

| Hykes's Stock Sales[16] | | | |
|---|---|---|---|
| **Transaction Date** | **Shares Sold** | **Average Stock Price** | **Proceeds** |
| 18-Jan-22 | 5,000 | $76.91 | $ 383,235.12 |
| 1-Feb-22 | 5,000 | $74.08 | $ 368,368.62 |
| 28-Feb-22 | 6,304 | $90.05 | $ 567,675.50 |
| 1-Mar-22 | 13,696 | $90.74 | $ 1,239,402.09 |
| 1-Apr-22 | 10,000 | $91.22 | $ 911,577.52 |
| 2-May-22 | 5,000 | $79.65 | $ 398,351.28 |
| 7-Jun-22 | 5,000 | $70.08 | $ 350,400.00 |
| 5-Jul-22 | 5,000 | $70.31 | $ 351,550.00 |
| 1-Aug-22 | 5,000 | $78.47 | $ 393,359.33 |
| 6-Sep-22 | 5,000 | $70.00 | $ 350,000.00 |
| 20-Oct-22 | 9,000 | $72.63 | $ 651,006.54 |
| 21-Nov-22 | 9,000 | $77.68 | $ 698,895.16 |
| 20-Dec-22 | 9,000 | $68.15 | $ 616,456.80 |
| 20-Jan-23 | 9,000 | $62.01 | $ 557,129.00 |
| 21-Feb-23 | 9,000 | $55.19 | $ 496,710.00 |
| 20-Mar-23 | 9,000 | $64.46 | $ 578,610.00 |
| **TOTAL:** | **191,000** | | **$15,336,622** |
| **PROFIT:** | | | **$15,310,822** |

212. Hykes's Class Period stock sales represented 24.4% of his total holdings.

213. In sum, the Individual Defendants collectively profited over $155.5 million by selling shares at fraud-inflated prices during the Class Period.

214. The Individual Defendants' insider selling was unusual and suspicious in the number of shares sold, the percentage of holdings sold, and the amount of profits realized from the sales:

(a) Hoffman unloaded 59.7% of his holdings during the Class Period for profits of over $121 million. At more than 14 times the approximately $8.6 million he received in total cash and stock-based compensation from the Company as CEO between 2021 and 2022, this was an enormous windfall for Hoffman. Further, Hoffman's compensation was inflated by incentive-based compensation contingent on revenue goals only achieved because of the illicit kickback scheme;

(b) Hykes sold 24.4% of his holdings for over $15 million in profits, almost 1.5 times the approximately $10.8 million he received in total compensation for the three-year period of 2021 to 2023; and

(c) Hill sold 53.5% of his holdings for over $19 million in profits, almost triple his total compensation of approximately $6.7 million received from the Company from 2021 to 2023.

215. Moreover, throughout the Class Period, the Individual Defendants routinely exercised their stock options, at strike prices of often less than $1, many years ahead of when those options were set to expire. For example, Hoffman and Hykes exercised options that were not set to expire until as late as May 3, 2028, and Hill exercised options that were not set to expire until as late as April 30, 2029.

216. That the Individual Defendants sold shares pursuant to existing Rule 10b5-1 plans does not insulate them from liability or negate their knowledge of Inari's kickback scheme, as SEC Rule 10b5-1, 17 C.F.R. §240.10b5-1 provides that a person is considered to have traded "on the basis of" material, nonpublic information if the person who engaged in the transaction was "aware of" that information at the time of the trade. Hill, Hoffman and Hykes entered into Rule 10b5- 1 plans on August 23, 2021, September 16, 2021, and September 14, 2021, respectively – all dates within the Class Period when Defendants were aware of and participating in Inari's sales scheme, as alleged throughout. *See supra* n.14-16. The overwhelming majority of the Individual Defendants' Class Period trades were made under those plans. Because new Rule 10b5-1 plans entered into during the Class Period while Defendants were in possession of material, nonpublic information offer no cover, the plans at issue here offer no protection for Defendants' insider sales.

### 2. The Individual Defendants' High-Level Positions and Experience

217. The Individual Defendants were experienced executives in positions to know that affirmative statements that Inari was in compliance with "all health care laws" were materially false and misleading and that Inari's revenue growth was fueled by improper conduct and not the growth drivers Inari repeatedly touted during the Class Period.

218. Hoffman had over 20 years of experience working for medical device/technology businesses and served as President and CEO of Inari from February 2015 to December 2022. Hykes also had over 20 years of experience working at medical device/technology businesses and served in many high-level roles at Inari, including CCO from September 2017 to October 2020, COO from October 2020 to December 2022, and then CEO since January 2023. By the time Hill became Inari's CFO in March 2019, Hill had over 20 years of CFO experience at numerous healthcare companies, along with extensive service as an audit committee member.

219. The Individual Defendants' scienter is imputable to the Company because the misrepresentations and omissions made by Inari were approved by Hoffman, Hykes, and Hill – Inari's most senior executive officers – who possessed sufficient knowledge of the Company's operations to know that those statements and omissions were materially misleading.

### 3. The Individual Defendants' Compensation Was Directly Tied to Metrics Manipulated by Their Fraud

220. In addition to their highly suspicious stock sales, made while in possession of material non-public information and with knowledge of their fraudulent scheme, the Individual Defendants were financially motivated by their executive compensation plans, which favored driving the Company to increase revenue and – only in the final year of their fraud – paid lip service to the Company's operating losses.

221. As reported in the Company's annual proxy statement filed with the SEC on Schedule 14A on April 14, 2022, in FY 2021, the Individual Defendants received 130% of their target incentive payments for achieving yearly revenue of $277.0 million. There were no pre-set corporate metrics for FY 2021 performance goals.

222. As reported in the Company's annual proxy statement filed with the SEC on Schedule 14A on April 6, 2023, in FY 2022, the Individual Defendants received 109% of their target incentive payments for achieving yearly revenue of $383.5 million. The incentive plan in place at the time weighted revenue as 80% of the Individual Defendants' "performance goals," while the company's costs or operating losses were not considered. Thus, the Individual Defendants were incentivized to increase revenue by investing heavily in their kickback scheme.

223. As reported in the Company's annual proxy statement filed with the SEC on Schedule 14A on March 13, 2024, in FY 2023, Hykes and Hill received 118% of their target incentive payments because yearly revenue was $493.6 million and the Company's operating loss was "only" $1.6 million. While the newly implemented incentive plan incentivized its recipients to drive down costs, the "Operating Gain – (Loss)" milestone was only weighted at 10%; revenue was weighted 700% more heavily than the "operating gain or loss" factor.

## IX. LOSS CAUSATION

224. The market for Inari common stock was open, well-developed, and efficient at all relevant times. Throughout the Class Period, Inari common stock traded at artificially inflated prices as a direct result of Defendants' scheme and their materially false and misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public. Lead Plaintiffs and other Class members purchased or otherwise acquired Inari common stock relying upon the integrity of the market price for Inari common stock

and market information relating to the Company. Defendants' misrepresentations and fraudulent conduct became apparent to the market through disclosures on February 28 and 29, 2024. As a result, the price of Inari's common stock immediately declined as the artificial inflation was removed from the market price of the securities, causing substantial damage to Lead Plaintiffs and the Class.

225. After the close of trading on February 28, 2024, Inari disclosed during an earnings call with analysts and investors that it had received the CID from the DOJ "requesting information primarily related to meals and consulting service payments provided to healthcare professionals" back in December 2023.

226. On February 29, 2024, prior to the market opening, Inari filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2023. Under Item 3 titled "Legal Proceedings," Inari disclosed:

> In December 2023, we received a civil investigative demand ("CID") from the U.S. Department of Justice, Civil Division, in connection with an investigation under the federal Anti-Kickback Statute and Civil False Claims Act (the "Investigation"). The CID requests information and documents primarily relating to meals and consulting service payments provided to health care professionals ("HCPs"). We are cooperating with the Investigation. We are unable to express a view at this time regarding the likely duration, or ultimate outcome, of the Investigation or estimate the possibility of, or amount or range of, any possible financial impact. Depending on the outcome of the Investigation, there may be a material impact on our business, results of operations, or financial condition.

227. In response to this news, the price of Inari common stock decreased $12.14 per share, or nearly 21%, from $58.26 per share on February 28, 2024 to $46.12 per share on February 29, 2024, on abnormally high trading volume.

228. The corrective disclosure listed above removed the artificial inflation from the price of Inari's common stock, and was the direct and foreseeable consequence of the disclosure of the relevant truth concealed by Defendants. Lead Plaintiffs and the other Class members were damaged as a result of Defendants' fraudulent conduct as alleged herein.

## X. CLASS ACTION ALLEGATIONS

229. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), individually and on behalf of a Class consisting of all persons who purchased or otherwise acquired shares of Inari common stock during the Class Period (the "Class"). Excluded from the Class (an "Excluded Person") are: Defendants, the executive officers and directors of Inari during the Class Period, the immediate family members of any Excluded Person, the legal representatives, heirs, successors or assigns of any Excluded Person, and any entity in which any Excluded Person has or had a controlling interest.

230. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Inari common stock actively traded on the Nasdaq, with over 57.9 million outstanding shares as of February 23, 2024. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery from Defendants, Lead Plaintiffs believe that there are likely thousands of members in the proposed Class. Class members may be identified from records maintained by Inari or its transfer agent and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

231. Lead Plaintiffs' claims are typical of all other Class members' claims, as all Class members were similarly affected by Defendants' wrongful conduct in violation of the federal securities laws complained of herein.

232. Lead Plaintiffs will fairly and adequately protect the interests of Class members and have retained competent counsel with extensive experience in class action securities litigation. Lead Plaintiffs have no material interests antagonistic to or in conflict with those of the Class.

233. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether Defendants' publicly disseminated statements to the investing public during the Class Period omitted and/or misrepresented material facts;

(c) whether Defendants acted knowingly or with severe recklessness in omitting and/or misrepresenting material facts;

(d) whether the price of Inari common stock was artificially inflated during the Class Period due to the material nondisclosures and/or misrepresentations alleged herein; and

(e) the extent of injuries sustained by members of the Class and the appropriate measure of damages.

234. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable. As the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it impossible for class members to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

235. The Private Securities Litigation Reform Act's statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

236. None of the statements complained of herein were forward-looking statements. Rather, each was a historical statement or statement of purportedly current facts and conditions at the time each statement was made.

237. To the extent that any materially false or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement or portion thereof. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants do not insulate Defendants from liability for their materially false or misleading statements or omissions.

238. The Company's rote risk warnings failed to meaningfully warn the market of the risks detailed here. They were not meaningfully different quarter-to-quarter, they failed to disclose that certain risks had already begun to materialize, and they altogether failed to disclose other risks. Accordingly, the "cautions" were untethered from known problems at hand, which rendered them meaningless. Further, given that Defendants were embroiled in some of the circumstances about which they warned, and Defendants had adverse knowledge undermining the warnings, the risk warnings were themselves false and misleading, and they do not shield Defendants from liability.

239. To the extent that the statutory safe harbor applies to any materially false or misleading statement alleged herein, or any portion thereof, Defendants are liable for any such materially false or misleading forward-looking statement because at the time such statement was made the speaker knew the statement was materially false or misleading, or the statement was authorized and approved by an executive officer of Inari who knew that the forward-looking statement was materially false or misleading.

## XII. APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD-ON-THE-MARKET DOCTRINE

240. At all relevant times, the market for shares of Inari common stock was an efficient market due to the following reasons, among others: (i) shares of Inari common stock met the requirements for listing, were actually listed, and actively traded on the Nasdaq; (ii) according to the Company's FY 2023 10-K, Inari had over 57 million outstanding shares of common stock as of February 23, 2024; (iii) as a registered and regulated issuer of securities, Inari filed periodic reports with the SEC and Nasdaq, in addition to the Company's frequent voluntary dissemination of information; (iv) Inari regularly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services, the Internet, and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; (v) Inari was followed by securities analysts employed by major brokerage firms, who wrote reports that were distributed to the customers of their respective brokerage firms and such reports were publicly available and/or publicly reported on; (vi) the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Inari common stock; and (vii) without knowledge of the misrepresented or omitted facts, Lead Plaintiffs and the members of the class purchased Inari common stock between the time Defendants made the material misrepresentations and omissions and the time the truth was revealed, during which period the price of Inari's common stock was artificially inflated as a result thereof.

241. The market for Inari common stock promptly digested current information regarding Inari from all publicly available sources and reflected such information in the price of Inari common stock. Under these circumstances, all purchasers of Inari common stock during the Class Period who relied upon the integrity of the market price of Inari common stock, including Lead Plaintiffs,

suffered similar injury through their purchase of Inari common stock at artificially inflated prices, and a presumption of reliance under the fraud-on-the-market doctrine applies.

## XIII. CLAIMS FOR RELIEF

### COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

242. Lead Plaintiffs repeat and incorporate by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

243. Defendants violated Rule 10b-5 ("misstatement and omission" liability) and Rule 10b-5(a) and (c) ("scheme" liability under *Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71 (2019)) in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Inari common stock during the Class Period.

244. Pursuant to the above wrongful course of conduct, each of the Defendants participated directly or indirectly in: (a) a scheme to defraud; and (b) the preparation and/or issuance of the quarterly and annual reports, SEC filings, releases, and other statements described above, including the statements made to securities analysts and the media that were designed to influence the market for Inari common stock. Such filings, releases, and statements were materially false and

misleading in that they failed to disclose material adverse information and misrepresented the truth about Inari's operations, finances, and business prospects.

245. By virtue of their positions at Inari, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with such reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions were committed willfully or with reckless disregard for the truth.

246. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Inari, Defendants had knowledge of Inari's internal affairs.

247. Defendants are directly and indirectly liable for the wrongs complained of herein. Because of their positions of control and authority, Defendants were able to and did, directly or indirectly, control the content of the statements of Inari. As officers and/or directors of a publicly held company, Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Inari's businesses, operations, future financial condition, and future prospects. As a result of Defendants' misconduct, the market price of Inari stock was artificially inflated throughout the Class Period. In ignorance of the adverse concerning Inari's true business and financial condition, which were concealed by the Individual Defendants, Lead Plaintiffs and other members of the Class purchased or otherwise acquired Inari common stock at artificially inflated prices and in doing so relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by the Individual Defendants, and were damaged thereby.

248. During the Class Period, Inari common stock was traded on an active and efficient market. Lead Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired Inari common stock at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired it at the inflated prices paid. At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class, the true value of Inari common stock was substantially lower than the prices paid by members of the Class. The market price of Inari common stock declined upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and Class members.

249. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other class members suffered damages in connection with their transactions in the Company's common stock during the Class Period. By reason of the conduct herein, Defendants have knowingly or recklessly, directly or indirectly, violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

250. Lead Plaintiffs repeat and incorporate by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

251. During the Class Period, the Individual Defendants participated in and oversaw the operation and management of Inari, and conducted and participated, directly and indirectly, in the conduct of Inari's business affairs. Each of the Individual Defendants exercised control over Inari's

operations and possessed the power to control, and did control, the specific activities which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain.

252. Each of the Individual Defendants acted as controlling persons of Inari within the meaning of §20(a) of the Exchange Act, 15 U.S.C. §78t(a). By virtue of their high-level positions with the Company and their ownership of Inari shares, the Individual Defendants had the power and authority to cause Inari to engage in the wrongful conduct complained of herein. Inari controlled the Individual Defendants and all of its employees. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

253. In particular, Hoffman as CEO, Hykes as COO and then CEO, and Hill as CFO had direct or supervisory responsibility over the day-to-day operations of the Company, and therefore, are presumed to have had the power or control to influence the particular transactions, and business practices giving rise to the securities violations alleged in Count I, and exercised that power.

254. Inari had the power to control and influence the Individual Defendants and other Company executives through its power to hire, fire, supervise, and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation, and other employment considerations. By virtue of the foregoing, Inari had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Individual Defendants, including the content of their public statements.

255. As a direct and proximate result of these defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases and/or acquisitions of Inari's common stock during the Class Period when the relevant truth was revealed.

256. By reason of the foregoing, the Individual Defendants violated §20(a) of the Exchange Act.

## COUNT III

### For Violations of Section 20A of the Exchange Act Against the Individual Defendants

257. Lead Plaintiffs repeat and incorporate by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

258. During the Class Period, the Individual Defendants were in possession of material non-public information concerning Inari. The Individual Defendants took advantage of their possession of material non-public information regarding Inari to obtain significant insider trading profits during the Class Period.

259. The Individual Defendants' sales of Inari common stock (set forth below) were made contemporaneously with Lead Plaintiffs' purchases of Inari's common stock (set forth below and in Lead Plaintiffs certifications previously filed with the Court (*see* Dkt. Nos. 20-1 & 20-2)) during the Class Period.

260. As demonstrated in the below chart, many of Defendants' Class Period stock sales were contemporaneous with Lead Plaintiffs' purchases of Inari common stock in violation of §20A:

| Defendants' Sales | | | Contemporaneous Purchases | | |
|---|---|---|---|---|---|
| **Defendant** | **Date of Sale** | **Shares Sold** | **Plaintiff** | **Date of Purchase** | **Shares Purchased** |
| Hoffman | 4-Jun-21 | 30,000 | PGERS | 7-Jun-21 | 440 |
| Hoffman | 7-Sep-21 | 30,000 | Local 353 PF | 7-Sep-21 | 1,373 |
| Hoffman | 20-Oct-21 | 25,778 | PGERS | 20-Oct-21 | 1,210 |
| Hoffman | 5-Nov-21 | 30,000 | Local 353 PF | 10-Nov-21 | 1,763 |
| Hoffman | 4-Jan-22 | 30,000 | PGERS | 4-Jan-22 | 685 |
| Hoffman | 7-Mar-22 | 60,000 | OLERS | 7-Mar-22 | 500 |
| | | | OLERS | 8-Mar-22 | 300 |
| | | | OLERS | 9-Mar-22 | 300 |
| | | | OLERS | 11-Mar-22 | 603 |
| Hoffman | 5-May-22 | 30,000 | Local 353 PF | 6-May-22 | 981 |

| **Defendants' Sales** | | | **Contemporaneous Purchases** | | |
|---|---|---|---|---|---|
| **Defendant** | **Date of Sale** | **Shares Sold** | **Plaintiff** | **Date of Purchase** | **Shares Purchased** |
| Hoffman | 15-Dec-22 | 55,000 | OLERS | 20-Dec-22 | 371 |
| Hoffman | 15-Feb-23 | 50,000 | PGERS | 15-Feb-23 | 765 |
| Hoffman | 14-Mar-23 | 5,000 | OLERS | 14-Mar-23 | 661 |
| | | | PGERS | 17-Mar-23 | 10 |
| Hoffman | 15-Mar-23 | 25,000 | PGERS | 17-Mar-23 | 10 |
| Hoffman | 15-Jun-23 | 25,000 | PGERS | 16-Jun-23 | 65 |
| Hoffman | 15-Sep-23 | 25,000 | PGERS | 15-Sep-23 | 560 |
| Hoffman | 16-Oct-23 | 25,000 | PGERS | 16-Oct-23 | 680 |
| Hoffman | 15-Nov-23 | 25,000 | PGERS | 15-Nov-23 | 600 |
| Hoffman | 15-Dec-23 | 25,000 | PGERS | 15-Dec-23 | 13 |
| Hill | 9-Nov-21 | 5,000 | Local 353 PF | 10-Nov-21 | 1,763 |
| | | | Local 353 PF | 11-Nov-21 | 440 |
| Hill | 15-Mar-22 | 7,500 | OLERS | 17-Mar-22 | 258 |
| Hill | 15-Jun-22 | 7,500 | PGERS | 17-Jun-22 | 76 |
| Hill | 12-Dec-22 | 12,750 | PGERS | 16-Dec-22 | 23 |
| Hill | 13-Feb-23 | 12,750 | PGERS | 15-Feb-23 | 765 |
| Hill | 13-Mar-23 | 12,750 | PGERS | 13-Mar-23 | 645 |
| | | | OLERS | 14-Mar-23 | 661 |
| | | | PGERS | 17-Mar-23 | 10 |
| Hill | 12-Jun-23 | 6,500 | PGERS | 16-Jun-23 | 65 |
| Hill | 12-Sep-23 | 6,500 | PGERS | 15-Sep-23 | 560 |
| Hill | 12-Oct-23 | 6,500 | PGERS | 16-Oct-23 | 680 |
| Hill | 13-Nov-23 | 6,500 | PGERS | 15-Nov-23 | 600 |
| Hill | 12-Dec-23 | 6,500 | PGERS | 15-Dec-23 | 13 |
| Hykes | 19-Aug-21 | 9,000 | Local 353 PF | 19-Aug-21 | 423 |
| | | | Local 353 PF | 20-Aug-21 | 315 |
| | | | Local 353 PF | 23-Aug-21 | 414 |
| | | | Local 353 PF | 24-Aug-21 | 558 |
| Hykes | 19-Oct-21 | 9,000 | PGERS | 20-Oct-21 | 1,210 |
| Hykes | 1-Feb-22 | 5,000 | Local 353 PF | 4-Feb-22 | 583 |
| Hykes | 28-Feb-22 | 6,304 | OLERS | 28-Feb-22 | 1,900 |
| Hykes | 1-Mar-22 | 13,696 | OLERS | 1-Mar-22 | 200 |
| | | | OLERS | 2-Mar-22 | 600 |
| | | | OLERS | 3-Mar-22 | 400 |
| | | | OLERS | 4-Mar-22 | 200 |
| Hykes | 2-May-22 | 5,000 | PGERS | 2-May-22 | 1,163 |
| | | | Local 353 PF | 6-May-22 | 981 |
| Hykes | 1-Aug-22 | 5,000 | Local 353 PF | 4-Aug-22 | 1,545 |
| Hykes | 20-Dec-22 | 9,000 | OLERS | 20-Dec-22 | 371 |

261. Lead Plaintiffs and members of the Class who purchased shares of Inari common stock contemporaneously with the Individual Defendants' stock sales suffered damages because: (i) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange Act as alleged herein; and (ii) they would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

262. By reason of the foregoing, the Individual Defendants violated §20A of the Exchange Act.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, including:

A. Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure; and certifying Lead Plaintiffs as the representatives of the Class and their counsel as counsel for the Class;

B. Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

## XV. JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

DATED: October 22, 2026

ROBBINS GELLER RUDMAN & DOWD LLP
LUCAS F. OLTS
JOHN M. KELLEY
JACK ABBEY GEPHART

s/ *Lucas F. Olts*
LUCAS F. OLTS

655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
lolts@rgrdlaw.com
jkelley@rgrdlaw.com
jgephart@rgrdlaw.com

ROBBINS GELLER RUDMAN & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com

GRANT & EISENHOFER P.A.
JAMES S. NOTIS
VINCENT J. PONTRELLO
MICA COCCO
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone: (646) 722-8500
jnotis@gelaw.com
vpontrello@gelaw.com
mcocco@gelaw.com

*Lead Counsel for Lead Plaintiffs and the Proposed Class*

ASHERKELLY
MICHAEL J. ASHER
JACQUELINE A. KELLY
CYNTHIA J. BILLINGS-DUNN
25800 Northwestern Highway, Suite 1100
Southfield, MI 48075
Telephone: 248/746-2710
cbdunn@asherkellylaw.com

*Additional Counsel*